UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
------------------------------------------------------X

UNITED STATES OF AMERICA

   - against -              <u>Cr. No. 08-571 (JG)</u>

ISRAEL WEINGARTEN,

            Defendant.
------------------------------------------------------X


DEFENDANT ISRAEL WEINGARTEN'S MEMORANDUM OF POINTS AND
AUTHORITIES IN SUPPORT OF HIS MOTION TO VACATE, SET ASIDE, OR
CORRECT HIS SENTENCE, UNDER 28 U.S.C. §2255


Oral Argument to be scheduled on a date and time to be designated by the Court


Counsel for Mr. Weingarten:

| | |
|---|---|
| Jodi Thorp | Todd W. Burns |
| California Bar No. 223663 | California Bar No. 194937 |
| Law Offices of Jodi Thorp | Burns & Cohan, Attorneys at law |
| 1010 Second Avenue, Suite 1800 | 444 West C Street, Suite 410 |
| San Diego, California 92101 | San Diego, California 92101 |
| 619-233-3169 | 619-236-0244 |
| jodithorp@thorplawoffice.com | todd@burnsandcohan.com |
| | |
| Admitted *pro hac vice* | *Pro hav vice* application pending |

Clarke and Rice, APC
1010 Second Avenue Suite 1800
San Diego, California 92101
619-308-8484

## <u>TABLE OF CONTENTS</u>

*Page*

TABLE OF AUTHORITIES . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . vi

INTRODUCTION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

STATUTE OF LIMITATIONS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

    I.     Introduction . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

    II.    Non-Retroactivity Of 2003 Amendment To §3283 . . . . . . . . . . . . . . . . . . . . . 4

    III.   Inapplicability Of §3283 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

    IV.   The Procedural Default Doctrine Does Not Bar Relief . . . . . . . . . . . . . . . . . . 11

UNPREPARED TRIAL COUNSEL, AND BREAKDOWN IN ATTORNEY-CLIENT
RELATIONSHIP . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

    I.     Introduction . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

    II.    Relevant Law With Respect To Constitutionally Offensive Choice . . . . . . . . . . 16

    III.   Events That Led To Mr. Weingarten's Request To Discharge Counsel . . . . . . . 17

         A.    Arrest And Initial Attorney Meetings . . . . . . . . . . . . . . . . . . . . . . . . 18

         B.    October 6, 2008 Court Appearance . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

         C.    Attorney Alan Stutman Enters The Case . . . . . . . . . . . . . . . . . . . . . . . 19

         D.    October 8, 2008 Hearing . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

         E.    October 14, 2008 Hearing . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

         F.    October 28, 2008 Bail Hearing . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

         G.    Mr. Weingarten's Initial Meeting With Mr. Stutman At The MDC . . . . . 22

         H.    November 19, 2008 Bail Hearing . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

I.      Mr. Weingarten's First Meeting With Mr. Rhodes. . . . . . . . . . . . . . . . . 26

J.      Defense Pre-Trial Motions – Filed November 26, 2008. . . . . . . . . . . . . 27

K.      December 7, 2008 Letter To Court From Mr. Rhodes.. . . . . . . . . . . . . . 29

L.      December 8, 2008 Letter To Court From Mr. Rhodes . . . . . . . . . . . . . . 33

M.      Mr. Weingarten Tells His Children To Try To Find Him A New
        Lawyer. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 34

N.      December 12, 2008 Hearing. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 34

O.      December 15, 2008 Hearing Regarding Foreign Depositions. . . . . . . . . 35

P.      December 15, 2008 Post-Hearing Meeting. . . . . . . . . . . . . . . . . . . . . . . 39

Q.      Mr. Weingarten Meets With Other Counsel. . . . . . . . . . . . . . . . . . . . . . 39

R.      February 6, 2009 Motions Hearing. . . . . . . . . . . . . . . . . . . . . . . . . . . . . 41

S.      Mr. Weingarten's Conversation With Rabbi Freund After The
        February 6, 2009 Hearing. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 46

T.      Mr. Weingarten's February 23, 2009 Letter To The Court. . . . . . . . . . . 47

U.      February 23, 2009 Letter To Court From Mr. Rhodes.. . . . . . . . . . . . . . 48

V.      February 24, 2009 Letter To Court From Menachem M. Blum. . . . . . . . 51

W.      February 25, 2009 Hearing On Request To Discharge Counsel. . . . . . . . 52

X.      Mr. Weingarten's Subsequent Conversation With Rabbi Freund. . . . . . . 54

Y.      Meetings With Attorneys Between February 25 And March 2. . . . . . . . . 54

Z.      March 2, 2009 – First Day Of Trial. . . . . . . . . . . . . . . . . . . . . . . . . . . . . 55

IV.     Mr. Stutman And Mr. Rhodes Were Not Prepared For Trial. . . . . . . . . . . . . . . 58

A.      Introduction. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 58

B.      Allegation Of Years Of Sexual And Physical Abuse.. . . . . . . . . . . . . . . 59

1.      Government's Case. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 59

2.      Evidence That Could Have Rebutted The History-Of-Abuse Aspect Of The Government's Case. . . . . . . . . . . . . . . . . 61

     a.      CPS Investigations. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 61

     b.      Feige Weingarten's Prior Statements. . . . . . . . . . . . . . . . 62

     c.      Children Tell CPS And Police About Feige's Abuse Of Them. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 63

     d.      Mr. Weingarten Cooperated With CPS. . . . . . . . . . . . . . 64

     e.      Feige Changes Her Story. . . . . . . . . . . . . . . . . . . . . . . . . 65

     f.      Feige Fails, Then Switches Forums. . . . . . . . . . . . . . . . . 66

C.      Allegation Of Sexual Abuse In Brooklyn. . . . . . . . . . . . . . . . . . . . . . . 67

1.      Government's Case. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 67

2.      Evidence That Could Have Rebutted the Brooklyn Aspect Of The Government's Case. . . . . . . . . . . . . . . . . . . . . . . . . . . . . 67

D.      Allegation Of Sexual Abuse In Belgium. . . . . . . . . . . . . . . . . . . . . . . 69

1.      Government's Case. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 69

2.      Evidence That Could Have Been Used To Rebut Belgium Aspect Of Government's Case. . . . . . . . . . . . . . . . . . . . . . . . . . 70

E.      Allegation Of Attempt To Abduct Frieme Leaieh In Manchester. . . . . . 73

1.      Government's Case. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 73

2.      Evidence That Could Have Been Used To Rebut Manchester Aspect Of Government's Case. . . . . . . . . . . . . . . . . 73

F.      Other Things That Show Defense Counsel Were Not Prepared. . . . . . . 75

        1.      Unprepared To Call Any Witnesses.. . . . . . . . . . . . . . . . . . . . . . 75

               a.     Experts. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 75

               b.     Six Younger Children. . . . . . . . . . . . . . . . . . . . . . . . . 77

               c.     Character Witnesses. . . . . . . . . . . . . . . . . . . . . . . . . . 78

        2.      Unprepared To Introduce Mr. Weingarten's 911 Call. . . . . . . . . 78

        3.      Unprepared To Preclude Repentance Letter. . . . . . . . . . . . . . . 81

        4.      Unprepared To Introduce Tape Recordings. . . . . . . . . . . . . . . 82

    V.     Analysis Of Constitutionally Offensive Choice Argument. . . . . . . . . . . . . . 89

    VI.    Relief Is Also Warranted If The Court Applies A Traditional Ineffective
          Assistance Of Counsel Test. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 94

    VII.   Irreconcilable Conflict And Breakdown In Attorney-Client Relationship. . . . . 95

    VIII.  Conclusion. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 98

GOVERNMENT MISCONDUCT. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 99

    I.      Introduction. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 99

    II.     Misconduct With Respect To Repentance Letter. . . . . . . . . . . . . . . . . . . . 99

    III.   Misconduct With Respect To Principal Stauber And Rabbi Weis, And
          Broader Misconduct. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 102

        A.    Introduction. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 102

        B.    Relevant Background. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 103

               1.      Pre-Trial. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 103

               2.      Opening Statement. . . . . . . . . . . . . . . . . . . . . . . . . . . . 104

               3.      Frieme Leaieh Weingarten's Testimony. . . . . . . . . . . . . . . 105

               4.      Feige Weingarten's Testimony. . . . . . . . . . . . . . . . . . . . 106

iv

5.      Yoinesun Weingarten's Testimony. . . . . . . . . . . . . . . . . . . . . . . 107

6.      The Government's Closing Argument. . . . . . . . . . . . . . . . . . . 107

7.      Declarations Of Principal Stauber And Rabbi Weis. . . . . . . . . 109

C.      The Government's Misconduct Was Multi-Faceted. . . . . . . . . . . . . . 111

IV.     Conclusion. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 116

SENTENCING CLAIM. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 118

INCOMPETENCY. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 121

I.      Mr. Weingarten's Trial Counsel Were Ineffective for Failing to Investigate
        Whether He Was Competent to Represent Himself and Failing to Seek
        Expert Assistance to Help Determine Whether He Could Represent
        Himself. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 121

II.     Trial Counsel Was Ineffective by Failing To Raise Mr. Weingarten's
        Inability To Assist in His Own Defense to the Court, Allowing Mr.
        Weingarten To Proceed To Trial While Incompetent, and Mr. Weingarten
        Was Denied His Right to a Contemporaneous Determination of
        Competence. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .    132

III.    Mr. Weingarten Was Tried While Legally Incompetent, Thus Violating
        Due Process. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 135

CUMULATIVE ERROR CLAIM. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 139

FREESTANDING ACTUAL INNOCENCE CLAIM. . . . . . . . . . . . . . . . . . . . . . . . . . 140

CONCLUSION. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 141

CERTIFICATE OF SERVICE. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 142

LIST OF ATTACHED EXHIBITS. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 143

# TABLE OF AUTHORITIES

*Page*

## FEDERAL CASES

*Berger v. United States,*
95 U.S. 78 (1935). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 111

*Bouchillon v. Collins,*
907 F.2d 589 (5th Cir. 1990). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 133, 134

*Boykins v. Wainwright,*
737 F.2d 1539 (11th Cir. 1984). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 135

*Brady v. Maryland,*
373 U.S. 83 (1963). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . *passim*

*Brennan v. Blankenship,*
472 F. Supp. 149 (W.D. Va. 1979), *aff'd*, 624 F.2d 1093 (4th Cir. 1980). . . . . . . . . . 135

*Bridges v. United States,*
346 U.S. 209 (1953). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . *passim*

*Brown v. Craven,*
424 F.2d 1166 (9th Cir. 1970). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 95

*Bryant v. Scott,*
28 F.3d 1411 (5th Cir.1994). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 94

*Burns v. Gammon,*
260 F.3d 892 (8th Cir. 2001). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 119, 120

*Burrage v. United States,*
134 S.Ct. 881 (2014). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7, 11

*Burrell v. United States,*
384 F.3d 22 (2d Cir. 2004). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

*Carr v. United States,*
560 U.S. 438 (2010). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

*Carriger v. Stewart,*
    132 F.3d 463 (9th Cir. 1997). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 140

*Child Sexual Abuse Accommodation Syndrome. And in Bell v. Miller,*
    500 F.3d 149 (2d Cir. 2007).. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 123

*Connick v. Thompson,*
    131 S.Ct. 1350 (2011). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 114

*Cooper v. Oklahoma,*
    517 U.S. 348 (1996).. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 132

*Couch v. Booker,*
    632 F.3d 241 (6th Cir. 2011). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 123

*Crandell v. Bunnell,*
    144 F.3d 1213 (9th Cir. 1998). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17, 90

*Crawford v. Washington,*
    541 U.S. 36 (2004).. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 118

*Daniel v. Thigpen,*
    742 F. Supp. 1535 (M.D. Ala. 1990). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 135

*Darden v. Wainwright,*
    477 U.S. 168 (1986).. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 111

*Davis v. Grant,*
    532 F.3d 132 (2d Cir. 2008).. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 131

*Descamps v. United States,*
    133 S.Ct. 2276 (2013). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8, 11

*Driscoll v. Delo,*
    71 F.3d 701 (8th Cir. 1995). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 123

*Drope v. Missouri,*
    420 U.S. 162 (1975).. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 132, 133, 136, 137, 138

*Dugas v. Coplan,*
    428 F.3d 317 (1st Cir. 2005). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 123

*Duncan v. Ornoski,*
    528 F.3d 1222 (9th Cir. 2008). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 123

*Dusky v. United States,*
    362 U.S. 402 (1960). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 133, 136

*Fagan v. Washington,*
    942 F.2d 1155 (7th Cir. 1991). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

*Faretta v. California,*
    422 U.S. 806 (1975). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16, 17

*Fountain v. United States,*
    357 F.3d 250 (2d Cir. 2004).. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

*Gall v. United States,*
    552 U.S. 38 (2007). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 118

*Gerstein v. Senkowski,*
    426 F.3d 588 (2d Cir. 2005).. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 90, 93, 95, 123

*Giglio v. United States,*
    405 U.S. 150 (1972). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 114

*Glover v. United States,*
    531 U.S. 198 (2001). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 120

*Godinez v. Moran,*
    509 U.S. 389 (1993). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 135

*Gonzalez v. United States,*
    722 F.3d 118 (2d Cir. 2013).. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 120, 123

*Indiana v. Edwards,*
    554 U.S. 164 (2008). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 124, 125

*Iowa v. Tovar,*
    541 U.S. 77 (2004). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 126, 127, 128, 129, 130

*James v. Mukasey,*
    522 F.3d 250 (2d Cir. 2008).. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

viii

*James v. United States,*
    550 U.S. 192 (2007) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9, 10

*Jenkins v. Artuz,*
    294 F.3d 284 (2d Cir. 2002) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 111, 112

*Johnson v. United States,*
    529 U.S. 694 (2000) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5, 6

*Johnson v. Zerbst,*
    304 U.S. 458 (1938) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 126

*Leocal v. Ashcroft,*
    543 U.S. 1 (2004) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

*Linstadt v. Keane,*
    239 F.3d 191 (2d Cir. 2001) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 92, 93, 95

*Loe v. United States,*
    545 F. Supp. 662 (E.D. Va. 1982) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 135

*Lokos v. Capps,*
    625 F.2d 1258 (5th Cir. 1980) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 137

*Massaro v. United States,*
    538 U.S. 500 (2003) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12, 14

*Maynard v. Meachum,*
    545 F.2d 273 (1st Cir. 1976) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

*Mayo v. Henderson,*
    13 F.3d 528 (2d Cir. 1994) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13, 14

*McKaskle v. Wiggins,*
    465 U.S. 168 (1984) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 124, 125

*McKee v. Harris,*
    649 F.2d 927 (2d Cir. 1981) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

*McQuiggin v. Perkins,*
    133 S.Ct. 1924 (2013) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 140

ix

*Nijhawan v. Holder,*
    557 U.S. 29 (2009). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

*North Carolina v. Alford,*
    400 U.S. 25 (1970). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11, 12

*Olivas-Motta v. Holder,*
    746 F.3d 907 (9th Cir. 2013). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

*Pate v. Robinson,*
    383 U.S. 375 (1966). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 135, 137

*Pavel v. Hollins,*
    261 F.3d 210 (2d Cir. 2001). . . . . . . . . . . . . . . . . . . . . . . . . . . . . 90, 91, 92, 93, 94, 123

*Powell v. Alabama,*
    287 U.S. 45 (1932). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

*Richey v. Bradshaw,* 4
    98 F.3d 344 (6th Cir. 2007). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 123

*Rivas v. Fischer,*
    687 F.3d 514 (2d Cir. 2012). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 140

*Sanchez v. Mondragon,*
    858 F.2d 1462 (10th Cir. 1988). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

*Sanders v. Ratelle,*
    21 F.3d 1446 (9th Cir.1994). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 94

*Schell v. Witek,*
    218 F.3d 1017 (9th Cir. 2000). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

*Showers v. Beard,*
    635 F.3d 625 (3d Cir. 2011). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 123

*Siehl v. Grace,*
    561 F.3d 189 (3d Cir. 2009). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 123

*Speedy v. Wyrick,*
    702 F.2d 723 (8th Cir. 1983). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 133

*Stogner v. California,*
       539 U.S. 607 (2003). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

*Strickland v. Washington,*
       466 U.S. 668 (1984). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12, 17, 90, 94, 133

*Taylor v. United States,*
       494 U.S. 75 (1990). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

*Toussie v. United States,*
       397 U.S. 112 (1970). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6, 11

*Trevino v. Thaler,*
       133 S.Ct. 1911 (2013). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

*United State Broxmeyer,*
       616 F.3d 120 (2d Cir. 2010). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

*United States v. Acevedo,*
       229 F.3d 350 (2d Cir. 2000). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

*United States v. Agurs,*
       427 U.S. 97 (1976). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 116

*United States v. Allen,*
       895 F.2d 1577 (10th Cir. 1990). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17, 18

*United States v. Arenburg,*
       605 F.3d 164 (2nd Cir. 2010). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 132

*United States v. Barnes,*
       693 F.3d 261 (2d Cir. 2012). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 124

*United States v. Barton,*
       712 F.3d 111 (2d Cir. 2013). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

*United States v. Beardsley,*
       691 F.3d 252 (2d Cir. 2012). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8, 10

*United States v. Blueford,*
       312 F.3d 962 (9th Cir. 2002). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 112

*United States v. Boigegrain,*
    155 F.3d 1181 (l0th Cir. 1998). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 134

*United States v. Brown,*
    352 F.3d 654 (2d Cir. 2003).. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

*United States v. Cronic,*
    466 U.S. 648 (1984). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 123

*United States v. Cruz,*
    977 F.2d 732 (2d Cir. 1992).. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 118, 119, 120, 121

*United States v. Han,*
    230 F.3d 560 (2d Cir. 2000).. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

*United States v. Haynes,*
    729 F.3d 178 (2d Cir. 2013).. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 139

*United States v. Jeffries,*
    405 F.3d 682 (8th Cir. 2005). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12, 13

*United States v. Kojayan,*
    8 F.3d 1315 (9th Cir. 1993). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 111, 114, 116

*United States v. Kozeny,*
    541 F.3d 166 (2d Cir. 2008).. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

*United States v. Leo Sure Chief,*
    438 F.3d 920 (9th Cir. 2006). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12, 13

*United States v. Lusterino,*
    450 F.2d 572 (2d Cir. 1971).. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 116

*United States v. Morrisey,*
    441 F.2d 666 (2d Cir. 1972).. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 95

*United States v. Reyes,*
    577 F.3d 1069 (9th Cir. 2009). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 111

*United States v. Richardson,*
    512 F.2d 105 (3d Cir. 1975).. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5, 6

*United States v. Schmidt,*
    105 F.3d 82 (2d Cir. 1997).. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16, 95, 96

*United States v. Truman,*
    688 F.3d 129 (2d Cir. 2012).. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 113

*United States v. Universita,*
    298 F.2d 365 (2d Cir. 1962).. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 101, 111

*United States v. Valentine,*
    820 F.3d 565 (2d Cir. 1987).. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 103, 111, 112, 116

*United States v. Wallach,*
    935 F.2d 445 (2d Cir. 1991).. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 116

*United States v. Whitten,*
    610 F.3d 168 (2d Cir. 2010).. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 119, 120

*Wiggins v. Smith,*
    539 U.S. 510 (2003).. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 90

*Williams v. Thaler,*
    684 F.3d 597 (5th Cir. 2012). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 123

*Williamson v. Ward,*
    110 F.3d 1508 (10th Cir. 1997). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 133, 134

## FEDERAL STATUTES

18 U.S.C. §922(g)(1). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

18 U.S.C. §2423(a). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3, 7, 9, 10

18 U.S.C. §3282. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2, 4, 11

18 U.S.C. §3283. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . *passim*

18 U.S.C. §3293. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

18 U.S.C. §3509. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9, 10

18 U.S.C. §3553(a). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 118

28 U.S.C. §2255. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . *passim*

**MISCELLANEOUS**

ABA Standards for Criminal Justice 4-4.1 (2014). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 90

Model Rules of Professional Conduct. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 122

## INTRODUCTION

Broadly speaking, Mr. Weingarten raises seven claims in support of his motion for relief under 28 U.S.C. §2255, each of which is addressed separately below.

First, the charges in the indictment were (and are) time barred.

Second, when Mr. Weingarten elected to represent himself at trial, his consequent waiver of his right to counsel was not constitutionally valid because he was faced with a choice between representing himself or going to trial with counsel that were not prepared, and with whom there was an irreconcilable conflict. Furthermore, based on the same facts, Mr. Weingarten can establish a claim for ineffective assistance of counsel because his counsel's lack of preparation amounted to constitutionally deficient performance, and Mr. Weingarten was prejudiced thereby.

Third, the government committed misconduct by (1) deliberately misleading the jury, and (2) failing to comply with its obligations under *Brady v. Maryland*, 373 U.S. 83 (1963).

Fourth, the Court impermissibly increased Mr. Weingarten's sentence based on his having exercised his constitutional rights to self-representation and confrontation, or at least there is an "unacceptable risk" that the Court did so.

Fifth, Mr. Weingarten's competency should have been evaluated prior to allowing him to represent himself as he suffers from cognitive impairments that render him unable to perform the tasks required to represent himself, and his counsel were ineffective for failing to raise the issue of competency with the Court.

Sixth, relief is warranted based on an accumulation of prejudice from the errors mentioned above.

Seventh, there is substantial evidence to support a freestanding actual innocence claim.

## STATUTE OF LIMITATIONS

### I.    Introduction

The travel underlying Mr. Weingarten's convictions occurred in July and August 1997, when the alleged victim, Frieme Leaieh Weingarten, was sixteen years old.  Because the indictment was filed on August 18, 2008, more than five years later, and when Frieme Leaieh was twenty-seven years old, the charges were (and are) time-barred.

In pretrial motions, Mr. Weingarten's counsel erroneously asserted that the charges were not time-barred.  *See* CR 19 at 22.[1]  Defense counsel believed that the general five-year limitations period in 18 U.S.C. §3282 did not apply, and instead the 2003 version of 18 U.S.C. §3283 controlled.  Section 3283 sets forth the statute of limitations for offenses "involving the sexual . . . abuse" of a minor.  In 1997, section 3283 said that its limitations period ran until "the child reaches the age of 25 years."  In their pretrial motions, defense counsel noted that Congress amended §3283 in 2003, so that charges could be brought "during the life of the child."  Defense counsel also stated that because the 2003 amendment was made before Frieme Leaieh reached age twenty-five, and thus before the 1997 limitations period had run for the offenses charged against Mr. Weingarten, there was no Constitutional *ex post facto* bar to applying the 2003 statute of limitations to Mr. Weingarten.  Based on this, defense counsel said there was no statute of limitations defense, and the only viable delay claim was based on the due process clause.  Defense counsel's concession was wrong, for two reasons.

---

[1]  CR refers to the clerk's docket sheet.  RT stands for reporter's transcript.  Because the trial transcript is sequentially numbered, there is no date indicator for those cites.  For the other transcripts cited, there is a date indicator.

First, *even if* §3283 provides the applicable limitations period (*i.e.*, if the offenses charged "involv[e] the sexual . . . abuse" of a minor), Congress did not clearly express its intent that the 2003 amendment to §3283should be applied retroactively.  Absent such an expression, the amendment has only prospective effect; that is, it only applies to conduct that occurred after it was enacted in 2003.  Thus, the version of §3283 that was in effect in 1997, when the alleged offense conduct occurred, applied to Mr. Weingarten's charges.  And under that version of §3283, the charges in the indictment were time barred because Frieme Leaieh was more than twenty-five years old when the indictment was filed.  Notably, this is entirely separate from the Constitutional *ex post facto* analysis that motivated defense counsel's mistaken concession.

Second, and taking a step back, section 3283 does not apply to the offenses charged in this case, 18 U.S.C. §2423(a) and (b), regardless of whether one applies the 1997 version or the 2003 version (or even the 2006 version).  That is because all of these versions of §3283 apply only to offenses "involving the sexual . . . abuse" of a minor.  To determine whether charged offenses "involv[e] the sexual . . . abuse" of a minor, and thus whether the limitations period in §3283 applies, courts use a strict categorical approach.  Thus, for the limitations period in §3283 to apply, all of the conduct encompassed in a charged statute must amount to "sexual abuse" of a minor.  But the offenses set out in §2423(a) and (b) encompass conduct that does not involve "sexual abuse" of a minor.  Therefore, the limitations period in §3283 does not apply.

Mr. Weingarten first discusses the merits of both arguments.  He then explains why the claim raised here is not procedurally defaulted, because:  (1) it amounts to a claim of "actual innocence," which cannot be barred by a procedural default; and (2) any default is excused by ineffective

3

assistance of counsel, which is also a freestanding Sixth Amendment claim that Mr. Weingarten was not required to raise until these §2255 proceedings.

## II.    Non-Retroactivity Of 2003 Amendment To §3283

The general statute of limitations for non-capital offenses is five years.  *See* 18 U.S.C. §3282. But Congress has established longer limitations periods for some offenses.  *See* 18 U.S.C. §3283 *et seq.*  As noted, the potentially relevant provision in this case is §3283.  In 1997, when the travel in this case occurred, that statute said:

> No statute of limitations that would otherwise preclude prosecution for an offense involving the sexual or physical abuse of a child under the age of 18 years shall preclude such prosecution before the child reaches the age of 25 years.

If this is the applicable statute of limitations, there is no doubt that the charges against Mr. Weingarten were (and are) time-barred, because the indictment was filed on August 18, 2008, when Frieme Leaieh was twenty-seven years old.  *See* Presentence Report at 5 (indicating Frieme Leaieh's birthday).

Presumably, however, the government will claim that the applicable statute of limitations is found in either (or both) of the versions of §3283 that Congress enacted in 2003 and 2006.  The version of §3283 enacted in 2003 said:

> No statute of limitations that would otherwise preclude prosecution for an offense involving the sexual or physical abuse, or kidnaping, of a child under the age of 18 years shall preclude such prosecution *during the life of the child*.

(Emphasis added.)  The current version of §3283, which was enacted in 2006 says:

> No statute of limitations that would otherwise preclude prosecution for an offense involving the sexual or physical abuse, or kidnaping, of a child under the age of 18 years shall preclude such prosecution *during the life of the child, or for ten years after the offense*, whichever is longer.

4

(Emphasis added.)  Because the indictment in this case was brought more than ten years after the travel charged, the only issue is whether the "life of the child" limitations period (found in both the 2003 and 2006 amendments) applies.

That question is answered by a fundamental, longstanding principle of statutory construction: if Congress does not clearly express its intent to have a statute apply retroactively, it applies prospectively only.  Based on that principle, in *United States v. Richardson*, 512 F.2d 105 (3d Cir. 1975), the Third Circuit held that a statute of limitations does not apply retroactively absent Congress's clear indication to the contrary.  And Congress gave no such indication with respect to the 2003 or 2006 amendments to §3283.

Before turning to a more detailed discussion of *Richardson* and the relevant Supreme Court case law, it is important first to emphasize that Mr. Weingarten is not raising a Constitutional *ex post facto* claim regarding §3283.  That is the misstep made by his former counsel, who focused solely on whether the 2003 amendment to §3283 could be applied without offending the *ex post facto* clause.  *See* CR 19 at 22; *see also Stogner v. California*, 539 U.S. 607 (2003).  The issue raised here, on the other hand, focuses on statutory construction and legislative intent.  The Supreme Court has made clear that in this context a court should always consider Congressional intent before considering an *ex post facto* issue, which is an approach that may obviate the need to address the constitutional issue.  *See Johnson v. United States*, 529 U.S. 694, 701-02 (2000); *see also Carr v. United States*, 560 U.S. 438, 458 (2010).  And when considering Congressional intent, there is a presumption that Congress does *not* intend that criminal provisions apply retroactively, and that presumption can only be rebutted by Congress's "clear statement" to the contrary.  *Johnson*, 529 U.S. at 701.

5

The Third Circuit put these commands into effect in *Richardson*, which is directly on-point. The defendant in *Richardson* failed to register for the draft in 1968, when the applicable statute of limitations was five years.  In 1971, before that five-year period expired, Congress extended the limitations period.  *See Richardson*, 512 F.2d at 106 (quoting new limitations period).  The indictment against Richardson was filed in 1974, which was untimely under the 1968 version of the limitations statute, but timely under the 1971 version.  In its analysis, the Third Circuit recognized that the issue presented did not relate to the *ex post facto* clause, but instead focused on "ascertaining congressional intent."  *Id.*  The court began its analysis of that issue by emphasizing that "[c]riminal statutes of limitations . . . are to be interpreted in favor of repose."  *Id.* at 106 (citing *Toussie v. United States*, 397 U.S. 112, 115 (1970)).  More important, it held that because statutory "law is presumed to operate prospectively in the absence of a clear expression to the contrary," and there was no such expression with respect to the 1971 amendment, the 1968 limitations period controlled, and the charge was time-barred.  *See id.* at 106.  The same analysis applies here because Congress did not indicate that it intended the 2003 or 2006 amendments to §3283 to apply retroactively.

And there is no doubt that Congress knows what the case law requires in this context, and how to make its intent clear.  For example, when Congress extended the statute of limitations for financial institution offenses in 1989 and 1990, it included notes stating that the amendments were to be applied retroactively.  *See* 18 U.S.C. §3293 (historical and statutory notes).  Congress included no such note with respect to the 2003 or 2006 changes to §3283, which affirmatively shows that it intended that the amendments not be applied retroactively.  *See Johnson*, 529 U.S. at 702 n.5 (relying on Congress's express statement of an effective date in related legislation to find that criminal provision did not apply to offenses committed before its enactment).

6

Finally, to the extent that there is any doubt about Congress's intent in this regard, the rule of lenity supports Mr. Weingarten's position. *See, e.g.*, *Burrage v. United States*, 134 S. Ct. 881, 891 (2014).

## III. Inapplicability Of §3283

Even if this Court determines that Congress manifested a clear intent that the amendments to §3283 apply to offenses committed before the amendments were enacted, the charges against Mr. Weingarten would still be time barred. None of the versions of §3283 apply unless at least one of the two offenses charged involves "sexual abuse" of a minor. When assessing whether a charged offense involves "sexual abuse" of a minor, a court must apply a strict categorical approach. Using that approach, it is apparent that neither §2423(a) nor (b) *categorically* involves sexual abuse of a minor, because both statutes encompass offense conduct that does not involve sexual abuse of a minor.

In *Bridges v. United States*, 346 U.S. 209 (1953), the Supreme Court addressed a similar situation, and held that a strict categorical approach must be used. The petitioner in *Bridges* was charged with making a false statement in his naturalization petition. His prosecution was barred by the governing statute of limitations, unless the Wartime Suspension of Limitations Act applied. That Act suspended limitations periods for offenses "*involving* the defrauding of the United States." In deciding whether the offense charged qualified, the Supreme Court first recognized that suspending the ordinary limitations period constituted an exception to the "longstanding" policy of repose that is "fundamental to our society and our criminal law." *Id.* at 216. It then held that the suspension statute was inapplicable to petitioner's offense because "defrauding the United States" was not an "essential ingredient of the offense charged." *Id.* at 221. The Court reasoned that although fraud

7

will often accompany making a false statement in a naturalization petition, that offense can be shown without proof of fraud. *See id*. at 221-22. And, importantly, the Court emphasized that "[t]he insertion in the indictment of the words 'procured by fraud' does not change the offense charged. The embellishment of the indictment does not lengthen the time for prosecution. It is the statutory definition of the offense that determines whether or not the statute of limitations comes within the" statute extending the limitations period. *Id.* at 222-23.

In short, the Court in *Bridges* used a strict "categorical approach," and held that courts must examine the elements of the offense charged to determine whether a limitations period applies, rather than looking at the facts charged in the specific case. The Supreme Court has more recently, and repeatedly, used that test when interpreting similar statutes. *See, e.g., Descamps v. United States*, 133 S.Ct. 2276 (2013) (categorical approach is an "elements-based inquiry," not an "evidence-based" one); *Taylor v. United States*, 494 U.S. 75 (1990).

Moreover, the Court has made clear that the specific language used in §3283 compels application of the categorical analysis. Section 3283 applies to "*offense[s] involving* the sexual or physical abuse, or kidnaping of a child . . . ." 18 U.S.C. §3283 (emphasis added). The impact of both "offense" and "involving" have been addressed by the Court.

As for the former, the Court has held that the word "offense" signifies that a court must look to the elements of the statute charged, "rather than to the particular facts relating to [the defendant's] crime." *Leocal v. Ashcroft*, 543 U.S. 1, 7 (2004). For comparison sake, the opposite is true if Congress uses the word "conduct" instead of "offense." *See United States v. Beardsley*, 691 F.3d 252, 275 (2d Cir. 2012) (categorical analysis of elements applies when statute refers to "certain type of *laws*, rather than to particular *conduct*").

8

Section 3283's use of the word "involving" also supports Mr. Weingarten's position.  Despite some earlier confusion among the courts, the Supreme Court has twice clarified that use of the word "involving" does not expand the elements-based inquiry, as "it too refers to crimes as generically defined." *Nijhawan v. Holder*, 557 U.S. 29, 36 (2009); *James v. United States*, 550 U.S. 192, 201-02 (2007).  After *Nijhawan* and *James*, it is well-established that the "use of the word 'involving' . . . is entirely consistent with . . . an element of the generic crime" approach.  *Olivas-Motta v. Holder*, 746 F.3d 907, 915 (9th Cir. 2013) (citing *Nijhawan* and *James*).

Having established that a strict categorical approach applies here, the next step is to determine whether all of the offense conduct encompassed in the statutes charged in this case, 18 U.S.C. §2423(a) and (b), amounts to sexual abuse of a minor.  First it is necessary to determine how "sexual abuse" of a minor is defined.  When assessing whether the elements of an offense constitute "sexual abuse" under the categorical approach, the Second Circuit has applied the definition in 18 U.S.C. §3509(a)(8).  *See, e.g.*, *James v. Mukasey*, 522 F.3d 250, 254 (2d Cir. 2008).  Using this definition makes sense here, considering that §3283 was originally codified at 18 U.S.C. §3509(k).

Section 3509(a)(8) defines "sexual abuse" as "the employment, use, persuasion, inducement, enticement, or coercion of a child to engage in, or assist another person to engage in, sexually explicit conduct or the rape, molestation, prostitution, or other form of sexual exploitation of children, or incest with children."  Section 3509(a)(6) and (9) further define "exploitation" as "child pornography or child prostitution," and provide a definition for "sexually explicit conduct."  For the reasons explained below, using a categorical approach, and applying §3509(a)'s definition, it is apparent that neither §2423(a) or (b) qualify as an offense involving sexual abuse of a minor.

9

As for §2423(a) (which was charged in counts 1 and 2 of the indictment), it is a "crime of intent and a conviction is entirely sustainable even if no underlying criminal sexual act ever occurs." *United State Broxmeyer*, 616 F.3d 120, 130 n.8 (2d Cir. 2010). Thus, the offense set out in §2423(a) encompasses more than the definition of sexual abuse found in §3509(a). Moreover, section 2423(a) extends to transportation with the intent to engage in "any sexual activity for which any person can be charged with a criminal offense . . . ." 18 U.S.C. §2423(a). This incorporates a wide range of state criminal statutes, many of which are significantly broader than the definition set forth in §3509(a). Indeed, the Second Circuit has explained that some state criminal statutes, such as New York's, include a kiss on the mouth as "sexual contact with a minor," which is a broader definition than the one contained in §3509(a). *James*, 522 F.3d at 258. Likewise, New York's statute for endangering the welfare of a child, which can be used as a predicate for a §2423(a) offense, is broader than the definition of "sexual abuse" contained in §3509(a). *See id.* at 258. Therefore, section 2423(a) fails to categorically fit within the definition of "sexual abuse" found in §3509(a).

Similarly, the §2423(b) offense charged in counts 4 and 5 of the indictment does not categorically constitute "sexual abuse" under §3509(a). Like §2423(a), section "2423(b) criminalizes crossing state lines with a criminal intent, without requiring commitment of a further criminal act." *United States v. Han*, 230 F.3d 560, 563 (2d Cir. 2000). And §2423(b) does not require any conduct by a child, nor does it even require any specific conduct directed to a child. The statute simply requires travel by the defendant with criminal intent.

Finally, it should be noted that another reason that a modified categorical approach (which looks at the actual conduct charged) does not apply here is because §2423(a) and (b) are not "divisible" statutes. *See, e.g.*, *Beardsley*, 691 F.3d at 258 (modified categorical approach could not

10

be used when considering whether offense constituted sexual abuse of a minor).  And the Supreme Court's decision in *Descamps* has also confirmed that a modified categorical analysis is not applicable here.

Accordingly, section 3283, in whatever permutation, does not apply to the statutes charged against Mr. Weingarten.  Instead, the five-year limitations period in §3282 applies, and the charges were time-barred when the indictment was filed in August 2008.  To the extent there is any doubt, Mr. Weingarten's position is supported by the rule of lenity, *see, e.g.*, *Burrage*, 134 S. Ct. at 891, and the principle that statutes of limitations are to be "liberally interpreted in favor of repose." *Toussie*, 397 U.S. at 115; *see United States v. Kozeny*, 541 F.3d 166, 171 (2d Cir. 2008).

## IV.    The Procedural Default Doctrine Does Not Bar Relief

The government may argue that Mr. Weingarten's statute of limitations claim is procedurally defaulted because it should have been raised before these §2255 proceedings.  That argument fails because (1) the actual innocence exception excuses any procedural default, and (2) the claim is cognizable as an ineffective assistance of counsel claim.

With respect to the actual innocence exception, *Burrell v. United States*, 384 F.3d 22, 27 (2d Cir. 2004), is on-point.  There the defendant filed a §2255 motion attacking his felon-in-possession of a firearm conviction, 18 U.S.C. §922(g)(1).  He argued that he was "actually innocent of the §922(g)(1) conviction" because the "Connecticut judgment relied on by the prosecution to establish the requisite predicate felony was based on a guilty plea entered pursuant to *North Carolina v. Alford*, 400 U.S. 25 (1970), and that Connecticut does not recognize such judgments as convictions." *Burrell*, 384 F.3d at 24.  Although the Second Circuit rejected the argument on the merits, it first stated "that because Burrell's *Alford*-based challenge [was] raised in support of a claim of actual

11

innocence, [he was] excused from any procedural default of this argument on direct appeal." *Id.* at 27. Mr. Burell's and Mr. Weingarten's claims stand on the same footing in this regard: they are both arguments that, if the defendant's legal position is accepted, would lead to a complete defense to the charge(s). Accordingly, the actual innocence exception precludes application of a procedural bar here.

But even if the procedural default doctrine applied, defense counsel's ineffective assistance with respect to the statute of limitations issue is a freestanding claim that is appropriately raised in a §2255 motion, and constitutes "cause" and "prejudice" to excuse any default. *See, e.g.*, *Trevino v. Thaler*, 133 S. Ct. 1911, 1917 (2013); *Massaro v. United States*, 538 U.S. 500 (2003); *Fountain v. United States*, 357 F.3d 250, 254 (2d Cir. 2004). As discussed above, Mr. Weingarten's former counsel erroneously conceded that there was no statute of limitations bar to the prosecution. In doing so, counsel ignored the first step in the applicable analysis, which focuses on Congressional intent, and instead went straight to whether there was a Constitutional *ex post facto* problem; counsel also incorrectly assumed that the offenses charged constituted "sexual abuse" of a minor. *See* CR 19 at 22. This was constitutionally deficient performance, which seriously prejudiced Mr. Weingarten. *See Strickland v. Washington*, 466 U.S. 668 (1984); *see also United States v. Acevedo*, 229 F.3d 350, 353, 356 (2d Cir. 2000) (tacitly acknowledging that failure to raise a meritorious statute of limitations defense constitutes ineffective assistance).

Mr. Weingarten first addresses the deficient performance prong of *Strickland*. In making their erroneous concession, Mr. Weingarten's attorneys cited *United States v. Leo Sure Chief*, 438 F.3d 920 (9th Cir. 2006), and *United States v. Jeffries*, 405 F.3d 682 (8th Cir. 2005). Those out-of-circuit cases are not on point (neither even comes close to mentioning the categorical analysis issue

discussed above), and thus did not provide a legitimate basis to abandon a meritorious defense founded on the well-established principles set out in the case law discussed above. In the Ninth Circuit case, the indictment was timely even under the pre-2003 version of §3283; thus, the arguments raised here were not even at issue. *See Leo Sure Chief*, 438 F.3d at 922. In the Eighth Circuit case, the issue was not whether Congress intended the 2003 amendment to §3283 to apply retroactively; instead, the Eighth Circuit considered a 1990 amendment and mostly focused on the *ex post facto* clause. *See Jeffries*, 405 F.3d at 684-85.[2] In short, neither case was on point, and thus they could not possibly support abandoning a complete defense to all the charges.

In that regard, it is noteworthy that in considering the deficient performance prong, the Second Circuit has indicated that the existence of non-controlling, adverse authority from intermediate appellate courts is not a valid basis for an attorney to fail to raise a potentially meritorious issue. *See Mayo v. Henderson*, 13 F.3d 528, 533-34 (2d Cir. 1994) (citing approvingly an Eleventh Circuit case that found deficient performance based on failing to raise an issue that had been rejected by three intermediate appellate courts). Analogously, the Second Circuit has emphasized that errors can be plain or obvious "even where uniformity among the circuits . . . is lacking." *United States v. Brown*, 352 F.3d 654, 664 (2d Cir. 2003). Thus, even if the Eighth and Ninth Circuit decisions relied on by Mr. Weingarten's former counsel could be considered adverse authority, that was not a valid basis for his counsel's conceding a meritorious statute of limitations defense. *See id.* ("the 'plainness' of the error can depend on well-settled legal *principles* as much as well-settled legal *precedents*").

---

[2] The Eighth Circuit's limited analysis of the 1990 amendment is also incorrect based on the arguments and authority previously cited. But that question is largely irrelevant, as the 1990 amendment is not at issue here.

It also bears noting that there is no "strategic" reason that could support counsel's waiving the statute of limitations defense and misadvising Mr. Weingarten and the Court about the applicable statute of limitations.  *See id.* at 665; 9/22/14 Weingarten Dec. at ¶15(c) (Exhibit 1).  Indeed, Mr. Weingarten's attorneys actually raised a delay claim, they just raised the wrong one.  That is, they asserted that unexplained pre-indictment delay violated the due process clause, while conceding the statute of limitations defense.  In *Mayo*, the Second Circuit explained that "a petitioner may establish constitutionally inadequate performance if he shows that counsel omitted significant and obvious issues while pursuing issues that were clearly and significantly weaker."  *Mayo*, 13 F.3d at 533.  Here, counsel did not just omit an obvious issue, they conceded a complete defense to the charges.  And there is simply "no reason" for counsel's ill-advised concession, "other than oversight or incompetence."  *Id.* at 533 (quoting *Fagan v. Washington*, 942 F.2d 1155, 1157 (7th Cir. 1991)).[3]

As for the "prejudice component," that "need not detain [the Court] long."  *Mayo*, 13 F.3d at 536.  Given that the statute of limitations claim raised here would have provided a complete defense to all the charges, prejudice is obvious.  *See id.*

Accordingly, Mr. Weingarten has established cause and prejudice to excuse any procedural default, and has simultaneously established a freestanding Sixth Amendment claim for ineffective assistance of counsel.

---

[3]  The Supreme Court's decision in *Massaro* establishes that an ineffective assistance of counsel claim does not have to be raised in post-trial motions or on direct appeal, and it is notable that this Court declined to entertain any such claims in post-trial motions.  But even if that were not so, any procedural default would be excused because Mr. Weingarten's post-trial and appellate counsel were also ineffective under the reasoning in *Mayo*.

14

## UNPREPARED TRIAL COUNSEL, AND BREAKDOWN
## IN ATTORNEY-CLIENT RELATIONSHIP

**I.     Introduction**

At a February 25, 2009 hearing, Mr. Weingarten asked the Court to discharge his counsel because they were not prepared for trial, and there was a breakdown in the attorney-client relationship.  The Court denied Mr. Weingarten's request.

On March 2, the first day of trial, defense counsel told the Court Mr. Weingarten wanted to question government witnesses during trial because his attorneys did not understand the case's basic facts.  The first thing the Court did in response was ask defense counsel, "do you feel as though you are prepared to defend this case?"  RT at 8.  They replied yes, and the Court denied Mr. Weingarten's request, telling him that he could proceed *pro se*, or his counsel would handle the case entirely.  Mr. Weingarten chose to proceed *pro se*.

As the evidence submitted in support of Mr. Weingarten's §2255 motion shows, defense counsel had not done even the most obvious things to prepare for trial.  Because of this, Mr. Weingarten's "choice" to proceed *pro se* cannot be considered voluntary, in the constitutional sense, and his convictions must be vacated.  While a showing of prejudice is not necessary to support this claim, Mr. Weingarten suffered ample prejudice.

The argument below proceeds as follows.

First, Mr. Weingarten summarizes the case law indicating that it is constitutionally offensive to require a defendant to choose between going to trial with counsel who are unprepared or self-representation.

15

Second, he reviews what led to his request to discharge defense counsel, and his decision to proceed *pro se*.

Third, to show that defense counsel were not prepared, Mr. Weingarten compares the government's trial case with the wealth of evidence that, through common sense investigation, was available to defense counsel to rebut the government's case.  Having failed to do any investigation, defense counsel were not prepared to present that evidence.

Fourth, Mr. Weingarten analyzes the constitutionally offensive choice argument.

Fifth, while Mr. Weingarten believes he need not show prejudice to warrant relief, he nonetheless discusses the prejudice that resulted from his attorneys' lack of preparation.  That is, he relies on the facts involved here to support a traditional ineffective assistance of counsel claim.

Finally, Mr. Weingarten addresses an argument that is closely related to the constitutionally offensive choice argument – that defense counsel should have sought to withdraw, or should have been discharged, because there was an irreconcilable conflict in the attorney-client relationship.

## II.   Relevant Law With Respect To Constitutionally Offensive Choice

The Sixth Amendment right to counsel encompasses the corollary right to self-representation. *See Faretta v. California*, 422 U.S. 806, 814–15 (1975).  But the choice to proceed *pro se* necessarily requires a defendant to waive his right to counsel, and that waiver must be knowing, intelligent, and voluntary.   The waiver is not constitutionally sound if a defendant is made to choose between representing himself or being represented by counsel that is unprepared.  *See McKee v. Harris*, 649 F.2d 927, 930-31 (2d Cir. 1981); *see also United States v. Barton*, 712 F.3d 111, 118 (2d Cir. 2013); *United States v. Schmidt*, 105 F.3d 82, 89 (2d Cir. 1997); *Maynard v. Meachum*, 545 F.2d 273, 278 (1st Cir. 1976) ("a defendant may not be forced to proceed to trial with incompetent or unprepared

16

counsel"); *Sanchez v. Mondragon*, 858 F.2d 1462, 1465 (10th Cir. 1988) ("A choice between incompetent or unprepared counsel and appearing pro se is a dilemma of constitutional magnitude," and a consequent "choice to proceed pro se cannot be voluntary") (quotation and citation omitted).

A defendant who is forced to make such a choice is caught somewhere between *Powell v. Alabama*, 287 U.S. 45 (1932), and *Strickland v. Washington*, 466 U.S. 668 (1984), and no matter which option he chooses, his fundamental right to a fair trial has been infringed. On the one hand, a *pro se* defendant typically "lacks both the skill and knowledge adequately to prepare his defense," *Powell*, 287 U.S. at 69; on the other, so does a lawyer who fails to fulfill his "duty to bring to bear such skill and knowledge as will render the trial a reliable adversarial testing process." *Strickland*, 466 U.S. at 688. Put differently, "[i]t is undeniable that in most criminal prosecutions defendants could better defend with counsel's guidance than by their own unskilled efforts," *Faretta*, 422 U.S. at 834, but that presumption does not hold when the defendant's counsel is unprepared.

"The issue here . . . is not legal strategy, but preparation." *Id.* at 1466. If it is established that Mr. Weingarten's counsel were unprepared for trial, his waiver of counsel cannot be considered voluntary, and relief is warranted without an independent showing of prejudice. *See Crandell v. Bunnell*, 144 F.3d 1213, 1216 (9th Cir. 1998); *see also Schell v. Witek*, 218 F.3d 1017, 1026 (9th Cir. 2000) (*en banc*); *United States v. Allen*, 895 F.2d 1577 (10th Cir. 1990).

## III.    Events That Led To Mr. Weingarten's Request To Discharge Counsel

As the background set out below shows, by the time he requested that his attorneys be discharged, and then decided to proceed *pro se*, Mr. Weingarten had ample reason to believe they were not prepared for trial. Moreover, the attorney-client relationship was in a shambles.

### A.   Arrest And Initial Attorney Meetings

After his arrest on October 6, 2008, Mr. Weingarten was taken to the federal courthouse in Brooklyn.  There he met Kenneth Gribetz, who said he would be representing Mr. Weingarten that day.  Mr. Weingarten explained to Mr. Gribetz that the charges in the indictment, and the claims in the government's detention motion, were based on the same allegations that his daughter, Frieme Leaieh, had made in family court proceedings.  Mr. Weingarten, or his children (who were present at the courthouse), told Mr. Gribetz that Brian Dlouhy, a caseworker with Child Protective Services ("CPS"), would be able to provide important details about the CPS investigations and family court proceedings.  *See* 9/22/14 I. Weingarten Dec. at ¶5(b)-(d) (Exhibit 1).

### B.   October 6, 2008 Court Appearance

Later that day, at Mr. Weingarten's initial appearance, Mr. Gribetz told the magistrate judge that he had already spoken with Mr. Dlouhy, and Mr. Gribetz emphasized the overlap between the facts at issue in the family court proceedings and the federal charges:

> This entire matter was litigated in front of Justice Margaret Goblet in Family Court of Rockland County.  In fact, when I spoke to Child Protective Service Brian [Dlouhy], who was the individual who investigated it, he basically found that the allegations that were contained and presented ultimately in the Family Court in Rockland County were found to be baseless.  Custody was awarded to the father, Mr. Weingarten, who's the defendant here at this particular time.

10/6/08 RT at 5.  Moments later, Mr. Gribetz said that it "was verbalized to [him] by Brian [Dlouhy] that the FBI was critical of the fact that he found that these allegations were found to have been baseless."  *Id.* at 7.

The important thing to note here is that from the outset of his case, Mr. Weingarten told his counsel about the witnesses and documents that were important for his defense.

18

**C.      Attorney Alan Stutman Enters The Case**

A few days later, a friend of Mr. Weingarten's, Menachem Mendel Blum, hired attorney Alan Stutman to represent Mr. Weingarten.  Mr. Blum helped Mr. Weingarten defend himself in the family court proceedings, and he took it upon himself to play the same role in the federal criminal proceedings.  This included Mr. Blum's hiring Mr. Stutman (who later hired Barry Rhodes), and raising money to pay the attorneys.  *See* 9/22/14 I. Weingarten Dec. at ¶6(c)-(f) (Exhibit 1).

**D.      October 8, 2008 Hearing**

On October 8, 2008, Mr. Weingarten was taken from the Metropolitan Detention Center ("MDC") to the courthouse, but he was not taken to court.  Mr. Stutman appeared in court that day, waived Mr. Weingarten's presence, and asked that Mr. Weingarten be housed at the federal prison in Otisville.  *See* 10/8/08 RT at 2-4.  At that point, Mr. Weingarten had not met Mr. Stutman, and had not signed any sort of representation agreement with him.  In fact, Mr. Weingarten never signed any such agreement.  *See id.*  9/22/14 I. Weingarten Dec. at ¶¶6(f), 8 (Exhibit 1).

**E.      October 14, 2008 Hearing**

On October 14, 2008, the Court held a status/bail hearing, but Mr. Weingarten was not present.  Mr. Stutman said that Mr. Weingarten's absence might be due to his religious requirements, but that was incorrect.  *See* 10/14/08 RT at 1; 9/22/14 I. Weingarten Dec. at ¶9(a) (Exhibit 1).

Mr. Stutman also said that the day before he had told Mr. Weingarten that he (Mr. Stutman) "was eventually going to prepare a bail package to present to the Court," but Mr. Weingarten "asked [Mr. Stutman] to delay on that, because there's so much background information."  10/14/08 RT at 2.  Contrary to what Mr. Stutman said, Mr. Weingarten's recollection is that the two men had not yet met, nor spoken.  *See* 9/22/14 I. Weingarten Dec. at ¶9(d) (Exhibit 1).  This is supported by

19

Mr. Stutman's inability to answer the Court's questions about what religious holiday prevented Mr. Weingarten from appearing at that day's hearing.  *See* 10/14/08 RT at 3.  Notably, the Court ordered Mr. Stutman to "sit down with [Mr. Weingarten] with a calendar" to determine any future dates that could present a conflict.  *See id.* at 2-4.  Mr. Stutman never did that.  *See* 9/22/14 I. Weingarten Dec. at ¶9(c) (Exhibit 1).

### F.        October 28, 2008 Bail Hearing

On  October  28,  2008,  the  Court  held  what  was  supposed  to  be  a  bail  hearing. Mr. Weingarten's recollection is that prior to that day, he still had not met Mr. Stutman.  *See id.* at ¶10.  From speaking with his children, however, Mr. Weingarten was aware that on October 28 the Court was going to address bail.  Prior to that day, Mr. Weingarten had asked his children to convey to Mr. Stutman that he should rely on records from the family court proceedings to rebut what was alleged in the government's written detention motion, including the false claim that during the family court proceedings Mr. Weingarten "hid his children and refused to produce them for a week."[4] 10/6/08 Gov't Det'n Mtn at 8 (CR 6).  Mr. Weingarten was concerned that if Mr. Stutman did not rebut the government's claims, the Court would not grant bail.  *See* 9/22/14 I. Weingarten Dec. at ¶10(a) (Exhibit 1)

Shortly before the October 28 hearing, Mr. Weingarten spoke briefly with Mr. Stutman in court, and his recollection is that was the first time they met.  Mr. Weingarten reiterated what he had already asked his children to convey to Mr. Stutman:  that Mr. Stutman should rely on the family court records to rebut the allegations in the government's detention motion.  *See id.* at ¶10(b).

---

[4]  Had the attorneys contacted Mr. Weingarten's family law attorney Daniel Schwartz, they would have learned that the government's assertion was in fact false and they could have presented evidence of that to the Court.  *See* Schwartz Letter (Exhibit 41).

20

Mr. Stutman proceeded to tell the Court that he was not prepared to make a bail application because "members of [Mr. Weingarten's religious] community" were "not satisfied with the package" that Mr. Stutman "would be able to put together at [that] time," and thus they wanted "approximately another three weeks," and "perhaps there will be a presentation at that point." 10/28/08 RT at 1-2.  To Mr. Weingarten, and to his family and friends, this was a curious statement, because the three-week delay that had already occurred, and the additional delay sought, was due to Mr. Stutman's need to become familiar with the relevant facts and records.  And Mr. Weingarten expected Mr. Stutman to do that.  *See* 9/22/14 I. Weingarten Dec. at ¶10(c)-(d) (Exhibit 1).

The other issue that was addressed at the October 28 hearing was the trial date.  The Court said that it was inclined to begin trial on January 20, 2009.  *See* 10/28/08 RT at 5-6.  In response, Mr. Stutman said that he was "still gathering information, so [he] would appreciate the time," and he noted that there were "several potential witnesses" in Belgium and Israel that he needed to interview.  *Id.* at 6, 8.[5]  The Court appeared open to setting the trial further out, so long as Mr. Sutman provided sufficient justification.  *See id.* at 8-10.  He did not, and the Court confirmed the January 20 date.  *See id.* at 9-10.

This worried Mr. Weingarten.  He knew that January 20 was much too soon for trial because: (1) many witnesses had to be contacted, most of whom were in foreign countries; (2) thousands of pages of documents needed to be reviewed; and (3) tape recordings had to be tracked down, transcribed, and translated from Yiddish to English.  He also recalled that in the family court proceedings, the county attorney had estimated that trying that case, which involved the same subject

---

[5]  It is worth noting that despite acknowledging that he needed to interview witnesses from Belgium and Israel, Mr. Stutman never did.

matter, would take 6-8 weeks.  Accordingly, Mr. Weingarten believed that Mr. Stutman would need

many months to prepare to try the federal case.  *See* 9/22/14 I. Weingarten Dec. at ¶10(e) (Exhibit 1).

### G.     Mr. Weingarten's Initial Meeting With Mr. Stutman At The MDC

Mr. Weingarten's recollection is that the first time he and Mr. Stuman met at the MDC was

shortly after the October 28 hearing.  *See id.* at ¶11.

One of the primary points discussed was that Mr. Stutman could not possibly be ready to try

the case by January 20, in light of all that needed to be done.  Mr. Stutman told Mr. Weingarten not

to worry, because, he said, the Court would agree to move back the trial date.  *See id.* at ¶11(g).

Mr. Weingarten also told Mr. Stutman about the documents that Mr. Stutman needed to

review (including the family court and CPS records), and he named the witnesses that had to be

contacted.  When discussing the records, Mr. Weingarten emphasized the importance of the family

court deposition transcripts of his daughter, Frieme Leaieh, and son, Yoinesun.  He explained that

the transcripts would give Mr. Stutman a good starting point for understanding the federal case and

would help direct his investigation.  Mr. Weingarten asked Mr. Stutman to bring a copy of both

deposition transcripts to the MDC so they could review key points together.  And Mr. Weingarten

told Mr. Stutman that he needed to speak with Brian Dlouhy from CPS, and the lawyers involved

in the family court proceedings, who would have important information for the defense.  *See id.* at

¶11(b)-(e).

Mr. Stutman responded that he was a specialist in federal criminal matters, and he claimed

that what had occurred in the family court proceedings, and with CPS, was completely irrelevant to

the federal case.  *See id.* at ¶11(a), (f).

22

### H.        November 19, 2008 Bail Hearing

On November 19, 2008, the Court held a bail hearing.  Mr. Stutman appeared for Mr. Weingarten, along with Mr. Rhodes.  Though Mr. Weingraten believes that prior to that day he had learned that Mr. Rhodes was going to be helping Mr. Stutman, and Mr. Weingarten may have briefly met Mr. Rhodes, Mr. Weingarten does not recall having had any sort of substantial discussion with Mr. Rhodes before the November 19 hearing.  *See id.* at ¶12(a).

Mr. Rhodes nevertheless took the lead at the hearing.  And after discussing the proposed security for the bond, Mr. Rhodes said:

> Now, also, I'm only six days into this case, Judge.  I've reviewed hundreds and hundreds of documents and a lot of them are transcripts of this Complainant and other children of the defendant, which are jam-packed with contradictions, recantations, contrary adjudications.  It's been in the Talmudic court a number of times.  It's been in the Family Court in two different counties on two occasions.  And nothing ever happened.
>
> The theory of the prosecutor for how this could possibly be is that Israel Weingarten has some hypnotic control over people in his presence.  If he has that kind of messianic control, perhaps he should run for public office in the United States, but he, in the time I've spent with him, did not strike me as a charlatan.  There were no attempts to cast spells on me.  He's just a man who has been broken and horrified by these charges, whose good name has been tarnished for 20 years by bogus allegations, and who's sitting in a Federal jail where he doesn't belong.

11/19/08 RT at 8.  Though Mr. Rhodes said he had "reviewed hundreds and hundreds of documents," a few minutes later he acknowledged that he had "not explored that evidence, Mr. Stutman has."  *Id.* at 9.  That claim was untrue, as soon became apparent.

Also inaccurate was Mr. Rhodes's statement that "nothing ever happened" in the family court proceedings.  Mr. Weingarten's six younger children were removed from his home for a year, while the investigations and proceedings were ongoing.  The children were then returned, and he

23

maintained sole custody, while his ex-wife was prohibited from seeing the children without approval. This is some of what Mr. Weingarten wanted his attorneys to tell the Court during the bail hearing. It was apparent to him that they had not listened to him, nor done the work necessary to understand these important facts. That was obvious when Mr. Rhodes said that Mr. Weingarten's "good name has been tarnished for 20 years by bogus allegations." Mr. Weingarten's daughter first made her allegations of sexual abuse in 1997, eleven years earlier. *See* 9/22/14 I. Weingarten Dec. at ¶12(e) (Exhibit 1). Perhaps this was a small stumble, but those stumbles accumulated, and foretold a big problem.

When Mr. Stutman addressed the Court, he also quickly demonstrated his ignorance of the basic facts, stating:

> I've read volumes and volumes of proceedings in Family Court. I've read volumes and volumes of Child Protective Services reports about the ongoing of this family. This went on from 1999 all the way through to 2003 or thereabouts. In all the proceedings that were had and all the discovery and all the testimony that was taken, never once were his children removed from him. And there were full evidentiary hearings in that respect.

11/19/08 RT at 10. There are several inaccuracies in this statement. First, the investigations and proceedings did not go "on from 1999 all the way through to 2003 or thereabouts;" the first complaint to CPS was made in 2001, and the family court proceedings ended in 2004. Second, Mr. Weingarten's children were "removed from him" for one year. Third, there were not "full evidentiary hearings." Instead, after the depositions of Mr. Weingarten's son and daughter, the case was dismissed against Mr. Weingarten and he was reunited with his six younger children. There was no criminal referral. *See* 9/22/14 I. Weingarten Dec. at ¶12(f)-(g) (Exhibit 1).

With respect to the only specific event that Mr. Stutman discussed at the hearing (an event that was obliquely referred to in the government's detention motion), he further demonstrated his ignorance of the relevant facts.  Mr. Stutman said:

> There was an incident where one daughter was screaming and a neighbor tried to intervene. The daughter was experiencing her first menstrual period and was reacting or overreacting at that point in time.  Neighbors came by because they heard and they were told that their presence was not necessary; that mother and father were taking care of that situation.

11/19/08 RT at 18.  The incident that Mr. Stutman was referring to involved Mr. Weingarten's daughter Chayeh, who, at the time of the event mentioned, was seventeen years old and was having severe discomfort from her menstruation.[6]  Mr. Weingarten and his children were visiting the home of some friends, and one of the friends' children went to a neighbor's home to ask for over-the-counter pain medication.  There was then some debate with a public safety officer about whether Chayeh needed to go to the hospital.  Thus:  (1) Chayeh was not experiencing her first period, she was seventeen-yers-old; (2) she was not overreacting; and (3) a neighbor did not "come by."  And the assertion that "mother and father were taking care of that situation" was also incorrect.  Mr. Weingarten's ex-wife was not there at the time and had not been living with the fmaily for quite some time.   It seemed to Mr. Weingarten as if Mr. Stutman had some basic idea about the event, then just made up details.  *See* 9/22/14 I. Weingarten Dec. at ¶12(h) (Exhibit 1).

It was Mr. Weingarten's understanding that the reason for the seven-week delay in holding the bail hearing was to allow his attorneys to get up-to-speed on the facts and the records so they could make a good presentation.  Instead of doing that, Mr. Stutman and Mr. Rhodes made vague statements that showed they had little knowledge about the underlying facts.

---

[6]  This incident is described in detail in the CPS records (exhibit 50).

This performance took a significant toll on Mr. Weingarten's confidence in the attorneys. It also took a toll on the confidence of his family and friends, who were cognizant of the fact that the attorneys failed to use information from Mr. Weingarten's family court proceedings to push back on the allegations in the government's detention motion.  A practical consequence of this was that the people who could fund the defense became reluctant to put up more money if it was going to be used to pay Mr. Stutman and Mr. Rhodes.  *See id.* at ¶14(a)-(c); *see also* 9/20/14 N. Englander Dec. (Exhibit 2) (indicating that Mr. Weingarten, and his supporters, became frustrated with defense counsel early in the case).

On November 21, 2008, the Court issued an order denying bail.  Neither Mr. Stutman nor Mr. Rhodes provided Mr. Weingarten a copy of the order at that time, or told him about its contents. Instead, Mr. Weingarten learned about the order later, from a different attorney.  *See* 9/22/14 I. Weingarten Dec. at ¶13 (Exhibit 1).

### I.     Mr. Weingarten's First Meeting With Mr. Rhodes

Mr. Weingarten's recollection is that the first substantial meeting he had with Mr. Rhodes was at the MDC, shortly after the November 19 hearing.  *See id.* at ¶15.

Mr. Rhodes said that he had been hired by Mr. Stutman to handle the defense motions, and that would be the extent of his role.  Mr. Weingarten explained to Mr. Rhodes that the same allegations underlying the federal charges had been made, and effectively rejected, in the family court proceedings, which is why he had retained custody of his six younger children.  He told Mr. Rhodes that there were many documents and witnesses that could help rebut the government's claims, and he named several of those.  *See id.* at ¶15(a)-(c).

Mr. Weingarten also told Mr. Rhodes that he thought it was essential that he be released on bail, so he could help track down witnesses and materials necessary for his defense.  He asked Mr. Rhodes if it was possible to again try to get bail granted, and, after waffling some, Mr. Rhodes said yes.  Mr. Weingarten told Mr. Rhodes to make such an effort, and said that he wanted the attorneys to call witnesses and present documents to rebut the claims in the government's detention motion.  Mr. Rhodes described that as a "mini-trial," and he said he would not do that.  Instead, Mr. Rhodes said, he could file something in writing, but that would cost $10,000.  Mr. Weingarten responded that he could not speak to the money, because he had no money, and no involvement with how Mr. Rhodes and Mr. Stutman were being paid.  But he said that he wanted Mr. Rhodes to file a written response to the government's detention motion, and to rely on the records from the family court proceedings and CPS investigations.  *See id.* at ¶12(d).  Mr. Rhodes never did that.[7]

### J.      Defense Pre-Trial Motions – Filed November 26, 2008

On November 26, 2008, Mr. Rhodes filed pre-trial motions, along with an unsigned declaration from Mr. Weingarten.  *See* CR 19.  Shortly thereafter, Mr. Weingarten received a copy of those documents in the mail.  *See* 9/22/14 I. Weingarten Dec. at ¶16 (Exhibit 1).  There are several things to note about those filings.

The motion papers did not demonstrate that the attorneys had developed any command of the most basic facts relevant to the defense.  To the extent those papers touched on the facts at all, they demonstrated the attorneys' ignorance.  Specifically, on pages 25-26 of the supporting memorandum, in arguing that the "travel" underlying the charges was for non-criminal reasons, Mr. Rhodes wrote:

---

[7]  To the extent Mr. Rhodes did not file the motion because he did not receive the money from the community to do so, this was a conflict of interest.

> The travel [underlying the charges] was for wholesome purposes. For example, and ironically, [Mr. Weingarten] left Belgium to separate his daughter, Jane Doe, from a married neighbor with whom she was having sexual relations. He did not want her to remain in Great Britain as this was outside the fold of the family's Hasidic views, and again as she was engaging in illicit sexual conduct.

CR 19 at 26. Though Mr. Rhodes's reference in the last sentence quoted is less-than-clear, the only thing he could have logically been referring to was the February 14, 1999 incident at Rabbi Royde's home in Manchester, England, which was subsequently a topic at trial. But there are obvious problems with what Mr. Rhodes wrote.

First, the travel underlying the charges in the indictment occurred in the Summer of 1997, whereas the event that Mr. Rhodes referred to occurred in Feburary 1999. Second, though Mr. Weingarten and his then-wife traveled to Manchester in February 1999, their daughter did not. Third, there was no allegation that Mr. Weingarten sexually abused his daughter during that time period. *See* 9/22/14 I. Weingarten Dec. at ¶16(b)-(c) (Exhibit 1).

But for Mr. Weingarten, the most alarming aspect of Mr. Rhodes's butchering of the facts was that it seemed to endorse the government's theory, stated in its detention motion, that Mr. Weingarten had "attempted to kidnap" his daughter from England in February 1999. *See* 10/6/08 Gov't Det'n Mtn at 4 (CR 6); 9/22/14 I. Weingarten Dec. at ¶16(d) (Exhibit 1). As Mr. Weingarten had explained to both of his attorneys, he and his then-wife went to Manchester to dissuade their daughter from going forward with an arranged marriage, not to abduct her, and not even to convince her to come home. These mistakes in the motion papers told Mr. Weingarten that Mr. Rhodes did not appreciate the most basic facts in the case and was not listening to Mr. Weingarten.

The unsigned declaration filed by Mr. Rhodes also caused Mr. Weingarten great concern, for three reasons.

First, Mr. Rhodes did not tell Mr. Weingarten that he would be drafting such a declaration, and much of what was set out in the declaration was information that Mr. Weingarten did not give to Mr. Rhodes.   Perhaps Mr. Rhodes learned that information from Mr. Blum, or from Mr. Weingarten's children or friends.  But Mr. Weingarten was surprised that Mr. Rhodes would file an unsigned declaration from him without at least first confirming the accuracy of the facts stated. *See id.* at ¶16(e).

Second, the unsigned declaration mentioned "Brian DeLouis," a CPS investigator, and then said that Mr. Weingarten did not know how to spell Mr. Dlouhy's name.  Mr. Weingarten told Mr. Rhodes that he could learn that spelling by looking at the family court and CPS records, or by asking Mr. Weingarten's children.  Mr. Weingarten also told Mr. Rhodes that Mr. Dlouhy was a key witness.  Yet the declaration made clear that Mr. Rhodes had made no effort to even learn how to spell Mr. Dlouhy's name.  *See id.* at ¶16(g).

Third, some of what was set out in the declaration was inaccurate or incomplete.  Because of this, Mr. Weingarten told Mr. Rhodes that he wanted changes made.  Mr. Rhodes said that was not a problem, and he promised to explain the changes to the Court at the motions hearing.  But as the two men worked on making the changes, Mr. Rhodes became increasingly angry and verbally abusive.  Though the process became ugly, eventually Mr. Rhodes drafted a declaration that Mr. Weingarten agreed to sign.  *See id.* at ¶17(a)-(d).

### K.    December 7, 2008 Letter To Court From Mr. Rhodes

On December 7, 2008, Mr. Rhodes filed a letter with the Court, along with Mr. Weingarten's modified, signed declaration.  *See* CR 22.  In his letter, Mr. Rhodes complained that having to submit the modified declaration was unlike "anything" he had experienced in "almost four decades as a

lawyer," and it was "difficult for [him] professionally and personally." *Id.* at 1.  Mr. Rhodes wrote that when he submitted the unsigned declaration, he believed that it was accurate, and that Mr. Weingarten would sign it.  When Mr. Weingarten asked that changes be made, Mr. Rhodes made what he characterized as ridiculous changes, but, to his "amazement and embarrassment [Mr. Weingarten] refused to sign . . . .  More changes, even more subtle, were demanded." *Id.* at 1-2.  Eventually, Mr. Weingarten agreed to sign a declaration that, according to Mr. Rhodes, was "essentially the same as the first [declaration that was filed]." *Id.* at 2.  Mr. Rhodes concluded by writing, "I was, as was co-counsel, vehement in our belief that the additions demanded by our client [were] unneeded and foolish in the extreme.  But nothing we could do persuaded the defendant.  So it is with great humiliation and apologies that I request that the appended affidavit be substituted for the first." *Id.*

Mr. Rhodes's harsh words – and his decision to breach his ethical obligations of confidentiality and loyalty – invite a comparison between the unsigned and signed declarations.  The first thing one notices is that the signed declaration is nearly twice as long as the unsigned version, which alone raises doubt that the two declarations are, in Mr. Rhodes's words, "essentially the same."  They are not, as shown by the non-exhaustive review below.

1.  In paragraph five of the signed declaration (which corresponds to paragraph four in the unsigned declaration), Mr. Weingarten sought to make clear that when he and his daughter traveled to Brooklyn on July 30, 1997 (*i.e.*, the travel underlying indictment counts one and four), he thought his father was ill, not on death's door.  Mr. Weingarten wanted to indicate that his daughter was brought on the trip because she was the only child not in school, and thus could help with the

rotation of family members who were sitting around-the-clock with his father at the hospital.  *See* 9/22/14 I. Weingarten Dec. at ¶18(c) (Exhibit 1).

2.  Paragraph seven in the signed declaration  (which corresponds to paragraph six in the unsigned declaration) indicated that the travel underlying count three of the indictment occurred in large part because Frieme Leaieh wanted to spend the Passover holiday in Israel, and thereby avoid the Belgian neighbor with whom she had an inappropriate relationship.  Furthermore, in the signed declaration Mr. Weingarten explained that taking a trip to celebrate Passover with his family was common, and had the added benefit of alleviating the need for the rigorous pre-Passover house cleaning that would otherwise be required at the family's Antwerp home.

3.  In paragraph three in the signed declaration, Mr. Weingarten expressed concern that the lack of detail in the first declaration, coupled with statements made in Mr. Rhodes's declaration and the motion papers, "create[d] a false impression that [Mr. Weingarten] went to England to abduct [his] daughter, as alleged by the prosecution, which is simply not so."  CR 22 at 2.  This issue was addressed further in paragraph nine of the signed declaration.  There, Mr. Weingarten wrote that he and his then-wife traveled to Manchester to try to convince Frieme Leaieh not to go ahead with an arranged marriage.  *Id.* at 3.  As discussed above, this change was meant to correct Mr. Rhodes's having endorsed the government's kidnapping theory on pages 25-26 of his memorandum supporting the defense motions (CR 19).

4.  Paragraph twelve in the signed declaration  (which corresponds to paragraph ten in the unsigned declaration) indicates that there were tape recordings (*i.e.*, not just one) that could be beneficial to the defense, and if those could not be located, that supported a finding of prejudice resulting from the pre-indictment delay.

31

5. Paragraph fifteen in the signed declaration  (which corresponds to paragraph thirteen in the unsigned declaration) deleted the claim that when Mr. Weingarten was arrested an FBI agent "had to be pulled off of me."  CR 19 at 11.

Perhaps some of these changes were not necessary.  But it should be recalled that, from the outset of the case, Mr. Weingarten had been asking his attorneys to push back on the government's allegations.  His attorneys repeatedly failed to do so, and they badly misstated the facts when they stooped to address them at all.  So Mr. Weingarten wanted to finally tell the Court some of the case background, rather than the Court repeatedly hearing the government's claims with no rebuttal. Moreover, some of the changes were important – indeed, removing Mr. Rhodes's embellishment about the FBI agent was necessary.   But regardless of how one characterizes the changes, Mr. Weingarten's request that they be made did not warrant Mr. Rhodes's attacking his client in a publicly-filed letter to the Court.  Nor did Mr. Rhodes have anything approaching sufficient cause for revealing client communications and violating his duty of loyalty.  *See* NY Rules of Prof. Conduct, Preamble n. 2 & Rule 1.6.

On some level, Mr. Rhodes must have known that his letter was ill-advised, as evidenced by his not sending a copy to Mr. Weingarten.  Instead, Mr. Weingarten learned about the letter from his children some time after the Court's December 15, 2008 hearing.  Aside from the blow to the attorney-client relationship, there was another practical consequence of the letter: Mr. Weingarten's supporters who could provide funding for the defense grew even more reluctant to put up any money to pay Mr. Stutman and Mr. Rhodes.  *See* 9/22/14 I. Weingarten Dec. at ¶18(a), (g) (Exhibit 1).

### L.       December 8, 2008 Letter To Court From Mr. Rhodes

On December 8, 2008, Mr. Rhodes filed a letter with the Court in which he opposed the government's motion to take foreign depositions.  *See* CR 24.  Mr. Weingarten received a copy of that letter shortly before the related December 15 hearing.  Mr. Weingarten was surprised when he read the letter, because he had told Mr. Rhodes that he wanted to take depositions of the witnesses indicated by the government, if they could come to the trial.  What Mr. Weingarten objected to was not being present for the depositions.  *See* 9/22/14 I. Weingarten Dec. at ¶19(a) (Exhibit 1).

A specific statement in Mr. Rhodes's letter also concerned Mr. Weingarten.  Mr. Rhodes wrote that while the government had sought to take the deposition of Rachel Rosenberg, it was "curious that no deposition [was] requested for [Frieme Leaieh's] school friend, Sarah Rosenberg." A few sentences later, Mr. Rhodes wrote:

> The defendant has no access to the school friend although it appears that the government might.  The government is in communication with Sarah's mother, Rachel, and the defense urges the government to inquire of Sarah to determine if she is willing to come to the United States, and if not, asks the government whether it will consent to her deposition in Great Britain should the Court direct depositions of any other witness there.

12/8/08 Rhodes Letter at 2 (CR 24).  This passage concerned Mr. Weingarten, for two reasons.

First, he was aware that Sarah Rosenberg had married and was living in Israel, and he had no reason to believe that she could not be located, if the attorneys made reasonable efforts.  Second, and more important, Mr. Weingarten had told the attorneys that it would be unlikely that Sarah Rosenberg could provide any relevant evidence, and she likely would not cooperate with the defense, because she had been his daughter's closest friend in England.  On the other hand, there were

witnesses in England (and Belgium) that Mr. Weingarten had told the attorneys to talk with, and who would certainly be helpful to the defense. *See* 9/22/14 I. Weingarten Dec. at ¶19(b)-(c) (Exhibit 1).

Thus, what Mr. Rhodes wrote in his December 8 letter indicated to Mr. Weingarten that his attorneys (1) were not listening to, or were disregarding, what Mr. Weingarten said, and (2) were not investigating his case.

### M.   Mr. Weingarten Tells His Children To Try To Find Him A New Lawyer

Following the November 19 bail hearing, and prior to the December 15 hearing with respect to the government's request to take depositions, Mr. Weingarten was becoming increasingly concerned that Mr. Stutman and Mr. Rhodes were not able, or willing, to properly represent him. He told his children about his concerns, and asked them to get Mr. Blum to find him another lawyer. *See id.* at ¶20(a).

When Mr. Weingarten talked with his children about this shortly thereafter, they said that Mr. Blum had talked with Mr. Stutman and Mr. Rhodes, and the attorneys assured Mr. Blum that they would get prepared and would do a good job defending Mr. Weingarten. Thus, Mr. Blum did not make an effort to replace Mr. Stutman and Mr. Rhodes at that time. *See id.* at ¶20(b).

### N.   December 12, 2008 Hearing

On December 12, 2008, there was a hearing that was set to deal with the government's motion to take foreign depositions. The hearing did not go forward, because Mr. Weingarten was not present. But it is noteworthy that at the hearing the Court said to Mr. Stutman, "Orally, through my law clerk, I have heard about a desire on the part of Mr. Stutman and Mr. Rhodes to be relieved, correct?" 12/12/08 RT at 3. Mr. Stutman responded, "That situation has changed, judge. The nature of the representation, the nature of the people who we are representing, it's been a roller coaster

34

ride." *Id.* at 4.  It is hard not to see this statement as derogatory, and one wonders who the "people" were that Mr. Stutman thought he was "representing."  Setting that aside for now, this exchange evidences Mr. Weingarten's attempt to get Mr. Blum to find him a new lawyer, and Mr. Stutman's and Mr. Rhodes's success in heading off that effort.

### O.    December 15, 2008 Hearing Regarding Foreign Depositions

On December 15, 2008, the Court held a hearing on the government's motion to take foreign depositions.  Mr. Rhodes did not attend.  That surprised Mr. Weingarten, because Mr. Rhodes had said it was his job to handle the motions, and Mr. Weingarten had discussed the deposition issue with Mr. Rhodes, not with Mr. Stutman.  *See* 9/22/14 I. Weingarten Dec. at ¶22(a) (Exhibit 1). Several noteworthy things occurred.

Mr. Weingarten's recollection is that before the hearing officially started, the Court said that if the depositions were going to be held, Mr. Weingarten should be able to attend.  *See id.* at ¶22(b). Mr. Weingarten understood the Court to repeat that point during the hearing, when it mentioned "burdening the defendant with the need to go" to Europe for the depositions.  12/15/08 RT at 8. When Mr. Stutman proceeded to oppose the depositions, Mr. Weingarten tried to tell him that he wanted the depositions to go forward, so long as he could attend.  Mr. Stutman responded that Mr. Weingarten did not understand and told him to be quiet.  *See* 9/22/14 I. Weingarten Dec. at ¶22(c) (Exhibit 1).

After the Court denied the government's motion to take depositions, it asked Mr. Weingarten if he understood that his attorneys could not later argue to the jury, effectively, Why didn't we hear testimony from these witnesses?  *See* 12/15/08 RT at 30.  Mr. Weingarten responded that he "could say for the judge many points I wanted to add, to say for the judge."  *Id.*  The Court cautioned

35

Mr. Weingarten and encouraged him to speak with Mr. Stutman off the record. *See id.* at 31. At that point, Mr. Weingarten again told Mr. Stutman that he wanted to take foreign depositions, so long as he could be present. Mr. Stutman again responded that Mr. Weingarten did not understand, and added that he was not going to spend the time and money necessary to go to Europe to take depositions. *See* 9/22/14 I. Weingarten Dec. at ¶22(d) (Exhibit 1).

Back on the record, Mr. Stutman said that he had told Mr. Weingarten "my position," that Mr. Weingarten understood Mr. Stutman's position, and that the Court could "inquire." 12/15/08 RT at 32. The Court again asked Mr. Weingarten if he understood the implications of its ruling denying the government's motion to take depositions. Mr. Weingarten responded by stating what he understood to be the attorneys' position – that "we did not want to go to Europe to take depositions." *Id.* at 33. That was not, however, his position. As he made clear at the hearing, he "would be happy" to have the jury hear from the witnesses identified by the government, because, as he told his lawyers, he thought those witnesses would help the defense. *Id.* at 33; 9/22/14 I. Weingarten Dec. at ¶22(d) (Exhibit 1).

Next Mr. Stutman asked the Court to continue the trial date, "due to the complexity of the case," and the "volumes of material that have accumulated due to the prior legal proceedings in Rockland County, Orange County . . . ." 12/15/08 RT at 38. Mr. Stutman added that he "had surgery last week and [his] attention to detail was a little bit limited," and Mr. Rhodes had been occupied with "another engagement." *Id.* Mr. Stutman also said "there is a lot of work," and there are "cartons in my office that I have been reviewing," and, given that the documents were fifteen-years-old, a "single review is really not sufficient." *Id.*

36

When the Court asked for more specifics, Mr. Stutman said that he needed to review "prior testimony" from Mr. Weingarten's ex-wife and "various social workers," and documents related to CPS investigations that resulted from "[c]omplaints made by the community." *See id.* at 39.  There was no prior testimony to review from Mr. Weingarten's ex-wife.  *See* 9/22/14 I. Weingarten Dec. at ¶22(i) (Exhibit 1).   In addition, as Mr. Weingarten said when correcting Mr. Stutman at the hearing, there were no "complaints made by the community."  *See* 12/15/08 RT at 40.

Mr. Stutman took a moment to talk with Mr. Weingarten, to try to get his facts straight. Mr. Stutman then said to the Court, "Your Honor, apparently the wife had notified Child Protective Services that there was abuse going on in the home."  *Id.*  When the Court asked when that happened, Mr. Stutman said, "This was in 1993." *Id.*  While that was consistent with Mr. Stutman's earlier claim that he was reviewing fifteen-year-old records, it was wrong (and there were no fifteen-year-old records to review).   Which is why Mr. Weingarten and the prosecutor corrected Mr. Stutman, pointing out that the complaints were first made about eight years earlier, and the state court proceedings began in 2003.  *See id.*  Corrected, Mr. Stutman said:

> They started in the early 2000s.  There were court proceedings that continued throughout the early 2000s.  There have been – I have been reading testimony – I have been reading depositions taken by social workers that investigated the home situation.  There is certainly voluminous testimony by the daughter given at a deposition as well.

*Id.* at 40-41.  These statements confirmed to Mr. Weingarten that Mr. Stutman had only a vague understanding of the facts and documents that were relevant to presenting a defense.  *See* 9/22/14 I. Weingarten Dec. at ¶22(k), (m) (Exhibit 1).

37

Because of his lawyers' lack of preparation up until that point, the witnesses that needed to be contacted, and the materials that had to be reviewed and prepared, Mr. Weingarten tried to make clear to the Court that the lawyers needed a substantial continuance of the trial date:

> There are hundreds of things which we don't have already, still on paper.  But witnesses and what happened in this twelve years and specifically with the child, she makes all the allegations and what happened every stage and it has to go through and prepare for the trial.  I don't believe they could do it in the way they do it.  I'll tell you the truth, I – I feel very bad.  I am not out on bail.  The lawyers come once a week to try to come.  They let them sit.  Then comes time and they don't understand.  When I talk to them the next time, they don't know what I talked before.
>
> It's not the proper place to – to get this trial, to come to the truth what's happening.  I am not – I didn't come to this – to the Court, but God made it happen.  So I want once and for all it should come out clearly what happened here.  Every stage, at every place, exactly what happened.  What happened with this child and what's the truth and was it true with ex.  Everything what happened and what's existing.
>
> So I don't feel –

12/15/08 RT at 41-42.  The Court interjected and asked, "how much time do you think you need, Mr. Stutman?"  *Id.* at 42.  Mr. Weingarten said, "I don't think it's only a question of time, I have to be outside –"  *Id.*  The Court told Mr. Weingarten to "stop talking," and again asked Mr. Stutman how much time he needed.  *Id.*  Mr. Stutman said the beginning of March would work, but Mr. Weingarten said, "I'm sure it wouldn't be done."  *Id.*  The Court set trial for March 2.  *See id.* at 42-43.

When the Court proposed the March 2 trial date, Mr. Weingarten told Mr. Stutman that date would not work because:  (1) the lawyers could not possibly be ready to try the case by that time; and (2) many defense witnesses would not want to travel to court during the Purim holiday and the lead-up to the Passover holiday, which requires rigorous cleaning of the home.  Mr. Stutman ignored

Mr. Weingarten and motioned with his hand for Mr. Weingarten to stop speaking.  *See* 9/22/14 I. Weingarten Dec. at ¶22(l) (Exhibit 1).

### P.    December 15, 2008 Post-Hearing Meeting

At the end of the December 15 hearing, Mr. Weingarten asked Mr. Stutman to come speak with him in the courthouse holding area.  There, Mr. Weingarten reiterated the problems with the March 2 trial date.  Mr. Stutman told Mr. Weingarten he should not worry because the Court would agree to continue the trial date again.  *See id.* at ¶23(a).

Mr. Weingarten also reiterated what he had previously told Mr. Rhodes, and what he had said to Mr. Stutman in court – that he wanted to depose the witnesses indicated by the government, so long as he could attend.  Mr. Stutman had no response.  *See id.* at ¶23(b).

During this meeting, Mr. Stutman first proposed his trial strategy.  He said that Mr. Weingarten should testify that:  (1) he had sexually abused his ex-wife; (2) his ex-wife felt that she could not complain to anyone about the abuse, because in their community a wife may not make such accusations against her husband; so (3) his daughter made false claims of sexual abuse against him to vindicate her mother.  Mr. Weingarten told Mr. Stutman that this was not true, and ridiculous – nothing in the tenets or mores of his religious community would have prevented his ex-wife from being heard to complain that he had sexually abused her.  Mr. Stutman and Mr. Weingarten argued about the theory, and Mr. Weingarten told Mr. Stutman that he no longer wanted Mr. Stutman or Mr. Rhodes to represent him.  *See id.* at ¶23(c).

### Q.    Mr. Weingarten Meets With Other Counsel

Due to Mr. Weingarten's growing concerns (including his learning about Mr. Rhodes's December 7, 2008 letter to the Court), he asked his children and friends to try to find an attorney to

take over his defense.  *See* 9/22/14 I. Weingarten Dec. at ¶25 (Exhibit 1); 9/21/14 Yakev Weingarten

Dec. at ¶¶6-15 (Exhibit 3) (discussing his, and his father's, bad experiences with defense attorneys);

9/20/14 N. Englander Dec. At ¶¶11-13 (Exhibit 2) (indicating Mr. Weingarten's, and his supporters,

frustration with defense counsel beginning early in the case, and attempts to hire new counsel);

4/14/09 Blum Dec. at ¶¶28, 30-35, 37, 51 (CR 70-13) (same).  As a result, Mr. Weingarten met with

other attorneys at the MDC during the December 2008 to January 2009 time frame.  Though he

cannot recall all of their names, one was Susan Necheles.  Mr. Weingarten was very impressed with

Ms. Necheles.  She met with him for several hours, she listened, and she took notes; and when he

told her about the witnesses that needed to be contacted, and the documents and materials that

needed to be reviewed, she was receptive, rather than dismissive.  *See* 9/22/14 I. Weingarten Dec.

at ¶25(a)-(c) (Exhibit 1); 9/22/14 Necheles Dec. (Exhibit 4).

However, Mr. Weingarten understood that Ms. Necheles, and every attorney that he met with,

would not take over his defense unless the Court agreed to discharge Mr. Stutman and Mr. Rhodes

and continue the trial date.  All of the attorneys felt that they would need more time to prepare his

defense than was available with a March 2, 2009 trial date.  *See* 9/22/14 I. Weingarten Dec. at ¶25(d)

(Exhibit 1); 9/22/14 Necheles Dec. (Exhibit 4).

During this period of time, Mr. Stutman and Mr. Rhodes became aware that Mr. Weingarten

was meeting with other attorneys, they became upset, and they told him to stop.  *See* 9/22/14 I.

Weingarten Dec. at ¶26 (Exhibit 1).  But after Mr. Weingarten met with Ms. Necheles, he told

Mr. Stutman and Mr. Rhodes that he wanted to replace them, and that they should get off the case.

They responded that the Court would have to approve their being relieved, and they said the Court

would not do that.  That was consistent with what Mr. Weingarten heard from other inmates at the

MDC – that the Court would not allow him to replace his counsel at that point.  *See id.* at ¶27(a) (Exhibit 1); *see also* Local Civ. R. 1.4 (made applicable in criminal context by Local Crim. R. 1.1, and stating, "An attorney who has appeared as attorney of record for a party may be relieved or displaced only by order of the Court and may not withdraw from a case without leave of the Court granted by order").

After Mr. Weingarten spoke with Mr. Rhodes and Mr. Stutman about replacing them as counsel, and they said what was not possible, his children told him that Mr. Blum said they should stop trying to find him new lawyers.  Mr. Weingarten thought he was stuck with Mr. Stutman and Mr. Rhodes.  *See* 9/22/14 I. Weingarten Dec. at ¶27(b)-(c) (Exhibit 1)

### R.     February 6, 2009 Motions Hearing

At the February 6, 2009 motions hearing, defense counsel confirmed that they were not prepared, and would not be prepared, to try the case on March 2.  Some other things are noteworthy about that hearing.

To support a pre-indictment delay motion that he wrote, Mr. Rhodes relied on a tape recording of a conversation in which Frieme Leaieh had said that the sexual abuse allegations were not true.  That recording was misplaced during the ensuing years.  At the hearing, Mr. Rhodes expressed skepticism that there had been such a recording, saying, "how could one lose a tape that is – I understand that argument as well."  2/6/09 RT at 7.  Having invited the Court's skepticism, one would expect Mr. Rhodes to have a quick explanation as to how the tape was lost or misplaced.  That is, if Mr. Rhodes's comment was meant as a rhetorical flourish – rather a statement obviously contrary to his client's interests – one would expect him to explain what happened with the tape. He did not.

41

Not surprisingly, a few minutes later the Court asked how the tape was lost.  *See id.* at 12.  Mr. Rhodes said, "It was lost – the family moved from location to location."  *Id.*  Mr. Weingarten said that was not true.  Mr. Rhodes then said, "Your Honor's question is acute.  I'm learning the answer as I fumble for an answer."  *Id.*  Mr. Weingarten was surprised by this statement, because he had explained to Mr. Rhodes what had happened with the tape.  *See* 9/22/14 I. Weingarten Dec. at ¶28(b)-(c) (Exhibit 1).  Mr. Weingarten tried to explain to the Court, but the Court said, "You can only talk with the permission of your lawyers.  It's never a good idea for you to speak, for a defendant to speak."  2/6/09 RT at 12.

After talking with Mr. Weingarten, Mr. Stutman and Mr. Rhodes told the Court that during the family court proceedings some tapes were sent to England and Beligum to be translated, and they were not returned to Mr. Weingarten when those proceedings concluded without a trial.  *See id.* at 12-14; *see also* 9/22/14 I. Weingarten Dec. at ¶28(b) (Exhibit 1).  In the midst of this discussion, Mr. Weingarten asked for "permission to talk," and Mr. Rhodes said, "we don't give you permission to do anything."  2/6/09  RT at 13.  Moments later, the Court said, "Is there mention of the other tapes in the papers, because if there is I missed it."  *Id.* at 14.  Mr. Rhodes responded, "There's no mention of them in my papers, Judge, but there are other tapes."  *Id.*  As discussed above, one of the changes that Mr. Weingarten had Mr. Rhodes make to his unsigned declaration was to include a statement that several potentially useful recordings could not be located.  *Compare* CR 19 at ¶10, *with* CR 22 at ¶12.

(It is worthwhile to pause to consider a few things.  When Mr. Weingarten asked Mr. Rhodes to make changes to the unsigned declaration, Mr. Rhodes wrote a letter to the Court in which he attacked Mr. Weingarten and breached the rules of professional conduct.  Later, at the motions

hearing, Mr. Rhodes undercut Mr. Weingarten's credibility when arguing the pre-indictment delay issue, then "fumbled" for an answer (*i.e.*, made stuff up) with respect to something Mr. Weingarten had explained to him. Moments later, Mr. Rhodes showed his ignorance of a change that Mr. Weingarten had asked Mr. Rhodes to make to his unsigned declaration – a change that related to the pre-indictment delay issue that Mr. Rhodes was arguing.)

After the Court dealt with the pre-trial motions, Mr. Rhodes asked the Court to continue the trial date. He began by stating that he would not "burden the Court with the two-hour lecture [he had] received" with respect to the Purim and Passover rituals observed by many of the defense trial witnesses. Because of those religious requirements, Mr. Rhodes said, many "witnesses in Europe that the defense intends to bring here . . . have expressed that it's an impossibility to do so with the trial starting March 2." 2/6/09 RT at 39; *see also id.* at 41 (Mr. Rhodes explained that there were "a variety of [such] witnesses"). Mr. Stutman added that those witnesses would not travel during the month prior to Passover, and "we're very concerned that we may not be able to reach out to the witnesses during this period." *Id.* at 41-42.

Mr. Rhodes also told the Court that he and Mr. Stutman needed more time to investigate and prepare, stating:

> And it's a complex situation. We're responding to charges that span ten years, that ended about ten years ago, in three countries, four countries. It's difficult at best.
>
> The government had fully five years and the resoures of the United States to conduct its investigation. *We need more time than the Court is affording us than between now and the projected trial date.*

*Id.* at 42 (emphasis added).

43

The Court asked the attorneys why they did not make their request earlier.  Mr. Rhodes did not explain why it had just occurred to him that it would take a substantial amount of time – more than allotted by a March 2 trial date – to prepare to defend a case in which most of the key events occurred overseas, many years ago.  Having no good answer for that, Mr. Rhodes instead focused on the Purim and Passover holidays problem.  For that lapse, Mr. Rhodes blamed Mr. Weingarten, claiming that was something Mr. Rhodes had learned about "just this week."  Mr. Rhodes also said that he had been completely unaware that orthodox Jews engage in rigorous household cleaning in the weeks prior to Passover.  *See id.* at 43.

Both assertions were untrue.  Mr. Weingarten told Mr. Stutman about the holidays problem on December 15, 2008.  *See* 9/22/14 I. Weingarten Dec. at ¶28(e) (Exhibit 1).  And Mr. Weingarten explained the cleaning requirements for Passover to Mr. Rhodes before Mr. Rhodes filed Mr. Weingarten's declaration with the Court on December 7, 2008 – indeed, that was another change between the unsigned and signed version of Mr. Weingarten's declarations.  *See* CR 22 at  ¶7.  But even if Mr. Weingarten had not previously told the lawyers about the holiday travel problem, they would have been aware of it if:  (1) Mr. Stutman had sat down with Mr. Weingarten and reviewed important religious dates, as the Court ordered on October 14, 2008, *see* 10/14/08 RT at 2-4; and (2) they had been speaking to the witnesses and scheduling their trial appearances.  Thus, if the attorneys were truly unaware of the Jewish holidays problem, that was due to their not listening to their client, not following the Court's order, and not preparing.

The Court denied the motion to continue, at which point Mr. Stutman asked the Court to reconsider, and again emphasized that the attorneys could not be prepared for trial by March 2:

Your Honor, in just paraphrasing the Court.  In the Court's ruling against dismissal based on preindictment delay.  The Court did say, in so many words, if there is no prejudice by that do.  This is a complex international investigation.  We have had this case since October since the time that he has been indicted.  It is complex, it is international, and it is requiring investigation; and it is extremely difficult for the defense to have people try to coordinate people from Israel, from Belgium, from England to bring them here in light of, again, the ultraorthodox beliefs.  And I don't think the people will be prejudiced by any delay.

I understand the Court has its schedule, but I do believe that we do need this extra time to properly prepare.  We haven't been able to get witnesses here from Europe and these people, at this point in time, do not want to come because of their religious requirements and we ask the Court to reconsider that.

2/6/09 RT at 44.  Mr. Stutman concluded by saying, "right now we're behind the eight ball."  *Id.* at 45.  And, notably, neither Mr. Stutman nor Mr. Rhodes blamed Mr. Weingarten for their insufficient preparation.  The Court again denied the request.  *See id.*

The Court then shifted to consideration of Federal Rule of Evidence 412 issues.  Some noteworthy things happened during that portion of the hearing.

First, Mr. Rhodes said that "we have statements where" Frieme Leaieh "admits . . . that she was having sexual intercourse with the neighbor," contrary to what she "testified under oath" in family court proceedings.  *Id.* at 52.  That claim was incorrect.  Through a proper investigation, it was possible to locate a witness (that is, the family's former housekeeper in Belgium), or perhaps a tape recording, to show that Frieme Leaieh had made such a prior inconsistent statement.  But Mr. Weingarten knew that the lawyers had not done any investigation, and thus did not have any such "statements."  *See* 9/22/14 I. Weingarten Dec. at ¶28(f) (Exhibit 1).

A few minutes later, Mr. Stutman made a similar claim, saying, "I have a witness that could be available to come in and contradict [Frieme Leaieh's]  statement [about not having a sexual relationship with the neighbor], but she can't come in by March 2d, that's the problem."  2/6/09 RT

45

at 59.  Considered in context, Mr. Stutman was saying that the family's former housekeeper could not come to testify because of the Purim and Passover holidays.  But the housekeeper is Polish Catholic.  It was apparent to Mr. Weingarten that Mr. Stutman was willing to twist (or make up) facts to try to get a trial continuance, rather than admitting that the attorneys had failed to prepare. *See* 9/22/14 I. Weingarten Dec. at ¶28(g) (Exhibit 1).

It was also obvious to Mr. Weingarten that his attorneys were not prepared, and would not be prepared, for trial.  Aside from what he could tell from his interactions with them, his attorneys said as much on the record.  Thus, Mr. Weingarten was deeply distressed when, contrary to Mr. Stutman's assurances on December 15, the Court denied the trial continuance.  *See id.* at ¶28(i).

### S.    Mr. Weingarten's Conversation With Rabbi Freund After The February 6, 2009 Hearing

About a week after the February 6 hearing, Mr. Weingarten spoke with Rabbi Chaim Freund at the MDC.  He told Rabbi Freund that he was concerned because it was obvious that his attorneys could not possibly become prepared in time for trial.  Rabbi Freund said he would talk with Mr. Stutman and Mr. Rhodes.  *See id.* at ¶29(a).

Rabbi Freud then met with Mr. Stutman twice, and one time Mr. Rhodes was present.  *See* Freund Dec. (Exhibit 5).  In his declaration, Rabbi Freund recalls what Mr. Stutman told him:

> Mr. Stutman told me he and Mr. Rhodes were not prepared for trial but that Mr. Weingarten should not worry because he was confident the trial would be continued or he would be relieved from the case.  Mr Stutman told me he was confident he could win the case but did not provide any information about what he had done to prepare for trial.

*See id.* at ¶7.

When Rabbi Freund returned to speak with Mr. Weingarten, he related to Mr. Weingarten that his children and supporters were trying to arrange for another lawyer to represent him, Demosthenes Lorandos, who specializes in sexual abuse cases. Rabbi Freund told Mr. Weingarten that Mr. Lorandos had recommended that Mr. Weingarten write a letter to the Court setting out his complaints about the lawyers and asking for time to hire a new lawyer. If that continuance were granted, Mr. Lorandos would then have time to prepare and take over the defense. *See* 9/22/14 I. Weingarten Dec. at ¶29(b) (Exhibit 1); Freund Dec. at ¶¶8-9 (Exhibit 5).

### T.    Mr. Weingarten's February 23, 2009 Letter To The Court

In a letter dated February 23, 2009, Mr. Weingarten asked the Court to discharge his counsel and allow time for new counsel to prepare his defense. *See* CR 47. He expressed concern that his attorneys were not prepared to competently represent him at trial, and were not acting consistent with the duty of loyalty owed to a client. *See id.* at 3. Mr. Weingarten supported his request with the following specifics.

First, he noted that the attorneys had met with him for less than thirty hours, and much of that time was spent arguing about papers the attorneys submitted on his behalf. *See id.* at 1. To support the latter point, Mr. Weingarten enclosed a November 27, 2008 letter to him from Mr. Rhodes, in which Mr. Rhodes apologized "if you view our last session as a bit harsh."

Second, Mr. Weingarten complained that his attorneys repeatedly failed to provide him with documents he requested that were relevant to his defense. *See id.* at 2. That included filings in the family court proceedings, most importantly the depositions of Frieme Leaieh and Yoinesun. *See* 9/22/14 I. Weingarten Dec. at ¶30(b) (Exhibit 1).

47

Third, Mr. Weingarten wrote that he had repeatedly "expressed [his] wishes [to Mr. Rhodes and Mr. Stutman] that [he did not] want them representing" him.  CR 47 at 2.  As support for this, Mr. Weingarten attached a January 14, 2009 letter from Mr. Rhodes to Mr. Weingarten, in which Mr. Rhodes wrote that he would do his "level best to give [Mr. Weingarten] a chance to review [defense filings] before they are filed, assuming that I am still on the defense team."  This was the time period in which Mr. Weingarten told the lawyers that he wanted them to get off the case so he could hire new counsel.

Fourth, Mr. Weingarten wrote that when the March 2 trial date was set in December 2008, he told Mr. Stutman the reasons that date would not work, and Mr. Stutman ignored him.  *See id.* at 3.  Then, on February 6, 2009, Mr. Stutman and Mr. Rhodes returned to the Court and said they could not be prepared for trial on March 2, for exactly those reasons.  *See id.*

Finally, Mr. Weingarten wrote that he had met with the attorneys since the February 6 court appearance, and it was apparent that they had not begun to review the important documentary evidence, had not begun to prepare his defense, and did not have "any serious knowledge" of the case.  *See id.* at 2.

### U.     February 23, 2009 Letter To Court From Mr. Rhodes

Mr. Rhodes filed a letter with the Court on February 23, 2009, and wrote that he had learned from one of Mr. Weingarten's supporters that Mr. Weingarten wanted to discharge his counsel.  *See* CR 42 at 1.

Again, taking a position contrary to his client's interests, Mr. Rhodes began by telling the Court, "Neither Mr. Stutman nor I are seeking to withdraw from the case, and this is so though both of us are owed substantial amounts for work done, neither of us has been paid for the forthcoming

48

trial, and we have been told that we will never be paid. . . .  Payment or no payment, however, we each believe it is our professional obligation to continue with our representation of the defendant, though why he must have two uncompensated lawyers with whom he is unhappy, rather than one, I do not know." *Id.*

Next, Mr. Rhodes anticipated two issues that Mr. Weingarten might raise with the Court:

One concerns retention of an expert, and the defendant's supporters refusal to pay for such services despite past declarations that such funds were available.  I located a dozen available experts over the past month, and their respective merits have been provided to the defendant's aides.  They spoke to potential experts as well. But no one has been hired and no money to hire an expert has been tendered notwithstanding the statements that such funds were at hand.  Both the defendant and his supporters have been explicitly and repeatedly told that the delay in providing the expert's CV, and forthcoming report, could and likely would lead to preclusion of the expert's evidence.  He and they were also expressly advised of the obvious:  unless an expert is hired, we cannot benefit from any defense keyed to a need for expertise.

*Id.*  Based on Mr. Weingarten's interactions with Mr. Rhodes and Mr. Stutman, the only expert that he was aware of them considering hiring was a surgeon who could testify regarding physical characteristics of his private parts, which characteristics were already known to Frieme Leaieh and discussed in the CPS documents.  *See* 9/22/14 I. Weingarten Dec. at ¶31(b) (Exhibit 1)(Exhibit 50).

Mr. Rhodes's letter went on to say:

The second issue concerns the copying, translation and transcription of tape recordings.  Some are said to exist, though *none have been provided* to Mr. Stutman or me.  For weeks, the defendant and the others were told to get them copied, translated and transcribed, lest the delay causes them to be precluded.  For the most part, these are alleged inconsistent prior statements of the victim and her mother.  *No tapes were given to counsel*, but three conversations and synopses of them were turned over to the government ten days ago.  As to the rest, despite the demands of the defense lawyers, there is only silence from the defendant and those who have been helping him.

CR 42 at 2 (emphasis added).  Mr. Rhodes did not explain why he had not tried to get the tapes and have them translated, and instead passed that duty onto "the defendant and the others . . . lest the delay causes them to be precluded."  Early on in the case, Mr. Weingarten told the attorneys that they should try to obtain useful tape recordings by contacting:  (1) his children; (2) Mr. Blum; and (3) Moishe Krausz and Moishe Herszaft in England.  *See* 9/22/14 I. Weingarten Dec. at ¶31(e) (Exhibit 1).  Moreover, when Mr. Blum tried to give copies of tape recordings to the attorneys, they refused to receive them.  *See id.* at ¶31(f).  Thus, Mr. Blum turned the recordings over to the prosecutors, without defense counsel even reviewing them.[8]  *See id.*

Mr. Rhodes closed by complaining that the "defendant or his supporters" had failed to "produce purported witnesses," "hire" an expert, or "process" tape recordings.  CR 42 at 2.  One wonders what Mr. Rhodes, who was representing a detained client, thought were his investigative duties.

This was the second letter that Mr. Rhodes sent to the Court in which he attacked Mr. Weingarten, and revealed attorney-client communications and protected information.  And with no real interest at stake (he claimed he was not being paid), Mr. Rhodes opposed a request to discharge counsel, a request that he was not sure had been made, and the grounds for which he did

---

[8]  And contrary to Mr. Rhodes's claim that "[n]o tapes were given to [defense] counsel," in a February 13, 2009 letter to government counsel Mr. Rhodes wrote, "enclosed are some of the tape recordings that may be an issue at trial," but, he noted, he "ha[d] not personally examined the enclosure."  This evidences a stunning disinterest in his role as defense counsel.  Surprisingly, the government attached this letter to its opposition to Mr. Weingarten's post-trial motions.  *See* CR 71-6.  Mr. Rhodes has been unwilling to produce copies of his file materials (including his correspondence) to Mr. Weingarten's successor counsel.  *See* 9/22/14 Burns Letter (Exhibit 6); 9/23/14 Gravel Dec. (Exhibit 7).  This is just one reason that Mr. Weingarten requests that the Court permit discovery.

not know.  Anything that might have remained of a functional attorney-client relationship was surely snuffed-out by this letter.

## V.  February 24, 2009 Letter To Court From Menachem M. Blum

The Court also received a February 24, 2009 letter from Menachem M. Blum, which addressed the situation between Mr. Weingarten and his counsel.  That letter was copied to defense counsel and the prosecutors.  The Court declined to read Mr. Blum's letter, because he is not an attorney.  *See* 2/25/09 RT at 3.  However, the letter provides a contemporaneous account of the relationship between Mr. Weingarten and his counsel, and counsel's performance, thus it is discussed here.

Mr. Blum wrote that the attorneys did not listen to Mr. Weingarten or let him participate in his defense.  *See* 2/24/09 Blum Letter at 1 (Exhibit 8).  Consequently, Mr. Weingarten became frustrated when his attorneys did not understand key facts.  *See id.* at 2, 4.  Mr. Blum explained that the situation took a marked turn for the worse when Mr. Rhodes filed his December 7, 2008 letter to the Court, which "caused everybody to lose trust."  *Id.* at 2.  This, in turn, made it "increasingly problematic in getting funds [to pay the attorneys] as [Mr. Weingarten's] friends [who were funding the defense] said they cannot continue paying if the attorneys do not listen . . . ."  *Id.* at 1.

Mr. Blum wrote that he also had bad experiences with the attorneys.  He noted that he was the one who retained the attorneys, and that nearly every time he spoke with the attorneys they asked for money.  *See id.*  As for the investigation, Mr. Blum told the attorneys that there were approximately 50 witnesses that could be helpful, most of whom were abroad, and he asked the attorneys to consider those potential witnesses and determine who needed to be contacted.  *See id.* at 3.  Instead, the attorneys told Mr. Blum to "have [the potential witnesses] call."  Mr. Blum pointed

51

out the impracticality of that approach, given the number of potential witnesses, the different time zones, the attorneys' busy schedules, and that often "only an answer[ing] machine" answered calls to their offices.  *See id.*  The attorneys would not relent, and when Mr. Blum had witnesses call, they got the answering machine.

Mr. Blum also wrote that the attorneys never asked to discuss  the documents he provided to them.  Instead, they repeatedly told him "that nothing will be admitted in court," though "upon consulting other attorneys [he] was told quite the contrary, that the evidence and witnes[es] we have is crucial . . . ."  *Id.*  In short, Mr. Blum wrote, dealing with Mr. Rhodes and Mr. Stutman "was simply a nightmare."

### W.    February 25, 2009 Hearing On Request To Discharge Counsel

On February 25, 2009, the Court considered Mr. Weingarten's request to discharge counsel. The Court began by offering some thoughts about Mr. Weingarten's February 23 letter. Mr. Weingarten responded briefly, mentioning counsel's verbal abuse and Mr. Rhodes's having submitted his unsigned declaration.   *See* 2/25/09 RT at 3-6.   The Court then addressed Mr. Weingarten's request *ex parte*.

Mr. Weingarten began by saying that he had told Mr. Stutman, when the March trial date was set, that there would not be sufficient time to prepare, and he had expressed concern about witnesses being unwilling to travel around the religious holidays. *See id.* at 9.  Mr. Weingarten also explained that when he talked with the lawyers, they never took notes, and it was apparent that they did not understand the facts adequately to defend his case.  *See id.* at 10-13, 16.  Moreover, after the February 6 hearing, when the attorneys told the Court that they could not be prepared for trial by March 2, Mr. Weingarten had told them to "get off the case."  *Id.* at 10, 17.  The attorneys did not

52

dispute the vast majority of what Mr. Weingarten said – they mostly focused on assuring the Court

that they had not threatened Mr. Weingarten with physical violence. *See id.* at 18-19.

The Court denied the motion and said to Mr. Weingarten that it did not credit "the notion that

you thought many months ago that these lawyers couldn't represent you . . . ." *Id.* at 21.  The Court

then said:

> I will allow you, if you wish, you and your people, if you want to retain other counsel
> to join this team now and the trial, you are welcome to.  They will be permitted to
> join the team.  You can represent yourself.  I advise you strongly against that.  We are
> going to go to trial Monday.  I'm not relieving these two men who have told me they
> can represent you and will, and that's that.

*Id*. at 21-22.  Mr. Weingarten asked the Court to check the MDC recordings of his telephone calls,

which would confirm his ongoing problems with the attorneys. *See id.* at 25.  The Court rejected that

request.

Later in the hearing, government counsel noted that the defense had not provided any

discovery with respect to an expert witness, nor any tape recordings that might be used at trial.

*See id.* at 32.  Mr. Rhodes responded that "for weeks, judge, I have been urging defendant's

community supporters to assist in the retention of an expert," but "nobody has been hired to my

knowledge." *Id.* at 33-34.  This added more support for Mr. Weingarten's belief that his attorneys

were not taking necessary steps to defend him and were inappropriately delegating their duties to

community members.

Toward the end of the hearing, the Court told Mr. Weingarten to "hire another lawyer if you

want," to which Mr. Weingarten responded that, given the "short time," that did not seem "possible

maybe." *Id.* at 36.  It is apparent from the record that Mr. Weingarten was distraught with the

Court's decision not to allow him time to get new counsel, and he repeatedly begged the Court to reconsider.  *See id.* at 22, 24, 25, 36-37.

### X.      Mr. Weingarten's Subsequent Conversation With Rabbi Freund

After the Court denied his request to discharge counsel, Mr. Weingarten again spoke about his concerns with Rabbi Freund.  During that conversation, they discussed having Mr. Lorandos cross-examine Frieme Leaieh, because sexual abuse cases are Mr. Lorandos's specialty.  *See* 9/22/14 I. Weingarten Dec. at ¶33 (Exhibit 1); Freund Dec. at ¶10 (Exhibit 5).

### Y.      Meetings With Attorneys Between February 25 And March 2

Between the February 25 hearing and the start of trial proceedings on March 2, Mr. Weingarten met with his attorneys two or three times, for a total of about four hours.  Little was accomplished to prepare for trial.  *See* 9/22/14 I. Weingarten Dec. at ¶34(a) (Exhibit 1).

Mr. Weingarten told the attorneys that they should admit to the Court that they were not prepared for trial.  They did not dispute that they were not prepared, but they blamed Mr. Weingarten's supporters for that.  *See id.* at ¶34(b).

The day before trial, the attorneys brought a copy of the transcript of Frieme Leaieh's grand jury testimony.  That was the first time the attorneys brought Mr. Weingarten any documents related to his case, with a few exceptions.  *See id.* at ¶34(e).  The attorneys read from the grand jury transcript and told Mr. Weingarten, essentially, that there was nothing that could be done for his defense.  When he tried to tell them how they could counter Frieme Leaieh's claims, they were not interested, and they said, essentially, that his case was hopeless.  *See id.*

At that meeting, the attorneys mentioned to Mr. Weingarten that his family and friends were trying to hire Mr. Lorandos to help with his defense.  They said that Mr. Lorandos had a doctorate

in psychology, and had special training and experience with respect to sexual abuse claims.  The attorneys also discussed the possibility of Mr. Lorandos joining the defense team.  *See id.* at ¶34(f).

Mr. Rhodes left that meeting a few minutes before Mr. Stutman.  After Mr. Rhodes left, Mr. Weingarten asked Mr. Stutman to admit to the Court that he and Mr. Rhodes were not prepared.  Mr. Stutman agreed to do that, but asked Mr. Weingarten what he wanted to do if the Court would not continue the trial.  Mr. Weingarten said that he would like to at least question some of the witnesses at trial, because the attorneys did not know what questions to ask.  Mr. Weingarten did not expect to have to go that route, however, because he hoped that once Mr. Stutman was candid with the Court about his and Mr. Rhodes's lack of preparation, the trial would be delayed.  Either way, he had no intention of questioning his daughter – in the worst case scenario, he hoped that Mr. Lorandos would do that.  *See id.* at ¶34(g).

### Z.       March 2, 2009 – First Day Of Trial

When the proceedings convened on March 2, Mr. Rhodes told the Court that during trial defense counsel would "consult" with a "rape trauma expert . . . whose office is in California," who would advise them about cross-examining the government's expert, and "may end up being a witness."  RT at 2-3.  Mr. Rhodes identified this person as Demones Norendos, and spelled the last name.  The person he was referring to was Demosthenes Lorandos, whose office is in Michigan, and there was no plan for him to be a witness; Mr. Weingarten's plan, or hope really, was that, if necessary, Mr. Lorandos would cross-examine Frieme Leaieh.  *See* 9/22/14 I. Weingarten Dec. at ¶35(b) (Exhibit 1).

A few moments later, Mr. Rhodes said that his wife was "in the hospital, will be there at least all of this week. . . .  It's distressing, but not so distressing that I won't be able to give this trial my

full attention." RT at 5. On more than one occasion, Mr. Rhodes had told Mr. Weingarten that his

wife's health problems seriously limited the time that he could devote to Mr. Weingarten's defense.

And Mr. Weingarten understood that this was one reason that Mr. Rhodes would not be (or at least

was not supposed to be) involved in the trial.

Next Mr. Stutman told the Court that because his counsel were not prepared for trial,

Mr. Weingarten "has expressed an interest, because he feels he knows the case better than both

attorneys, he has a desire to be allowed to examine each one of the government's witnesses as they

proceed." RT at 6-7. The Court told Mr. Weingarten that he had the right to represent himself, but

that was a bad idea. Before proceeding along that line, the Court said, "let me back up. Mr. Rhodes,

Mr. Stutman, do you feel as though you are prepared to defend this case?" *Id.* at 8. They said yes,

though a day earlier Mr. Stutman had told Mr. Weingarten that he would admit that he was not

prepared. And neither man explained why he had changed his view – stated on the record on

February 6 – that they were "behind the eight ball" and could not be ready for trial on March 2. *See*

2/6/09 RT at 45.

Based on the attorneys' representations, the Court said that the trial was going forward, and

told Mr. Weingarten that he would either have to represent himself in all respects, or allow his

attorneys to do so. *See* RT at 8. The Court also discussed why self representation is a bad idea. *See*

*id.* at 8-10. Mr. Weingarten responded that he understood, and made clear that he was not trying to

challenge the Court's February 25 denial of his request for time to replace his counsel. *See id.* at 10-

11. But since then, he said, nothing productive had happened, and he had become aware that the

government had just produced materials relating to the family court proceedings that defense counsel

never provided to him before, specifically Frieme Leaieh's deposition transcript. *See id.* at 11-12.

This further confirmed to him that his lawyers were not prepared to use evidence of the family court proceedings and CPS investigations to present his defense.  *See id.* at 12.

Then the following exchange occurred:

THE COURT:  Do you really want to be the one to cross-examine Leaih?  You do?

MR. WEINGARTEN:  I won't actually.  On the first hand, I wouldn't do it.  Never, never.  And when she was deposed in Rockland –

THE COURT:  I'm not talking about the deposition.  I got a jury outside the door.  I see their faces.  They are coming in in a few minutes.  Your're going to make a decision now whether or not –

MR. WEINGARTEN:  Let me explain.

THE COURT:  I don't want you to explain.  I don't want to hear about the Rockland County case any more.  We're trying the Brooklyn criminal case.

*Id.* at 12-13.  Mr. Weingarten wanted to explain that his attorney for the family court proceedings had questioned Frieme Leaieh during her lengthy deposition, and that attorney did a good job, effectively derailing the efforts to take his six younger children from him, and heading off a state court prosecution.  *See* 9/22/14 I. Weingarten Dec. at ¶35(d) (Exhibit 1); *see also* RT at 319 (Frieme Leaieh testified that she "got really angry" during deposition questioning by her father's attorney).  The obvious difference between that attorney, and Mr. Stutman and Mr. Rhodes, was that attorney was prepared, they were not.

Shortly after the exchange set out above, the Court asked Mr. Weingarten if he wanted to represent himself, to which he responded:

I didn't want, and that's why I wanted to get other lawyers, because I didn't want. But I tried to talk to them.  I gave them one or two examples.  She says this and this and this in the grand jury. . . .  How can you rebut it?  Do you know the story?  From where do you have proof?  They didn't know the answer.  I showed them here and there and there, and it's there.  You can't do it for the whole case in one day.  I feel

57

> it's impossible.  That's why.  That's the only reason why.  The best chance in my situation is, only because of my situation, have no other chance, I have to do it, because I still know my case better than anyone.

RT at 13.  Mr. Weingarten reiterated these points over-and-over, and said that he would like to proceed with hybrid representation, which the Court rejected.  *See id.* at 14-15.

Mr. Weingarten then said that his family was trying to hire a "cross examiner," who is an expert on sexual abuse, and he proposed handling one witness, and the "cross examiner" would handle the others.  *See id.* at 17.  In light of his earlier statement that he did not want to cross-examine his daughter, *see id.* at 12-13,  it is apparent that Mr. Weingarten sought to bring in another attorney to cross examine her.  That attorney was Mr. Lorandos.  *See* 9/22/14 Weingarten Dec. at ¶35(e)-(f) (Exhibit 1).  The Court rejected that request.  *See* RT at 13.  Mr. Weingarten reiterated that he did not want to represent himself, but because his counsel were unprepared, he felt he did not have a choice.  *See id.* at 18-19.  The trial proceeded.

## IV.    Mr. Stutman And Mr. Rhodes Were Not Prepared For Trial

### A.    Introduction

Mr. Weingarten had good reason to believe that his attorneys were not prepared for trial. Aside from what he observed in and out of court, at the February 6 hearing his attorneys admitted that they would not be ready for trial, and after trial they tacitly acknowledged that they had nothing – no witnesses, no exhibits, no strategy.  *See* CR 71-8 (4/23/09 Rhodes dec.) & 71-9 (4/24/09 Stutman dec.); *see also* 9/22/14 I. Weingarten Dec. at ¶¶45(a)-(e) (exhibit 1).  For some reason – maybe because they were not being paid – the attorneys did not learn the relevant facts, much less prepare to present a defense.  *See id.* at ¶¶11, 15, 34, 36-43; 9/23/14 Gravel Dec. at ¶¶5-6 (Exhibit

7);  4/14/09 Blum Dec. at ¶¶28, 30-35, 37, 51 (CR 70-13).  Yet there was a mountain of powerful evidence that was easy to find, which would have led to an acquittal.

This is best shown by comparing the government's trial case with the readily available evidence.  Mr. Weingarten makes that comparison by summarizing each of the four major aspects of the government's case, then summarizing the powerful rebuttal evidence that the attorneys were not prepared to present.  The four aspects of the government's case were based on allegations that Mr. Weingarten:

> (1) sexually abused Frieme Leaieh for years, and terrorized the family home;

> (2) sexually abused Frieme Leaieh in Brooklyn on the night of July 30-31, 1997;

> (3) sexually abused Frieme Leaieh in Antwerp from August 19 to September 12, 1997; and

> (4) went to Manchester, England, in February 1999 to abduct Frieme Leaieh.

After discussing the evidence that was available to rebut each of these aspects of the government's case, Mr. Weingarten turns to other glaring failures that show defense counsel were not prepared for trial.

### B.    Allegation Of Years Of Sexual And Physical Abuse

#### 1.    Government's Case

The government's case was based almost entirely on the claims of Frieme Leaieh.  She testified that her father began sexually abusing her when she was nine years old, and the abuse occurred in every room of the family's Antwerp apartment.  *See* RT at 201-20, 226-28, 231-35.

Frieme Leaieh asserted that when she was a young girl, she told her mother that her father was touching her, and two days later he beat her for that.  *See* RT at 220.  When she was fifteen years

old, her mother found her in bed with her father.  Days later, she told her mother that her father had been sexually abusing her, and to punish her, Frieme Leaieh said, her father beat her so badly that she was kept home from school.  *See* RT 239-41, 245-51.  She claimed that when she returned to school, the principal, Mordechai Stauber, and a high level rabbi, David Weis , intervened and sent her to a seminary school in Manchester, England.  *See* RT 251-52, 257-59.

Mr. Weingaren's ex-wife, Feige, testified that when Frieme Leaieh was nine-years-old, she said her father was touching her in "unusual places," but Feige did nothing because she was "very afraid" of her husband.  *See* RT at 692.  Feige also recalled finding Mr. Weingarten and Frieme Leaieh in bed together.  *See* RT at 693-95.  Feige claimed that after she confronted her husband about the sexual abuse days later, he beat Frieme Leaieh, and shortly thereafter Principal Stauber and Rabbi Weis intervened and sent Frieme Leaieh to school in Manchester.  *See* RT at 701-03, 728. Feige also asserted that Mr. Weingarten terrorized everyone in the household "24 hours a day."  RT at 838-40.

Mr. Weingarten's oldest son, Yoinesun, also testified.  His testimony seemed to be aimed mostly at supporting the assertion that Mr. Weingarten terrorized the household.  *See* RT at 530, 618, 624-25.

In its opening statement and closing argument, the government emphasized its theory that Mr. Weingarten had terrorized his family, and it was only because of Principal Stauber's and Rabbi Weis's intervention that Frieme Leaieh "escaped."  RT at 121, 984-87, 990.  The government also

bolstered its terrorizing claim by introducing an order of protection entered in Hull, England on March 1, 1999. *See* RT at 314.[9]

### 2. Evidence That Could Have Rebutted The History-Of- Abuse Aspect Of The Government's Case

There was a mountain of evidence that prepared counsel could have used to rebut the government's big-picture portrayal of Mr. Weingarten as a serial abuser and household terrorizer. In fact, the six other children recall a vastly different childhood, where they suffered physical and sexual abuse at the hands of their mother before she ultimately abandoned them and then brought false sexual abuse allegations against their father in an effort to get them back. Their experiences are supported by documentation and information that was readily available in CPS records, family court documents, and by contacting witnesses whose names were located throughout those documents and whose names the children tried to provide the attorneys. Some of that is summarized below.

### a. CPS Investigations

Starting in 2001, Rockland County CPS received complaints of sexual abuse in the Weingarten home. The allegations against Mr. Weingarten were determined to be unfounded but started a three year period where CPS was extensively involved with the Weingarten family, including conducting continual safety assessments of the home stemming from people calling in the same allegations over and over. *See* CPS Records (Exhibit 50). Each time, after thoroughly

---

[9] The government bolstered this claim by eliciting testimony that the Hull protective order was very rare and hard to obtain. Had Mr. Weingarten's attorneys spoken to Frieme Leaieh's attorney Max Gold, who got the protection order, they could have rebutted this testimony as Max Gold affirms that the protection order sought in the case was a routine protection order that is easily obtained. *See* Gold Dec.

61

investigating the case, Rockland County CPS determined the home to be safe and the allegations against Mr. Weingarten to be unfounded. *Id.* (Exhibit 50). The last set of allegations were raised before Orange County CPS, and were referred to family court based on Frieme Leaieh's claims. After a year of investigations and proceedings, and depositions in family court, the case was dismissed and the children were returned to their father. *See* Family Court Records (Exhibit 51).

### b.    Feige Weingarten's Prior Statements

In 2002, sexual abuse allegations were brought against Israel Weingarten on at least five different dates. *See* CPS Records (Exhibit 50). After extensive investigation, CPS found all of the allegations to be unfounded. Importantly, during this time Feige Weingarten repeatedly told CPS workers her husband never physically or sexually abused the children and that he would never harm them. She said he was a loving father and that he was not abusive toward her. Mrs. Weingarten made these statements on multiple occasions and while she was living apart from Mr. Weingarten and contemplating a divorce. Mrs. Weingarten explained to CPS workers that her family was bringing the allegations against Mr. Weingarten because they had never liked him and wanted him

out of the family.[10]   Feige said this multiple times to different CPS workers and to detectives throughout 2002.   *See* CPS Records (Exhibit 50).

> **c.      Children Tell CPS And Police About Feige's Abuse Of Them**

At the same time Feige was admitting that her husband did not abuse the children, the Weingarten children were being repeatedly interviewed by CPS officials, police detectives and Rabbis outside the presence of their mother and father.   *See* CPS Records (Exhibit 50).   During the many interviews of the children, all of them said they would rather live with their father than their mother.   As early as March 2002, Yoil Weingarten told Police Detective Gregory Dunn that his mother abused him and used to beat him up.   He said that he had never been abused by his father and that his father did not hit him.   Yoil lamented that his mother goes into a rage every few weeks.

When detectives spoke with Chayeh Sureh, she told them her father had never touched or abused her sexually but that her mother is verbally and physically abusive toward her and the other children.   She said she has never observed her father hit her mother but that her mother hits and pinches the children. Chayeh Sureh said the reports about her father are not true and that her mother's family has been threatening her father for many years with such rumors.   Chayeh Sureh said

---

[10]   This is consistent with the tension between Feige Weingarten's sister, Chaya, and Mr. Weingarten, which came to a head when Chaya told lies about Mr. Weingarten molesting his children when she was visiting the Weingarten home.  Mr. Weingarten became angry with her for saying such things and made her leave his home.  When he closed the door on her, unbeknownst to Mr. Weingarten, her four-year-old son was still in the house.  Chaya's family members beat up Mr. Weingarten while Feige stood in the doorway and watched.  The younger Weingarten children had to pull the attackers off of Mr. Weingarten.  The police were called and Mr. Weingarten was arrested, however, charges were dropped after the facts came to light.  Detectives noted that Mr. Weingarten had bruises on his face.  In fact, Mr. Weingarten was the only person with documented injuries.  *See* Photograph (Exhibit 49).  The next day, Chaya brought a claim with CPS, and the CPS official determined the case was unfounded and closed it.  *See* CPS Records (Exhibit 50).

her mother told her family lies, claiming that she was having sex with her father, and that she tells rumors to harm her.  Chayeh Suren also said that sometimes she is scared of her mother when her mother gets "crazy and yells and screams for no reason," and that she would rather live with her father because he never hits and most of the abuse occurs when her father is not at home.  Chayeh Sureh also mentioned that her mother recently left the home and left the kids with their father for a few weeks.  Independent witnesses noted that when Mrs. Weingarten left the home, the home was more calm and peaceful because she was the one who was responsible for the abuse.  *See* Klein Dec. (Exhibit 37); S. Weis Dec. (Exhibit 38).

The detectives also spoke to Chaneh Goldeh, who told them her mother is very abusive towards her father and the children and that her father has never sexually or physically abused her.  *See* CPS Records (Exhibit 50).  The other children also said that their mother hit them almost daily.  All of the children began telling their foster parents about the terrible things their mother did to them when she lived with them, including physical abuse, sexual abuse, and verbal abuse.  *See* Klein Dec. (Exhibit 37).

Throughout the proceedings, the children did not want to speak with their mother on the phone or visit her.  *See* CPS Records.  She had abandoned them for at least ten months, after having abused them while she lived in the home.  The children were happier with their mother being out of their lives, and only visited her because their father encouraged them to.

### d.    Mr. Weingarten Cooperated With CPS

Mr. Weingarten was cooperative throughout the three year period when CPS was continuously investigating him.  He consented to all of his children speaking to detectives and child protective workers without him present.  He signed consent forms so that CPS could obtain records

from the kids' schools, medical providers, and any other entity CPS requested.  He also answered all of the questions CPS workers posed to him.  *See* CPS Records (Exhibit 50).  In March 2002, when Detective Graham and Dunn interviewed Mr. Weingarten regarding the allegations of sexual abuse, Mr. Weingarten informed the detectives that he has been a victim of these false allegations for many years and that his wife's family started the rumors because they didn't like him in the family.  He told them he has never abused or neglected his children and gave the detectives permission to speak with all of his children and obtain any records necessary to investigate the case. Mr. Weingarten also  told the detectives he has been having domestic issues with his wife Feige for many years and that Feige has been physically and emotionally abusing the children.

### e.    Feige Changes Her Story

During 2003, Feige Weingarten decided to seek custody of the six minor children from the Rabbinical courts.  *See* Geldzahler Dec. (Exhibit 39); CPS Records (Exhibit 50).  While she was fighting for custody, Feige changed her statements to CPS and said that Mr. Weingarten abused her and her children, and that she feared for her children's safety.  *See id.*  A custody battle ensued. Feige Weingarten began making up harmful lies about Chayeh Sureh saying that her father was keeping her home from school to abuse her, and that she was pregnant from the sexual abuse of her father.  *See* C.S. Weingarten Dec. (Exhibit 54).  CPS verified through medical records that Chayeh Sureh was not pregnant, she suffered from Lyme's disease and was doing homeschooling as a result of her disability.  *See* CPS Records (Exhibit 50).  The allegations against Mr. Weingarten included complaints that he had been sexually abusing Chayeh Sureh, treating her like his wife, and keeping her home from school to abuse her, which were similar to the allegations Feige alleged about her daughter Frieme Leaieh.  After conducting witness interviews of all of the children in the home,

65

contacting schools, medical facilities, and obtaining other information, CPS professionals found the allegations were unfounded on multiple occasions.  *See* CPS Records (Exhibit 50).

### f.        Feige Fails, Then Switches Forums

When the evidence was not weighing in Mrs. Weingarten's favor at the rabbinical proceeding, she stopped consenting to the jurisdiction of the Court.  *See* Geldzahler Dec. (Exhibit 39).  When Rockland County CPS continued finding the allegations against Mr. Weingarten to be unfounded, Mrs. Weingarten told Orange County CPS that Rockland County was not impartial and that they should take over the case.  *See* CPS Records (Exhibit 50).  In July 2003, Mrs. Weingarten tried to take Sheindl by force from a camp, leaving bruises on her neck.  Rockland County CPS substantiated the allegations against Mrs. Weingarten.  After that, Mrs. Weingarten accused CPS worker Jennifer Heller of having a sexual relationship with Israel Weingarten.  *See* Heller Tr. (Exhibit 53).  During the family court proceedings, when Mrs. Weingarten was not prevailing, she stopped trying to get custody of her children through the family court process.

There was a plethora of evidence in the family court and CPS records that should have been used to defend Mr. Weingarten.  Had the attorneys reviewed the CPS records and family court proceedings records, they would have learned valuable information that demonstrates that Feige Weingarten began accusing Mr. Weingarten of sexual abuse after a custody battle for the children ensued, and all of her six minor children said they preferred to live with their father because she had abused them.  A review of these records provides numerous witnesses that defense attorneys should have contacted regarding the background of the case and Feige's inconsistent statements.  This evidence would have seriously undercut the government's portrayal of Mr. Weingarten and his roln the Weingarten household.

66

### C.      Allegation Of Sexual Abuse In Brooklyn

#### 1.      Government's Case

Frieme Leaieh and Mr. Weingarten traveled from Israel to Brooklyn on July 30, 1997, to see his father, who was ill and in the hospital.  *See* RT at 706.  Frieme Leaieh said that her father made her go on that trip "to be with him.  He can't let me out of his sight."  *See* RT at 283-84.

When the two arrived in New York, they went to her aunt and uncle's apartment in Brooklyn, where they were given a room "to sleep in by ourselves."  RT at 285.  Frieme Leaieh claimed that her father sexually abused her "that very night in that room in my uncle's apartment."  RT at 285, 433.

The next morning, she and other family members went to see her grandfather, who passed away hours later.  She then went to upstate New York to visit her cousins, and did not see her father for the rest of the time they were in New York.  *See* RT at 285-86, 289, 431.

#### 2.      Evidence That Could Have Rebutted the Brooklyn Aspect Of The Government's Case

Defense counsel did not even go to the Brooklyn apartment.  Had they done so, they would have met Israel's brother and sister-in-law, Juda and Rachel, who have lived there for decades, and who were there on the night of July 30-31, 1997.  From talking to those two, the lawyers would have learned that Israel's brother Alfred was also present that night.  With a bit of follow-up, defense counsel would then have been prepared to present the following testimony.

1.      Alfred (exhibit 9)[11] could have testified:  (1) that the purpose for Israel's trip to Brooklyn was to spend time with his ill father; (2) "Frieme Leaieh begged to go;" (3) he and Israel

---

[11]   The exhibits so indicated are witness declarations.

intended to stay in their father's apartment that night, but that plan changed at the last minute; (4) they were only at the apartment for a short time, because they got in late and went to the hospital early the next morning; (5) he did not sleep that night; (6) all the bedroom doors remained open during the night; (7) he did not see or hear anything inappropriate, and he would have been sensitive to that because he knew that Frieme Leaieh had accused her father of sexual abuse; (8) based on Israel's emotional and physical condition, he believed it was impossible that he could have sex, much less sexually abuse his daughter; and (9) Frieme Leaieh did not act in a way that might indicate that she had been sexually abused.

2.      Rachel (exhibit 10) could have testified:  (1) about  the circumstances that led to Mr. Weingarten coming to Brooklyn; (2) that Israel wanted to stay in his father's apartment that night, and have Frieme Leaieh stay in Rachel and Juda's apartment, but Rachel changed that plan; (3) Israel and Frieme Leaieh were in the apartment for only a few hours, because they got in late and went to the hospital early; (4) she got up frequently during the night, due to a medical condition; (5) the apartment is very small; (6) the doors to the bedrooms remained open that night, as usual; (7) she never heard or saw anything unusual; and (8) the next day, Frieme Leaieh's demeanor did not seem unusual, other than being sad about her grandfather's death.

3.      Juda (exhibit 11) could have provided testimony consistent with Rachel's.

And had defense counsel made any real effort to talk with Mr. Weingarten's children, they would have learned from his daughter Chaneh (exhibit 26) and Chayeh Sureh (exhibit 54) that Frieme Leaieh was not forced to go to Brooklyn, as Frieme Leaieh and Feige had claimed, but instead Frieme Leaieh argued with her sister Chayeh about who should be able to go, and Frieme Leaieh prevailed.

Notably, these witnesses could have provided a wealth of other testimony that would have been helpful to the defense, including character testimony.  Only the most important aspects are summarized above; more is detailed in their declarations.

### D.     Allegation Of Sexual Abuse In Belgium

#### 1.     Government's Case

Frieme Leaieh and Mr. Weingarten traveled from Brooklyn to Belgium on August 19, 1997, to finish packing the family's remaining belongings at the Antwerp apartment.  Frieme Leaieh claimed, however, that there was no good reason for the trip because the family's belongings had previously been packed by her and her mother.  *See* RT 475-77, 499; *see also* RT at 713.  She testified that from the day she arrived in Antwerp, until she left on September 12, her father "abused [her] night and day, every day," "non-stop," "all [of] it happening in that same room," where he kept her for "almost the whole month," "naked all the time."  RT 290-91, 453-54, 475.

On cross examination, Frieme Leaieh said that during that time period her father never went to synagogue, and he did not take her to his friend Yosef Cohen's apartment, "[b]ecause [he was] in bed all day."  RT 499-500, 502-03.  She also said that Mr. Cohen never visited their apartment, and she saw him only once during that period.  *See* RT at 519.

Feige testified that when Frieme Leaieh returned to Israel on September 12, she looked pale, changed, and tortured, and she told her mother that her father "had a lot of sex with her one time after time," and he "didn't leave her alone for a moment."  RT at 714.

In its opening and closing, the government emphasized the claim that Mr. Weingarten sexually abused Frieme Leaieh in a non-stop "sexathon," such that she "could not even distinguish between night and day."  *See* RT at 123, 969, 982, 1060.  The government did not suggest that

Frieme Leaieh's testimony was exaggerated, but instead claimed that the sexual abuse was, literally, "non-stop."

### 2.   Evidence That Could Have Been Used To Rebut Belgium Aspect Of Government's Case

Many people who knew the Weingartens well during their years in Antwerp could have undercut the government's Beligum claims.  Defense counsel did not speak to any of those witnesses, much less arrange to have them present for trial.  Some of the testimony they could have provided is summarized here.[12]

1.      Alexander and Rachel Krausz (exhibits 13 and 14, respectively), and their daughters Esther, Gita, and Elkie (exhibits 15, 16, and 17), could have testified that during the August to September 1997 time frame, Mr. Weingarten and Frieme Leaieh and were often dinner guests at their home, and she seemed happy and healthy.  Elkie was Frieme Leaieh's best friend, and she also recalls seeing Frieme Leaieh at her school and on the street, where she "appeared to be in good health and spirits."  And Alexander could have testified that, contrary to Frieme Leaieh's claim, he and Mr. Weingarten went to synagogue daily for several hours, and Mr. Weingarten was also busy packing the family's belongings.

2.      Yosef Cohen (exhibit 18) could have testified that he saw Frieme Leaieh several times at the Weingartens' Antwerp apartment during the August to September 1997 time frame, and "she appeared to be in good spirits."  He and his wife, Sarah (exhibit 19), both recall having

---

[12] Incidentally, most of the people whose recent declarations are summarized here previously signed declarations that supported Mr. Weingarten's post-trial filings.  *See* CR 70, 75, 102. Mr. Weingarten continues to rely on those previously submitted declarations, and related exhibits, for their substance, and to support the conclusion that the witnesses were readily available, had Mr. Stutman and Mr. Rhodes made an effort to contact them.

Mr. Weingarten and Frieme Leaieh over to their home for dinner several times, and she appeared to be fine. Sarah also saw Frieme Leaieh out on the street and shopping. As for Frieme Leaieh's claim that her father never went to the synagogue, Yosef could have testified that he and Mr. Weingarten went to the synagogue together every day.

3.      Yidel Rotter (exhibit 20) could have testified that he saw Mr. Weingarten on a daily basis in the August to September 1997 time period, including when he stopped by the Weingartens' apartment, unannounced, for visits. During those visits, Frieme Leaieh would bring the men juice or water, and she appeared to be fine. Mr. Rotter also saw Mr. Weingarten and his daughter separately, on the street and at the grocery store, and both seemed happy and normal. And Mr. Rotter saw Mr. Weingarten at the synagogue regularly.

4.      Robert Friedman (exhibit 21) could have testified that during the August to September 1997 time frame, he and Mr. Weingarten walked to synagogue together, often two times a day. Mr. Friedman also saw that Mr. Weingarten was busy packing the family's belongings. And when Mr. Friedman saw Mr. Weingarten and Frieme Leaieh on the street together, she seemed happy and healthy.

5.      Hinde Englander (exhibit 22) was friends with Frieme Leaieh. She could have testified that during the August to September 1997 time period, she saw Frieme Leaieh on the street, and she seemed to be happy. Hinde also saw Mr. Weingarten, who often visited with her father, Abraham Englander. Abraham (exhibit 23) could have testified to the latter point, and to having seen Mr. Weingarten regularly at synagogue.

6.      Liba Berger (exhibit 24) was Frieme Leaieh's good friend, and could have testified that she recalled Frieme Leaieh returning to Antwerp to pack the family's belongings after her

71

grandfather died, and Frieme Leaieh "looked clean and put together," with nothing out of the ordinary.

7.     Chaim Freed (exhibit 25) could have testified that he helped Mr. Weingarten move the family's belongings during the August to September 1997 time period, he saw Frieme Leaieh regularly (at her home, at his home, and in the community), and she did not show the "slightest sign of stress."

8.     Chayeh Sureh Weingarten, Sheindl Cohen and Chaneh Goldeh Berkovits (exhibits 54, 16 and 26), Frieme Leaieh's younger sisters, could have testified that when Frieme Leaieh returned to Israel from Belgium in September 1997, she did not look changed, different, or tortured, as Feige Weingarten claimed.  Instead, she seemed excited about the new clothes she bought in New York.

9.     Alfred Weingarten (exhibit 9) could have testified that the August 1997 trip to Belgium was not planned, but instead became necessary when Israel was in Brooklyn, because the landlord for the family's Antwerp apartment threatened to put their belongings on the street.  In addition, Alfred picked up Frieme Leaieh at the airport in Israel when she returned from Belgium, and she looked and acted fine.  Knowing that she had previously accused her father of sexual abuse, and had withdrawn that accusation, Alfred took the chance to ask if she was okay, and if her father had done anything inappropriate with her.  She said no, and did not seem distraught.

As with the declarations discussed with respect to Brooklyn, the declarations discussed in this section contain a wealth of other information that would have been useful for the defense. Defense counsel were not prepared to present any of that evidence.

E.      **Allegation Of Attempt To Abduct Frieme Leaieh In Manchester**

1.      **Government's Case**

After Frieme Leaieh left Belgium on September 12, 1997, she returned to Israel. Two weeks later, she traveled to England, and eventually she went back to the seminary school that she had previously attended in Manchester.  *See* RT at 300, 716.

She testified that a year-and-a-half later, on February 14, 1999, she learned that her parents had come to see her, and she went to the home of the school's principal, Rabbi Royde, to hide.  *See* RT at 301-02.  When her parents showed up at Rabbi Royde's home, she went upstairs, but she claimed she could hear her father yelling that he wanted his daughter back, and he was tearing up the house.  *See* RT at 302.  She called the police, who arrived and separated her parents from her. She told the police that her father had been molesting her for years, and he was arrested.  Shortly thereafter, with the help of a lawyer, she got a "non-molestation order" against her father, a copy of which was introduced into evidence.  *See* RT at 305, 314.

The government also presented the testimony of an English constable and a detective, both of whom said that Frieme Leaieh told them that her father had sexually abused her over the course of several years.  Mr. Weingarten was arrested based on those allegations.  *See* RT at 661, 663, 680. Both officers also said that a "police protection order" was issued, which one of them characterized as being a "very, very rare thing," and "quite serious."  RT at 662, 686.

2.      **Evidence That Could Have Been Used To Rebut Manchester Aspect Of Government's Case**

There were witnesses that could have badly undercut this aspect of the government's case, witnesses that defense counsel made no effort to find, much less present at trial.

73

1.    Eliezer Hochhauser (exhibit 27) could have refuted the government's theory that Mr. and Mrs. Weingarten went to Manchester to abduct their daughter.  Instead, he would have testified, they were trying to meet with Frieme Leaieh to express their concern about her entering into an ill-advised arranged marriage.  Mr. Hochhauser also could have testified that it was Feige Weingarten that lost control and began hitting Rabbi Royde with a "glue stick."  *See also* RT at 760 (Feige mentioned that Mr. Hochhauser and Mr. Kraus were at Rabbi Royde's home during the event).

2.    Moshe Kraus (exhibit 28) could have testified similarly to Mr. Hochhauser, because he tried to facilitate a meeting with the Weingartens and Frieme Leaieh to discuss the arranged marriage.  Mr. Kraus also could have testified that on the night of February 14, 1999, Feige was out of control, and that was consistent with her ongoing emotional and behavioral issues, about which he counseled her for years.

Moreover, on a somewhat different subject, but one that played an important role at trial, Mr. Kraus could have testified that Feige told him she was upset because Frieme Leaieh had an inappropriate relationship with a married neighbor.  Feige also told Mr. Kraus that she believed Frieme Leaieh made false accusations against her father because she wanted to escape the strict religious strictures of the family's household.  Finally, Mr. Kraus attended Frieme Leaieh's wedding, and he observed a natural, happy relationship between her and her father.

Once again the jury received a one-sided version of events by Mr. Weingarten's attorneys failing to investigate witnesses that could have rebutted the government's claims**.**

74

**F.      Other Things That Show Defense Counsel Were Not Prepared**

Defense counsel also failed in several other respects, each of which provides heavy evidence of their lack of preparation.  Specifically, they were unprepared to:  (1) call any witnesses, not even expert or character witnesses; (2) introduce the 911 recording relating to Mr. Weingarten's arrest; and (3) preclude introduction of a "repentance letter" that the government introduced as exhibit 4A-C.  Each of these points is addressed below.

**1.      Unprepared To Call Any Witnesses**

Setting aside for the moment the witnesses discussed above, defense counsel's failure to have any witnesses prepared to testify is especially disturbing in the following contexts:  (1) experts; (2) Mr. Weingarten's six younger children; and (3) character witnesses.

**a.      Experts**

Defense counsel did not consult with, much less prepare to testify, any expert witnesses. There are three contexts in which they obviously should have done so.

First, Mr. Rhodes decided that a good strategy would be to have a surgeon examine Mr. Weingarten's private parts, then try to impeach Frieme Leaieh if she was unable to describe her father's physical characteristics.  A bad strategy, but a strategy nonetheless.  Executing that strategy, however, required hiring an expert, something defense counsel never did. *See* 9/22/14 I. Weingarten Dec. at ¶31(b) (Exhibit 1).

Second, the government had given notice that it intended to call "an expert witness to testify about the psychological effects of abuse and manipulation upon a child victim."  2/13/09 Gov't Letter (CR 25); *see also* 11/19/08 Gov't Letter (CR 14).  Competent counsel would have filed an *in limine* motion to compel more detailed notice, or to preclude the witness.  Having done neither,

75

defense counsel should at least have consulted with their own expert, and had that expert ready, if necessary, for trial.  They did not do that, either.

Notably, however, on March 2 Mr. Rhodes announced to the Court that defense counsel would be "consult[ing]" with a "rape trauma expert" regarding cross-examination of the government's expert, and that person "may end up being a witness."  RT at 2-3.  That person was Mr. Lorandos, and there was no plan for him to serve as a defense witness, nor was he even available to do so.  What this shows, howevr, is that Mr. Rhodes had an inkling that an expert would be useful, he just never bothered to hire one.

Finally, and perhaps most important, when Mr. Rhodes first asked Mr. Weingarten about his private parts (in the context of devising his impeachment strategy), Mr. Rhodes also asked Mr. Weingarten if he was impotent.  Mr. Weingarten responded that he was not, but that he had problems with his sexual function for many years.  Because of that, Mr. Weingarten explained, he could only have sex infrequently, and in 1997 his condition had progressed to the point that he could only have sex about once every two weeks.  *See* 9/22/14 I. Weingarten Dec. at ¶31(c) (Exhibit 1).  It was, therefore, not physically possible for Mr. Weingarten to do the things that Frieme Leaieh claimed at trial.  *See, e.g.,* RT at 121 (government counsel claimed that Mr. Weingarten ejaculated several times a night in Belgium).  Mr. Weingarten also told Mr. Rhodes that he had sought treatment for this problem from his primary care physician in Antwerp, Dr. Rappaport, whose office was on Concience Straat.  Evidently his attorneys did nothing with that information.  *See* 9/22/14 I. Weingarten Dec. at ¶31(c) (Exhibit 1).  This is an overwhelming indicator of defense counsel's lack of preparation.

76

While the lasting prejudice from this failure is not relevant to establishing Mr. Weingarten's right to relief on the claim raised here (the lack of preparation is), it is still worth discussing. Mr. Weingarten's present counsel recently tried to track down Dr. Rappaport, and learned that he had died on October 5, 2011. *See* 9/16/14 Mancaux Dec. ¶6 (Exhibit 29). After he died, most of his patient records were destroyed. *See id.* All that remains are limited computer records that do not have much information. But one thing that is noteworthy from those records is that on January 12, 1998, Mr. Weingarten saw Dr. Rappaport for "hypogonadism." *See* Dr. Rappaport Records and Eng. Translation (Exhibit 30). The primary symptom of that condition in adult men is "erectile dysfunction," and another common symptom is "decreased sex drive." Mayo Clinic, *Diseases and Conditions, Male Hypogonadism* (2014) (Exhibit 31). This alone would have been very helpful to the defense. Had Mr. Stutman and Mr. Rhodes done their jobs, much better evidence, including the testimony of Dr. Rappaport, could have been presented at trial.

### b.    Six Younger Children

Defense counsel should have prepared at least some of Mr. Weingarten's six younger children to testify, but they did not. If nothing else, the children could have rebutted the government's portrayal of Mr. Weingarten's having terrorized the family home.

At trial, Mr. Stutman recognized this concept, stating that Mr. Weingarten's daughters could provide testimony that would "fill in a picture we've only seen from one side." RT at 816. And at the November 19 bail hearing, Mr. Stutman said that he "personally interviewed the [second] oldest daughter," and "found her to be intelligent," "forthright." and "spontaneous." 11/19/08 RT at 11-12. In light of this, it is astounding that the attorneys did not prepare this daughter, or any of the other

children, to testify.  As for Mr. Rhodes, perhaps his excuse is that he did not even know that the children spoke English.  *See* RT at 409.

### c.      Character Witnesses

As evidenced by the letters of support sent to the Court, many people have a great deal of respect for Mr. Weingarten.  *See, e.g.*, 2/6/09 RT at 10.   And many of those people are well respected, and respectable.  Defense counsel could have easily called upon, and prepared, such people to testify as character witnesses.  Their failure to do so could be forgiven if defense counsel had something substantive prepared for the defense.  But, by their own admission, they had nothing.

### 2.      Unprepared To Introduce Mr. Weingarten's 911 Call

Defense counsel's handling of the recording of Mr. Weingarten's 911 call also shows that they were not prepared for trial.

To support its detention motion on October 6, 2008, government counsel claimed that when Mr. Weingarten was arrested, FBI agents had to force their way into his house, and into a "locked in [a] bedroom" where Mr. Weingarten was, "[i]nstead of caring for what was happening for his children."  10/6/08 RT at 3.  In response, Mr. Gribetz, who was appearing as Mr. Weingarten's counsel that day, explained that when the agents arrived at his home, Mr. Weingarten thought they were people who were allied with his ex-wife, and they were coming to hurt him.  Mr. Gribetz also said that Mr. Weingarten's mind frame, and what happened, would be evidenced by a recording of a call he made to 911.  *See id.* at 13.

At the November 19 bail hearing several weeks later, Mr. Stutman addressed the government's claims regarding Mr. Weingarten's arrest, and noted that Mr. Weingarten made a call to 911 that would rebut the government's characterization of the events surrounding his arrest.  *See*

11/19/08 RT at 10-11.  Mr. Stutman showed the Court a written record of the 911 call, because he still had not obtained a copy of the recording.  *See id.* at 11.

The circumstances surrounding Mr. Weingarten's arrest were again highlighted in the declaration of Mr. Weingarten that Mr. Rhodes wrote to support the pre-trial motions.  In that declaration, Mr. Weingarten indicated that there should be a 911 tape recording that would rebut the government's claims about his arrest.  *See* CR 19 at 10-11; CR 22 at 5.

On December 5, 2008, the government gave defense counsel a copy of the 911 call recording.  *See* CR 21.

Considering this lead-up, one would expect defense counsel to have a plan as to how to deal with the arrest situation, should it come up at trial.  Not so.  At the end of the fourth day of trial, Mr. Weingarten said to the Court:

> I want to ask you, Judge, there was a telephone conversation in the morning when I was arrested.  It was given to my lawyers.  I begged them many times, maybe five, six times, each about two or three times, I begged them bring me in the MDC this tape.  I want to listen to this tape before the FBI comes and explains what was there.

3/5/09 RT at 808.  The Court asked "what tape?", and Mr. Weingarten explained that it was of a "telephone call to 911 which I made on that morning when they were breaking in and –."  In response to a question from the Court, the prosecutor said that the tape was "[a]lready provided."  RT at 808.  Mr. Weingarten reiterated that his attorneys ignored his request to bring the tape to the MDC for his review.  *See* RT at 809.  The Court asked defense counsel if they had the tape, and Mr. Rhodes responded:

> There was a time we had the 911 tape.  I listened to it.  I've discussed it with Mr. Weingarten.  For the life of me, I don't remember if I still have it.

79

RT at 809. The Court asked the government to provide another copy to defense counsel, and asked defense counsel to bring it to the MDC that night and play it for Mr. Weingarten. *See* RT at 810.

On March 9, 2009, the government called FBI Agent James Lazarski. A major component of Agent Lazarski's testimony was to repeat the claims the government had made as early as Mr. Weingarten's first appearance – that is, that Mr. Weingarten hid in his bedroom when the agents arrived to arrest him. *See* RT 845. Surprisingly, Agent Lazarski claimed that he was not aware that Mr. Weingarten had called 911 when the agents were coming into this home. *See id.* at 863. Unfortunately, Mr. Weingarten did not have the tape to introduce, nor would he have had any idea how to do so. *See* 9/22/14 I. Weingarten Dec. at ¶46(a)-(c) (Exhibit 1).

The important point is what this situation shows about defense counsel's trial preparation. To begin with, it is not clear why Agent Lazarski's testimony about the arrest was relevant, or more probative than prejudicial. It seemed intended to show only that Mr. Weingarten was a coward. But it should have been apparent to defense counsel, prior to trial, that the government would seek to introduce that evidence. And they should have filed an *in limine* motion to preclude it. More important, they should have been prepared to rebut any such testimony at trial by playing the 911 recording (a copy of which will be lodged with the Court). They weren't, because they lost the tape.

In short, defense counsel not only failed to do any of their own investigation, they could not even hang onto, much less be prepared to present, the fruits of the government's investigation. And it is hard not to harken back to Mr. Rhodes's February 6, 2009 statement to the Court, when he questioned how the tape recording of Frieme Leaieh's inconsistent statements, made many years earlier, could have been misplaced. *See* 2/6/09 RT at 7.

### 3.      Unprepared To Preclude Repentance Letter

Defense counsel were also unprepared to preclude introduction of a letter that was produced to them in discovery on October 27, 2008 (CR 11), which was later introduced at trial.

During trial, the government introduced the letter by having an FBI agent describe it as "a piece of paper that had some writing on it," which he had taken from a pocket of Mr. Weingarten's jacket after he was arrested.  *See* RT at 852-53.  The government then moved to introduce the "piece of paper that had some writing on it."  Mr. Rhodes objected, but gave no grounds.  The Court overruled the objection, and the exhibit was received into evidence.  *See id.* at 853; *see also* Trial Exh. 4A-C (attached as Exhibit 32 hereto).

What was introduced is, essentially, a repentance letter.  It does not say who it is addressed to, nor the sender, though by its content it is evident that it is a child-to-father letter.  The writer asked for forgiveness, saying things such as, "I'm ashamed of my bad deeds," which were "despicable, base, sinful and criminal."  And the letter says that the writer had sought forgiveness for similar deeds in the past.

A few minutes after the letter was introduced, at a sidebar conference, Mr. Weingarten explained that the letter was written by his son, and there was another page to it that was missing. *See* RT at 859-60; *see also* 9/22/14 Weingarten Dec. at ¶47 (Exhibit 1); Yoil Weingarten Dec. at ¶15 (Exhibit 55).  Shortly thereafter, Mr. Rhodes said:

> I wanted to amplify my objection.  There's been no foundation that this note has either been adopted or written by the defendant.  I needed, I received information that it's not in his handwriting.  So I believe that there's been no proper foundation for this to be published to the jury.

RT at 861-62.  The Court said, "Thank you," and the letter remained in evidence.

Given the apparently[13] explosive content of the letter, the foundation objection, and Federal Rules of Evidence 401 and 403 objections, should have been made in an *in limine* motion.  At the very least, those should have been at the tip of counsel's tongue when the government sought to introduce the evidence.  Mr. Rhodes instead made an undefined "objection," because he had no idea who wrote the letter, or, more importantly, that Mr. Weingarten did not.  He probably did not even know what the letter said.  And by the time Mr. Rhodes realized his mistakes, it was too late.[14]

The letter and the 911 recording were among the few things that the government turned over in what Mr. Rhodes accurately called a "scant" amount of government-produced discovery.  *See* 11/26/08 Def. Pretrial Motions at 3 (CR 19).  That defense counsel could not get a handle on that limited discovery speaks loudly about their lack of preparation.

### 4.    Unprepared To Introduce Tape Recordings

Had the attorneys reviewed the tapes that Mr. Weingarten pleaded for them to obtain and listen to, they would have discovered valuable evidence to rebut Frieme Leaieh's and Feige's claims that Frieme Leaieh was abused by her father.  For instance, both Frieme Leaieh and Feige testified that the sexual abuse from her father started when Frieme Leaieh was about nine to ten years old, and that Frieme Leaieh told her mother about the abuse at that time, which resulted in Mr. Weingarten beating her.  *See* RT at 220, 692.  However, in a telephone conversation with her neighbor, Chayala Meyerowitz, Frieme Leaieh said that the abuse started when she was ten years old, but she did not tell her mother at tahat time because she did not have any witnesses and she did not want to disrupt

---

[13] "Apparently" is used here because while the content of the letter looked bad, exaggerated language is common for such repentance letters, and can be found in Jewish prayer books.  Put in a different cultural context, it seems to be analogous to self-flagellation.

[14] As will be discussed below, the government's conduct in this context is also disturbing.

her parents' marriage.  *See* Tape Tr. Excerpt (Exhibit 44).  Throughout the recording, Frieme Leaieh repeatedly said that she did not tell her mother or anyone about the abuse.  This is significant, as it supports the theory that Frieme Leaieh started telling people that her father sexually abused her after it came to light that she was having an inappropriate relationship with the neighbor, not when she was nine years old, as she had testified to buttress her claim.  This could have been used to impeach both Feige and Frieme Leaieh, and calls into question the damaging testimony that Mr. Weingarten beat Frieme Leaieh after she revealed the abuse to her mother at that time.  The following is an excerpt of that conversation.

| UNIDENTIFIED FEMALE 2: | That's why I wanted to ask you a few things - at what age - if you remember - did he start with this? |
|---|---|
| UNIDENTIFIED FEMALE 1: | At age ten. I told you already. |
| UNIDENTIFIED FEMALE 2: | At age ten. |
| UNIDENTIFIED FEMALE 1: | *Ahm.* |

| UNIDENTIFIED FEMALE 2: | I didn't remember exactly. And um... Indeed, why didn't you ever tell your mother? |
|---|---|
| UNIDENTIFIED FEMALE 1: | Firstly, I didn't have witnesses. |
| UNIDENTIFIED FEMALE 2: | And? |
| UNIDENTIFIED FEMALE 1: | And secondly, I didn't want to disrupt the marriage. I [inaudible] because of that. |

Later in the conversation, referring to the sexual abuse, Frieme Leaieh again states that she didn't tell anyone.

| UNIDENTIFIED FEMALE 2: | Your mother doesn't want to imagine, can anyone imagine on such a holy person? I mean, particularly I had to know? |
|---|---|
| UNIDENTIFIED FEMALE 1: | Oh. [beep] |
| UNIDENTIFIED FEMALE 2: | That's the problem. |
| UNIDENTIFIED FEMALE 1: | Aha. Sure, that's also what I thought, that's why- is also one of the reasons why I didn't tell anybody. |

A third time in the conversation Frieme Leaieh says that she didn't tell anyone about the sexual abuse.

| UNIDENTIFIED FEMALE 2: | One minute, another thing - indeed, why didn't you ever tell it to your mother? |
|---|---|
| UNIDENTIFIED FEMALE 1: | Because, I told you already, because I didn't want to ruin the marriage [beep] and I knew that I don't have witnesses. |

In the same conversation, Mrs. Meyerowitz expressed concern that Mr. Weingarten was blaming the sexual abuse on her husband and asked Frieme Leaieh why he would do that. Frieme Leaieh lied and said she did not know. Frieme Leaieh did not disclose her inappropriate relationship with Mr. Meyerowitz. This calls into question Frieme Leaieh's credibility and supports the many witnesses who say Frieme Leaieh had a reputation for telling lies. Frieme Leaieh testified that her father framed her as a liar from a young age. However, other witnesses could testify as to their personal experience with Frieme Leaieh lying. *See* S. Cohen Dec. (Exhibit 19).

| UNIDENTIFIED FEMALE 2: | And- and why did he particularly pick on the neighbor? |
|---|---|
| UNIDENTIFIED FEMALE 1: | Why not? Because with whoever I had contact, on that one he picks, don't you know? One can't pick on a person just like that. [beep] |
| UNIDENTIFIED FEMALE 2: | But did he have any reason in doing so? |

| | |
|---|---|
| UNIDENTIFIED FEMALE 1: | No. |

Mrs. Meyerowitz also suggested to Frieme Leaieh that if she were to say that her father forced her to make statements on tape, then she wouldn't be at fault.  This is relevant as it calls into question Frieme Leaieh's testimony that her father forced her to put conversations on tape so he would have evidence against her.

| | |
|---|---|
| UNIDENTIFIED FEMALE 2: | That's why I'm I am even a little confused with the whole thing, back and forth with the cassette, and- and do you not know anything about the tape indeed? |
| UNIDENTIFIED FEMALE 1: | I know nothing. I knew there were always such things- |
| UNIDENTIFIED FEMALE 2: | I don't mean anything – if he forced you then you're not at fault. |
| UNIDENTIFIED FEMALE 1: | What? |
| UNIDENTIFIED FEMALE 2: | If he forced you to - make-  talk on the telephone like that to the neighbor – then you're not at fault. |
| UNIDENTIFIED FEMALE 1: | Ach![1]  Are you normal?! |

Finally, the neighbor also tried to get her story straight with Frieme Leaieh, in case Mrs. Meyerowitz was contacted by the Rabbinical Court.

| | |
|---|---|
| UNIDENTIFIED FEMALE 2: | And, no, that's why I am so confused about all these things, so I wanted to clarify a few things. Do I know? If the Rabbinical judge calls me or something, do you understand? |
| UNIDENTIFIED FEMALE 1: | Yes. |
| UNIDENTIFIED FEMALE 2: | I mean, it's just for your benefit, you don't have to worry that I'm asking that they'll do something. This is just for your benefit, directly. |
| UNIDENTIFIED FEMALE 1: | Yes. |

| | |
|---|---|
| UNIDENTIFIED FEMALE 2: | I mean, you have nothing left to lose with him. |
| UNIDENTIFIED FEMALE 1: | Indeed not. |
| UNIDENTIFIED FEMALE 2: | That's why I wanted to ask you a few things - at what age - if you remember - did he start with this? |
| UNIDENTIFIED FEMALE 1: | At age ten. I told you already. |
| UNIDENTIFIED FEMALE 2: | At age ten. |

Another important use for the tapes was to rebut Frieme Leaieh's testmony that the apartment in Antwerp was already packed, so there was not reason for her to be there.  They day that she was leaving Antwerp for Israel, Frieme Leaieh spoke to Mrs. Meyerowitz about the significant amount of packing she was doing while in Belgium.  *See* Tape Tr. Excerpt (Exhibit 46)

| | |
|---|---|
| Unidentified Female 2: | There you will need to work less hard than here. |
| Unidentified Female 1: | Yes. Here moving out was hard. |

When Mrs. Meyerowitz asked Frieme Leaieh about whether she suffered any abuse by her father when she was alone with him in Antwerp, Frieme Leaieh did not sound sad or say that her father forced her to have sex night and day.  She did not mention that any abuse occurred during this time despite speaking about sexual abuse by her father earlier in the conversation.  Also of interest is that Mrs. Meyerowitz told Frieme Leaieh they have to battle against the rumors Mr. Weingarten is spreading against Frieme Leaieh and her husband.  *See* Tape Tr. Excerpt (Exhibit 44).

| |
|---|
| And what was in Antwerp, in America, in Antwerp you were with him alone for so long- |
| *Ahm* |
| Did he try it there as well? |
| Chayala, what is the matter with you today? You're making me nervous, [inaudible] [chuckle] I don't have patience to you. |
| I intend your benefit. |

| |
|---|
| But tell me, from where are you talking? The truth. [beep] |
| What do you mean by saying 'the truth'? I really want to help you. I really pity you, I understand there were difficult days for you and and- |
| I want to go to sem, help me go to sem. |
| You understand, he spreads rumors on you and on my husband, and on this and on that, [beep] and we have to battle against it. |

In another tape recording with sexual overtones, Frieme Leaieh tried to convince her male married neighbor in Antwerp to come to her apartment so they can be together while her father is at synagogue. *See* Tape Tr. Excerpt (Exhibit 45). This is significant because Frieme Leaieh testified that during the time she and her father were alone in Antwerp, he did not go to synagogue, but instead abused her day and night. *See* RT at 499-500, 502, 503. Yet in this tape she is home alone, free from her father, and asking the neighbor, with whom she has had a physical relationship, to come be with her while her father is out.

| | |
|---|---|
| UNIDENTIFIED FEMALE 1: | Yes, but no- it's not nice of you. I've so- I happened to bath yesterday. Not nice. I thought   You don't have to be scared. He won't come in so fast. You can wait a little longer. For a half hour you could definitely- |
| UNIDENTIFIED MALE 1: | You don't know what could possibly happen. |
| UNIDENTIFIED FEMALE 1: | Nothing could happen. I promise you. |
| UNIDENTIFIED MALE 1: | don't know. don't know. Maybe somebody could ask him for some little thing in the synagogue [inaudible] I remembered something; I must to run home quickly. [inaudible] He will come running home quickly because he needs to take something. |
| UNIDENTIFIED FEMALE 1: | Leave me alone. |
| UNIDENTIFIED MALE 1: | You can't know. |
| UNIDENTIFIED FEMALE 1: | Leave me alone. Don't talk nonsense. |
| UNIDENTIFIED MALE 1: | Nonsense? |
| UNIDENTIFIED FEMALE 1: | Let go. You're talking nonsense now. |
| UNIDENTIFIED MALE 1: | Why I am talking nonsense? |

| | |
|---|---|
| UNIDENTIFIED FEMALE 1: | Because so; he won't come home. I know my father better than you. Come, I am missing you for so long already. What do you want? Once and for all; a good one. Hm? |
| UNIDENTIFIED MALE 1: | [inaudible] |
| UNIDENTIFIED FEMALE 1: | Hm? [What] do I know? Whatever you want. |
| UNIDENTIFIED MALE 1: | [Inaudible] |
| UNIDENTIFIED FEMALE 1: | Hm? |
| UNIDENTIFIED MALE 1: | A good- [Inaudible] |
| UNIDENTIFIED FEMALE 1: | However you want it. It'll happen by itself. We'll see what will be. Come over. |
| UNIDENTIFIED MALE 1: | Not there. |
| UNIDENTIFIED FEMALE 1: | What? |
| UNIDENTIFIED MALE 1: | Certainly not there. |
| UNIDENTIFIED FEMALE 1: | Why? |
| UNIDENTIFIED MALE 1: | [inaudible] Do you know what happens if just then he knocks in? [inaudible] half naked [inaudible] |
| UNIDENTIFIED FEMALE 1: | [unintelligible] |
| UNIDENTIFIED MALE 1: | No, not. |
| UNIDENTIFIED FEMALE 1: | Hm. |
| UNIDENTIFIED MALE 1: | Do you understand? |
| UNIDENTIFIED FEMALE 1: | Hm. |
| UNIDENTIFIED MALE 1: | [whispering to unidentified] sh... be quiet. sh... quiet. |
| UNIDENTIFIED FEMALE 1: | So, perhaps you come still? Come. Come. It's silly to argue. You could have been here for ten minutes. |
| UNIDENTIFIED MALE 1: | [Inaudible] |
| UNIDENTIFIED FEMALE 1: | Come. [inaudible], you can tell me good bye then. |
| UNIDENTIFIED MALE 1: | No, no, no, no. It won't happen. |

In a conversation between Frieme Leaieh and her neighbor, Mrs. Meyerowitz, Frieme Leaieh said that she was leaving Antwerp that day and her father was out running errands. This, too, casts doubt on Frieme Leaieh's testimony that her father kept her home as a sex slave day and night and didn't even leave the house to go to synagogue. *See* Tape Tr. Excerpt (Exhibit 46).

| Unidentified Female 2: | Where is he now? |
| Unidentified Female 1: | He went to run some errands. He's not here now. |

Finally, there was a tape that supported the six other children's contention that their mother is the one who mistreated them and terrorized the home.  *See* Tape Tr. Excerept (Exhibit 47).  In this tape, Feige is on the telephone with her sister and yelling at one of the children in the home: "How many cups are you taking?  Put it down!  Put it down!  Put it down, wash a cup.  No, I need [them] for dinner."  Feige continues to mock the children and say that the children will tell their father that she scolded them when he comes home and screams, "I do want to yell!  I do want to yell!  You haughty one."  Then she talks about how Yoel and Chaneh Goldeh are "one copy," "the same garbage truck."  She then agrees with the person she is talking to, her sister, that she should throw the kids away and abandon them all except Yonesen and Frieme Leaieh.  *See* Tape Tr. Excerpt (Exhibit 47).

Mr. Weingarten repeatedly requested that his attorneys listen to the tapes, and they failed to do so.  Had they done so, they would have been prepared to rebut critical testimony, and cast doubt on a key aspects of the government's case.

## V.    Analysis Of Constitutionally Offensive Choice Argument

The facts discussed above speak for themselves.  Mr. Weingarten was presented with the constitutionally offensive choice of proceeding to trial with counsel that were not prepared, or representing himself, thus relief is required.  Nevertheless, it is useful to emphasize a few points.

As an initial matter, however, there is the question of what standard the Court should apply when considering whether defense counsel were prepared for trial.  The Ninth Circuit has held that, in this context, a "district court [should use] the first prong of the ineffective assistance of counsel

89

standard in *Strickland v. Washington*, 466 U.S. 668, 104 (1984)." *Crandell*, 144 F.3d at 1216.  But when the Court asked Mr. Stutman and Mr. Rhodes whether they were prepared, presumably it was asking that question in a common sense way, rather than asking if the attorneys were prepared in the constitutional bare-minimum sense.  And when they "answered, unequivocally," the Court "accepted those representations" in large part because the attorneys "have a professional obligation to" be honest and candid with the Court.  5/8/09 Order at 16-17 (CR 78).  Given this, it is appropriate for the Court to rely on its supervisory powers and apply something stronger than the *Strickland* standard here.

This point, however, is academic, because it is clear that "[d]efense counsel should conduct a prompt investigation of the circumstances of the case and explore all avenues leading to facts relevant to the merits of the case . . . .  [And that] duty to investigate exists regardless of the accused's admissions or statements to defense counsel . . . ."  ABA Standards for Criminal Justice 4-4.1 (2014) (referred to approvingly in *Rompilla v. Beard*, 545 U.S. 374, 387 (2005)); *see also Pavel v. Hollins*, 261 F.3d 210, 221 (2d Cir. 2001) (holding that defense counsel may not rely solely on what they learn from the defendant).  In fact, an attorney's strategic decisions at trial generally will not be protected from review if they were not backed by a reasonable investigation.  *See, e.g, Gerstein v. Senkowski*, 426 F.3d 588, 607, 609 (2d Cir. 2005) (citing *Wiggins v. Smith*, 539 U.S. 510, 521 (2003)).

In their post-trial declarations, Mr. Stutman and Mr. Rhodes did not dispute that they failed to do any investigation, they instead blamed their failure on Mr. Weingarten and his family and friends.  *See* CR 71-8 (Rhodes dec.) & 71-9 (Stutman dec.).  But it is incredible that, through reasonable efforts, they could not have found most, if not all, of the witnesses discussed above.  For

the Brooklyn events, the attorneys had only to visit the scene of the alleged crime and they would have found Juda and Rachel, two witnesses that the Second Circuit has likened to alibi witnesses. *See Pavel*, 261 F.3d at 220 (characterizing as "something of an alibi witness" a woman who could have undermined claims of sexual abuse by testifying that alleged victims "were alone in the bathroom with [the defendant] only at night . . . and then only with the door open"). Rachel and Juda would then have alerted the attorneys that Alfred was also present on the night of July 30-31, 1997. "[I]t should [have been] perfectly obvious" to defense counsel that they needed to speak to the occupants of the Brooklyn apartment, who were "readily-available" and "whose non-cumulative testimony would [have] directly corroborate[d] the defense's theory of important disputes." *Pavel*, 261 F.3d at 221.

That the attorneys could not locate any witnesses in Belgium is also incredible. The Satmar religious community is close-knit, and many of its members strongly support Mr. Weingarten. Talk to one, and the door is opened to dozens. That is amply demonstrated by the fact that after just a few weeks Mr. Lorandos was able to submit declarations from almost all of the witnesses discussed above. And there is no doubt that these witnesses were important. In addition to starkly undermining Frieme Leaieh's claims about her and her father being in the Antwerp apartment continuously for the three-week period, they all would have testified that Frieme Leaieh appeared happy and normal. *See Pavel*, 261 F.3d at 220 n.12 (witness could have undermined claims of sexual abuse by testifying that she "noticed nothing out of the ordinary and perceived no indications of sexual abuse").

Another reason that the attorneys' blame-shifting is unconvincing is because they failed to even visit the Brooklyn or Antwerp apartments to get diagrams and photographs. The Brooklyn

91

apartment is just two miles, and two subway stops, from Mr. Stutman's office.  His failure to go there and assess the surroundings is inexcusable.  What he would have found is that it is a small apartment with tight quarters.  And there were several people who were there on the night of July 30-31, yet they did not notice anything to support the sexual abuse claims.  Even without the testimony of Rachel, Juda, and Alfred Weingarten, an attorney armed with just a diagram of the apartment could have raised serious doubts during Frieme Leaieh's cross-examination.  *See Pavel*, 261 F.3d at 218 (defendant "could have argued, with some force, that it would have been difficult to [sexually abuse two children], unnoticed, in the relatively small apartment"); *Linstadt v. Keane*, 239 F.3d 191, 200 (2d Cir. 2001) (finding attorney's investigation was deficient because he did not visit home where alleged abuse occurred, which would have given him important information to undermine government's case); 8/14/14 R. Weingarten Dec. (Exhibit 10) (diagram of Brooklyn apartment attached).

The same holds true for the Antwerp apartment.  Frieme Leaieh claimed that she had been sexually abused there repeatedly, over the course of many years, yet no one ever saw the sexual abuse.  An attorney armed with a diagram of the apartment, and the fact that there were ten people living there, could have raised strong doubts about those claims.  *See* 9/21/14 Chaneh Berkovits Dec. (Exhibit 26) (diagram of Antwerp apartment attached).  Indeed, during trial Mr. Weingarten foundered because he lacked such a diagram.  *See* RT at 472.

Also inexcusable was defense counsel's failure to speak with CPS case worker Brian Dlouhy.  Mr. Dlouhy not only had a wealth of information, he apparently strongly disbelieved Feige and Frieme Leaieh's claims, and thus would have been a powerful, neutral witness for the defense.  *See Linstadt*, 239 F.3d at 203, 205 (defendant's parole officers could have supported that defendant's

92

wife had shown a pattern of making unfounded allegations against him, and "[n]othing could have been more relevant . . . in a credibility contest [than], the testimony of neutral, disinterested witnesses"); *see also id.* at 203 n.2 (citing approvingly studies that show that false claims of child sexual abuse are often motivated by vindictive spouses); *Pavel*, 261 F.3d at 222 (finding deficient performance based on defense counsel's failure to "introduce any evidence from a disinterested source in support of the theory that" the defendant's ex-wife was "manipulating" their sons to make false claims of sexual abuse).

Similarly confounding is defense counsel's decision to not speak with Mr. Weingarten's former counsel from the family court proceedings.  She could at least have provided a wealth of information, and likely would have been a powerful witness to summarize all of the unsubstantiated claims that Feige had made during the CPS investigations and state court proceedings.  *See, e.g., United States v. Taylor*, 551 Fed. Appx. 452, 460 (10th Cir. 2014) (Ebel, J., dissenting) (unpublished) (noting that defendant justifiably questioned counsel's preparedness based on their "failing to contact both his state attorney and certain witnesses that were prominent to" an adequate defense).

Also disturbing is defense counsel's failure to consult with expert witnesses, in any of the contexts discussed above.  "It is difficult to imagine a child abuse case . . . where the defense would not be aided by the assistance of an expert."  *Pavel*, 261 F.3d at 224 n.17.  For that reason, an attorney's failure "to consult with or call an expert on the psychology of child sexual abuse" is "often indicative of ineffective assistance of counsel."  *Gerstein*, 426 F.3d at 607, 611.  Despite Mr. Weingarten's request, Mr. Rhodes and Mr. Stutman said they would not consult with such an expert because they hoped that the government's expert would be precluded.  *See* 9/22/14 I. Weingarten Dec. at ¶31(d) (Exhibit 1).  One suspects that the real reason was money.  But whatever

93

the case, doing nothing in the hope that the government's expert will be precluded is not a reasonable strategy. *Cf. Pavel*, 261 F.3d at 210 (failing to prepare defense in hope that case will be dismissed "militates strongly in favor of the conclusion that [counsel's] representation . . . was constitutionally deficient").

It is apparent that defense counsel completely failed to investigate or prepare the case for trial. There is no doubt that amounts to deficient performance under the *Strickland* standard, or any other standard. *See Sanders v. Ratelle*, 21 F.3d 1446, 1457 (9th Cir.1994) ("Ineffectiveness is generally clear in the context of complete failure to investigate"); *Bryant v. Scott*, 28 F.3d 1411, 1418 (5th Cir.1994) ("[counsel's] complete failure to investigate alibi witnesses fell below the standard of a reasonably competent attorney"). As a result, Mr. Weingarten was presented with the constitutionally offensive choice of proceeding with counsel who were unprepared, or representing himself, and his convictions must be vacated.

## VI.   Relief Is Also Warranted If The Court Applies A Traditional Ineffective Assistance Of Counsel Test

As discussed above, because Mr. Weingarten was presented with a "constitutionally offensive" choice, he need not show prejudice to warrant relief. However, if this claim were instead analyzed as a traditional ineffective assistance of counsel claim – requiring a showing of deficient performance by counsel *and* resulting prejudice – relief would still be warranted.

Defense counsel's deficient performance has already been adequately addressed. As for prejudice, even if that is assessed by looking only at what counsel did up until Mr. Weingarten began representing himself, prejudice is overwhelmingly evident. Put succinctly, there were no witnesses scheduled to come (or under subpoena), no witness files to use, and no exhibits prepared to be

94

introduced.  *See* RT at 710-11, 804, 806, 872, 951-60; 9/22/14 I. Weingarten Dec. at ¶¶44-45

(Exhibit 1); 9/23/14 Gravel Dec. at ¶¶5-6 (Exhibit 7).  Mr. Weingarten effectively stepped into the

inept shoes cobbled by his unprepared counsel.

Had counsel actually prepared, Mr. Weingarten could have presented a wealth of evidence

to support his defense.  And there was so much good evidence available that, even if it had been

clumsily presented, there is a reasonable probability that Mr. Weingarten would have been acquitted.

*See Gerstein*, 426 F.3d at 613 (characterizing as "underwhelming" government case that was based

largely on alleged sex abuse victim's testimony, bolstered by her "mother's testimony about the

victim's emotional outburst on revealing the abuse"); *Linstadt*, 239 F.3d at 204-205 (same).  "There

were only two people with any direct knowledge as to whether [Mr. Weingarten] sexually abused

his daughter. . . .  And counsel's failure to investigate prevented an effective challenge to the

credibility of the prosecution's only eyewitness, [Mr. Weingarten's] daughter." *Id.* at 204.  Notably,

even with the lopsided case that was presented, the jury was out for over a day, and initially

deadlocked on three counts.  Had the jury been presented with even a portion of the evidence

discussed above, there is a reasonable probability that the outcome would have been different.

## VII.    Irreconcilable Conflict And Breakdown In Attorney-Client Relationship

The breakdown in the attorney-client relationship that is evident from the facts already

discussed is another basis for granting relief.  "[T]o compel one charged with a grievous crime to

undergo a trial with the assistance of an attorney with whom he has become embroiled in

irreconcilable conflict is to deprive him of the effective assistance of any counsel whatsoever."

*Brown v. Craven*, 424 F.2d 1166, 1170 (9th Cir. 1970) (cited approvingly in *United States v.

Morrisey*, 441 F.2d 666, 670 (2d Cir. 1972)); *see also United States v. Schmidt*, 105 F.3d 82, 89 (2d

Cir. 1997) (acknowledging that even "[o]n the eve of trial," a defendant is entitled to substitute new counsel when there is "a complete breakdown of communication or an irreconcilable conflict").

Mr. Rhodes's treatment of Mr. Weingarten alone showed there was a complete breakdown in the attorney-client relationship – how could a client digest Mr. Rhodes's public attacks, and breaches of his professional obligations, without losing trust?  Add to that the attorneys' repeated failures to consult with Mr. Weingarten, and to bring him important materials for review (lapses they never denied), and it is impossible to not credit Mr. Weingarten's assessment that the relationship was in a shambles.  That conclusion is supported before one even considers the attorneys' obvious lack of preparation.

And there appears to have been a more traditional conflict involved here.  That is, a conflict between Mr. Weingarten's interests and the attorneys' interests.  As Mr. Rhodes complained to the Court in his February 23, 2009 letter, he and Mr. Stutman were "both owed substantial amounts for work done, neither of us has been paid for the forthcoming trial, and we have been told that we will never be paid."  CR 42 at 1.  Mr. Rhodes said that he would nonetheless stick it out, "though why [Mr. Weingarten] must have two uncompensated lawyers with whom he is unhappy, rather than one, I do not know."  *Id.*

For his part, at the December 12, 2008 hearing Mr. Stuman told the Court (through its clerk) that he and Mr. Rhodes wanted to be relieved, but then he said "[t]hat situation has changed, judge. The nature of the representation, *the nature of the people who we are representing*, it's been a roller coaster ride."  12/12/08 RT at 3-4 (emphasis).  What this indicates is that Mr. Stutman believed the people that he and Mr. Rhodes were "representing" were Mr. Weingarten's supporters, who had paid them.

96

It seems obvious that when those supporters became unhappy with the attorneys' (lack of) work, and stopped paying, the attorneys stopped providing their services to those "people." That is, they quit doing anything to represent Mr. Weingarten, like hiring an investigator or experts, talking to witnesses, going to Europe to interview witnesses, or asking the Court to order foreign depositions for witnesses that refused to travel during the religious holidays. The attorneys' work stoppage reaction to not being paid is the most logical explanation for their failures. The other logical explanations are laziness or stunning incompetence.

Explanations aside, the inexorable result of the attorneys' actions, and inaction, was a complete breakdown in the attorney-client relationship. Under these circumstances, it was unconstitutional to force Mr. Weingarten to proceed to trial with Mr. Stutman and Mr. Rhodes, and his choice to go *pro se* cannot be considered voluntary.

Looked at differently (and in the same vein as the alternative analysis with respect to the attorneys' failure to prepare), the attorneys could see that the relationship was a mess, they acknowledged as much, and they will be hard-pressed to make a contrary claim today. They were, thus, professionally obligated to seek to withdraw. That they did not amounts to deficient performance, and also supports relief based on ineffective assistance of counsel.

## VIII.   Conclusion

In light of what is set out above, and the supporting evidence, Mr. Weingarten requests that the Court allow him to use the tools of civil and criminal discovery to gather further evidence in support of his claims, including materials that have been withheld by Mr. Rhodes, copies of electronic documents, records from the MDC, and relevant records held by the government (*e.g.*, copies of correspondence between defense counsel and government counsel).  He also requests that after the discovery process the Court hold an evidentiary hearing.  *See* Rule 6 Gov. §2255 Proc.; 28 U.S.C. §2255(b) ("[u]nless the motion and the files and records of the case conclusively show that the prisoner is entitled to no relief, the court shall . . . grant a prompt hearing thereon").

## GOVERNMENT MISCONDUCT

### I.  Introduction

It appears that the government committed misconduct in two relatively discrete ways, and more broadly.

First, it misled the jury into believing that the repentance letter introduced as government's exhibit 4A-C (and attached as exhibit 32 hereto) was written by Mr. Weingarten.  It was not, and government counsel knew that.

Second, the government misled the jury into thinking that Principal Stauber and Rabbi Weis credited Frieme Leaieh's claims of sexual abuse, and thus took extraordinary steps to help her "escape."

Each of these issues is addressed below, and the second proves a useful vehicle for appreciating a broader range of government misconduct in this case.

### II.  Misconduct With Respect To Repentance Letter

At trial, the government introduced "a piece of paper that had some writing on it," which an FBI agent said he found in a pocket of Mr. Weingarten's jacket after he was arrested.  *See* RT at 852-53.  The government moved to introduce the "piece of paper that had some writing on it," and it was received.  *See id.* at 853; *see also* Exhibit 4A-C (attached as exhibit 32 hereto).  As explained above, the "piece of paper" is, essentially, a repentance letter.  It does not say who it is addressed to, nor the sender, though by its content it is apparent that it is a child-to-father letter.  The writer asks for forgiveness, and says things such as, "I'm ashamed of my bad deeds," which were "despicable, base, sinful and criminal."  And the letter suggests that the writer has sought forgiveness for similar deeds in the past.

By introducing the letter, the government obviously wanted the jury to infer that it amounted to Mr. Weingarten's confessing to his father the "despicable, base, sinful and criminal deed" of having sexually abused his daughter.  And the government did its best, under the circumstances, to get the jury to infer that, by having Agent Lazarski testify that Mr. Weingarten:  (1) saw the agent take the "piece of paper" from his jacket pocket; (2) said the paper "was personal," and three times "asked to have it back;" and (3) on "[o]ne occasion he . . . had actually move[d] towards" the agent. RT at 852-53.  But the problem with the inference the government pushed is that the letter was not written by Mr. Weingarten, it was written to him by his son, Yoil.  *See* Yoil Weingarten Dec. at ¶15 (Exhibit 55).

Mr. Weingarten explained this to the prosecutor before she introduced the letter, and he explained it during a sidebar after she introduced the letter.  *See* RT 859-60; 9/22/14 I. Weingarten Dec. at ¶47(d) (Exhibit 1).  Both times he pointed out that the letter was missing its second page, which showed Yoil's signature.  *See* RT 859-60; 9/22/14 I. Weingarten Dec. at ¶47(d) (Exhibit 1). When the jury asked to see the letter during its deliberations, Mr. Weingarten again explained that he did not write it.  *See* RT at 1089-90.  All to no avail.  The letter went back to the jury, and the jury almost surely drew the inference the government hoped for.  Notably, the evidence packed an especially prejudicial kick, given the confluence of events regarding the alleged abuse in Brooklyn on July 30-31, 1997, the death of Mr. Weingarten's father the next day, and Frieme Leaieh's testimony that she was appalled that her father would sexually abuse her at such a mournful time.

Perhaps the prosecutor did not believe Mr. Weingarten when he told her the letter was not written by him, and was instead written by Yoil.  Though it is noteworthy that when Mr. Weingarten tried to explain to the Court that he did not write the letter, the government said nothing.  This

suggests that the government had no basis to conclude that Mr. Weingarten wrote the letter (after all, normally it is the receiver of a letter that possesses it, not its sender), and common sense supports that conclusion.

Prior to trial, the prosecutors knew they were required to have some basis to believe that Mr. Weingarten wrote the letter. If not, it would be inadmissible under Federal Rules of Evidence 401 and 403. Moreover, introducing it would present serious foundational problems. It appears that the government "solved" those problems at trial by saying as little as possible about the foundation for the letter; it was simply "a piece of paper that had some writing on it." That sufficed for its admission over a defense objection (albeit an objection that did not specify the grounds). *See* RT at 853. But generally a prosecutor faced with this type of situation pre-trial, who wants to ensure that there are actually adequate foundational and evidentiary bases for admitting a letter, will have a handwriting expert compare the defendant's known handwriting with the letter. The prosecutors in this case did not need to go to that much effort, because they had the ultimate experts available: Mr. Weingarten's ex-wife and two of his children. It seems highly likely that the prosecutors used that resource, and that they were told by one, two, or three of those people that the handwriting was not Mr. Weingarten's, and was actually Yoil's.

Thus, the direct and circumstantial evidence shows that the prosecutors knew that the repentance letter was not written by Mr. Weingarten. What they did, then, is fairly disturbing. "The prosecution has a special duty not to mislead . . . ." *United States v. Universita*, 298 F.2d 365, 367 (2d Cir. 1962). Moreover, whatever the prosecutors might have thought about who wrote the letter, if they had evidence that Mr. Weingarten did not write it – such as statements by his family members

101

or an expert, or the second page with Yoil's signature on it – they were obliged to produce that in discovery under *Brady v. Maryland*, 373 U.S. 83 (1963).

Accordingly, Mr. Weingarten requests that the Court order discovery, hold an evidentiary hearing, and impose an appropriate remedy.  *See* Rule 6 Gov. §2255 Proc.; 28 U.S.C. §2255(b) ("[u]nless the motion and the files and records of the case conclusively show that the prisoner is entitled to no relief, the court shall . . . grant a prompt hearing thereon").

## III.   Misconduct With Respect To Principal Stauber And Rabbi Weis, And Broader Misconduct

### A.   Introduction

The government's trial case was based on the testimony of Frieme Leaieh.  The government sought to bolster its case with the testimony of Mr. Weingarten's ex-wife, Feige, and son, Yoinesun. But they did not witness any sexual abuse.  Moreover, their testimony was suspect because they were on one side of a deep family rift.  *See, e.g.,* RT at 123 (government acknowledges that allegations were first made as part of "an ugly and painful divorce and custody battle"); RT at 317-18 (Frieme Leaieh refers to her involvement supporting her mother in the divorce and custody battle); RT at 526 (Yoinesun testifies that Frieme Leaieh is only sibling with whom he has a relationship).  It is not surprising, then, that the government cast about for some other way to buttress Frieme Leaieh's claims.

It came up with two official imprimaturs:  (1) the "protective order" entered in Hull, England on March 1, 1999; and (2) Frieme Leaieh's "rescue" by her school principal, Mordechai Stauber, and the "head of the Satmar community in Belgium," Rabbi David Weis.  With respect to the second of these imprimaturs, the government led the jury to believe that Principal Stauber and Rabbi Weis

102

credited Frieme Leaieh's claims of abuse, and thus spirited her out of her home, and out of the country. But, as Mr. Weingarten's counsel recently discovered, the government knew that Principal Stauber and Rabbi Weis doubted Frieme Leaieh's claims. *See* 9/16/14 Stauber Dec. (Exhibit 33); 9/17/14 Weis Dec. (Exhibit 34); *see also United States v. Valentine*, 820 F.3d 565, 571 (2d Cir. 1987) (holding that procedural default does not apply when claim is based on evidence that was withheld by the government). This was misconduct, and it points the way toward wide-ranging violations of *Brady v. Maryland*, 373 U.S. 83 (1963), and its progeny.

Below, Mr. Weingarten sets out the relevant facts with respect to the Stauber/Weis situation, then he discusses the government's multi-faceted misconduct.

### B.    Relevant Background

The record shows that the government had a deliberate plan, which culminated in a misleading argument to the jury.

#### 1.    Pre-Trial

Th government's approach was foreshadowed in its November 26, 2008 motion to take depositions, in which it asserted that Principal Stauber and Rabbi Weis had taken extraordinary steps to rescue Frieme Leaieh from her father's abuse. *See* CR 18 at 15. In that motion, the government said that Principal Stauber would not come to the United States to testify. Shortly thereafter, the government filed a letter with the Court in which it addressed Rabbi Weis's availability:

> Despite repeated attempts, the government has been unable to reach Rabbi Hein Dovid Weiss in recent weeks to confirm his willingness and ability to travel to the United States in order to testify at the defendant's trial. As noted in the government's motion in limine, it may be necessary for the government to supplement its Rule 15 request to include Rabbi Weiss.[15]

---

[15] Mr. Weingaren's counsel believe that the correct spelling is Weis.

CR 20 at 2 n.1.  Rabbi Weis's recent declaration states that he told FBI agents that he was willing to come testify, but the FBI agents did not follow up with him.  *See* 9/17/14 Weis Dec. at ¶8 (Exhibit 34).  Principal Stauber's declaration says that he told FBI agents that he was willing to come testify, but they said "they were not going to call me to testify."  *See* 9/16/14 Stauber Dec. at ¶11 (Exhibit 33).

As will be discussed in detail below, the reason the government did not call these men as witnesses seems obvious:  because doing so would have thwarted the government's plan to mislead the jury about the men's views of Frieme Leaieh's claims.

### 2.    Opening Statement

In its opening statement, the government referred to the testimony that it intended to elicit at trial:

> [W]hen she was fifteen years old, her mother walked into the bedroom when the defendant and Leaieh were in bed together, and, once again, Leaieh reached out, and, once again, when the defendant found out, he beat Leaieh.  He beat her without mercy.  He beat her so bad, she couldn't go to school because of the bruises that covered her.  *And this time, members of the community in Belgium tried to help. They tried to intervene.  They tried to get her away from this defendant by sending her to boarding school in England.*

RT at 122 (emphasis added).  The message was clear:  the "members of the community in Belgium" knew that Mr. Weingarten was sexually abusing his daughter, and they took extraordinary steps to rescue her.  During the trial testimony, the government established that the "members of the community" to whom it referred were Principal Stauber and Rabbi Weis.

### 3.      Frieme Leaieh Weingarten's Testimony

After discussing the incident when her mother saw her in bed with her father, Frieme Leaieh

testified:

> One day my principal called me into his office, and the male principal, and he usually
> doesn't talk to students.  It's most of the time the female principal that speaks to
> students.  So I thought something was wrong because he called me personally.

> When I got to his office, he was pacing up and down the room.  He couldn't even
> look at me.  He was very distracted.  I didn't know what was wrong.  He was playing
> with his beard and he asked me if it's true, what he's hearing, and I know right away
> what he's talking about.  And I told him yes, it is true.

RT at 251.  She said she then went to stay with a friend while Rabbi Weis figured out what to do:

> I just stayed at my friend's house and waited for  Dayan Weiss to call me, Rabbi
> Weiss, who is Rabbi Weiss in the Beligan Satmar community.
> He's a – he's a very revered rabbi that actually has a – a Jewish court and people will
> come to him for advice and also for Jewish court rules.

RT at 252.  The government asked Frieme Leaieh, "did you speak with Rabbi Weiss," and "what

happened?"  Frieme Leaieh responded:

> A lot.  I had to go in front of a Jewish rabbinical court where three rabbis were.  They
> asked me if that happened to me according to that, to that time I was there, they all
> said that I am not allowed to go home.

RT at 253. Mr. Rhodes objected on the bases of hearsay and relevance.  At sidebar, government

counsel responded:

> We are not offering it for the truth of the matter.  It is simply part of the story.  It
> describes her state of mind and what eventually led her to leave Belgium shortly
> thereafter.

105

RT at 254. The Court said to the prosecutor, "The rabbinical court says you can't go home. Then what?" *Id.* The prosecutor replied, "Rabbi Weiss gets a hold of her passport. Rabbi Weiss assists her to getting to England." *Id.* The Court overruled the objection.

In response to further questions, Frieme Leaieh said that she left Belgium to England with Rabbi Weiss, "[n]ot too long after the rabbinical court, and after Dayan Weiss was able to get my passport somehow." RT at 255. She claimed that when she arrived in England:

> Rabbi Weiss got me to stay at his daughter's house in London. But I couldn't leave the house because everyone – I was scared and Rabbi Weiss was scared that my father was going to find out where I was. So I stayed in – in the attic most of the time.

RT 258. A few weeks later, she testified, she "found out that [her] father might know where she was so Rabbi Weiss got me to go to another house," and shortly after that she went live at a seminary school in Manchester. RT at 259.

### 4. Feige Weingarten's Testimony

The prosecutor elicited similar testimony from Feige Weingarten, by asking if Frieme Leaieh had moved out of the family home. Evidently prepared for this topic, Feige responded, "Not by herself. It was done by the principal of the school and the head of the Satmar movement." RT at 702. The government asked who was "the head of the Satmar community," and Feige replied, "Rabbi Chaim David Weiss." RT at 702-03. Feige said that Rabbi Weis arranged for her daughter to go to school in Manchester. *See id.* Feige claimed that Mr. Weingarten subsequently "brought [Frieme Leaieh] home without the school's permission," but Rabbi Weis again intervened and "arranged for her to go back to Manchester." *Id.* at 704.

### 5.      Yoinesun Weingarten's Testimony

The government asked Yoinesun Weingarten if he had learned that Frieme Leaieh left home at some point, and he said yes, she went to stay at a friend's home.  *See* RT at 538.  Government counsel then asked, "Did you ever learn that she was going to leave Belgium?"  In an answer that appears to have been prepared, he said:

> My father told me one evening that he got a call from Rabbi Weiss, he's one of the rabbis in the Satmar community in Antwerp, and he asked him to immediately surrender my sister.

RT at 538.  Mr. Rhodes objected, and in the course of a few moments that objection was sustained, overruled, and withdrawn.  The government again referred generally to Frieme Leaieh leaving Belgium, and Yoinesun gave almost the same answer he gave before:

> My father told me one evening that he got a call from Rabbi Weiss, and he's one of the rabbis in the Satmar community in Antwerp, and Rabbi Weiss told him immediately to surrender my sister's passport, and my father told me that story, that he was forced to surrender my sister's passport.

RT at 539.  When asked whether he knew if his father had complied with that order, Yoinesun said yes, because he went along when his father did so.  *See id.*

### 6.      The Government's Closing Argument

Having laid the groundwork, in its closing argument the government repeatedly drove home what it meant to establish with the testimony discussed above:  that Principal Stauber and Rabbi Weis believed Frieme Leaieh was being sexually abused by her father, and thus took extraordinary steps to rescue her.  This was one of the first lines of argument the government pursued:

> [Frieme Leaieh] managed to *escape [her father's abuse] with the help of members of her community*, she left and went to school in Manchester, but the defendant brought her back and then he took Leaieh to places where he knew no one could

107

stand in his way, *where no one could stop him from sexually abusing his daughter at will*.

RT at 969 (emphasis added). In light of what was discovered recently by Mr. Weingarten's counsel (which will be discussed below), some might call this argument clever and careful. But its meaning was not subtle – a person does not help another escape from sexual abuse unless that person believes that sexual abuse is occurring. A few minutes later, the government continued in the same vein:

> Leaieh's bruises were so bad after this that he wouldn't let her go to school. She stayed home, locked in a room.

> By the time she returned to school, *people knew what had happened to her. The school principal helped her take the first step towards escape*.

> She didn't go home. She went to stay with her friend instead. But she was so afraid of her father that she stayed in their attic almost the whole time she was there, *until the head rabbi, Rabbi Weiss, could figure out where she could go*.

> She went to him and she *spoke before a rabbinical court* and she said what her father had been doing to her.

> *After listening to her, Rabbi Weiss arranged for her to go to school in Manchester.* She went there to avoid, to get away, from her father's abuse.

RT at 974 (emphasis added). The argument here is markedly less subtle: "people knew what had happened to [Frieme Leaieh]," those people included Principal Stauber and Rabbi Weis, and they helped Frieme Leaieh make her "escape."

The government argued that Rabbi Weis intervened again after Frieme Leaieh came home for Purim:

> In March of 1997, when her father insisted that she return home for Purim, Leaieh told her school principal in Manchester why she didn't want to go.

But her father won in the end.  He dragged her back to Belgium and at the family dinner he got her drunk and he demanded to know from her who was supporting her, who had dared to get in his way.

*As soon as Rabbi Weiss found out that she was home though he sent her back.*  But in April, when the school closed for Passover, she had no place to go.  She went back home and back to the horrific abuse.

The defendant had learned that Purim, though, *it wasn't so easy anymore.  People like Rabbi Weiss and the school principal in Belgium were there to help her.*

So between April and August of 1997, the defendant took Leaieh away from the few people who could protect her, traveling with her between Belgium, Israel and New York.

RT at 975 (emphasis added).  Again, the message is not subtle – these two important men were "helping" Frieme Leaieh because they believed that her father was sexually abusing her.

The government returned to this line of argument in its rebuttal closing argument:

The defendant argued to you that, first of all, the reason that Leaih went to Manchester is because the defendant wanted it, that he registered her in school and that she had to then come home.  That's not in the evidence.  *What's in the evidence* is that Leaih finally escaped her father, got sent to Manchester.  He tried to drag her back in.  When he couldn't control her at home, Purim, *when Rabbi Weiss found out Leaih was back in Belgium, he sent her back to Manchester.*  He knew he couldn't stay in Belgium anymore.

*People like Rabbi Weiss, people like the principal were starting to interfere, get Leaih away from him*.  He took her and the rest of his family to Israel.

RT at 1059 (emphasis added).

### 7.     Declarations Of Principal Stauber And Rabbi Weis

The problem with the government's argument is that it painted a picture that the government

knew was untrue.  Before trial, Principal Stauber and Rabbi Weis told the FBI that they had serious

doubts about Frieme Leaieh's claims of sexual abuse. This is indicated in their declarations, which are attached hereto.

In Rabbi Weis's declaration, he recalls that prior to trial he spoke for about two-and-half hours with FBI agents. He told them that he had no proof to support Frieme Leaieh's allegations of sexual abuse, and that he had come to think that Frieme Leaieh might have made up the allegations "because she no longer wanted to be part of the Orthodox Jewish community." 9/17/14 Weis Dec. at ¶¶6-9 (Exhibit 34). After he shared these thoughts with FBI agents, they "contacted [him] about testifying," and he "called them back and told them [he] was prepared to go to court to testify." *Id.* at ¶8. For what seem to be obvious reasons, the government did not take him up on that offer.

Mr. Stauber also told FBI agents that he "had no independent information as to whether [Frieme Leaieh's] allegations [that her father sexually abused her] were true," and he "doubted the allegations . . . were true." 9/16/14 Stauber Dec. at ¶¶6-7 (Exhibit 33). Not surprisingly, the FBI agents "told [him] they were not going to call [him] to testify." *Id.* at ¶11.

Thus, during its closing the government repeatedly pressed an inference – that these two men endorsed Frieme Leaieh's claims – while knowing that was not true. It is apparent that the government sought to set up its argument from the outset of the trial. At the one point where the plan might have gone off the tracks – when Mr. Rhodes objected on relevance and hearsay grounds during Frieme Leaieh's testimony – government counsel told the Court that she was eliciting testimony about Rabbi Weis and the rabbinical court "not . . . for the truth of the matter," but because "[i]t is simply part of the story. It describes her state of mind and what eventually led her to leave Belgium shortly thereafter." RT at 254. The testimony did not describe Frieme Leaieh's state of mind. Nor was it intended to. It was intended to falsely portray Principal Stauber's and Rabbi

110

Weis's state of mind; specifically, to make the jury believe that Principal Stauber and Rabbi Weis thought Frieme Leaieh's allegations were true.

### C.     The Government's Misconduct Was Multi-Faceted

The government's misconduct was broader than what it did with respect to Principal Stauber and Rabbi Weis.  But the Stauber/Weis misconduct is a good starting point to understanding the breadth of the government's misconduct.

"The prosecution has a special duty not to mislead; the government should, of course, never make affirmative statements contrary to what it knows to be the truth." *Universita*, 298 F.2d at 367. Moreover, the government's "argument to the jury" must not "contain[] improper insinuations and assertions calculated to mislead the jury." *Berger v. United States*, 295 U.S. 78, 86 (1935); *see also Darden v. Wainwright*, 477 U.S. 168, 181-82 (1986) (recognizing that "prosecutor's argument" may not "manipulate or misstate the evidence"); *United States v. Reyes*, 577 F.3d 1069, 1077 (9th Cir. 2009) ("it is improper for the government to present to the jury . . . inferences it knows to be false or has very strong reason to doubt").  "Standing alone, a prosecutor's [misleading] comments upon summation can 'so infect [a] trial with unfairness as to make the resulting conviction a denial of due process.'" *Jenkins v. Artuz*, 294 F.3d 284, 294 (2d Cir. 2002) (quoting *Darden*, 477 U.S. at 181); *see also United States v. Kojayan*, 8 F.3d 1315, 1323 (9th Cir. 1993) ("Evidence matters; closing argument matters; statements from the prosecutor matter a great deal").

The Second Circuit's opinion in *United States v. Valentine*, 820 F.3d 565 (2d Cir. 1987), applies these principles in a context that is analogous to the Stauber/Weis situation.  In *Valentine*, the prosecutor did not call certain witnesses at trial because he knew, from their grand jury testimony, that they would say things that were inconsistent with an important aspect of his case.

111

The Second Circuit reviewed the grand jury transcripts "*in camera*" and found that they "reveal[ed] why the government chose not to call them as witnesses:  their testimony would not have supported the government's loan theory of culpability."  *Id.* at 569.  By advancing a trial theory that it knew was contrary to the *undisclosed* grand jury testimony, the government "violated the due process prohibition against a prosecutor's making knowing use of false evidence, including by misrepresenting the nature of nontestimonial evidence." *Id.* at 570 (quotation and citations omitted); *see also Jenkins*, 294 F.3d at 294 (holding that while prosecutor's statements during closing were literally true, he nonetheless committed misconduct by "falsely suggesting the absence of a deal between [a witness] and the prosecution").

In *United States v. Blueford*, 312 F.3d 962, 968 (9th Cir. 2002), the Ninth Circuit dealt with the prosecutor's mis-characterizing wiretap evidence that was not introduced at trial.  Citing approvingly to the Second Circuit's opinion in *Valentine*, the court said:

> It is certainly with the bounds of fair advocacy for a prosecutor, like any lawyer, to ask the jury to draw inferences from the evidence that the prosecutor believes in good faith might be true.  But it is decidedly improper for the government to propound inferences that it knows to be false, or has very strong reason to doubt . . . .

*Id.* at 968.

What the government did in this case was worse than what was found to be misconduct in *Valentine* and *Blueford*.  It followed a deliberate plan that was designed to present to the jury a picture that the government knew was false – specifically, that Principal Stauber and Rabbi Weis believed Frieme Leaieh was credible, and that Mr. Weingarten was guilty.  The government pursued that plan in the face of a defense objection, telling the Court that it was "not offering [the testimony about Rabbi Weis and the rabbinical court] for the truth of the matter.  It is simply part of the story."

RT at 254.  It is clear from the record what the government's purpose was, and its purpose was improper.

When fairly viewed, the government's conduct in this regard also violated *Brady v. Maryland*, 373 U.S. 83 (1963).  To make this point, it is first useful to discuss two preliminary ways in which the testimony the government elicited was improper.

The government crafted the trial testimony of three witnesses so that it could later argue, in essence, that Principal Stauber and Rabbi Weis vouched for Frieme Leaieh's claims of sexual abuse.  Had the government sought to introduce those opinions directly from the two men, that would have been precluded as improper testimony.  *See, e.g., United States v. Truman*, 688 F.3d 129, (2d Cir. 2012).  And having another witness relate the opinions of those men would have made it doubly inadmissible, as hearsay.  The government's approach allowed it to disguise these violations of evidentiary rules, and the principles on which they stand.

Nevertheless, the government's approach brought into play Federal Rule of Evidence 806 applied.  That Rule states, in relevant part:

> When a hearsay statement . . . has been admitted in evidence, the declarant's credibility may be attacked . . . by any evidence that would be admissible for those purposes if the declarant had testified as a witness.  The court may admit evidence of the declarant's inconsistent statement or conduct, regardless of when it occurred or whether the declarant had an opportunity to explain or deny it.

Because the government effectively introduced (false) hearsay opinions of Principal Stauber and Rabbi Weis, Mr. Weingarten was entitled to introduce "evidence of [Principal Stauber and Rabbi Weis's] inconsistent statement[s] or conduct, regardless of when it occurred or whether the declarant had an opportunity to explain or deny it."  The dictates of due process demanded no less.

113

Such inconsistent statements would include, of course, the two men's statements to the FBI, in which they said that they doubted the veracity of Frieme Leaieh's claims. But the government never provided those statements in discovery, and that failure was contrary to the dictates of *Brady* and its progeny. *See Connick v. Thompson*, 131 S. Ct. 1350, 1382 (2011) ("*Giglio v. United States*, 405 U.S. 150 (1972), made plain: Impeachment evidence is *Brady* material prosecutors are obligated to disclose") (Ginsburg, J., dissenting); 9/22/14 I. Weingarten Dec. at ¶44(a) (Exhibit 1).

The Ninth Circuit's opinion in *Kojayan* is on-point. There, the government: (1) refused to answer before trial whether one of the participants in the offense conduct charged (a man named Nourian) was cooperating with the government; (2) presented Nourian's "testimony" at trial through hearsay statements; and (3) argued to the jury that it was not able to present Nourian's live testimony because he had a Fifth Amendment right against self incrimination. *See Kojayan*, 8 F.3d at 1317-19. After trial, the defense learned that Nourian had signed a cooperation agreement with the government, which required him to testify when the government asked. The Ninth Circuit found that the prosecutor's misleading statements to the jury amounted to misconduct. And in a passage that is apt here, the court asked, "How did this all come about? . . . [B]ecause of the [prosecutor's] strategic decision to present Nourian's evidence by way of hearsay." Given that choice, the court said, the prosecutor had an obligation to "give the defense whatever information he had" that undercut the credibility of Nourian's hearsay "testimony." *Id.* at 1323. Rule 806, and the dictates of due process and the confrontation clauses, compel that conclusion.

The same conclusion holds here: having effectively introduced the hearsay "testimony" of Principal Stauber and Rabbi Weis, the government was obligated to produce discovery that conflicted with that "testimony."

The government's misconduct was not limited to the situation involving Principal Stauber and Rabbi Weis.  As discussed above, the government presented to the jury a picture of Mr. Weingarten's having terrorized the entire family for many years.  The government bolstered that portrayal by introducing a copy of the protective order from Hull, England, and by Frieme Leaieh's vague references to a rabbinical court in Europe.  Meanwhile, the government was aware that there was evidence that directly refuted its portrayal, evidence that was in the records of CPS officials and the New York courts.

If one were to set aside how the government presented its case, perhaps some of the evidence about the CPS investigations and family court proceedings would not have been admissible.  Even in that vacuum, however, some of that evidence would have been admissible to impeach Feige, show her bias, and support the argument that the two oldest children were helping her advance her position in the ongoing custody battle.  The case was not tried in a vacuum, of course.  And by raising the specter of the Hull protective order proceedings, and the Antewrp rabbinical court, the government opened the door to an onslaught of compelling evidence about what had occurred in the family courts, in the rabbinical courts, and with respect to the CPS investigations.

But except for providing the deposition transcripts of Frieme Leaieh and Yoinesun shortly before trial, the government provided no records from the family court proceedings, and no records from the CPS investigations.  This amounts to wide-ranging failure to comply with *Brady*, and a considered abridgment of Mr. Weingarten's constitutional rights.

115

## IV.   Conclusion

If the government knew that the repentance letter was not written by Mr. Weingarten, and nevertheless tried to mislead the jury into thinking that it was, reversal is warranted, not just because of the substantial prejudice, but also to punish that misconduct.

The same holds true with respect to the Stauber/Weis situation.  Assuming that what is set out in their declarations is accurate, the government's misconduct in that context alone warrants vacating Mr. Weingarten's convictions.  *See, e.g., Valentine*, 820 F.2d at 571 ("because of the prosecutor's 'consistent pattern' argument, at best questionable and perhaps outrightly disingenuous, our confidence in the jury verdict is severely shaken"); *United States v. Lusterino*, 450 F.2d 572, 575 (2d Cir. 1971) ("When the prosecution participates in allowing a false picture to be painted, it bears a heavy burden of showing that it could not have affected the verdict"); *cf. United States v. Wallach*, 935 F.2d 445, 456 (2d Cir. 1991) ("if it is established that the government knowingly permitted the introduction of false testimony reversal is virtually automatic") (quotation omitted).  Accordingly, Mr. Weingarten requests that relief.

But to fully understand the breadth of the government's *Brady* violations (*i.e.*, what exactly the government had, and what it failed to turn over), and to apply a refined analysis, more information is needed.  *See United States v. Agurs*, 427 U.S. 97, 103 (1976) (holding that nature of *Brady* analysis varies based on context); *Kojayan*, 8 F.3d at 1318 ("In determining the proper remedy, we must consider the government's willfulness in committing the misconduct and its willingness to own up to it"); *Valentine*, 820 F.3d at 570 (in assessing whether relief is warranted due to prosecutorial misconduct, a key factor is the severity of the government's misconduct).  Accordingly, Mr. Weingarten requests that the Court permit him to employ the tools of civil and

116

criminal discovery to unearth all of the relevant evidence.  *See* Rule 6 Gov. §2255 Proc.; 28 U.S.C. §2255(b) ("[u]nless the motion and the files and records of the case conclusively show that the prisoner is entitled to no relief, the court shall . . . grant a prompt hearing thereon").

### SENTENCING CLAIM

At Mr. Weingarten's re-sentencing following the first appeal, the Court calculated a sentencing guidelines range of 168-210 months. *See* 9/12/11 RT at 9. Defense counsel then addressed the appropriate sentence based on the 18 U.S.C. §3553(a) factors, and asked the Court "not to punish the defendant for representing himself." *Id.* at 13. The Court proceeded to impose a sentence of 360 months, 150 months more than the high-end of the advisory guidelines range.

The Court explained its reasons for that substantial variance, as is required by Supreme Court case law. *See Gall v. United States*, 552 U.S. 38, 50 (2007) (major variance from guidelines range requires more substantial justification). It said that "it is hard to believe that a defendant [who has] engaged" in the type of activity for which Mr. Weingarten was convicted could "make it even worse but he did it." 9/12/11 RT at 18. To explain how, the Court detailed aspects of Mr. Weingarten's cross examinations of his daughter, ex-wife, and son. *See id.* at 19-20.

As has already been discussed, Mr. Weingarten has a Sixth Amendment right to represent himself, and he also has a right to confront his accusers. *See, e.g.*, *Crawford v. Washington*, 541 U.S. 36 (2004). And while it has long been established that a court may give a defendant a sentencing "discount" for relinquishing such constitutional rights (*e.g.*, a guidelines reduction for acceptance of responsibility), it is also well established that a court may not "penalize [a] defendant for exercising his constitutional right[s]." *United States v. Cruz*, 977 F.2d 732, 734 (2d Cir. 1992).

In *Cruz*, for example, the judge informed the defendant that if he went to trial and did not have a good defense, "you're going to get the maximum, because you're playing games with me." *Id.* at 733. After trial, the court gave the defendant a sentence near the high end of the guidelines range. *See id.* The Second Circuit held that the district court's "remarks created an *unacceptable*

*risk* that the sentence was impermissibly enhanced above an otherwise appropriate sentencing norm to penalize the defendant for exercising his constitutional right to stand trial." *Id.* at 734 (emphasis added). Accordingly, the sentence was reversed and the case was remanded for re-sentencing by a different judge.

The well-established rule relied on in *Cruz* applies with equal force to a defendant who exercises his constitutional right to cross-examine a victim at trial, no matter how unpleasant that experience is for the witness. In *Burns v. Gammon*, 260 F.3d 892 (8th Cir. 2001), the jury was tasked with determining the appropriate penalty. In closing argument, the prosecutor told the jurors that in setting the punishment, they should consider that "by exercising his constitutional right to a jury trial and to confront witnesses, [the defendant] forced the victim to attend trial, take the stand and relive the attack." *Id.* at 896. The Eighth Circuit held that this argument clearly violated the defendant's constitutional rights, and his counsel was ineffective for failing to make appropriate objections. *See id.* at 896-98.

The Second Circuit has cited approvingly to the Eighth Circuit's opinion in *Burns*, and has emphasized the distinction between granting a defendant leniency to reward his waiving his constitutional rights, versus increasing a defendant's sentence based on his having exercised his constitutional rights. *See United States v. Whitten*, 610 F.3d 168, 194-95 (2d Cir. 2010). In *Whitten*, the Second Circuit held that it was unconstitutional for the prosecutor to argue to the jury that the defendant's demand for a trial reflected a lack of remorse, and therefore supported a finding of future dangerousness, a factor that supports imposing the death penalty. *See id.* at 195. As in *Cruz* and *Burns*, the court in *Whitten* explained that it was improper for the government to rely on the

119

defendant's exercise of a constitutional right to increase the defendant's punishment. *See id.* at 195-96.

Contrary to the well established principles discussed in *Cruz*, *Whitten*, and *Burns*, the Court improperly relied on Mr. Weingarten's exercise of his constitutional rights to support its substantial upward variance from the applicable guidelines range. While Mr. Weingarten believes that the Court's comments clearly reflect that it enhanced the sentence based on his decision to exercise his fundamental constitutional rights, at the very least the comments create an "unacceptable risk" of such an impermissible sentencing consideration. *Cruz*, 977 F.2d at 734.

Notably, at the re-sentencing hearing defense counsel asked the Court not to punish Mr. Weingarten for representing himself, but did not object when the Court made remarks indicating that it was doing exactly that. And Mr. Weingarten's appellate counsel did not raise the impermissible punishment claim in the subsequent direct appeal. The failure to raise this obvious error constitutes a freestanding ineffective assistance of counsel claim, and also constitutes cause and prejudice excusing any procedural default. *See, e.g.*, *Glover v. United States*, 531 U.S. 198 (2001); *Gonzalez v. United States*, 722 F.3d 118, 135-36 (2d Cir. 2013). Indeed, in finding ineffective assistance of counsel in *Burns*, 260 F.3d at 897, the Eighth Circuit held that an evidentiary hearing was not even necessary, because there was no "sound" reason that could justify failing to make an objection, and the potential that the jury increased the defendant's sentence based on the exercise of a constitutional right was clearly prejudicial.

Accordingly, Mr. Weingarten's sentence should be vacated, and, in accordance with *Cruz*, he should be resentenced by a different judge.

## INCOMPETENCY

**I.      Mr. Weingarten's Trial Counsel Were Ineffective for Failing to Investigate Whether He Was Competent to Represent Himself and Failing to Seek Expert Assistance to Help Determine Whether He Could Represent Himself.**

Mr. Weingarten's communications with his trial counsel revealed early on evidence of his mental disabilities. Assuming the truth and accuracy of their representations, his trial attorneys noted that during their representation, "[w]hen pressed re [sic] the details of the case, [Mr. Weingarten] would change the subject or start a harangue on irrelevancies …. His view of how to defend the case was the foolish notion that each and every fact, however minor or immaterial, had to be rebutted. He thus refused to focus on key issues or witnesses and became obsessed with minutiae." CR71 [Rhodes Affidavit, 4/23/09]. Counsel stated that Mr. Weingarten was "very verbose, dominating every conference with excruciatingly complicated details, but not very forthcoming with information that both myself and co-counsel felt were of vital importance to the defense of the case." CR 71 [Stutman Affidavit, 4/24/09]. They complained to the Court about the "two-hour lecture" they received "with respect to the Purim and Passover rituals." 2/6/09 RT at 39. They noted Mr. Weingarten had "demands" that were "unneeded and foolish in the extreme." CR 22 [Dec. 7, 2008 Letter to Court from Rhodes, p. 2] They noted that "nothing they could do persuaded the defendant." *Id.* They told the court that their representation of Mr. Weingarten had "been a roller coaster ride." 12/12/08 RT at 3. They had a "harsh" session with the client when preparing him for his testimony. Mr. Weingarten was not able to be "brief" or "stay on point," which frustrated his attorneys. [Nov. 27, 2008 Letter to Court from Rhodes].

Stutman and Rhodes were ineffective for failing to investigate a mental health reason for what they experienced as difficult interactions with their client.  Rather than abide by their duty to

protect his best interests, they became impatient and frustrated with Mr. Weingarten. They took his deficiencies personally and went on the defensive, caring more about their reputations than their duties to their client. This led to a complete breakdown in their relationship.

This was counsel's failure. As professionals, attorneys have an ethical duty to develop a relationship with their client,[16] a duty to investigate any factor that may protect the interest of their client,[17] a particularized duty when they are dealing with any client with any possible psychological issues,[18] and a duty to consult with appropriate experts[19]. Counsel here abdicated their responsibility

---

[16] ABA Criminal Justice Section Standards, Defense Function, Standard 4- 3.1(a) Establishment of Relationship, http://www.americanbar.org/publications/criminal_ justice_section_archive/ crimjust_standards _dfunc _blk.html "Defense counsel should seek to establish a relationship of trust and confidence with the accused…."

[17]ABA Standard 4-4.1 requires the defense lawyer to investigate the circumstances of the case promptly, exploring all avenues leading to facts relevant to the merits of the case and the possible penalty. *See also* http://www.nlada.org/Defender/ Defender_Standards/Performance_Guidelines, Guideline 4.1 Investigation (a) Counsel has a duty to conduct an independent investigation regardless of the accused's admissions or statements to the lawyer of facts constituting guilt. The investigation should be conducted as promptly as possible).

[18] The ABA Model Rules of Professional Conduct, Adopted by New York in 2009, 1.14, set forth the responsibilities of counsel when dealing with a client with diminished capacity:

(a) When a client's capacity to make adequately considered decisions in connection with a representation is diminished, whether because of minority, mental impairment or for some other reason, the lawyer shall, as far as reasonably possible, maintain a normal client-lawyer relationship with the client.
(b) When the lawyer reasonably believes that the client has diminished capacity, is at risk of substantial physical, financial or other harm unless action is taken and cannot adequately act in the client's own interest, the lawyer may take reasonably necessary protective action, including consulting with individuals or entities that have the ability to take action to protect the client and, in appropriate cases, seeking the appointment of a guardian ad litem, conservator or guardian.

[19] Whether it is an expert in blood spatter or psychological expertise, counsel should at a minimum investigate the need for expert assistance and consult with a relevant expert. In *Gersten v. Seknkowski,* 426 F.3d 588 (2d Cir. 2005), for example, the Second Circuit vacated a state conviction in a child sex abuse case where the attorney failed to consult a medical expert on the issue of penetration and failed to consult or call a psychological expert to counter the prosecution's expert

to act as Mr. Weingarten's advocate. *See United States v. Gonzalez*, 722 F.3d 118, 136 (2d Cir. 2013) ("The problem … is that [counsel] did not act as an advocate for Gonzalez at all. 'The adversarial process protected by the Sixth Amendment requires that the accused have counsel acting in the role of an advocate. While a criminal trial is not a game in which the participants are expected to enter the ring with a near match in skills, neither is it a sacrifice of unarmed prisoners to gladiators.'") (quoting *United States v. Cronic*, 466 U.S. 648, 656-57 (1984)).

To the extent Mr. Weingarten's attorneys encountered difficulties working with him, they had an ethical obligation to, at a minimum, investigate a mitigating reason for his behavior or

on so-called Child Sexual Abuse Accommodation Syndrome. And in *Bell v. Miller*, 500 F.3d 149 (2d Cir. 2007), reversing the denial of a §2254 claim, the Second Circuit found counsel constitutionally ineffective for failing to consult a medical expert, when the only witness was the victim, found lying in the street, who was then in a coma and did not identify the defendant as the assailant until eleven days later. In a weak case, a medical expert could have testified to the effects of trauma, blood loss, pain killers and other medications on the human brain that would have affected the victim's ability to ID the defendant. *See also Pavel v. Hollins*, 261 F.3d 210, 225 (2d Cir. 2001) (counsel, convinced that the evidence was insufficient, ineffective for failing to retain a medical expert to "drive home" the disparity between the allegations of child abuse, including sodomy, and the absence of injury). *See also Showers v. Beard*, 635 F.3d 625 (3d Cir. 2011) (state court's determination that counsel was not ineffective was unreasonable where counsel failed to present rebuttal expert testimony on whether the victim's death could have been caused by forcible administering of liquid morphine, relying solely on cross-examination of the Commonwealth expert); *Siehl v. Grace*, 561 F.3d 189 (3d Cir. 2009) (reversing denial of habeas petition where defense counsel failed to present expert testimony about the timing and position of a crucial fingerprint, and did not investigate blood stain evidence); *Williams v. Thaler*, 684 F.3d 597 (5th Cir. 2012) (counsel performance objectively unreasonable because he failed to obtain any independent ballistic or forensic evidence and thus could not challenge state's forensic case); *Couch v. Booker*, 632 F.3d 241 (6th Cir. 2011) (unreasonable for counsel to fail to explore a causation defense with an expert); *Duncan v. Ornoski*, 528 F.3d 1222 (9th Cir. 2008) (counsel's failure to consult an expert in serology prevented him from making an informed strategic decision with regard to blood evidence); *Richey v. Bradshaw*, 498 F.3d 344 (6th Cir. 2007) (counsel ineffective where before receiving a report, he disclosed his expert's name; that expert then testified for the prosecution and counsel put on no rebuttal expert testimony); *Dugas v. Coplan*, 428 F.3d 317, 328 (1st Cir. 2005) (counsel ineffective for failing to consult arson expert when his investigation involved "some limited reading," and his own "visual assessment" of the fire scene; and his cross-examination reflected his lack of consultation with a expert); *Driscoll v. Delo*, 71 F.3d 701, 709 (8th Cir. 1995) (counsel ineffective where he failed to consult serology expert to challenge State expert's testimony explaining why victim's blood not present on the murder weapon).

inability to communicate with them. Instead, they blamed him. Further, once the issue of Mr. Weingarten's self-representation arose, and certainly by the time it was raised to the Court, the attorneys should have requested a hearing on Mr. Weingarten's competency to do so. Because of counsel's failure, the Court, jury, and witnesses were subjected to a trial conducted by a neuropsychologically impaired defendant who was unable to competently represent himself, in violation of *Indiana v. Edwards*, 554 U.S. 164 (2008).

*Edwards* held that "the Constitution permits judges to take realistic account of the particular defendant's mental capacities by asking whether a defendant who seeks to conduct his own defense at trial is mentally competent to do so." 554 U.S. at 177-78; *see also United States v. Barnes*, 693 F.3d 261, 270-71 (2d Cir. 2012) ("there is necessarily 'a competency limitation on the self-representation right....' Thus, the trial court should refuse to accept a waiver of the right to counsel unless and until the court 'is satisfied that the defendant fully understands the consequences of such an election and is competent to make it.'") (internal citations omitted). Mental disability "interferes with an individual's functioning at different times in different ways…. In certain instances an individual may well be able to satisfy *Dusky's* mental competence standard, for he will be able to work with counsel at trial, yet at the same time he may be unable to carry out the basic tasks needed to present his own defense without the help of counsel." *Edwards*, 554 U.S at 175-176 (citing N. Poythress, R. Bonnie, J. Monahan, R. Otto, & S. Hoge, Adjudicative Competence: The MacArthur Studies 103 (2002) ("Within each domain of adjudicative competence (competence to assist counsel; decisional competence) the data indicate that understanding, reasoning, and appreciation [of the charges against a defendant] are separable and somewhat independent aspects of functional legal ability"); *see also McKaskle v. Wiggins*, 465 U.S. 168,

174 (1984) describing trial tasks as including organization of defense, making motions, arguing points of law, participating in *voir dire*, questioning witnesses, and addressing the court and jury)).

*Edwards* (a case decided before Mr. Weingarten's trial) cited the American Psychiatric Association's amicus brief, noting that "[d]isorganized thinking, deficits in sustaining attention and concentration, impaired expressive abilities, anxiety, and other common symptoms of severe mental illnesses can impair the defendant's ability to play the significantly expanded role required for self-representation even if he can play the lesser role of represented defendant." 554 U.S. at 176 (citing Brief for APA et al. as *Amici Curiae* 26). And it concluded that "a right of self-representation at trial will not 'affirm the dignity' of a defendant who lacks the mental capacity to conduct his defense without the assistance of counsel." *Id.* (citing *McKaskle*, 465 U.S. at 176-77), going on to highlight that "[t]o the contrary, given that defendant's uncertain mental state, the spectacle that could well result from his self-representation at trial is at least as likely to prove humiliating as ennobling. Moreover, insofar as a defendant's lack of capacity threatens an improper conviction or sentence, self-representation in that exceptional context undercuts the most basic of the Constitution's criminal law objectives, providing a fair trial." *Id.* at 176-77. Thus, judges should "take realistic account of the particular defendant's mental capacities by asking whether a defendant who seeks to conduct his own defense at trial is mentally competent to do so." *Id.* at 177-78.

Mr. Weingarten's counsel were ineffective for failing to investigate his mental capacity to determine if he was competent to represent himself. A waiver of counsel must be knowingly and intelligently made, and the defendant must be "able and willing to abide by rules of procedure and courtroom protocol." *Micolo v. New York*, No. 2:07-CV-0449,  2010 WL 3310721 at *8 (E.D.N.Y. Aug. 18, 2010) (citing *McKaskle*, 465 U.S. at 173). The determination of whether a defendant is

competent to represent himself is "fact-specific and depends upon the circumstances of the case, 'including the defendant's education or sophistication, the complex or easily grasped nature of the charge, and the stage of the proceeding.'" *Iowa v. Tovar*, 541 U.S. 77, 88 (2004) (citing *Johnson v. Zerbst*, 304 U.S. 458, 464 (1938)).

Mr. Weingarten was not able to conform to the rules of procedure and courtroom protocol. The same deficits that counsel observed in their meetings with him resulted in the "spectacle" that the Court, jury and witnesses experienced. The behavior that led the Court to tell Mr. Weingarten that he was "running out of patience with [him]," RT 3/3/09 at 394, was caused by neuropsychological impairments that trial counsel never bothered to investigate or discover. For example, the Court repeatedly admonished Mr. Weingarten to "get to the point." Mr. Weingarten's deficits made it impossible for him to follow even one of the most simple rules of courtroom procedure: Rule 401 pertaining to relevance. The Court made repeated remarks throughout the trial about Mr. Weingarten's inability to focus on the important details. "I don't know exactly where you're going, whether you're going to spend this entire cross-examination debating whether it was the first or second day of Purim, or whether your daughter touched your skin before you had her touch your penis. I'm not exactly sure where this cross-examination is going." *Id.* at 346-47. "[D]oes it really matter if the rain went into it? Sustained." RT 3/4/09 at 464. "[I]t's enough on subject of the invitation to the wedding. Please move on." *Id.* at 572. "I want you to focus it. You continue to ask questions exhaustively about the configuration of the apartment, Jewish law about who stands where at the funeral, the linguistic capabilities of Belgium movers, your father's estate, light itineraries…. From time to time you alight on important issues in the case, the claim of abuse." *Id.* at 486. At one point Mr. Weingarten perseverated on the issue of whether the translator was correct in stating that Mr. Weingarten's father was not feeling well or dying. The Court noted in seeming exasperation: "that's what you think is the important part?" RT 3/5/09 at 708.

126

The Court repeatedly tried to assist Mr. Weingarten in focusing on relevant details, but was

unable to do so because Mr. Weingarten suffered from cognitive impairments. A colloquy during

the cross examination of Feige Weingarten is illustrative:

> The Court: Sustained about the bath. Sustained about going to the police. We understand. Move on ….

*Id.* at 831.

> The Court: How much more do you have?
>
> The Defendant:  A lot.
> The Court:  You don't. What is the point?
>
> Defendant:  Started that I should give a divorce, leave the house. It was the neighbor together with my daughter, the first time in life.
>
> The Court:  Ask those questions. Ask those questions. It doesn't matter how long it normally takes to set the Sabbath table. It doesn't matter how long the bath was, how often you went to the Sabbath, to the synagogue on the Sabbath. What's at issue is what you just mentioned. I'm not going to let you ask these other questions.
>
> The Defendant:  It happens --
>
> The Court:  I'm not going to continue with this.
>
> The Defendant: She's saying I made the ^ I think it's kaddish kiddish. I could do it when the children --
>
> The Court: It's 27 minutes after the hour. At 40-minute after the hour, if you're not already finished, you're sitting down.
>
> The Defendant: Then I could do nothing.

*Id.* at 835. Mr. Weingarten continued with the irrelevant line of questioning, and the

Court was forced to apply the Rules of Evidence and shut him down.

> Q  Do you know that Frieme Leaih said we were both dressed completely?
>
> Ms. Nash: Objection.

The Court: Sit down. The cross-examination is over.

*Id.* at 841.

Mr. Weingarten's questioning on minor and irrelevant details continued with the questioning of Agent Lazarksi of the FBI.

The Court: What do you want to try here? Do you want to try whether or not you molested your daughter?

Mr. Weingarten: No, no.

The Court: Or do you want to try the FBI procedure on the day you were arrested? What do you think is more important?

Mr. Weingarten: More important on my part.

The Court: Why don't you focus on that. Focus on the charges against you.

Mr. Weingarten: I shouldn't finish?

The Court: I am going to let you finish. You can ask him about the other piece of paper. Focus on what is important on your case.

Mr. Weingarten: Can I ask him -- he was taken to the Magistrate -- up to the Judge, taken away. How come that possible.

RT 3/9/09, at 861.

Mr. Weingarten proceeded to continue the questioning about the FBI procedures, until finally the Court admonished him to "[f]ocus on the case." *Id.* at 866. Mr. Weingarten still couldn't adjust. He asked the agent: "One other thing, when my children give the tallis and tfillen, which have to put on every day, that's religious, you must do it everyday, and I was waiting, didn't I beg the whole day give it to me and you didn't want to give it to me?" The Court again had to interrupt, ordering Mr. Weingarten to "[m]ove off this topic." *Id.*

128

The Court noted how self-destructive Mr. Weingarten's behavior was. "[W]hy have you disregarded my encouragement to you to get to the testimony that if unrebutted will… convict you? Whether it's bubble wrapped or cardboard… or big containers or little containers, you are on trial for sexually abusing your daughter and for traveling in interstate commerce to do so. You really ought to get off these paralyzing details about how things were packed. If they are somehow related to your defense, you ought to get to the link to how it's related to your defense." *Id.* at 496.

The Court was patient with Mr. Weingarten, and repeatedly instructed Mr. Weingarten on how to impeach a witness with a prior inconsistent statement, but Mr. Weingarten simply couldn't follow the Court's instructions. The Court also repeatedly advised Mr. Weingarten to ask one question at a time, rather than have a long diatribe before each question. The Court noted that Mr. Weingarten was just "not understanding." RT 3/4/09 at p. 575.  The Court was in an untenable situation. It was compelled to still enforce the Rules of Evidence even against a *pro se* defendant, but Mr. Weingarten was clearly "not getting it." RT 3/3/09 at 395.

Trial practice requires mental flexibility, an ability to organize and prioritize information, an ability to ask precise questions, an ability to hold more than one thing in your mind at the same time, an ability to ask questions that are relevant, and particularly for a pro se defendant, an ability to absorb new information. Mr. Weingarten's impairments were uniquely at odds with an ability to conduct a trial.

As neuropsychological testing showed, Mr. Weingarten has marked deficits in executive functioning. According to Dr. Jason Krellman, "[t]he findings of neuropsychological testing revealed that Mr. Weingarten exhibited deficits in several aspects of executive functioning, including learning and retrieval of recently heard or seen information, cognitive flexibility, and the ability to learn task rules and form a concept using feedback." (Krellman Dec Exhibit 43).

129

Dr. Krellman noted, "Mr. Weingarten's weakness in the processing and retrieval of information he has just learned means that he will likely have difficulty absorbing and effectively using new information. Such individuals tend to rely on already-learned information and/or their established pattern of behavioral responses because they are less able to accommodate new information." *Id.* Dr. Krellman further noted that "Mr. Weingarten's reduced ability to effectively reason and analyze information in novel problem solving situations and to think flexibly means that he is likely to become stuck in 'mental ruts,' especially when situations are new or unfamiliar, and that he is likely to rigidly repeat mistakes despite feedback from the environment and/or other individuals." *Id.*   Neuropsychological testing showed that Mr. Weingarten is unable to discern between what is important and what is irrelevant. As Dr. Krellman found: "Individuals with Mr. Weingarten's pattern of performance on the WCST and the SCT often also have difficulty identifying the most critical aspects and ignoring irrelevant aspects of a situation in order to effectively solve problems and approach tasks. Indeed, he was repeatedly unable to 'see the forest for the trees' or the 'big picture' on the WCST and SCT – he could not recognize the critical clues needed for success on these tasks even with guidance from the examiner." *Id.* These are cognitive deficits beyond Mr. Weingarten's control, yet it was this impaired individual who had to marshal his own defense in a federal felony trial.

These impairments were obvious to Mr. Weingarten's other counsel, including his attorney in family court, Linda Christopher. Even in a more relaxed setting, where Mr. Weingarten was out in the community, accompanied by a trusted friend at meetings, and in a civil proceeding where he was not facing loss of liberty, he showed these symptoms. Attorney Demosthenes Lorandos, who met with Mr. Weingarten before and after the trial, also immediately noticed his symptoms. (Declaration of Attorney Lorandos, Exhibit 42).

130

Without the benefit of knowing that these were neuropsychological deficits beyond Mr. Weingarten's control, the Court was in an untenable situation. The Court understandably lost patience with Mr. Weingarten. It was incumbent on counsel, who had noticed these same problems in their pretrial preparation with Mr. Weingarten, to investigate the possibility and raise to the Court before it was too late that he would not be able to conform to the rules and procedures required of trial practice.

In *Davis v. Grant*, 532 F.3d 132, 144 (2d Cir. 2008), the Second Circuit considered the requirement of whether "a defendant *must* be 'able and willing to abide by rules of procedure' in order to waive his right to counsel," concluding that it might if it were not constrained by the limits of an extremely deferential habeas review.[20] Regardless, it was incumbent upon trial counsel, in light of their repeated and intractable difficulties in communicating with the client, and in light of their duty to advocate for their client, to investigate Mr. Weingarten's capacity to represent himself, and to raise the issue to the Court so that it could have determined whether Mr. Weingarten was capable of representing himself. Counsel's failure to do so, as well as their numerous prejudicial remarks against Mr. Weingarten, left the Court with no other impression of Mr. Weingarten than that his only goal in representing himself was to continue to exercise domination and control over his daughter, which was a factor the Court considered in sentencing Mr. Weingarten to consecutive terms of incarceration.  RT 9/12/2001 at 19.

When the Court raised the possibility of representing himself, Mr. Weingarten stated he did not want to. He simply felt like he could not proceed with attorneys Stutman and Rhodes, who it

---

[20]The posture of the case before the Court was whether the New York Court's decision that defendant was not deprived of his Sixth Amendment right to counsel was an objectively unreasonable application of, or failure to extend, clearly established Supreme Court precedent. Supreme Court precedent at the time was that a judge "*may* use willingness and ability to abide by courtroom protocol as prerequisites for accepting a defendant's waiver of his right to counsel." *Id.* at 143.

turns out, were in fact unprepared. Had trial counsel investigated a mental health reason for their difficulties with him and requested that the Court hold a hearing to determine whether Mr. Weingarten was competent to represent himself, or had the Court sua sponte ordered an evaluation based on the information it had received from the attorneys, the situation would have been avoided. *United States v. Arenburg*, 605 F.3d 164, 169 (2nd Cir. 2010) (the court must sua sponte order a hearing if there is reasonable cause to question the defendant's mental competency). Here the information defense counsel provided pretrial about their communications with Mr. Weingarten and Mr. Weingarten's actions during court appearances constituted reasonable cause for a sua sponte competency hearing by the Court. During trial, Mr. Weingarten's actions also should have prompted defense counsel to request a competency hearing or the Court to order one sua sponte.

There was a significant amount of investigation and information that the jury did not hear in making its determination as a result of trial counsel's ineffective assistance, prejudicing Mr. Weingarten before the jury no less than the spectacle of his impaired self-representation.

## II. Trial Counsel Was Ineffective by Failing To Raise Mr. Weingarten's Inability To Assist in His Own Defense to the Court, Allowing Mr. Weingarten To Proceed To Trial While Incompetent, and Mr. Weingarten Was Denied His Right to a Contemporaneous Determination of Competence.

The right not to be tried while incompetent is a fundamental precept of our adversary system of justice. *See Cooper v. Oklahoma*, 517 U.S. 348 (1996). As the Supreme Court has explained, "[i]t has long been accepted that a person whose mental condition is such that he lacks the capacity to understand the nature and object of the proceedings against him, to consult with counsel, and to assist in preparing his defense may not be subjected to a trial." *Drope v. Missouri*, 420 U.S. 162, 171 (1975). The test for incompetence is well-settled. A defendant may not be put to trial unless he has "sufficient present ability to consult with his lawyer with a reasonable degree of rational

understanding" and "a rational as well as factual understanding of the proceedings against him." *Id.* at 172 (quoting *Dusky v. United States*, 362 U.S. 402, 403 (1960)).

Consequently, under *Strickland*, trial counsel's failure to request the trial court to order a competency hearing violates a defendant's right to effective assistance of counsel "where there [is] evidence raising a substantial doubt about a [defendant's] competence to stand trial," *Speedy v. Wyrick*, 702 F.2d 723, 726 (8th Cir. 1983), and where there is "a reasonable probability" that the defendant would have been found incompetent. *Williamson v. Ward*, l10 F.3d 1508, 1519 (10th Cir. 1997). "This is a lower burden ... than the preponderance [of the evidence] standard." *Bouchillon v. Collins*, 907 F.2d 589, 595 (5th Cir. 1990). "Thus, even if [the defendant] were to fail to prove his incompetency by a preponderance of the evidence, it is still possible that he raised sufficient doubt on that issue to satisfy the prejudice prong of his ineffective assistance of counsel claim." *Id.*

In this case, the existing circumstances created sufficient doubt about Mr. Weingarten's competence to render trial counsel's decision not to request a competency hearing professionally unreasonable and prejudicial. There was adequate evidence to put counsel on notice that Mr. Weingarten had psychological issues that impaired his ability to cooperate with counsel.

Mr. Weingarten's conduct and relationship with trial counsel throughout the proceedings should have put counsel on notice that Mr. Weingarten was not competent to assist them in his defense. Mr. Weingarten perseverated on minutiae, impairing his ability to see the "big picture." "If the client cannot process information or understand the lawyer's advice, then he may not be able to weigh options intelligently and make informed decisions. The client's inability to make informed fundamental decisions forces defense counsel to assume decision-making responsibility for the client or to raise the issue of the client's competency." Rodney J. Uphoff, The Role of the Criminal Defense Lawyer in Representing the Mentally Impaired Defendant: Zealous Advocate or Officer of the Court?, 1988 Wis. L. Rev. 65, 69-70 (1988). Attorneys have a duty to consider competency if

the client's behavior is "impinging upon the lawyer-client relationship or causing her to doubt the client's understanding of the proceedings, counsel must carefully consider the competency issue." *Id.*

Trial counsel was also aware that Mr. Weingarten's incarceration at the Metropolitan Detention Center only exacerbated his conditions. This treatment, combined with the stress of trial and facing what amounted for him to a life sentence, impaired Mr. Weingarten's ability to assist his counsel in his own defense, and put counsel on notice that Mr. Weingarten's competency was seriously in doubt.

Despite observing all of this, trial counsel never requested that the Court hold a competency hearing. Instead, the trial team simply became defensive to Mr. Weingarten's behavior, rather than recognizing his behavior as manifestations of the cognitive impairments from which they came. Their failure to investigate this issue was objectively unreasonable. *Williamson v. Ward*, 110 F.3d 1508 (l0th Cir. 1997) is instructive. There, the Tenth Circuit held that trial counsel's own observations and experiences while representing the defendant, which included "significant difficulties in dealing [with the defendant]" and "unpredictable" conduct in court," required at a minimum investigation of competency by counsel. *Id.* at 1518.

Here, as in Williamson, counsel's own observations should have compelled a request for a competency hearing. Counsel had great difficulty working with Mr. Weingarten.  At base, "[o]f all the actors in a trial, defense counsel has the most intimate association with the defendant. Therefore, the defendant's lawyer is not only allowed to raise the competency issue, but, because of the importance of the prohibition on trying those who cannot understand proceedings against them, she has a professional duty to do so when appropriate." *United States v. Boigegrain*, 155 F.3d 1181, 1188 (l0th Cir. 1998).

Trial counsel's failure to request a competency hearing prejudiced Mr. Weingarten. Although the evidence known at the time of trial is sufficient to establish a "reasonable probability" that Mr. Weingarten was incompetent, new evidence discovered only after trial further solidifies the conclusion that Mr. Weingarten was not capable of assisting his attorneys in his own defense.

Unquestionably, defense counsel must investigate and analyze the competency issue if the defendant's appearance, action or statements suggest he is incompetent. *See Boykins v. Wainwright*, 737 F.2d 1539 (11th Cir. 1984); *Daniel v. Thigpen*, 742 F. Supp. 1535 (M.D. Ala. 1990) (finding ineffective assistance of counsel when doubts were not brought before the court)*; Brennan v. Blankenship*, 472 F. Supp. 149, 156-57 (W.D. Va. 1979), aff'd, 624 F.2d 1093 (4th Cir. 1980); *Loe v. United States*, 545 F. Supp. 662 (E.D. Va. 1982).

In 1979, the Group for Advancement of Psychiatry listed 21 items to consider in determining whether a defendant is competent to stand trial. Some of those items include a defendant's ability to "to trust and communicate relevantly with his counsel; to comprehend instructions and advice; to make decisions after receiving advice; to tolerate the stress at the trial and while awaiting trial; to refrain from irrational and unmanageable behavior during the trial; to disclose pertinent facts surrounding the alleged offense." *See Misuse of Psychiatry In the Criminal Courts: Competency to Stand Trial* (Group for the Advancement of Psychiatry, Report 89, 1974).

Mr. Weingarten's counsel complained of all of these difficulties and should have raised a question of Mr. Weingarten's ability to assist counsel. Their failure to do so rendered ineffective assistance of counsel, and prejudiced Mr. Weingarten.

## III.    Mr. Weingarten Was Tried While Legally Incompetent, Thus Violating Due Process

A criminal defendant may not be tried unless he is competent. *Godinez v. Moran*, 509 U.S. 389 (1993). The conviction or sentencing of a defendant who is legally incompetent at the time of the proceedings violates due process. *Pate v. Robinson*, 383 U.S. 375 (1966). Trial courts have the

135

obligation of conducting a hearing whenever there is sufficient doubt concerning a defendant's competence. *See Drope*, 420 U.S. at 180-181*; see also* 18 U.S.C §4241(a) (at any time after the commencement of a prosecution for an offense and prior to the sentencing of the defendant, the defendant or the attorney for the Government may file a motion for a hearing to determine the mental competency of the defendant. The court shall grant the motion, or shall order such a hearing on its own motion, if there is reasonable cause to believe that the defendant may presently be suffering from a mental disease or defect rendering him mentally incompetent to the extent that he is unable to understand the nature and consequences of the proceedings against him or to assist properly in his defense).

The standard for determining competency to proceed to trial set out by the Supreme Court more than forty years ago has remained firmly established: "it is not enough for the district judge to find that 'the defendant (is) oriented to time and place and (has) some recollection of events,' but that the ' test must be whether he has sufficient present ability to consult with his lawyer with a reasonable degree of rational understanding – and whether he has a rational as well as factual understanding of the proceedings against him.'" *Dusky*, 362 U.S. at 402.

The precise difficulties that Rhodes and Stutman had with Mr. Weingarten went to the heart of the competency question: whether a defendant is capable of assisting his attorneys in his own defense. He was unable to provide them relevant information. He focused on minutiae to the exclusion of the bigger picture. His anxiety over the stress of the trial and conditions of confinement[21] exacerbated his inability to cooperate with his counsel, as did his attorneys' lack of

---

[21] The stress of the trial, and the particular conditions of confinement at the time of trial, exacerbated Mr. Weingarten's deficits. He had a regimented diet because of his religious beliefs, which the Metropolitan Detention Center was unable to accommodate. He stated to the Court that he "doesn't eat," because the food isn't kosher. 3/2/09 RT at 77. Family witnessed marshals giving Mr. Weingarten a raw onion, and nothing else, for food. He complained of fatigue and hunger. He stated that he was "weak" and asked to remain seated in order to address the court. *Id.* at 7. He was also unable to perform the necessary rituals attendant to his religious beliefs. He stated that he

preparation.  Mr. Lorandos, who observed Mr. Weingarten before, during and after the trial, and who represented him at sentencing, did not believe Mr. Weingarten was competent to assist counsel. (Lorandos dec. Exhibit 42).

The Court had a *sua sponte* duty to raise the issue of competency to assist his attorneys. Although trial counsel is, in the first instance, responsible for determining whether its client is competent, the court is also charged with the duty to inquire into competency, *sua sponte*, where there is reason to doubt a defendant's competency, and the failure to do so violates due process because it deprives the defendant of his right to a fair trial.  *Robinson*, 383 U.S. at 385 (holding that where the evidence before a trial court raises a "bona fide doubt" as to the defendant's competence, due process requires the court *sua sponte* to order a competency hearing).  "The question is: Did the trial judge receive information which, objectively considered, should reasonably have raised a doubt about defendant's competency and alerted him to the possibility that the defendant could neither understand the proceedings or appreciate their significance, nor rationally aid his attorney in his defense."  *Lokos v. Capps*, 625 F.2d 1258, 1261 (5th Cir. 1980).  Though the Supreme Court has not "prescribe[d] a general standard with respect to the nature or quantum of evidence necessary to require resort to an adequate procedure," it has explained:

> A defendant's irrational behavior, his demeanor at trial, and any prior medical opinion on competence to stand trial are all relevant in determining whether further inquiry is required, but that even one of these factors standing alone may, in some circumstances, be sufficient.  There are, of course, no fixed or immutable signs which invariably indicate the need for further inquiry to determine fitness to proceed; the question is often a difficult one in which a wide range of manifestations and subtle nuances are implicated.

*Drope*, 420 U.S. at 172.

---

couldn't pray and couldn't wash his hands. *Id.* at 76-77. Conditions of confinement even without these added stresses can be taxing on a defendant. In Mr. Weingarten's case, these conditions exacerbated his deficiencies and contributed to his inability to assist his counsel in his own defense.

"There are, of course, no fixed or immutable signs which invariably indicate [to this Court] the need for further inquiry to determine fitness to proceed; the question is often a difficult one in which a wide range of manifestations and subtle nuances are implicated." *Drope,* 420 U.S. at 180. In a given case, the Court advised, "even one . . . factor[] standing alone may, in some circumstances, be sufficient" in determining that further inquiry is required of the Court. Id. In another case, the court may look to "the aggregate of indicia" in deciding to order a psychiatric or psychological examination and report. *Id.*

The Court should have ordered a competency hearing upon learning of the myriad difficulties that the defendant was having with his attorneys. The Court noted during the conversation on the eve of trial where it was suggested to Mr. Weingarten that he represent himself, that "[t]here is obviously tension between counsel and Mr. Weingarten." RT 2/25/09 at 21.

This was prejudicial because neuropsychological testing conducted by current counsel shows that Mr. Weingarten suffered from a mental disease or defect which rendered him unable to assist counsel in his own defense. The Court had reasonable cause to believe that Mr. Weingarten was not competent to assist his attorney, and should have ordered an evaluation.

## CUMULATIVE ERROR CLAIM

Should the Court conclude that errors that occurred in this case do not individually warrant relief, Mr. Weingarten asks the Court to consider the cumulative effect of such errors and grant relief. *See, e.g., United States v. Haynes*, 729 F.3d 178, 197 (2d Cir. 2013).

## FREESTANDING ACTUAL INNOCENCE CLAIM

Mr. Weingarten also requests that the Court grant relief under a freestanding actual innocence claim. *See, e.g., Carriger v. Stewart*, 132 F.3d 463, 476-77 (9th Cir. 1997) (*en banc*) (recognizing such a claim if petitioner can "prove that he is probably innocent"); *Rivas v. Fischer*, 687 F.3d 514, 540 (2d Cir. 2012) (stating that Supreme Court has "never expressly held that a petitioner may qualify for habeas relief based solely on a showing of actual innocence," but it has assumed that executing an actually innocent defendant would be unconstitutional).  The array of evidence discussed above, and set out in the attached declarations, makes it likely that Mr. Weingarten is actually innocent of the offenses for which he was convicted.  That conclusion is buttressed substantially by the declaration of Feige Weingarten's ex-husband, Rabbi Yosef Meir, whom she married shortly after Mr. Weingarten was convicted.  Rabbi Meir states:

> While we were married Feige Weingarten told me that the stories of Israel Weingarten sexually abusing Frieme Leaieh were not true and she made up the stories because she wanted to push him down.  She also said she believed he had an affair with another woman and wanted to give him a kick.

9/21/14 Meir Dec. at ¶6 (Exhibit 36).  Rabbi Meir's declaration also calls into question Feige's mental health and credibility – according to him, and several other declarants, she is unhinged.

Actual innocence is also a basis for excusing any sort of procedural default, and, if necessary, Mr. Weingarten will rely on that exception.  *See cQuiggin v. Perkins*, 133 S. Ct. 1924 (2013).  However, should the Court conclude that none of the bases for relief set out above warrant relief, Mr. Weingarten asks that it grant relief based on a freestanding claim of actual innocence.

## CONCLUSION

Based on what is set out above, the supporting evidence, and evidence that Mr. Weingarten expects to be adduced, Mr. Weingarten asks that the Court vacate his convictions and sentence, and: (1) order him discharged from custody, and that the indictment be dismissed; (2) order a new trial; or (3) order him re-sentenced before a different judge.  First, however, he asks that the allow him to employ the tools of civil and criminal discovery, and hold an evidentiary hearing, as authorized by Rule 6 of the rules governing §2255 proceedings.

Respectfully submitted,

 s/ *Jodi Thorp*
Jodi Thorp
California Bar No. 223663
Law Offices of Jodi Thorp
1010 Second Avenue, Suite 1800
San Diego, California  92101
619-233-3169
jodithorp@thorplawoffice.com

Admitted *pro hac vice*

 s/ *Todd W. Burns*
Todd W. Burns
California Bar No. 194937
Burns & Cohan, Attorneys at law
444 West C Street, Suite 410
San Diego, California  92101
619-236-0244
todd@burnsandcohan.com

*Pro hav vice* application pending

**CERTIFICATE OF SERVICE**

Counsel for Defendant certifies that the foregoing pleading is true and accurate to the best of her information and belief, and that a copy has been caused to be delivered, via ECF, to government counsel.

Dated:  September 30, 2014

s/ *Jodi Thorp*
Jodi Thorp
California Bar No. 223663
Law Offices of Jodi Thorp
1010 Second Avenue, Suite 1800
San Diego, California  92101
619-233-3169
jodithorp@thorplawoffice.com

Admitted *pro hac vice*

142

## LIST OF ATTACHED EXHIBITS

1.      Declaration of Israel Weingarten

2.      Declaration of Naftali Englander

3.      Declaration of Yakev Nuchem Weingarten

4.      Declaration of Susan R. Necheles

5.      Declaration of Rabbi Chaim Freund

6.      September 22, 2014 letter from Todd Burns to Barry Rhodes

7.      Declaration of Matthew J. Gravel

8.      February 24, 2009 Letter from Menachem M. Blum to Hon. John Gleeson

9.      Declaration of Alfred Weingarten

10.     Declaration of Rachel Weingarten

11.     Declaration of Juda Weingarten

12.     Declaration of Sheindl Cohen

13.     Declaration of Alexander Krausz

14.     Declaration of Rachel Krausz

15.     Declaration of Esther Krausz

16.     Declaration of Gita Krausz

17.     Declaration of Elkie Krausz

18.     Declaration of Yosef Chaim Cohen

19.     Declaration of Sarah Cohen

20.     Declaration of Yidel Rotter

21.     Declaration of Robert Friedmann

22.     Declaration of Hinde Englander

23.     Declaration of Abraham Englander

24.    Declaration of Liba Berger

25.    Declaration of Chaim Freed

26.    Declaration of Chaneh Goldeh Berkovits

27.    Declaration of Eliezer Hochhauser

28.    Declaration of Moshe Kraus

29.    Declaration of Nicole Mancaux

30.    Dr. Rappaport Medical Records for Israel Weingarten

31.    *Male Hypogonadism, Diseases and Conditions*, Mayo Clinic Staff

32.    Government Trial Exhibits 4A-C

33.    Declaration of Rabbi Mordechai Stauber

34.    Declaration of Rabbi David Weis

35.    Declaration of Raphael Werner

36.    Declaration of Rabbi Yosef Meir

37.    Declaration of Jacob Klein

38.    Declaration of Sussie Weiss

39.    Declaration of Rabbi Daniel Geldzahler

40.    Declaration of Edgard Pollak

41.    Letter of Daniel B. Schwartz

42.    Declaration of Demosthenes Lorandos

43.    Declaration of Dr. Jason Krellman

44.    Excerpt of Transcript of Conversation Involving Frieme Leaieh Weingarten and Mrs. Meyerowitz 1

45.    Excerpt of Transcript of Conversation Involving Frieme Leaieh Weingarten and Mr. Meyerowitz

46.     Excerpt of Transcript of Conversation Involving Frieme Leaieh Weingarten and Mrs. Meyerowitz 2

47.     Excerpt of Transcript of Conversation Involving Feige Weingarten

48.     Excerpt of Transcript of Conversation Involving Frieme Leaieh Weingarten and Feige Weingarten

49.     Photograph of Mr. Weingarten with Injuries

50.     Child Protective Services Records

51.     Family Court Record of Dismissal

52.     Letter from Frieme Leaieh Weingarten to Feige Weingarten

53.     Transcript of Jennifer Heller

54.     Declaration of Chayeh Sureh Weingarten

55.     Declaration of Yoil Weingarten

56.     Declaration of Shmiel Weingarten

57.     Declaration of Maurice Herszaft