# EXHIBIT 1

## DECLARATION OF ISRAEL WEINGARTEN

1.      I am the defendant in *United States v. Israel Weingarten*, E.D.N.Y. Case No. 08CR0571. The facts set out below relate to that case.

2.      This declaration was drafted by my counsel, based on things I told counsel. The choice of language is my counsel's choice. The facts stated are correct.

3.      This declaration supports a 28 U.S.C. §2255 motion, and I have been told that it was formatted in large part so that it correlates with the memorandum related to that motion. Thus, for example, many paragraphs below begin by referring to a hearing, event, or court filing, and are then followed by related sub-paragraphs.

4.      I previously signed a declaration on April 17, 2009, which my prior counsel, Demosthenes Lorandos, filed to support a motion for new trial. This declaration covers some of the same subject matter. I recently reviewed my earlier-filed declaration, and I believe it to be accurate. But there are some points that were mentioned in my earlier declaration that I want to clarify:

   a.      Paragraph 8 of my previous declaration says that three rabbinical courts investigated my daughter Frieme Leaieh's claims that I sexually abused her. There were four rabbinical courts that considered facts that have some connection to this case. Two of those rabbinical courts focused on Frieme Leaieh's sexual abuse allegations. One of those was convened in Antwerp, Belgium, and its final conclusion was in my favor. (Although there seems to have been some confusion on this point, Rabbi David Weis did not preside over, and was not even involved in, that proceeding.) The second rabbinical court that dealt with Frieme Leaieh's allegations was convened in Monsey, New York. During that proceeding, I had rabbinical counsel, and that proceeding essentially concluded in my favor after my ex-wife refused to continue to participate. This clarification also applies to paragraph 16 of my previous declaration. (Incidentally, I never represented myself in those rabbinical court proceedings.)

   b.      Paragraph 9(e) of my previous declaration refers to "Alter Ruven Weingarten," which is the Yiddish name for my brother Alfred. Similarly, paragraph 9(f) refers to: (1) Yakev Friedman, who is also known as Robert Friedman; (2) Sureh Cohen, who is also known as Sarah Cohen; and (3) Shulem Kraus, who is also known as Alexander Krausz. I provide this clarification in case, in the course of these proceedings, alternative names are used for the same person. I also note that sometimes the Yiddish to English translations of names are inexact.

5.      I was arrested, and first appeared in court, on October 6, 2008. The statements in this paragraph relate to events that occurred shortly before that appearance.

      a.      When I was being detained and waiting for my first appearance, an attorney with the federal public defender's office told me that she would represent me for my first court appearance if I did not have counsel, and she interviewed me. She also gave me copies of the indictment and the government's detention motion to read. I was impressed with this attorney, and felt that she would be a good choice to represent me. And I told her that I believed it would be appropriate for me to have a woman defense attorney in the event that it was necessary for someone to question my daughter.

      b.      Shortly thereafter, an attorney named Kenneth Gribetz arrived and spoke with me. Mr. Gribetz explained that my friends and members of my religious community had hired him to represent me, that he would represent me in court that first day, and that we would later figure out if he was going to represent me throughout my case.

      c.      I explained to Mr. Gribetz that the charges in the indictment seemed to be based on identical allegations that my daughter, Frieme Leaieh, had made to Child Protective Services ("CPS") officials and in family court proceedings.

      d.      Mr. Gribetz was told to speak with Brian Dlouhy from CPS, who would know many of the details with respect to the family court proceedings and the CPS investigations, and thus would know a great deal that was relevant to defending me. Based on what Mr. Gribetz said in court later that day, it is apparent to me that he grasped the importance of what I was telling him and that he spoke with Mr. Dlouhy shortly after our conversation.

      e.      I also told Mr. Gribetz that if he was going to represent me, I wanted a woman lawyer to be on the defense team, because I wanted a woman lawyer to be the one who questioned my daughter, if that became necessary. Mr. Gribetz told me that his law partner was a woman, and then brought her in and introduced us.

6.      A few days later, I was told by my children that a family friend, Menachmen Blum, had hired a different attorney to represent me. This paragraph discusses my relationship with Mr. Blum and his involvement in this case.

      a.      Mr. Blum is a member of the same religious community as I am, and I knew both of his grandfathers, one of whom was a teacher of mine. Prior to 2003, our families had been acquainted for many years.

b.      Beginning in 2003, my ex-wife and I became involved in proceedings in family court, in which the State of New York considered the status of each of our parental custody rights. There were also related CPS investigations, which began in late 2001. The proceedings against me were spurred by allegations made by my two oldest children, Frieme Leaieh and Yoinesun.

c.      In 2003, Mr. Blum contacted me and said he had heard about the troubles I was having with my ex-wife; this was after family court proceedings had begun against my ex-wife. He told me that he had heard things in our community that made him believe that my ex-wife and others were unfairly conspiring to falsely accuse me, and he offered to help me. In my religious community, it is common for one member to reach out to help another in this way, as it is considered somewhat of an obligation.

d.      When I was arrested on the federal charges, Mr. Blum apparently decided himself to take on a similar role. He had some knowledge of the relevant facts, due to his helping me in the family court proceedings. Moreover, after I was ordered detained on the federal charges he moved into my home to help support me and my children.

e.      It was (and is) my understanding that Mr. Blum tried to help out with my defense. In that role, he frequently spoke with my children and other members of my religious community, and he raised money to pay for attorneys. However, I never intended to entrust Mr. Blum to represent me in my criminal case, nor did I ever do or say anything to anyone that expressed that I so intended. I expected that I would have competent counsel to represent me, and that they would communicate with me about what needed to be done to present my defense, and they would do what needed to be done to present my defense.

f.      One of the first things Mr. Blum did in this role was to hire attorney Alan Stutman to represent me. I later heard that Mr. Stutman was referred to Mr. Blum by a man named John Middleton. I did not understand Mr. Middleton's connection to the case or my representation, nor what his role was supposed to be in preparing my defense. I later learned that Mr. Stutman hired Mr. Rhodes to help with my representation. I, however, never had any sort of interview with either attorney prior to their starting to represent me, nor did I ever have a retainer agreement, fee agreement, or representation agreement with either attorney.

g.      As the proceedings progressed, Mr. Stutman and Mr. Rhodes relied on Mr. Blum for payment of their fees, and also as their contact with my children, friends, and community supporters. Given his involvement with the family court proceedings and CPS investigations, Mr. Blum took it upon himself to provide the attorneys investigative leads and materials for the defense. I told Mr. Stutman and Mr. Rhodes that I wanted to provide that information, and it would not be sufficient for them to rely on Mr. Blum alone, although he might be of some help. And based on what I

3

told Mr. Stutman and Mr. Rhodes, and what they said to me, it was clear that they understood that Mr. Blum was a valuable resource in this regard. In fact, often when I would try to tell the attorneys important facts they would cut me off and say that they could get the information from Mr. Blum.

h.   As far as I know, Mr. Blum was the only person whom the attorneys consulted about my case. As far as I know, the attorneys had no contact with my children or with other members of my religious community.

7.   As I mentioned in the preceding paragraph, a few days after my first court appearance my children told me that Mr. Blum had hired Alan Stutman to represent me, and they said Mr. Blum had said that Mr. Stutman would be more effective than Mr. Gribetz.

a.   Because I was incarcerated and I could not afford to pay for an attorney, my friends and supporters secured representation for me, and Mr. Blum took the lead role in that regard. I did not believe I had any other options at the time, and I was almost completely ignorant about how the United States justice system worked.

b.   Because Mr. Stutman told me not to talk about my case with others, in person or on the telephone at the Metropolitan Detention Center ("MDC"), and because of the limited visiting privileges, I had to rely in large part on my children for news of what was being done on my behalf. Mr. Stutman also told Mr. Blum to warn my children not to talk with me about the case, so my children were often afraid to do so.

8.   I was taken from the MDC to the federal courthouse on October 8, 2008, but I was not taken to court. I did not meet Mr. Stutman on or before that date, but I now understand that he appeared in court that day and waived my appearance.

9.   On October 14, 2008, the Court held a status/bail hearing, but I was not brought to the courthouse that day.

a.   I have read the transcript of that hearing, and I am aware that Mr. Stutman appeared and stated that the reason I was not in court might be due to my religious observance. I do not know why I was not brought to court that day, but it was not because I refused to come for a religious, or any other, reason.

b.   Mr. Stutman told the Court that he had met with me the day before, but I do not recall meeting with Mr. Stutman at that time.

c.   At the hearing, the Court told Mr. Stutman to "sit down with [me] with a calendar" to determine any future dates that could present a conflict due to my religious observance. Mr. Stutman never did that.

4

10.     A hearing was held on October 28, 2008, which I understood was to determine whether I would be granted bail pending trial.  My recollection is that prior to that day, I still had not met Mr. Stutman.

    a.     However, my children had told me that the hearing would be a bail hearing, and I had already seen a copy of the government's written detention motion on the day I was arrested.  I asked my children to tell Mr. Stutman that:  (1) I wanted him to contest the allegations in the government's written detention motion; (2) he needed to rely on what had occurred in the family court and CPS proceedings, and he should talk to the lawyers who represented me in those proceedings; and (3) I was concerned that if Mr. Stutman did not contest the government's allegations, I was unlikely to be granted bail.

    b.     My recollection is that I did not meet Mr. Stutman until shortly before the October 28, 2008 hearing, when he met me in court and introduced himself.  During that meeting, which lasted a few minutes, I told Mr. Stutman that as part of the bail proceedings I wanted him to contest the allegations in the government's written detention motion.  I also pointed out that the family court and CPS records needed to be reviewed for useful information.

    c.     Given what I had told Mr. Stutman, and what I believed my children had conveyed to him, I was upset when, at the October 28 hearing, he told the Court that he was not ready to proceed with a bail hearing because "members of [my] community" were "not satisfied with the [bail] package" that Mr. Stutman had put together and wanted more time to make a "presentation."  That was not accurate.

    d.     The delay was because I, and my family and friends, had asked Mr. Stutman to become familiar with the facts and relevant family court and CPS records, and the people involved, so that he could contest the government's allegations during the bail hearing.  We understood that the bail hearing was previously delayed so that Mr. Stutman could get up-to-speed on the background facts.  But it was apparent to me, and to my family and supporters, that Mr. Stutman was making no effort to do that, and was unfamiliar with even the most basic facts involved.  Indeed, Mr. Gribetz appeared to know much more about the underlying facts following his involvement in the case for an hour or two than Mr. Stutman possessed three weeks after he had been hired.

    e.     I was also concerned when the Court scheduled my trial to begin on January 20, 2009, and Mr. Stutman did not ask for more time to prepare my case.  I knew that this was far too soon because:  (1) many witnesses had to be contacted, and most of them were in foreign countries; (2) thousands of pages of documents needed to be reviewed; and (3) tape recordings had to be tracked down, transcribed, and translated from Yiddish to English.  I also recalled that in the family court proceedings that

5

related to the same subject matter, the county attorney had estimated that trying the case alone would take 6-8 weeks. So I expected it would take a much longer period of time for Mr. Stutman to adequately prepare for my federal criminal trial.

11. In the days following the October 28, 2008 hearing, Mr. Stutman came to see me at the Metropolitan Detention Center ("MDC"). The following sub-paragraphs relate to that meeting.

 a.   Mr. Stutman told me that he was a specialist in federal criminal matters, and that nearly all of his experience was in that area.

 b.   I again told Mr. Stutman that to prepare my defense he needed to understand what had happened in the family court proceedings in Rockland and Orange Counties, which related to the same subject matter as the federal charges, and thus he needed to review the records from those proceedings, as well as from the CPS investigations. And I told Mr. Stutman to get records from England relating to (1) my arrest in Manchester on February 14, 1999, and (2) the protective order that was subsequently entered in Hull, England.

 c.   I told Mr. Stutman that it was very important that he review with me the deposition transcripts of my daughter Frieme Leaieh and son Yoinesun, which were taken as part of the family court proceedings. I explained that Frieme Leaieh's deposition was lengthy and would give him a good starting point for understanding the factual claims underlying the charges in my federal case, and where to direct his investigation.

 d.   I asked Mr. Stutman – on this day and many others – to bring me a copy of Frieme Leaieh's and Yoinesun's family court deposition transcripts. I repeatedly told Mr. Stutman that I wanted to review those transcripts with him so he would understand the case and what he needed to do to investigate.

 e.   I told Mr. Stutman that he needed to speak with my lawyers from the family court proceedings (Daniel Schwartz and Linda Christopher), with the lawyers that were appointed for my children, and with Brian Dlouhy from CPS, because they would be able to provide a great deal of relevant information for the defense.

 f.   Mr. Stutman said that whatever these people had to say was irrelevant to the federal proceedings, as were the records I mentioned. He said that the case started from the indictment, and anything that happened before would not be litigated. He told me that federal trials were different than state trials, and he was a federal lawyer.

g.    With respect to the January 20, 2009 trial date, I told Mr. Stutman that with all that needed to be done to prepare for trial, he could not possibly be ready for trial by that date.  He said that I should not worry, because the Court would agree to move that date back.

h.    Despite my repeated requests, Mr. Stutman, and later Mr. Rhodes, did not provide me with copies of Frieme Leaieh's and Yoinesun's deposition transcripts prior to trial; I only received those transcripts from the lawyers after trial, in the mail. However, the government gave me copies of those deposition transcripts on the first day of trial, as part of the 18 U.S.C. §3500 materials.  From the presence of the government exhibit stamp, it appeared that the copies of the transcripts that I subsequently received from the attorneys in the mail were provided to them by the government.

12.   On November 19, 2008, the Court held a bail hearing.  The following sub-paragraphs relate to that hearing.

a.    Mr. Stutman appeared for me at that hearing, along with Mr. Rhodes.  My recollection is that at that point I knew Mr. Rhodes was going to be helping Mr. Stutman with my case, and I may have met him briefly prior to the hearing, but I do not think that I had any sort of substantial discussions with Mr. Rhodes prior to the November 19 hearing.

b.    The attorneys did not contest the allegations in the government's detention motion, though I had told Mr. Stutman I wanted him to prepare a clear rebuttal on each issue with supporting documents and witnesses.   I understood that the whole reason for the several week delay in holding the bail hearing was so for them to become familiar with the background and prepare a proper presentation for the Court.  But instead of doing that, Mr. Stutman and Mr. Rhodes made vague statements that showed they had little knowledge about the underlying facts; they did not even understand the timeframes during which key events occurred.

c.    One thing that concerned me was that Mr. Rhodes said he had "reviewed hundreds and hundreds of documents and a lot of them are transcripts of this Complainant and other children of the defendant, which are jam-packed with contradictions, recantations, contrary adjudications." Only a few minutes later, Mr. Rhodes said that he had "not explored that evidence, Mr. Stutman has."  It became apparent that was not true.

d.    Mr. Rhodes also said that "nothing ever happened" in the family court proceedings, which was untrue.  My six younger children were removed from my home for a year, while the investigations and proceedings were ongoing.  They were then returned to me, I was awarded sole custody, and my ex-wife was prohibited from seeing them

without approval.  These were some of the important facts that I wanted the attorneys to tell the Court about during the bail hearings.  It was obvious to me that they did not do so because they had not reviewed any of the relevant documents, nor talked to any of the relevant witnesses, and thus did not know what they needed to know to properly make the bail application or to defend my in general.

e.     It was apparent to me that Mr. Rhodes did not even understand the most basic timeframes involved, because he said my "good name has been tarnished for 20 years by bogus allegations."  My daughter first made her allegations of sexual abuse in 1997, eleven years earlier.

f.     As for Mr. Stutman, he claimed to have "read volumes and volumes of proceedings in Family Court," and to have "read volumes and volumes of Child Protective Services reports about the ongoing of this family."  Then said "[t]his went on from 1999 all the way through to 2003 or thereabouts."  This was wrong.  The first complaints to CPS were made in late 2001; in 2003, charges in the family court were initiated against my ex-wife and then initiated against me; and the family court proceedings concluded in 2004.

g.     Mr. Stutman also said, "In all the proceedings that were had and all the discovery and all the testimony that was taken, never once were his children removed from him.  And there were full evidentiary hearings in that respect."  These statements were also incorrect.  First, my children were removed from my home for one year, during which time they were subject to all sorts of evaluations and interviews.  Second, there were not "full evidentiary hearings."  Instead, the case was resolved without trial, and I was given sole custody of the children.

h.     One particular event that Mr. Stutman addressed also demonstrated his ignorance of the relevant facts.  Specifically, Mr. Stutman said:

> There was an incident where one daughter was screaming and a neighbor tried to intervene. The daughter was experiencing her first menstrual period and was reacting or overreacting at that point in time.  Neighbors came by because they heard and they were told that their presence was not necessary; that mother and father were taking care of that situation.

The incident that Mr. Stutman was referring to involved my daughter Chayeh, who was seventeen years old and was having some severe discomfort from her menstruation.  At the time, we were visiting a friend's home, and one of my friend's children went to a neighbor's home to try to get an over-the-counter pain medication.  There was then some debate with a public safety officer about whether Chayeh needed to go to the hospital.  Thus:  (1) my daughter was seventeen years old, and

was not experiencing her first period; (2) she was not overreacting; and (3) a neighbor did not "come by" or "try to intervene." The assertion that "mother and father were taking care of that situation" was also incorrect. My ex-wife was not there at the time, and she was actually barred from seeing the younger children. It seemed as if Mr. Stutman had some basic idea about the event, and then just made up details.

i. In addition, and as discussed above, when we first met, Mr. Stutman said that the records and events related to the state court investigations and proceedings were completely irrelevant to the federal case. He was now taking a different position, though it was apparent that he had not looked at the records with any care, nor contacted any of the relevant witnesses.

13. The Court issued an order denying bail on November 21, 2008, but at that time neither Mr. Stutman nor Mr. Rhodes told me about, or provided me a copy of, the Court's order. I learned about the order later, from another attorney.

14. The attorneys' performance with respect to the bail matter caused me to lose a great deal of confidence in them. It seemed obvious to me that I would not be granted bail if the attorneys did not push back on the claims in the government's detention motion, but the attorneys refused to learn enough about the key facts to do so.

a. I told my children that I was becoming very concerned that the attorneys were not capable of properly representing me, and that they did not seem to be listening to me when I told them the witnesses they needed to talk to and the materials they needed to review.

b. My children told me that my friends and community supporters also had lost confidence in the attorneys when they saw their performance at the bail hearing. Those were the people I must rely on to post property to support bail. But they believed it was futile to offer to post property in addition to, or instead of, what was proposed during the bail proceedings. They believed that the Court would not grant bail unless the attorneys rebutted the allegations in the government's detention motion.

c. My friends and community supporters became reluctant to contribute money to pay Mr. Stutman and Mr. Rhodes, who I was told were being paid in installments as money was raised. Instead, those supporters who could contribute money for my defense began to insist that new attorneys be hired.

15.   My recollection is that while I may have met Mr. Rhodes briefly at the courthouse prior to the November 19 hearing, the first substantial meeting that I had with him was at the MDC shortly after that hearing.  Mr. Stutman was not present, and Mr. Rhodes said that was because Mr. Stutman was sick.

   a.   Mr. Rhodes explained that Mr. Stutman had hired him to write and argue the defense motions, and that would be the extent of his role in the case.  He said he would not be involved in trying the case, if there was a trial.

   b.   I explained to Mr. Rhodes that the same allegations underlying the federal charges had been made, and effectively rejected, in the family court proceedings, which is why I had retained custody of my six younger children when those proceedings concluded.  I told him, as I had told Mr. Stutman, that there were ample documents and witnesses that could help rebut the government's claims.

   c.   During this meeting, Mr. Rhodes and I discussed the pre-trial motions that he intended to file, one of which was based on the long delay between when the alleged illegal conduct occurred and when the indictment was filed.  In the context of this discussion, Mr. Rhodes told me that I did not have a viable claim that the statute of limitations had expired with respect to the charges against me.  He said that he could however, file a motion to dismiss based on pre-indictment delay.  This is consistent with what Mr. Rhodes wrote in the pre-trial motions that he filed on November 26, 2008.  I relied on what Mr. Rhodes told me in this regard with respect to the law, and only learned about a month ago that he was mistaken.

   d.   I also told Mr. Rhodes that I thought it was essential that I be released on bail, so I could help prepare the defense.  I asked Mr. Rhodes if it was possible to again try to get bail granted; he first said no, then changes his answer to yes.  I told him that I wanted to do that, and that the attorneys should call witnesses to rebut the claims in the government's detention motion.  He said that would be like a "mini-trial," and he would not do that.  He said he could file something in writing, but that would cost $10,000.   I told him that I could not speak to the money, because I had no involvement with how he and Mr. Stutman were being paid.  But I said that I wanted him to file at least a written response to the government's detention motion, and to rely on the records from the family court proceedings and CPS investigations.  He never did that.

   e.   At some point during this time period, I discussed with Mr. Rhodes the government's assertions regarding alleged "out-cry" statements made by my daughter, including statements made to police in Manchester, England.  In that context, I told Mr. Rhodes that: (1) there were letters in the family court file from English barristers that would show that Frieme Leaieh was effectively advised as to how to level accusations against me in England; (2) that she subsequently followed those instructions when

10

the February 14, 1999 incident at Rabbi Royde's home occurred; therefore (3) it was obvious that the statements she made at the time could not be considered excited utterances (that is, the statements were pre-planned). This is one of many things that the attorneys never pursued.

16. On November 26, 2008, Mr. Rhodes filed pre-trial motions, and shortly thereafter I received in the mail a copy of those motions. At about the same time, I received a copy of an unsigned declaration purporting to be from me, which Mr. Rhodes had already filed with the Court.

    a. The motion papers did not show that the attorneys had gained any sort of substantial understanding of the facts relevant to the charges. Nor did the motion papers discuss the many things I had pointed out to the lawyers that undermined those charges.

    b. One portion of the motion papers caused me particular concern. On pages 25-26 of the memorandum supporting the motions, Mr. Rhodes wrote that the "travel" underlying the charges was for non-criminal reasons. As an example, he then seemed to refer to the February 14, 1999 incident at Rabbi Royde's home in Manchester, England, which was subsequently a topic at trial.

    c. This reference caused me great concern, for several reasons. First, any travel related to that event did not involve my daughter. Second, any travel related to that event occurred nearly two years after the travel charged in the indictment. Third, there was no allegation of any sort of sexual abuse during that time period. Finally, what Mr. Rhodes wrote endorsed the government's view that I had gone to Manchester to abduct my daughter, because, Mr. Rhodes wrote, I "did not want her to remain in Great Britain as this was outside the fold of the family's Hasidic views, and again she was engaging in illicit sexual conduct."

    d. The first two points showed me that Mr. Rhodes did not appreciate the most basic facts in the case. As for the third, I told Mr. Rhodes and Mr. Stutman that my then-wife and I traveled to Manchester to see our daughter in February 1999 because we heard she was going to enter into an arranged marriage and we hoped to convince her not to do that. As I repeatedly told the lawyers, we did not intend to abduct my daughter, and we did not want her to return home, or even to leave England.

    e. The unsigned declaration from me that I received from Mr. Rhodes also caused me great concern. Mr. Rhodes did not tell me that he would be drafting such a declaration, and much of what was set out therein was not information that he received from me. Perhaps he had learned some of that information from Mr. Blum or my children or friends. But I was surprised that an attorney would file an unsigned declaration from me without even discussing the statements in that declaration with me first.

11

f.    And some of what was set out in the declaration was false or incomplete.

g.    One thing in particular that concerned me when I read the unsigned declaration was that it mentioned "Brian DeLouis," and then said that I did not know how to spell Mr. Dlouhy's name. It is true that when I first mentioned Mr. Dlouhy's name to Mr. Rhodes (and earlier than that to Mr. Stutman), I did not know how it was spelled. But I also told Mr. Rhodes that he could learn that spelling by looking at the family court and CPS records, or by asking my children. When I reviewed the unsigned declaration it was apparent to me that Mr. Rhodes had made no effort to even learn the spelling of Mr. Dlouhy's name, much less find him. In fact, Mr. Rhodes subsequently told me that he never contacted Mr. Dlouhy. That disturbed me because I had told Mr. Rhodes and Mr. Stutman that Mr. Dlouhy was a critical person to contact for the defense.

h.    My unsigned declaration also mentioned the fact that I believed there should be a 911 recording that evidenced – contrary to what the government claimed at my initial appearance – that I did not intend to resist arrest. Attorney Kenneth Gribetz mentioned that recording at my initial appearance, and Mr. Stutman mentioned the 911 call during the November 19, 2008 bail hearing. Yet despite my repeated requests that my attorneys obtain that recording, it was apparent from the unsigned declaration that they still had not done that.

17.    Because the unsigned declaration that Mr. Rhodes sent to me was inaccurate and incomplete, I told him that I wanted changes made to it and to the pretrial motion papers.

a.    When I first made that request, Mr. Rhodes said it would not be a problem to make the changes. He also told me that he would explain to the Court his mistake with respect to supporting the government's theory about the February 1999 incident in Manchester, and that he was not aware that I disputed the government's allegations.

b.    But as we worked on making the changes, Mr. Rhodes became increasingly angry and verbally abusive. He would raise his voice with me and swear, telling me the changes I wanted made were irrelevant or stupid.

c.    Mr. Rhodes eventually drafted a declaration that I agreed to sign. I was not pleased with the final product, but Mr. Rhodes refused to make any additional changes. I felt that much was missing, and we had lost another opportunity to push back against the government's allegations.

d.    I was also upset with the way Mr. Rhodes treated me in the process. It was obvious to me that he had contempt for me.

18.   Later (I believe some time after the December 15, 2009 hearing in my case), I heard from my children that along with my signed declaration, Mr. Rhodes had filed a letter to the Court in which he attacked me for asking that he make changes to the declaration.

a.    Mr. Rhodes did not send me a copy of that letter, nor tell me that he would send such a letter to the Court.

b.    I was deeply upset because he had initially told me that making the changes was a simple thing and he would explain the changes to the Court. I was also upset that he had not provided me a copy of the letter he filed with the Court, and instead had attacked me to the Court without my knowledge. His actions seemed to me like a betrayal.

c.    And I believed that the changes to the declaration that I requested were appropriate. For example, I wanted the declaration to make clear why Frieme Leaieh had been chosen to come to Brooklyn when my father was ill. My father had pneumonia, and the doctors believed that he would recover completely. We did not believe his death was imminent, nor, when I left for Brooklyn, did we assume he was going to die. As I explained to Mr. Rhodes, the family wanted someone to sit with my father while he was hospitalized, day and night. My brother Judah and his wife, who live in Brooklyn and had health issues themselves, had been handling that responsibility and had become overwhelmed. Thus, my brother Alfred and I were asked to come from Israel to be with our father, and to bring along any other family members that could come. Because my children and nephews and nieces were in school, and Frieme Leaieh was not, she was an obvious choice to come on the trip and sit with my father for periods of time. And Frieme Leaieh begged to go, because she was bored from sitting around and not going to school. Moreover, unlike many of her siblings and cousins, she was old enough to stay in the hospital alone, without adult supervision. My wife and Alfred's wife had to stay in Israel to care for the younger children. Mr. Rhodes thought this change and explanation was silly, I did not because otherwise I would be acceding to an inaccurate government theory.

d.    Another change I wanted made was intended to offset what Mr. Rhodes had written in his motion papers regarding the Manchester trip in February 1999, which was discussed above. It was hard for me to accept that Mr. Rhodes would attack me for making a change that was designed to clear up a mistake he made, a mistake that showed his ignorance of the most basic facts involved in the case.

e.    I believe a review of the two declarations shows that the other changes were also legitimate. For example, I told Mr. Rhodes to remove from the declaration the false claim that when I was arrested an FBI agent "had to be pulled off of me." I never told Mr. Rhodes anything of the sort, and I do not know why he wrote that in my declaration.

13

f.   It seemed to me that Mr. Rhodes had attacked me to try to cover for his own mistakes.

g.   As I mentioned, it was my children who alerted me that Mr. Rhodes had filed the letter with the Court.  When I discussed the situation with my children, and they shared what Mr. Rhodes had done with my friends and community supporters, the people who could be relied on to provide the money to pay the lawyers became even more reluctant to continue paying Mr. Stutman and Mr. Rhodes.

19.   On December 8, 2008, Mr. Rhodes submitted a letter to the Court opposing the government's request to take foreign depositions.  I received a copy of that letter shortly after it was filed, and before the December 15, 2008 hearing.

a.   I was surprised by the content of that letter, because I had discussed the issue of foreign depositions with Mr. Rhodes and I had told him that I wanted the witnesses indicated by the government to be deposed.  And I told Mr. Rhodes that he should contact other witnesses in England and Belgium to prepare for trial.  The only thing I objected to was not being present for the depositions.  Mr. Rhodes nonetheless filed the letter opposing the depositions, without telling me that was what he intended to do.

b.   I was also concerned about some of the things that Mr. Rhodes wrote in the December 8, 2008 letter.  Specifically, in opposing the deposition of Rachel Rosenberg, Mr. Rhodes wrote that "the defense" would like to take the deposition of Sarah Rosenberg, but "[t]he defendant has no access" to her.  This concerned me for two reasons.

c.   First, I was aware that Sarah Rosenberg had married and was living in Israel, and I had no reason to believe that she could not be located if the attorneys made reasonable efforts to do so.  Second, I had told the attorneys that it would be unlikely that Sarah Rosenberg could provide any admissible evidence, and she was also not likely to be cooperative with the defense, because she had been my daughter's closest friend in England.  Thus, what Mr. Rhodes wrote indicated to me that, at best, he was not listening to me.

20.   Following the November 19 bail hearing, and prior to the December 15 hearing with respect to the government's request to take depositions, I was becoming increasingly concerned that Mr. Stutman and Mr. Rhodes were not able, or willing, to properly represent me.

a.   I told my children about my concerns, and told them to get Mr. Blum to find me another lawyer.

14

      b.     When I talked to my children about this again, they said that Mr. Blum had talked with Mr. Stutman and Mr. Rhodes, and Mr. Blum had told my children to assure me that the attorneys would get prepared and would do a good job defending my case.

21.    On December 12, 2008, the Marshals did not bring me to court for the hearing scheduled for that day because I was sick.  I was actually segregated from other inmates in the bullpen because I was coughing so badly.  I am aware that Mr. Stutman may have said something to the Court, or its clerk, indicating that perhaps I did not come to Court for religious reasons. That is not true.

22.    On December 15, 2008, the Court held a hearing with respect to the government's motion to take foreign depositions.

      a.     Mr. Rhodes was not at that hearing.  He had not told me that he would not attend, and this upset me because he had told me that his role was to handle the motions in the case.  Moreover, I had discussed this issue with him only, not with Mr. Stutman.

      b.     My recollection is that before the hearing officially started, the Court said that if the depositions were going to be held, I should be able to attend in person.  And during the hearing, I understood the Court to make a statement consistent with that position, when it talked about "burdening the defendant with the need to go" to Europe for depositions.

      c.     When the issue of taking the foreign depositions was discussed during the hearing, I tried to tell Mr. Stutman, as I had told Mr. Rhodes, that I did not oppose the depositions, that I only wanted to ensure that I would be able to be present.  Mr. Stutman told me that I did not understand because I was not a lawyer, and he told me to be quiet.

      d.     At one point during the hearing, the Court allowed me and Mr. Stutman to confer off of the record, and I again told Mr. Stutman that I did not oppose the foreign depositions, so long as I could be present.  Mr. Stutman again told me that I did not understand, and he said that he was not going to spend time and money to go to Europe to take depositions.  On the record, Mr. Stutman then told the Court that he had told me his position, that I understood his position, and that the Court could inquire.  The Court then asked me if I understood the implications of its ruling denying the government's motion to take depositions.  I told the Court what I understood to be the attorneys' position – that we did not want to go to Europe to take depositions.  That was not, however, my position.  As I made clear at the hearing, I wanted the jury to hear from the witnesses identified by the government, because, as I told the lawyers, I thought they would be important for the defense. And as I made clear to Mr. Rhodes and Mr. Stutman, if that had to be done through depositions, that was fine with me, so long as I could be present for the depositions.

15

e.   During the hearing, Mr. Stutman also asked the Court to continue the trial date, and said several noteworthy things.

f.   Mr. Stutman mentioned that he had surgery the week before.  It is worth noting here that early on in the case Mr. Stutman had told me that he was having issues with his adenoid glands, tonsils, or something of that nature.  For that reason, he said, he was reluctant to visit me, either at the MDC or in the holding area at the courthouse.  He told me that prior to having surgery, he was trying to avoid germs which would cause infection.  And after having surgery, he said it was important to limit such visits to continue avoiding infecton.  Several times Mr. Stutman complained that visiting me was a burden because of this situation.

g.   At the hearing, Mr. Stutman also mentioned that Mr. Rhodes had "another engagement."  I understood this to refer to Mr. Rhodes having to attend to his wife.  Shortly after I first met him, Mr. Rhodes told me that his wife was ill, and at some point he told me that she had cancer and it was serious.  Mr. Rhodes said that this would limit how much time he could devote to my case, but that his only role was to handle the motions.

h.   Mr. Stutman also said at the hearing that he was developing "defense strategies."  I was concerned because there did not seem to be any defense strategy, and, most important, the lawyers seemed to be unwilling to review any of the documents, or talk to any of the witnesses, that I told them about.  At this point in the case, the only strategy that had been mentioned was by Mr. Rhodes, and that involved getting a doctor to examine me in the hope that Frieme Leaieh would not be able to identify distinguishing characteristics of my private area.   In light of all the potential witnesses and documentary evidence in support of a broader and more compelling innocence defense, I did not consider this alone to be a nearly complete strategy.

i.   Mr. Stutman also told the Court that he needed more time to prepare for trial because he had to review "prior testimony" from my ex-wife and "various social workers."  Though it was apparent that Mr. Stutman was referring to depositions from the family court proceedings, my wife did not testify (and was not deposed) in those proceedings, because she was effectively a defendant, and there was just one social worker that was deposed, though only briefly.  At another point, Mr. Stutman said that he had "been reading depositions taken by social workers that investigated the home situation," but there were only three depositions taken (of my two oldest children and a short deposition of a social worker), and they were all taken by attorneys, not social workers.

j.   Mr. Stutman also told the Court that the CPS investigations resulted from "complaints from the community," which was inaccurate.  The complaints against me were made by my ex-wife and two oldest children.

16

k.      The Court then asked Mr. Stutman when my ex-wife complained to CPS, and he said that "was in 1993." Consistent with his belief that a complaint was made in 1993, Mr. Stutman then told the Court that the records he was in the process of reviewing were fifteen-years-old.  But the initial complaints by my children were made in late 2001.  My wife initially denied those children's allegations, then later switched her position.  Again, it was obvious to me that Mr. Stutman did not understand the most basic facts.

l.      When the Court proposed the March 2, 2009 trial date, I told Mr. Stutman that would not work because:  (1) many potential defense witnesses would not want to travel to Court during the Purim holiday and the lead-up to the  Passover holiday, which requires extremely rigorous cleaning of the home; and (2) the lawyers could not possibly be ready to try the case by that time, particularly in light of their continued lack of preparation. Mr. Stutman ignored me when I told him this during the hearing, and motioned with his hand for me to stop speaking.

m.      The statements that Mr. Stutman made during the December 15, 2008 hearing confirmed to me that he had only a vague understanding of the facts and documents that were relevant to presenting my defense.  His statements also indicated that he still did not have a basic understanding of the important timeframes involved.  When he was required to descend to any level of specificity, he could not, because he was ignorant of the most basic facts.

n.      In light of the lawyers' lack of preparation up until that point, the witnesses that needed to be contacted, and the documents and other materials that needed to be reviewed and prepared, I tried to make clear to the Court that I did not believe counsel could be prepared for trial by March 2, 2009, the date the Court set.

23.    At the end of the December 15, 2008 hearing, I told Mr. Stutman that I wanted him to come and talk with me in the holding area downstairs in the courthouse, and he did.

a.      During that meeting, I repeated to Mr. Stutman the problems with the March 2, 2009 trial date, the same things I told him during the hearing.  Mr. Stutman told me not to worry, that the Court would agree to continue the trial date again, and that we would not have to try the case in less than eight months time.

b.      I also told Mr. Stutman that I was upset that he did not agree to take foreign depositions, so long as I could attend in person.  I reiterated what I told Mr. Rhodes – that I wanted to depose the witnesses indicated by the government, and perhaps other witnesses in Belgium and England.   Mr. Stutman did not give me any explanation.

     c.     During this meeting, Mr. Stutman raised with me for the first time his proposed strategy for defending my case.  He said that I should testify at trial that:  (1) I had sexually abused my ex-wife; (2) my ex-wife felt that she could not complain to anyone about the abuse, because in my community a wife may not make such accusations against her husband; so (3) my daughter made the claims of sexual abuse against me, to, in a sense, vindicate her mother.  I told Mr. Stutman that this was untrue, and ridiculous – nothing in the tenets or mores of my religious community would have prevented my ex-wife from being heard to complain that I had sexually abused her.  Mr. Stutman and I argued about his theory, and I told him that I no longer wanted him to represent me.

24.     Some time after December 15, 2008, I learned that Mr. Stutman had no federal court trial experience, even though he told me that he was a federal court specialist when we first met.

     a.     Following the December 15, 2008 hearing, I met with Mr. Rhodes at the MDC and I raised this issue with him.  Specifically, I asked who would represent me at trial, given that Mr. Stutman did not have federal court trial experience, and given that Mr. Rhodes had been saying that he was only hired to handle the motions, and his wife's health condition was making it impossible for him to devote much time to my case.  Mr. Rhodes responded that there was no difference between federal and state trials, and I should not worry about that.

     b.     But Mr. Rhodes said that a more important point was that I did not need two lawyers for trial, and there was no point in paying two lawyers.  So he suggested that I have only him represent me at trial.  I responded that I thought his role was to handle just the motions, and that his wife's health situation would make it impossible for him to properly prepare for and try the case.  Mr. Rhodes said he could take on the trial, too, if he was paid to do that.

     c.     Later, Mr. Stutman arrived and Mr. Rhodes left.  I raised with Mr. Stuman his lack of federal experience, and his contrary representation to me when we first met.  Mr. Stutman did not deny that he had misled me about his experience, and he offered no excuse for that.

     d.     I told Mr. Stutman that when I mentioned this situation to Mr. Rhodes, he had suggested that I have only him (that is, Mr. Rhodes) represent me at trial.  Mr. Stutman responded that Mr. Rhodes was always trying to get more money, and he told me that the two attorneys had often argued about money during my case.  Learning that the attorneys who were representing me were fighting about who would get paid what for my representation was one more concern that I had about their commitment to my defense.

18

25.  Based on my concerns discussed above (including my learning about Mr. Rhodes's December 7, 2008 letter to the Court), my children and friends told me they would contact other attorneys and have them come to meet with me to discuss taking over my defense.

   a.  I met with other attorneys at the MDC during the December 2008 to January 2009 time frame, to try to find someone to replace Mr. Stutman and Mr. Rhodes.

   b.  I cannot recall the names of all of the attorneys that I met with, but one was Susan Necheles, whom I understand was sent to see me by Rabbi Mordechai Stein.

   c.  I was very impressed with Ms. Necheles. She met with me for several hours, and she listened, and took notes, when I told her about the witnesses that needed to be contacted, and the documents and materials that needed to be collected. I also thought it would be good to have a woman lawyer represent me at trial, because I thought a woman lawyer would be more appropriate for questioning my daughter, Frieme Leaieh.

   d.  However, Ms. Necheles, and every attorney other that I met with, told me they would not take over my defense unless the Court agreed to discharge Mr. Stutman and Mr. Rhodes and continue the trial date. All of the attorneys felt that they would need much more time to prepare my defense than was available with a March 2, 2009 trial date.

26.  During this period of time, Mr. Stutman and Mr. Rhodes became aware that I was meeting with other attorneys. They seemed upset about this and told me that I should stop meeting with other lawyers.

27.  After I met with Ms. Necheles, I told Mr. Stutman and Mr. Rhodes that I wanted to replace them with new counsel. They told me that the Court would have to approve their being relieved from the case, and that the Court would not do that.

   a.  This was consistent with what I heard from other inmates at the MDC – that the Court would not allow me to replace my counsel at that point.

   b.  After I spoke with Mr. Rhodes and Mr. Stutman about replacing them as counsel, my children told me that Mr. Blum conveyed a message to them that they should stop trying to find me new lawyers.

   c.  I thought I was stuck with Mr. Stutman and Mr. Rhodes as counsel.

19

28.    On February 6, 2009, the Court held a motions hearing, and the statements in this paragraph relate to that hearing.

    a.    During the motions hearing, Mr. Rhodes effectively told the Court that he was skeptical that there had been a tape recording that was lost, in which my daughter could be heard acknowledging that I had not sexually abused her. That lost tape was a key aspect of Mr. Rhodes's motion to dismiss based on pre-indictment delay. And I knew that such a tape recording existed. I was stunned that Mr. Rhodes would undercut his own motion, and my interests, in this way.

    b.    I was also upset when Mr. Rhodes gave inaccurate answers to the Court's questions as to how potentially exculpatory tape recordings had been lost, or were now difficult to locate. This was something I had explained to Mr. Rhodes before he filed the pre-trial motions. As I explained to Mr. Rhodes, when the family court proceedings were ongoing, many tape recordings had been sent to Belgium and England for translation and transcription. This was done for two reasons: (1) it was difficult to find someone to do that job well in the United States, because of the differences between the dialects and usage of Belgian and American Yiddish; and (2) I preferred not to hire someone from the New York religious community for that job, due to the sensitivity of the things discussed on the tapes. When the family proceedings concluded, the tapes had not yet been translated and transcribed, because the trial for those proceedings was never held. And quickly recovering those tapes at the time was not a great concern for me because I thought that with the family court proceedings over, and the resolution in my favor, I could lay to rest my fears about these false accusations.

    c.    Because I had explained all of this to Mr. Rhodes, I was surprised when he could not answer the Court's questions as to how the tapes were lost, or could not readily be found. And I was upset when he gave blatantly inaccurate answers to the Court. I was also frustrated that when I tried to explain the situation to the Court, Mr. Rhodes said that I did not have permission to speak.

    d.    Mr. Rhodes and Mr. Stutman also asked the Court to continue the March 2 trial date, and they relied on the two points I had raised with Mr. Stutman during, and after, the December 15, 2008 hearing.

    e.    I was therefore upset when Mr. Stutman and Mr. Rhodes told the Court that they had only recently learned that some defense witnesses would not want to travel during the Purim holiday and the lead-up to Passover, and that they were unaware of the household cleansing rituals preceding Passover. As mentioned above, I had told Mr. Stutman about this issue on December 15, 2008, and he had told me not to worry, that the Court would later agree to move the trial date. Also, I had explained the rigorous household cleaning rituals for Passover to Mr. Rhodes before he filed my

20

signed declaration with the Court on December 7, 2008, as indicated in paragraph 7 of that declaration.

f.  I was also surprised to hear Mr. Rhodes say that "we have statements where" Frieme Leaieh "admits . . . that she was having sexual intercourse with the neighbor," and that claim was contrary to what she had said in the family court proceedings. Mr. Rhodes's claim about "having" such contradictory "statements" was untrue. Through a proper investigation, it was possible to locate a witness (that is, my family's former housekeeper in Belgium), or perhaps a tape recording, to show that Frieme Leaieh had made such a prior inconsistent statement. But I knew that the lawyers had not done any such investigation, and thus did not have any such "statements."

g.  Relatedly, I was surprised when a few moments later Mr. Stutman indicated that the key witness with respect to the contradictory statements mentioned above "can't come in by March 2d, that's the problem." When taken together with his and Mr. Rhodes's earlier statements, Mr. Stutman seemed to be saying that the family's former housekeeper could not come to testify because of the Purim and Passover holidays. But the housekeeper is Polish Catholic, so Mr. Stutman's statement was untrue. It seemed apparent that Mr. Stutman was willing to twist (or make up) facts to try to secure a continuance of the trial, rather than admitting that he and Mr. Rhodes had failed to do the necessary investigation and trial preparation.

h.  I was not surprised, however, to hear Mr. Stutman and Mr. Rhodes say that they would not be prepared to put on a proper defense by March 2, 2009. It was apparent from talking to them that they had not contacted any of the witnesses I told them to contact, nor had they reviewed any of the relevant documents, at least not with any care. And it was apparent from talking to them that they had only surface knowledge of the relevant facts, and what little they did say about those facts was regularly inaccurate. Thus, when they said they were not prepared, I believed them.

i.  As I mentioned above, Mr. Stutman had assured me, on December 15 and after, that the Court would agree to continue the March 2 trial date. When the Court declined to do so on February 6, 2009, even though defense counsel said they were not ready (and I knew they were not ready), I was alarmed.

29.  About a week after the February 6, 2009 hearing, Rabbi Chaim Freund visited me at the MDC.

a.  I told Rabbi Freund that I did not believe that my attorneys were prepared, nor could they possibly become prepared in time for trial. He told me he would talk with Mr. Stutman and Mr. Rhodes and try to learn what was going on.

21

b.     When Rabbi Freund came back, he told me that my children and supporters were trying to hire another lawyer, Demosthenes Lorandos, who specializes in sexual abuse cases. (Adding to my dismay, I had recently learned from Mr. Rhodes and Mr. Stutman that neither had previously tried a sexual abuse case.) Rabbi Freund said that Mr. Lorandos had recommended that I write a letter to the Court setting out my complaints against the lawyers and asking for time to be able to hire new lawyers. If that continuance was granted, Mr. Lorandos could then prepare and take over my defense.

30.    I wrote a letter to the Court dated February 23, 2009, and addressed my concerns about Mr. Stutman and Mr. Rhodes.  I recently reviewed that letter and what is stated therein is accurate.  The following statements relate to that letter.

a.     Given my English skills and my lack of experience with the criminal justice system, I did not feel capable of writing that letter on my own, so I sought assistance from some of the inmates at the MDC.  Because I wanted to type the letter, I had to wait until I was provided access to a typewriter at the MDC.

b.     In that letter, I mentioned that my attorneys repeatedly failed to provide me with documents that I requested.  Amongst the documents to which I was referring were records from the family court proceedings, most importantly the deposition transcripts of Frieme Leaieh and my son Yoinesun.

c.     I also wrote that I had "expressed my wishes [to Mr. Rhodes and Mr. Stutman] that I don't want them representing me."  Notably, early in the proceedings, when I expressed doubts about the lawyers to my children, they said that the lawyers had assured Mr. Blum that I should remain calm and everything would work out.  And, as discussed above, when I later wanted to hire another lawyer, Mr. Rhodes and Mr. Stutman told me that the Court would not remove them from the case, and they told Mr. Blum to stop my children from trying to hire another lawyer.

d.     I enclosed with my letter a January 14, 2009 letter to me from Mr. Rhodes, in which he wrote that he would try to send me copies of defense motions, "assuming that I am still on the defense team."  The reason that Mr. Rhodes questioned whether he would still be "on the defense team" was because this was the time period when I told the attorneys that I wanted them to get off the case because I wanted to replace them.

e.     My letter also referred to the fact that on December 15, 2008, I had told Mr. Stutman about the problems with setting the March 2, 2009 trial date, as discussed above.

31.   Mr. Rhodes submitted a letter to the Court dated February 23, 2009.   The following statements relate to that letter.

    a.     Mr. Rhodes provided me a copy of this letter in court on February 25, 2009, but then quickly took it back before I could read it and handed me, in its place, a letter written to the Court by Menachmen Blum, which was dated February 24, 2009. (Incidentally, I have recently reviewed a copy of the February 24, 2009 Blum letter that Mr. Rhodes gave to me on February 25, 2009; the copy I recently reviewed is the same letter that I was shown in court on February 25, 2009; and that copy will be submitted as a document in support of my §2255 motion.)

    b.     In his letter, Mr. Rhodes referred to efforts to hire an expert witness. Based on my interactions with Mr. Rhodes and Mr. Stutman, the only expert that I am aware of their considering hiring was a surgeon who could testify regarding physical characteristics of my private area, and that those physical characteristics have been longstanding (that is, must have existed in 1997). Prior to trial, Mr. Rhodes told me that he had talked to several such experts, but that none of them wanted to come to testify at trial. I am not aware why the attorneys never hired such an expert.

    c.     When Mr. Rhodes first asked me about my private area, in the context of hiring the type of witness discussed above, he also asked me if I was impotent. I told him that I was not impotent, but that I had experienced problems with my sexual function for many years.   Because of that issue, I could only have sex infrequently, and I explained to Mr. Rhodes that in 1997 my condition had progressed to the point that I could only have sex about once every two weeks.   Because of this, it was not physically possible for me to do the things that Frieme Leaieh claimed at trial.   I also told Mr. Rhodes that (1) I had sought treatment for this problem from my primary care physician in Antwerp, (2) his name was Dr. Rappaport, and (3) his office was on Concience Straat in Antwerp, Belgium.   I told Mr. Rhodes to pass on this information to Mr. Stutman, and I expected that this was something my attorneys would pursue.   As far as I know, the two attorneys made no effort to contact Dr. Rappaport.

    d.     I had also mentioned to Mr. Rhodes and Mr. Stutman that they should try to find an expert with respect to false rape claims and rape trauma, because I knew that the government had indicated that it intended to call a rape trauma expert. The attorneys said that was unnecessary because the government would not be permitted to call the expert for which it gave notice.

    e.     Mr. Rhodes's letter mentions the issue of my attorneys' failure to seek and obtain tape recordings (and translations and transcriptions of such) that would have been helpful for the defense. Early on in the case, I told the attorneys that they could

locate useful tape recordings by contacting: (1) my children; (2) Mr. Blum; and (3) Moishe Krausz and Moishe Herszaft in England.

f.  My understanding is that Mr. Blum tried to give copies of tape recordings, with the transcriptions and translations that were prepared in a rush, to Mr. Stutman and Mr. Rhodes, before trial. But the attorneys refused to receive the tapes, or to turn them over to the prosecutors. Thus, Mr. Blum turned the recordings over to the prosecutors, without defense counsel even reviewing them.

g.  While I was in custody, it was difficult for me to help coordinate anything with respect to preparing my defense, including locating tape recordings and preparing those to be used at trial. My attorneys cautioned me not to talk about my case with anyone other than them, and I tried to respect that advice. I discussed with my attorneys the recorded conversations that could be useful, and I told them to follow up with the people listed above. I also told my children to try to help locate the tapes, and I believe I mentioned to them some specific recorded conversations that would be helpful.

32. On February 25, 2009, the Court held a hearing with respect to my request to replace Mr. Rhodes and Mr. Stutman. The following statements relate to that hearing.

a.  At the hearing, I mentioned that Mr. Rhodes and Mr. Stutman had been verbally abusive with me. That includes using profanity and speaking to me in a very loud voice. One incident that stands out in my mind, and which is mentioned above, was the second time that Mr. Rhodes returned to see me about changes to the unsigned declaration from me that Mr. Rhodes had filed with the Court. Mr. Rhodes's language and tone were so abusive towards me that I was crying during and after that meeting.

b.  This sort of abusive treatment was not limited to that meeting. For example, I would receive the same treatment when I would ask for copies of the family court records, and when I would ask about legal issues in the case. The lawyers would respond by telling me, in an abusive tone and with profanity, that I did not know what I was talking about. Notably, profanity is almost unheard of amongst the members of my religious community, and is highly offensive to me and to the vast majority of the members of my religious community. I mentioned that to the attorneys, but they continued to use profanity.

c.  At the February 25, 2009 hearing, I also mentioned that the lawyers never took notes when they met with me, and that concerned me because they did not later recall what I had told them at previous meetings. I am aware that Mr. Stutman has claimed in a declaration that he provided me all of his file materials before trial. The materials that were provided to me included no notes relating to any of our meetings. Nor were

24

there notes, or any other materials, that indicated that Mr. Stutman or Mr. Rhodes had reviewed the documents that were relevant to presenting a defense, or had spoken with any potential trial witnesses.

d.     I am also aware that Mr. Rhodes has claimed in a declaration that he gave me documents to assist me with cross examining witnesses at trial and with closing argument. I never received any such documents from Mr. Rhodes or Mr. Stutman, nor from anyone else. I will describe below the materials that I received from Mr. Rhodes and Mr. Stutman.

33.    After the Court denied the request for a trial continuance on February 25, 2009, I spoke about my concerns with Rabbi Freund. During that conversation, we discussed having Mr. Lorandos cross-examine Frieme Leaieh, because sexual abuse cases are Mr. Lorandos's specialty.

34.    The following statements relate to meetings between me and my attorneys after the February 25 hearing and the start of trial proceedings on March 2, 2009.

a.     My recollection is that during this timeframe, my attorneys visited me on Friday and Sunday (February 27 and March 1), and maybe on Thursday (February 26). I estimate that the total amount of time we spent together during those visits was four hours. Nothing significant was accomplished as far as preparing for trial.

b.     I told the attorneys that they should admit to the Court that they were not prepared for trial, because I should not suffer for their lack of preparation. They did not dispute the point that they were not prepared – they acknowledged that fact, but said that it was the fault of my supporters, who, the attorneys claimed, had not done enough to help them.

c.     I also mentioned the complaints that I had raised with them before, regarding their: (1) not understanding the facts necessary to present a defense; (2) not bringing me important documents to review; (3) not talking to witnesses; and (4) not obtaining and having translated and transcribed tape recordings that would be useful to the defense. The attorneys mostly did not answer these complaints at that point, and instead blamed my supporters for their lack of preparation.

d.     In these final days before trial, the attorneys still did not bring me copies of any of the documents from the family court proceedings, including the deposition transcripts of Frieme Leaieh and Yoinesun.

e.     The day before trial began, the attorneys brought a copy of the transcript of Frieme Leaieh's grand jury testimony. Other than a few items of discovery, and some motion papers, that was the first time the attorneys brought me any documents related

to my case.   The attorneys read from the grand jury transcript and told me, essentially, that there was nothing that could be done for my defense.  In my view, they talked to me like I was obviously guilty, and they were disgusted with me for what they believed I had done to my daughter.  When I tried to tell them how they could counter Frieme Leaieh's claims, they were not interested in listening, and they said, essentially, that my case was hopeless.

f.     At that meeting the attorneys mentioned that my family and friends were trying to hire Mr. Lorandos to help with my case.  They said that he had a doctorate in psychology, and had special training and experience with respect to sexual abuse claims.  In front of me, they discussed the possibility of Mr. Lorandos joining the defense team.

g.     Mr. Rhodes left the Sunday meeting a few minutes before Mr. Stutman did.  After Mr. Rhodes left, I asked Mr. Stutman to admit to the Court that he and Mr. Rhodes were not prepared to try my case.  He said that he would do that, but he asked what I wanted to do if the Court still would not continue the trial.  I said that if I had to start trial the next day, I would like to at least question some of the witnesses, because he and Mr. Rhodes did not know what questions to ask.  I did not want to, and did not expect to, question Frieme Leaieh during trial; if the worst came to pass, I hoped that Mr. Lorandos would do so.  And I hoped that once Mr. Stutman was candid with the Court about his lack of preparation, the trial would be delayed.

35.    The following statements relate to the events that occurred on March 2, 2009, at the beginning of the trial proceedings.

a.     Early in the proceedings, Mr. Rhodes mentioned that his wife was in the hospital. As I mentioned above, Mr. Rhodes had previously told me that his wife had been stricken with cancer, her condition was serious, and because of that he did not believe he would be able to devote much time to my case.  Prior to March 2, 2009, I was concerned that this unfortunate situation would be a barrier to Mr. Rhodes's properly representing me in the motion proceedings.  And I was surprised to learn that he was going to be involved in my trial, because he had said that he did not intend to try my case, and a major reason he gave for that was his need to spend time with his wife. These circumstances also detracted from my confidence in his preparedness, though this was a relatively minor basis for my concern compared with everything else that had occurred.

b.     Next Mr. Rhodes asked the Court to broaden its protective order to include someone he identified as Demones Norendos, and Mr. Rhodes spelled the last name.  Mr. Rhodes mentioned that he and Mr. Stutman would be consulting with this person during trial, who was an expert on sexual abuse claims.  Mr. Rhodes also said that the person he named might be a trial witness.  It seems apparent that the person to

26

whom Mr. Rhodes was referring is Demosthenes Lorandos. But I had never heard that Mr. Lorandos would possibly testify at trial, and that was not my understanding of his potential role in the trial. Nor, to my knowledge, did Mr. Stutman or Mr. Rhodes ever identify him as a defense expert witness.

c.　　Mr. Stutman spoke next. I was shocked when he did not tell the Court that he was unprepared for trial, as he had promised me he would do just a day before. Instead, he said that I wanted to cross examine government witnesses.

d.　　The Court then questioned me about whether I wanted to represent myself, and during that discussion I tried to explain that I did not want to cross-examine my daughter. As part of that discussion, I tried, unsuccessfully, to explain to the Court that my attorney during the family court proceedings had questioned Frieme Leaieh during her lengthy deposition, and that attorney did a good job, effectively derailing the efforts to take my six younger children from me, and preventing a state criminal referral. The obvious difference between that attorney and Mr. Stutman and Mr. Rhodes was that she was prepared and understood the important facts, whereas Mr. Stutman and Mr. Rhodes were unprepared, and showed no inclination to try to become prepared.

e.　　I also tried to explain to the Court that if I had to represent myself at trial because Mr. Rhodes and Mr. Stutman were unprepared, I wanted to have an attorney who was experienced in sexual abuse cases cross examine Frieme Leaieh. The person I was referring to was Mr. Lorandos, who had been hired because of his experience in this area. The Court denied that request.

f.　　I did not want to cross examine my daughter. But faced with having unprepared attorneys representing me or handling my entire case, I chose the latter.

36.　Beginning shortly after my arrest, I told Mr. Stutman and/or Mr. Rhodes to contact several witnesses regarding the allegations that I sexually abused my daughter Frieme Leaieh in Brooklyn, New York, during the period July 30 to August 19, 1997. These witnesses included:

a.　　My brother Judah Weingarten, and his wife Rachel Weingarten, whose Brooklyn apartment I stayed in on the night of July 30-31, 2009; and

b.　　My brother Alfred (also called Alter Ruven) Weingarten, who was present in Judah and Rachel's Brooklyn apartment on the night of July 30-31, 2009. Incidentally, after that first night in Brooklyn, for the rest of my visit I stayed with my brother Alfred at my father's apartment, and Frieme Leaieh stayed in upstate New York, where I encouraged her to go to visit friends and family.

27

37. Beginning shortly after my arrest, I told Mr. Stutman and/or Mr. Rhodes to contact several witnesses regarding the allegations that I sexually abused my daughter Frieme Leaieh in Antwerp, Belgium, during the period August 19 to September 12, 1997, including:

    a.    Members of the Krausz family, including Alexander (also known as Shulem), Rachel, Gita, Esther, and Elkie;

    b.    Yosef Chaim Cohen and his wife Sarah (also known as Sureh);

    c.    Yakev Bear (also known as Robert) Friedman;

    d.    Abraham Englander and his daughter Hinde;

    e.    Yidel Rotter; and

    f.    Chaim Zurach Freed.

38. Beginning shortly after my arrest, I told Mr. Stutman and/or Mr. Rhodes to contact several witnesses regarding the allegation that I essentially attempted to abduct Frieme Leaieh from the home of Rabbi Royde in Manchester, England, on February 14, 1999, including:

    a.    Moshe Kraus;

    b.    Eliezer Hochhauser; and

    c.    Stacey and Shimon Rothstein.

39. Beginning shortly after my arrest, I told Mr. Stutman and/or Mr. Rhodes to contact several witnesses regarding rabbinical court proceedings relating to the same subject matter as the federal case, including:

    a.    Daniel Geldzhaler;

    b.    Rabbi Chaim Burch Rosenberg; and

    c.    Rabbi Mordechai Badad.

40. I told the attorneys that some of the witnesses above could provide additional, relevant information, such as with respect to Frieme Leaieh's credibility, or with respect to more than one time period.

28

41. Other potential witnesses that I mentioned to the attorneys were my children; Menachem Mendel Blum; Chaim Freund; Brian Dlouhy; Rabbi Yisroel Chaim Horowitz; Rabbi Royde; and others.

42. Sometimes when I told the attorneys about potential witnesses that were female, I did not know their first names. In those instances, I told the attorneys the person's family name and who was her father or husband.

43. Though I frequently told the lawyers about witnesses that they needed to talk to, they generally would not listen (or write down the names), and demonstrated repeatedly that they did not know who the key defense witnesses were.

44. As I mentioned above, I am aware that Mr. Stutman and Mr. Rhodes have made claims about things that they gave me immediately prior to, or during, my trial.

   a. The attorneys gave me nothing on March 2, 2009. Instead, on that day the government provided to me a stack of documents that was about three inches thick and which I believe were witness prior statements that were discoverable under 18 U.S.C. §3500. Incidentally, the materials that were provided to me by the government did not include any indication of statements made by Rabbi David Weis or Rabbi Mordechai Stauber. Nor do I recall ever seeing any government reports that contained anything about statements made to FBI agents by either of those two men.

   b. The only thing that I recall the lawyers giving to me in court was a copy of the 911 recording, which I believe was later taken from me by MDC personnel.

   c. The attorneys did, apparently, send me things at the MDC, either through the mail or the attorney-client dropbox at the MDC. Generally, however, I did not receive those items in a timely manner, because my unit counselor at the MDC had to have me sign a receipt for those documents, and my counselor was not at the facility when I left to court in the morning, and when I returned from court at night.

   d. Over the weekend break in trial, I did receive some documents from my counselor, but I believe those were things I had already received from the government in court on March 2 (that is, the §3500 materials).

   e. After trial, I received more materials at the MDC, which included several copies of the trial transcript and a diary for the period 1998-99. Aside from those items, and one other exception, I believe that all of these materials were things that were included in the §3500 materials that the government gave me on the first day of trial. The other exception was a report about a complaint my daughter made to the police that was unrelated to me.

f.   The lawyers never gave me any:  (1) indexes, notes, *et cetera* that indicated any organization, or review, of any records, transcripts, or the like; (2) lists of questions or topics for questioning witnesses; (3) copies of subpoenas, witness lists, schedules, *et cetera* that indicated that the attorneys had scheduled anyone to appear at trial; or (4) potential trial exhibits.

g.   In particular, Mr. Rhodes did not give to me:  (1) an "annotated version of [any] deposition, tabulated and cross referenced to pages of proposed cross examination questions;" (2) any "cross-examination materials;" (3) a "detailed outline of proposed closing;" or (4) section 3500 "materials with [his] annotations."

h.   In short, the attorneys did not give me anything that I could use to assist with my defense.  For example, there were no files with witness names that I could open and find questions or topics listed, or exhibits to use (or an indication of what exhibits to use).  And there were no potential exhibits of any kind provided to me by the attorneys, much less exhibits that were organized in a manner that would permit a person to retrieve them at appropriate times during trial.

45.   Mr. Stutman and Mr. Rhodes never told me that they intended to call any witnesses in my defense, and from what I could tell they had no plan to call any witnesses.

a.   This became most obvious when during trial there were no witnesses scheduled, or compelled by subpoena, to appear.  Thus, I could not call witnesses that my attorneys had arranged to appear for trial, because the attorneys had made no such arrangements.

b.   Similarly, there were no exhibits prepared or arranged for me to introduce at trial.

c.   Just prior to trial I learned that the attorneys had not talked to any of my children about their potential trial testimony.

d.   The attorneys had not even gone over my anticipated trial testimony with me.

e.   When I met with the attorneys the day before trial, I asked them how they were going to defend my case.  They had no answer.

46.   Prior to trial, the attorneys never brought to the MDC a copy of a recording of my October 6, 2008 911 call, though I requested that they do that several times.

a.   Mr. Stutman first brought the recording to the MDC during trial, after the court ordered him to do so.  Mr. Stutman played the recording for me at the MDC, and then took it with him when he left.

30

b.     During trial, Mr. Rhodes handed me a copy of what he said was a recording of the 911 call (on a cassette tape). I told him that the officials at the MDC would not allow me to keep it, and an official at the MDC took it away from me when I returned from court that day.

c.     Although I wanted to play the tape, I did not have the cassette with me to play at trial to impeach the witness, nor did I know how to introduce that evidence.

47.   The letter that was introduced at trial as government exhibit 4a was written by my son Yoil. The handwriting is not mine, because I did not write the letter.

a.     Yoil wrote that letter to me to repent. Though the language in the letter is dramatic, it is common in our religion to write such a letter, even if the thing being repented for is not particularly serious. Similar language can be found in Jewish prayer and religious customs books.

b.     The letter had a second page, on which it was signed by Yoil.

c.     Prior to trial, my attorneys brought me a copy of what was introduced at trial as exhibit 4a, and I told them that a page was missing from the letter. The attorneys never brought me the second page of the letter.

d.     While I was in court, the prosecutor asked me if I recognized the handwriting on the letter than was later introduced as Exhibit 4a. I said yes, it was my son Yoil's handwriting. I asked the prosecutor where the second page of the letter was, and she shrugged, as if she did not know the answer. The prosecutor asked if the translation of the letter that she had was accurate, and I responded that generally it was. I asked the prosecutor why she was going to introduce the letter, and she shrugged again, as if she did not know.

e.     I told Mr. Rhodes that there was nothing relevant in the letter.

48.   Several related factors made it difficult for me to understand: (1) how to handle my problems with Mr. Stutman and Mr. Rhodes; and (2) what was happening to prepare my defense. These include the following:

a.     Mr. Stutman and Mr. Rhodes told me that I should not discuss the facts of my case with anyone, including my children, and I should not talk about my case on the telephone. My children said they received the same message from the attorneys, conveyed by Mr. Blum. I generally tried to follow that advice, but that made it impossible for me to tell people who wanted to help what needed to be done.

b.     Based on what my children and the lawyers said, I knew that the lawyers were talking with Mr. Blum about my case, but I ended up feeling is if I was effectively shut out from helping to develop my defense.  That feeling was compounded by the fact that the attorneys generally would not take any notes of what I was saying, appeared to not register what I said to them, and would not bring me any of the documents I requested.

c.     The lawyers never sent an investigator, or anyone else, to meet with me, so I could not tell such a person what needed to be done to properly investigate and prepare the defense.

d.     I had no prior experience with the criminal justice system, and the proceedings, rules, vocabulary, expectations of people's roles, and the like were almost completely foreign to me.  This made it difficult for me to know how to handle the many problems that arose in my relationship with my attorneys, and throughout the case.

49.     In the materials that the government provided to me under 18 U.S.C. §3500, I did not see any reports or documents relating to statements that Brian Dlouhy made to FBI agents or any other government personnel.

     I declare under penalty of perjury under the laws of the United States of America that the foregoing statement is true and correct.  Executed this date in Petersburg, Virginia.

Date: 9/22/14

_Israel Weingarten_
Israel Weingarten

# EXHIBIT 2

## Declaration of Naftali Englander

1. My name is Naftali Englander. I am over 18 (DOB 11/15/75) and competent to testify in this matter. I reside in Brooklyn, New York.

2. My father is Abraham Englander and my mother is Rachel Englander. I have 15 siblings including Hinde, Esther, Moses, and Eliezer.

3. My family was close to the Weingarten family when both families lived in Antwerp, Belgium. My father was a close friend of Mr. Weingarten and I knew the Weingarten's from about age 12.

4. I began attending Mr. Weingarten's Yeshiva in 1989. Mr. Weingarten's Yeshiva was the most prestigious of the Yeshiva's in Antwerp and most parents wanted their children to be accepted into his Yeshiva. I was a student of Rabbi Weingarten for approximately 2 ½ years.

5. I continued a relationship with Rabbi Weingarten after leaving school and visited him twice a year after I moved from Antwerp to Brooklyn. Rabbi Weingarten made it a point to stay connected to his former students.

6. When I lived in Antwerp, I was a guest in Mr. Weingarten's home every Tuesday for 3-4 hours. I would sit together with the family and have dinner with them. Rabbi Weingarten and his family would also come to my father's home to have dinner while I was living there.

7. Mr. Weingarten was a very strict father and was more religiously observant than most people in our community.

8. During my time knowing the Weingarten's in Antwerp, I never saw anything out of the ordinary about the relationship between Rabbi Weingarten and his daughter Frieme Leaieh. I also never saw anything that would lead me to believe that Rabbi Weingarten had been sexually abusing Frieme Leaieh.

9. Rabbi Weingarten helped many people in the community with their problems. People would wait in line for an opportunity to speak. He was respected as a person who provided good advice.

10. My sister Hinde was close to Frieme Leaieh and they would spend a lot of time talking. I also knew Frieme Leaieh well and attended her wedding.

11. Within two weeks after Rabbi Weingarten's arrest Rabbi Weingarten expressed frustration that the attorneys were not doing any work on his case. Several of us in the community also saw that the attorneys were not doing anything. A meeting was convened to address this issue. There were at least 10 people present,

*N. E.*

1

including myself, and several rabbis. At that meeting, Mr. Sandel, a friend of Mr. Weingarten, said that he had hired an attorney with the last name Tacopina because the other attorneys weren't working on the case. However, Sandel expressed frustration that the current attorneys would not hand over the paperwork. Mendel Blum said the other attorneys should stay on the case because they had the paperwork and had already been paid first. Mr. Sandel had to request return of the $75,000 that he had already given attorney Tacopina.

12. After this meeting I would continuously hear that Mr. Weingarten was not happy with his attorneys and there had been a breakdown in the relationship. I also could see that the attorneys were not contacting anyone in the community.

13. Around January Mendel Blum told me that the attorneys needed additional money for the case. I wanted to help in any way I could. Mendel Blum told me to meet investigator John Middleton who was working with the trial attorneys. I met John Middleton on Court Street and gave him $5,000.00 in cash. He didn't ask me any questions or ask me for contact information for anyone.

14. Rabbi Weingarten's previous trial attorneys never contacted me prior to trial to ask me any questions. I am unfamiliar with the court system and did not know what information was needed. However, I would have willingly spoken to the attorneys and answered any question they asked.

15. Had the attorneys asked me, I would have provided them contact information for my family and people that knew the Weingarten family in Antwerp, Manchester, and London.

16. I also would have testified at the trial if I were needed.

17. I related the above information to a member of Israel's current legal team, who typed it for me.

18. I have carefully reviewed the contents of this declaration for accuracy.

19. I declare under penalty of perjury under the laws of the United States of America that the foregoing statement is true and correct. Executed this date in Brooklyn, New York.

_____          _____
Naftali Engalnder                                        9/20/14
                                                                    Date

2

# EXHIBIT 3

## Declaration of Yakev Nuchem Weingarten

1. My name is Yakev Nuchem Weingarten. I am 24 years old (DOB 6/21/90) and competent to testify in this matter. I am the third oldest son of Israel and Feige Weingarten.

2. I previously submitted an affidavit in my father Israel Weingarten's criminal case in the Eastern District of New York on April 14, 2009. It is accurate with the exception of a few typographical errors (ie 1007 should be 1997 in line 11). I adopt that affidavit as part of this declaration, which I am also submitting in my father's case.

3. For the past five years I have been working in Canada publishing rabbinical books and doing religious lectures. I am now married and have two boys ages 1 and 2.

4. During the time of my father's trial I lived together with my six siblings.

5. At the start of my father's case, a friend hired an attorney from Rockland County who worked primarily in state court. That attorney represented my father at the initial hearing. However, the attorney worked upstate so some community members felt it would be better to have an attorney who worked closer to the courthouse and who had federal experience. Mendel Blum encouraged the community to hire Alan Stutman.

6. From the start, Alan Stutman was not impressive. I remember meeting with Alan Stutman in his office. The meeting was short. I never saw Alan Stutman take notes and he never asked me any questions or discussed details of the case. He also slept at the meetings. Alan Stutman told me we should meet with him because Barry Rhodes was just handling the paperwork.

7. Throughout his representation of my father, Alan Stutman would not return my calls for days. I called him many times to give him messages from my father. The times attorney Stuttman returned my calls, he didn't return them until many days later and made excuses for the delay. My father was very frustrated that Mr. Stutman was so non responsive toward him.

8. Alan Stutman often complained of being sick and many times when I called him I was told he was on vacation.

9. I had several meetings with John Middleton who was working with Alan Stutman on the case. I asked him why nothing was being done in the case. John Middleton said he was working on it. Everything John Middleton would tell us didn't make sense.

10. When Alan Stutman met with me he spoke generally about the case but didn't ask me questions. I didn't know how the legal system worked. I didn't know if, as a son, I could testify in my father's case. I also didn't know if I could testify since I was under 18. A few weeks before trial I was told I qualified to be a witness and that was the first I heard that I could testify. I believe it was attorney Lorandos who told me this but I am not positive. Incidentally, I came to Court to testify. I had to travel from upstate New York and by the time I got the notice I was to be in Court, I couldn't get there in time. I remember the judge saying the children have nothing to say and there was nothing I could testify to anyway. I did have information that I could testify about; however, the attorneys never asked me about it.

11. When it got closer to trial, my siblings and I tried to contact the lawyers because they still had not obtained any information from us, including what we experienced and could testify to or other witnesses that they should contact. The attorneys never asked us for witnesses or evidence.

12. My father was constantly complaining about the lack of work that Alan Stutman was doing and Alan Stutman would tell him he doesn't know how cases work.

13. From early on in my father's case we wanted to help him get a new attorney but we didn't have money to hire one. My father was upset with Alan Stutman and Barry Rhodes from early on in the case and seemed increasingly more scared each time there was a court appearance. He said they were never prepared for Court and often presented incorrect information to the Court.

14. The month prior to trial my father called constantly worried about the fact that the attorneys were not prepared for trial. He expressed great concern over their lack of preparation and said he did not know what to do. He sounded desperate to me and I wanted to help him but didn't know how.

15. In January Mendel Blum began speaking to attorney Lorandos about taking the case over. Shortly before trial some community members agreed to try to help my father by hiring attorney Lorandos. However, the time was too short and attorney Lorandos said he could only come into the case if the Court granted an adjournment.

16. The Sunday before trial my father called me and said he asked the trial be adjourned because he cannot trust these attorneys. He was desperate and didn't know what to do because he didn't feel he could go to trial with attorneys who were unprepared.

17. I was young during the time period my sister Frieme Leaieh alleged she was abused in our apartment in Belgium. I nevertheless remember that time as I suffered from night phobias as a child. I woke up around 10 times per night and couldn't sleep. When I woke up throughout the night, I never heard anything or saw people moving between rooms. At least 3-4 times per week I would go into my father's bed at night and sleep with him for the night. When I went into my parents' room, my father and mother were sleeping well in their beds. I never found my father out of his bed or Frieme Leaieh in my father's bed. I was up so frequently that I would have seen or heard if someone was doing something inappropriate. I spent the majority of nights sleeping in my father's bed. Our house in Belgium was always quiet at night.

18. When I was young I suffered abuse from my mother.

19. The trial attorneys never asked me questions about this time and never listened to me when I told them I had information about things I remembered.

20. If they would have asked me, I would have provided the above information to them. I was also willing to testify in my father's case.

21. I related the above information to a member of my father's current legal team who typed it for me.

22. I have carefully reviewed the contents of this declaration for accuracy.

23. I declare under penalty of perjury under the laws of the United States of America that the foregoing statement is true and correct. Executed this date in Springfield, New York.


_____          September 21, 2014
Yakev Nuchem Weingarten                 Date

3