# EXHIBIT 4

## DECLARATION OF SUSAN R. NECHELES

1. I am an attorney licensed to practice law in the State of New York, my practice is focused to a large extent on federal criminal defense, and I have been practicing law for over thirty years. I have been asked to make this Declaration by attorneys for Rabbi Israel Weingarten, to set forth the substance of my conversation with Rabbi Weingarten which occurred in late 2008 or early 2009.

2. In late December 2008 or early January 2009, I was contacted by Rabbi Mordechai Stein, an acquaintance of Israel Weingarten. Mr. Stein inquired about my representing Rabbi Weingarten in the Eastern District of New York, with respect to charges alleging that Rabbi Weingarten had sexually abused his daughter.

3. In December 2008 or January 2009, I met with Rabbi Weingarten for several hours at the Metropolitan Detention Center in New York. I took notes at that meeting, but I no longer have those notes.

4. I recall that the meeting lasted a while - I believe that it was several hours long. I do not recall whether I met with Rabbi Weingarten on just one occasion or on more than one occasion and I do not recall all of the details of what we discussed, but I do remember the general outline of our discussion. Specifically, I recall Rabbi Weingarten telling me that he was very unhappy with his attorneys because they had not investigated his defense or interviewed the witnesses who Rabbi Weingarten insisted would corroborate his defense. Rabbi Weingarten outlined his defense to me and gave me specific names of witnesses who he said could testify on his behalf and help prove his defense in that they would show that the allegations being made by his daughter were impossible and/or untrue. These witnesses were in Europe (and maybe also in Israel). Additionally, I have a vague recollection that Rabbi Weingarten told me about specific

documents that he claimed existed which, to the best of my recollection, needed to be obtained from witnesses who were located either in Europe or Israel. Rabbi Weingarten explained how these documents would help establish his innocence.

5. Rabbi Weingarten told me that he had given this information about witnesses and documents which would support his defense to his attorneys but they had not investigated the defense.

6. While I do not have a copy of my notes, I do have an electronic copy of a January 5, 2009 draft retainer agreement that I wrote to Rabbi Stein. A copy of that draft retainer agreement is attached to this declaration. Reviewing this retainer agreement has refreshed my recollection on some of what I discussed with Rabbi Weingarten.

7. My definite recollection is that Mr. Weingarten was anxious to be represented by an attorney who would take on investigating the evidence he identified, and presenting that evidence at trial.

8. As I wrote Rabbi Stein in the attached retainer agreement, based on what Mr. Weingarten had told me, investigating and preparing Rabbi Weingarten's defense would "take hard work." I specifically stated:

> This case will require substantial investigation and preparation in order to uncover the exculpatory evidence essential to Rabbi Weingarten's defense. Currently the case is scheduled for trial on March 2, 2009. I am not willing to take on this case if I cannot properly represent Rabbi Weingarten and I would not be able to adequately prepare this case unless I am able to obtain an adjournment of the trial date. Accordingly, my agreement in this retainer letter that I will represent Rabbi Weingarten is subject to Judge Gleason agreeing to grant us an adjournment of the trial date until at least June, 2009.

9. The reason I placed this condition in my retainer agreement was that it was clear to me that Rabbi Weingarten was very unhappy with his current lawyers, and felt that they were not representing him properly, because they had failed to investigate his defense. I was unwilling to

place myself in a similar situation and be representing a client who was charged with such a serious crime and who had told me extensive details and names of witnesses who would purportedly provide a defense for him if I was not able to interview those witnesses and determine whether or not these documents and witnesses would provide a valid defense.   I did not know how long the case had been pending or whether Judge Gleason would be willing to entertain an application for an extension of time.  Because of these considerations, I did not believe I could be prepared to try the case any sooner than June 2009.

I declare under penalty of perjury under the laws of the United States of America that the foregoing statement is true and correct. Executed this date in New York, New York.

Dated September 22, 2014

Susan R. Necheles

2

January 5, 2009

**VIA FAX AND REGULAR MAIL**

Dear Rabbi Stein:

Thank you for consulting with me with respect to Rabbi Israel Weingarten's case. As you are aware, I met with Rabbi Weingarten for several hours the other day at the Metropolitan Detention Center.  It was an informative meeting.  Based on what Rabbi Weingarten told me, his case is very defensible.  It will take hard work but I am confident that I will be able to assist Rabbi Weingarten in this matter.

As we discussed, this case will require substantial investigation and preparation in order to uncover the exculpatory evidence essential to Rabbi Weingarten's defense. Currently the case is scheduled for trial on March 2, 2009.  I am not willing to take on this case if I cannot properly represent Rabbi Weingarten and I would not be able to adequately prepare this case unless I am able to obtain an adjournment of the trial date. Accordingly, my agreement in this retainer letter that I will represent Rabbi Weingarten is subject to Judge Gleason agreeing to grant us an adjournment of the trial date until at least June, 2009.

Subject to such an adjournment, this letter sets forth our understanding with regard to my firm's representation of Rabbi Weingarten in connection with the indictment currently pending against him in the Eastern District of New York.

**OUR COMPENSATION**

**Fee for Pre-Trial Preparation**

You have requested and I have agreed that Hafetz & Necheles will represent Rabbi Weingarten on a flat fee basis for pre-trial preparation.  Hafetz & Necheles agree to represent Rabbi Weingarten pre-trial for a fee of $350,000.  This fee is based on the

{00087973.DOC;1}

current indictment.  If the prosecutor were to supersede this indictment and add new charges, you agree that a further fee might be necessary.

## Trial Fee

Hafetz & Necheles cannot know how long the trial will last but we estimate that it will last approximately three to four weeks.  You agree, based on this estimate, to pay Hafetz & Necheles at this time a trial fee of $200,000 to cover the first four weeks of trial.  We agree to place that trial fee in escrow.  If this case is resolved more than two weeks prior to trial, you will be entitled to a refund of that entire trial fee.  If this case is not resolved prior to that date, Hafetz & Necheles will be entitled to withdraw $100,000 from the escrow account as a flat fee for the first two weeks of trial.  Thereafter, every Monday that the trial continues Hafetz & Necheles will be entitled to an additional trial fee of $50,000.

If prior to trial the government estimates that the length of the government's case at trial will be four weeks or longer, you agree to pay Hafetz & Necheles an additional $100,000 trial retainer.  You agree to pay this additional fee one month prior to the trial date.  Hafetz & Necheles will place this $100,000 in an escrow account with the other trial fee and will draw down on this fee at as set forth above, *i.e.,* $50,000 on every Monday for each additional week of trial beyond four weeks.  Hafetz & Necheles agrees to cap the trial fee at $300,000.

## Post Trial Fee

Should there be legal work required after trial, Hafetz & Necheles will bill you on an hourly basis according to the following fee schedule:

1.  Susan R. Necheles: $600 per hour.
2.  Firm Associates: $300 – 400 per hour.
3.  Paralegal Staff: $125.

## DISBURSEMENTS

In addition to the foregoing, there will be costs involved in representing Rabbi Weingarten.  Those costs may include travel, payment for an investigator, transcript, translation, expert fees, trial computer assistance fees, and the like.  You agree to pay Hafetz & Necheles $50,000 to hold in an escrow account, out of which we will pay expenses we incur in the course of our representation of Rabbi Weingarten.  Should the disbursements exceed $50,000 you will be billed for them and you agree to make prompt payment to Hafetz & Necheles

{00087973.DOC;1}

**INITIAL RETAINER PAYMENT**

As outlined above, you agree to pay Hafetz & Necheles an initial retainer of $600,000.  That retainer is due immediately.

Of this sum, $350,000 will be credited toward our pre-trial fee.  $200,000 will be placed in an escrow account as a trial fee.  An additional $50,000 will be placed in an escrow account for payment of costs.

**INDICTMENT**

This retainer agreement applies solely to representation of Rabbi Weingarten in connection the charges in the currently pending Indictment against him in the Eastern District of New York.

**APPROVAL AND CONSENT**

If these terms are acceptable to you, please sign and date this letter where indicated below and return it to me, together with a check in the amount of $600,000.00.

Very truly yours,


Susan R. Necheles

AGREED AND CONSENTED TO:

_____          Dated: _____

# EXHIBIT 5

## Declaration of Rabbi Chaim Freund

1. My name is Chaim Freund. I am over 18 years old (DOB 3/2/71) and competent to testify in this matter.

2. I understand that I am submitting this declaration in Israel Weingarten's criminal case in the Eastern District of New York.

3. I first met Rabbi Weingarten at the Metropolitan Detention Center (MDC) in New York after his arrest in this case while offering religious services to inmates. I began religious counseling with Rabbi Weingarten about two weeks after his arrest.

4. When I was counseling Rabbi Weingarten, starting around December he began expressing concerns to me regarding his upcoming trial and the lack of preparation by his counsel. My role was not to discuss legal issues with Mr. Weingarten but to help him through his problems and frustrations from a spiritual perspective. I tried to calm his nerves.

5. About a week after his February 6, 2009 hearing, I met with Rabbi Weingarten at the MDC. He was very upset and crying. He expressed to me that he was extremely worried about his upcoming trial because the attorneys had not been working on his case, did not know the facts of the case, and were not prepared for trial. In order to help keep Rabbi Weingarten spiritually calm, I told him that I would speak with his attorneys.

6. I met with attorney Alan Stutman two times. Mr. Rhodes was at one of the meetings. I hoped to obtain information about what the attorneys had done to prepare for trial so that I could alleviate Rabbi Weingarten's fears and help him find spiritual peace. When I asked Mr. Stutman about witnesses, he told me he and Mr. Rhodes had not interviewed any witnesses. This was approximately 2 weeks prior to the March 1st trial date.

7. Mr. Stutman told me he and Mr. Rhodes were not prepared for trial but that Mr. Weingarten should not worry because he was confident the trial would be continued or he would be relieved from the case. Mr Stutman told me he was confident he could win the case but did not provide any information about what he had done to prepare for trial.

8. In light of the lack of preparation of attorneys Stutman and Rhodes, some members of the community sought to hire Attorney Lorandos who specializes in sexual abuse cases. I was told that Mr. Lorandos advised that Mr. Weingarten should write a letter to the Court setting forth his concerns with his attorneys and request a continuance to seek new counsel. I understand Mr. Lorandos said if a continuance were granted, he would take

over the case.  However, if a continuance were not granted, there would not be enough time for him to prepare for trial.

9.  When I met with Rabbi Weingarten after learning this information, I told him that writing a letter to the Court about his concerns about his attorneys' lack of preparation and the break down in the relationship would be good for him spiritually as well.

10. After Mr. Weingarten's request to continue the case in order for him to obtain new counsel was denied on February 25, 2009, Rabbi Weingarten discussed with me his desire to have Mr. Lorandos cross examine his daughter Frieme Leaieh since he was a sexual abuse expert.  We discussed this from a spiritual stand point.

11. I related the above information to a member of Israel's current legal team, who typed it for me.

12. I have carefully reviewed the contents of this declaration for accuracy.

13. I declare under penalty of perjury under the laws of the United States of America that the foregoing statement is true and correct.  Executed this date in Brooklyn, New York.


9-28-14
_____
Dated

_____
Rabbi Chaim Freund

# EXHIBIT 6

**BURNS & COHAN**

ATTORNEYS AT LAW

September 22, 2014

**VIA EMAIL(barrygenerhodes@optonline.com)**
**AND FEDERAL EXPRESS**

Barry Gene Rhodes
112 West 34th Street, 18th Floor
New York, New York  10120-0101

> **Re:**   *United States v. Israel Weingarten*
> **E.D.N.Y. Case No. 08CR0571**

Dear Mr. Rhodes:

I am one of the attorneys who is presently representing Israel Weingarten.  I understand that you recently spoke with my colleague, Jodi Thorp, and I am writing to follow up on two issues.

I understand from Ms. Thorp that you have materials (including electronic documents) that relate to your representation of Mr. Weingarten, but you have not made those materials available to Mr. Weingarten's other successor counsel.  I also understand that you declined to provide copies of those materials to Ms. Thorp, and that your reason is that you want to hang onto those materials to defend yourself if your actions with respect to representing Mr. Weingarten are questioned.

I appreciate your feelings, but I have some concerns about your position.  First, while I am not a New York practitioner, I question whether declining to turn over materials to successor counsel is permissible under the rules of professional conduct.  Moreover, if the withheld materials become relevant to any inquiry, your having withheld them might lead to a negative inference.  It seems to me that your position would be far stronger if you at least provided a copy of the materials to Mr. Weingarten's successor counsel, and kept the originals for yourself – or vice versa.

In light of these points, we again request that you make the withheld materials available to us, including any electronic documents or materials.  We are fine with receiving either copies or the originals, and we will pay for any reasonable copying costs if you want to give us copies, or if you want copies made for your records.  Moreover, we will make arrangements to pick up those materials at your office, or, if it is more convenient for you, at another place.  However, in light of the time pressures that were are under, we request that you make those materials available promptly; that is, by September 29, 2014.

Turning to a different issue, before you reveal client confidences and protected information related to Mr. Weingarten, we request that you and Mr. Stutman follow the process set out in *Bittaker v. Woodford*, 331 F.3d 715 (9th Cir.2003) (*en banc*), unless, of course, something else is required by court order. This approach will serve to protect everyone's rights and interests.  Thus,

444 WEST C STREET #410
SAN DIEGO, CALIFORNIA 92101
619.236.0244

BURNSANDCOHAN.COM

5757 WEST CENTURY BLVD. #700
LOS ANGELES, CALIFORNIA 90045
310.740.6288

Mr. Rhodes
September 22, 2014
Page Two

for example, we ask that you not sign or draft a declaration that reveals protected information, unless those steps are first authorized by a court order.

Thank you for your consideration.  I look forward to your prompt response with respect to making arrangements for us to pick up the materials discussed above.

Sincerely,

TODD W. BURNS
Counsel for Israel Weingarten

# EXHIBIT 7

# DECLARATION OF MATTHEW J. GRAVEL

1.  This declaration relates to *United States v. Israel Weingarten*, E.D.N.Y. Case No. 08CR0571.

2.  I am the office manager for the law firm Lorandos Joshi, a firm of 4 lawyers that is based in Ann Arbor, Michigan.  I have held that position since 2005.  In that position, I maintain the firm's business records, and I am also involved in facilitating and monitoring the communications that firm employees and attorneys have with other people and organizations.

3.  Lorandos Joshi represented Mr. Weingarten with respect to the above-named case, in post-trial proceedings and on appeal.

4.  When Lorandos Joshi was retained to represent Mr. Weingarten, I was involved in the effort to obtain materials held by Mr. Weingarten's former counsel, Alan Stutman and Barry Rhodes,that related to his case.  And I have reviewed firm records to refresh my recollection with respect to events related to that effort.

5.  Despite repeated requests for such materials (including for any electronic documents), the only materials that Mr. Stutman and Mr. Rhodes provided to Lorandos Joshi were what appeared to be notes that Mr. Stutman took during Mr. Weingarten's trial, and copies of letters that Mr. Weingarten's friends and supporters sent to the Court.  There was nothing else provided by the attorneys, such as:  notes that might suggest a review of records or witness interviews; notes of client meetings; anything related to what appeared to be expert witnesses; trial witness files or outlines; an opening statement or closing argument; or copies of subpoenas.

6.  I have been an office manager at a litigation-focused law firm for 9 years, and in my opinion none of the materials produced by Mr. Stutman or Mr. Rhodes evidenced trial preparation.

7.  In the process of trying to obtain materials from Mr. Stutman, I reviewed an April 10, 2009 letter that Mr. Stutman wrote to the Court.  In that letter, Mr. Stutman indicated that he had reviewed materials that had been provided to him by a man named John Middleton.  Mr. Stutman also wrote, "As the materials [provided by Mr. Middleton] were not provided by the government, when I was finished with them, I returned the materials to Mr. Middleton."

8.  I telephoned Mr. Middleton and asked that he provide to Lorandos Joshi copies of all of the materials that he provided to Mr. Stutman with respect to Mr. Weingarten's case.  Mr. Middleton responded that he would not turn over those materials unless he was paid a fee for them.

9.  On April 18, 2009, Dr. Lorandos followed up on this situation with an email to Mr. Stutman

1

and Mr. Rhodes, on which Mr. Middleton was copied.   In that email, Dr. Lorandos asked that the attorneys intercede so that all materials that the attorneys relied on would be turned over to us.   I recently reviewed a copy of that email, which has been preserved in the records of Lorandos Joshi.

10.   I am not aware of Mr. Stutman or Mr. Rhodes ever having responded to the email referred to in the preceding paragraph.

11.   About forty minutes after Dr. Lorandos sent the April 18, 2009 email mentioned above, Mr. Middleton responded in an email in which he wrote that none of the materials that he had collected with respect to Mr. Weingarten had been used by Mr. Stutman.   Mr. Middleton also repeated his demand to be paid if Lorandos Joshi wanted to receive copies of the materials that he had with respect to Mr. Weingarten, and he wrote that if he was not paid he would turn those materials over to the government.

12.   I also recently reviewed an April 15, 2009 email from Ashish Joshi, the managing partner of Lorandos Joshi, to Mr. Rhodes and Mr. Stutman, on which I was copied.   In that email, Mr. Joshi indicated that "[a] large amount of defense materials seems to be missing in this case."   Mr. Joshi wrote that the Weingarten case was likely to be subject to significant post-trial proceedings, "and may also necessitate an extended evidentiary hearing." Accordingly, Mr. Joshi asked the attorneys "to save and safeguard all of your correspondence and or communications and/or notes – including but not limited to electronic or digital or audio or video communication/material – between yourselves and/or third persons regarding this case."

13.   I am not aware of Mr. Stutman ever responding to the email mentioned in the preceding paragraph.

14.   On April 17, 2009, Mr. Rhodes responded to the April 15, 2009 email from Mr. Joshi that is discussed above.   In that email, Mr. Rhodes wrote:

> Thirdly, I have no knowledge of any missing defense materials, papers or documents.   I gave Mr. Lorandos everything relevant in my possession. The 3500 material, my notes for proposed cross and direct examinations, piles of papers from the Family Court proceedings, and dozens of pages of my ideas for how to proceed were all given to Mr. Weingarten when he opted to represent himself.

None of the materials mentioned in this excerpt of Mr. Rhodes's email were ever provided to Lorandos Joshi.

15.   In his April 17, 2009 email, Mr. Rhodes also wrote:

> Finally, you have no right to fish through my correspondence, now or at an

2

"extended evidentiary hearing," and either know that or should know that. Your request is inappropriate, and your tone is improperly threatening.

Mr. Rhodes never provided copies of the requested materials.

16.   I have been involved in obtaining records from predecessor attorneys in approximately 40-50 cases.   The experience with Mr. Rhodes and Mr. Stutman was highly unusual and contentious.   In most cases we receive complete files from the previous counsel within two weeks of being retained.

I declare under penalty of perjury under the laws of the United States of America that the foregoing statement is true and correct to the best of my recollection.   Executed this date in Ann Arbor, Michigan.

Date: September 23, 2014

Matthew J. Gravel

3

# EXHIBIT 8



Menachem M. Blum
8 Ruzhin Rd.
Monroe, N.Y. 10950

February 24, 2009

Hon. John Gleeson
United States District Court
Eastern District of New York
225 Cadman Plaza East
Brooklyn, New York 11201

RE: Dismissal of attorneys – Israel Weingarten

Hon. Judge Gleeson,

I feel very sorry to have to write this letter, I have tried to protect everybody's interest in the best possible way, but I feel obliged to inform your honor about the events surrounding the dismissal of the attorneys.

In October of 2008 I have retained Mr. Allan Stutman, he said to me then that he will bring another attorney on the case to do the paperwork and he will split the fees, to which Mr. Rhodes became co-counsel later sometime in Nov. of 2008 to do the paperwork.

To my knowledge there was no retainer agreement or any others papers signed to the attorneys by anyone, there was a proposed agreement between the attorneys and myself for $150,000 to be paid for services up until after trial plus expenses, presuming they take the case up through trial. Of the said amount,  $80,000 was paid so far, when it became  apparent that there is a problem between the attorneys and Mr. Weingarten, it became increasingly problematic in getting funds for them as his friends said that they cannot continue paying if the attorneys do not listen, and that they should get off the case.

In essence there was a severe miscommunication, which resulted in him having no trust or confidence that they are representing his best interests, information about the case was not shared with the defendant even upon request, they were not listening to him to get the facts of the case, Mr. Rhodes was doing the papers but there was factual errors, and when asked to correct them or to orally argue the facts correctly, it would not happen, they were told by Mr. Weingarten repeatedly many times that he cannot work with them and that they were not listening, they simply refused to let Mr. Weingarten participate in his own defense, I will detail a few of the issues as follows, some of it I have witnessed myself and some of it I have been told repeatedly in the past few months.

Throughout the past few months Mr. Weingarten has been repeatedly telling the attorneys that he is extremely unsatisfied with the way they are handling the case, that they won't listen to him when he is trying to tell them the facts of the case, that they do not understand the case and its many facts needed for a proper defense preparation.

Mr. Weingarten had been informing friends and myself - constantly that he cannot work with the attorneys and that he had told them repeatedly about it, that here is a miscommunication between them, he repeatedly said that they will not listen, that they do not understand this case and the many facts surrounding the case needed for proper preparations and defense, and that he cannot communicate with them.

When the attorneys would go to see Mr. Weingarten, they would be screaming and shouting at him and would not listen to him, they would tell him that he is in prison and he has no say, there was bad language used and it just came to a point where there was simply no proper communication.

The attorneys did not want to share with Mr. Weingarten information on their plans or what they do in the case, Mr. Weingarten has asked them repeatedly that he wants to see what is filed in the papers, but he was not shown until after it was filed or it was shown to him in the last minute where he had no time to go over to correct anything that was needed.

He was told to sign an affidavit in the last minute without having chance to look it over properly, when he realized afterwards that there were factual errors, he asked them to change it, but the attorney refused to change the factual errors, instead a letter was filed by Mr. Rhodes blaming the defendant, when in fact the attorneys were not listening to him for the true facts of the case.

Mr. Weingarten had asked the attorney to send him the motions that was to be filed by Mr. Rhodes, so he can see if there is any factual mistakes, but instead Mr. Rhodes had sent a letter to Mr. Weingarten stating that he is mailing just the affidavit that he needs to sign it, and that another envelope is going out in the same time containing the motion, indeed the second envelope went out many weeks later way after it was filed in court, and apparently there was factual errors which Mr. Weingarten could not have helped at that point, including details about the motives and plans for travel, that was incorrect.

It was after the letter to the court by Mr. Rhodes to replace the affidavit of Mr. Weingarten that had caused everybody to lose all the trust, as they would not listen to him and argue over facts that should or should not be in the papers, than blaming the defendant for it, and than repeating the similar factual errors on the papers despite the fact they were asked to listen to the true facts.

Mr. Weingarten had repeatedly said that he wants the truth to come out and all he is concerned is that the true facts come out in court, instead some crucial facts were misconstrued in the papers to a point where it now conflicts the actual statements of some of the witnesses, I had pointed this out to the attorneys but they would not listen, due to mistrust and the miscommunication or whatever.

The attorneys were told repeatedly that there is factual errors in the papers and that on oral argument it must be corrected, they would not listen, there was no proper client attorney relationship unfortunately as they would not listen to him.

I communicated back and forth with the attorneys and Mr. Weingarten to try to facilitate proper communication but to no avail, Mr. Weingarten claimed that they would not listen and that there is no proper communication, and they do not let him participate in his own defense.

Meanwhile Mr. Weingarten's friends have been busy raising funds to hire another attorney as a result, and Mr. Weingarten was told that he will be getting another attorney to replace the current attorneys, he kept insisting to the attorneys and to his friends that there is no way he can work with them and that he does not trust them.

I have tried many times in the past few months to communicate with the attorneys about preparations but I was than faced with a difficult situation, first, Since there was this miscommunication and mis-participation of the defendant it was extremely difficult for anyone to help in any preparations including witness work and tapes or documentary evidence, as there has to be full communication and participation with Mr. Weingarten to help facilitate all of it, as without that it would be nearly impossible, it was obvious that there was no way that witness or evidence was able to be presented to the attorneys in light of such problems and in light of the lack of trust, I had only tried to facilitate it but to no avail, and I did not wish to get into discussions again recently about the mistrust and all other issues, therefore I had said "soon" to the attorneys.

I was also confronted almost every time I spoke to the attorneys about the payment issue, which made it very difficult to communicate about the case, even though I assured them that I will try to pay them for whatever is owed, it was extremely difficult to discuss much of the case with the payment of funds an issue every time, I am not aware of anyone having said anything to the extent of not paying them funds owed, I even offered at one point to have them put a lean on a property.

When I told them that I have many witnesses well in excess of 50 and most of them being abroad, that I need to know which witness would be material and crucial so to avoid time wasting and extra travel expenses etc., I was never able to discuss the necessary information to help me select the witness to talk to them, all they would say is have them call us, when I explained then, that I cannot have 50 or more people call them, as well as the multiple time zones and the attorneys busy schedules, and that often only an answer machine comes on, that it would make it impossible, and that there has to be a another way to work this out before the witness call.

When the attorneys still insisted on the witnesses calling without discussing it, I had two witness from abroad calling and all they got was indeed an answer machine, the rest I could not bother to call as I could not have witnesses trying to call again and again without being able to reach them or without setting up a plan of who is calling when and about what. It was simply a nightmare, I asked not once to discuss the documentary evidence and witness that are available, all I was being constantly told is that nothing will be admitted in court, upon consulting other attorneys I was told quite the contrary, that the evidence and witness we have is crucial and rebuttal evidence.

I was hoping that another attorney would take the case, as Mr. Weingarten's friends were continually raising funds for another attorney but we got closer to trial, and no attorney wanted to take it so close to trial without having adequate time for preparations.

Mr. Weingarten has also expressed great concern that as a result of the above he had interjected in court at the hearing despite the attorneys being there, simply because they would not listen to him in and out of court and he became terribly anxious and desperate since facts were misrepresented and

other facts and information he asked them to present were not presented, and although he tried to stay calm and told the attorneys, he felt helpless, he feels very sorry and apologetic for having interjected, had there not been these problems he would simply not have had to interject.

To sum it up, Mr. Weingarten has been expressing repeatedly to the attorneys that there is no proper communication between them, he has no trust in them, that they don't know the facts of the case, that they are not listening and not letting him participate in his own defense, he kept insisting to them that he cannot work with them, but they would not listen.

Unfortunately the above problems have made it impossible to prepare and continue as the trust and confidence was simply not there.

Mr. Weingarten cannot continue with the attorneys as it was not working till now to my dismay, it would be desirable that he get a 6 month postponement to allow for other counsel to be retained and prepare properly.

I feel very very sorry for all that happened, I wish this would have been resolved another way sooner, however I have tried my best taking into account everything that transpired.

Very truly yours.


Menachem M. Blum


Cc: Mr. Alan Stutman
Mr. Barry G. Rhodes
Ausa Andrea Goldbarg
Ausa Rachel Nash

# EXHIBIT 9

## Declaration of Alfred Weingarten

1. My name is Alfred Weingarten.  I am over 18 (DOB 3/15/51) and competent to testify in this matter.

2. Israel Weingarten is my brother and FriemeLeaieh Weingarten is my niece.

3. On July 24, 1997, my father, Solomon Weingarten, was hospitalized at The Brooklyn Hospital Center.  He was placed on a respirator and unable to talk.

4. During this time, my brother Israel and I were both stayingin Israel.

5. My brother Judah was living in New York and was helping our father.

6. I was contacted about my father's condition and decided to travel from Israel to New York to help and be with my father.   We wanted someone to be at his side day and night.

7. Israel did not have a phone at that time.  I went to my brother's apartment tospeak with him about the situation.  Itold him he should also travel to New York to be with our father.

8. Our wives needed to remain in Israel to care for our young children.   My wife and I had three young boys and Israel and his wife, Feige, had six young children.   All of us adults agreed that Feige and my wife should remain with the kids, including Feige.

9. While I was still at the apartment, my niece, FriemeLeaieh, begged to go in my presence.  My niece ChayehSureh was asking to go too.  I remember this because they were arguing back and forth as to who should get to go. FriemeLeaiehsaid she was out of school and didn't have anything to do all day and that ChayehSureh still had school.  She argued she didn't have any friends yet in Israel and really wanted to see her friends from the seminary in England who were vacationing in Monsey, NY. FriemeLeaieh also said she wanted to see her grandfather.ChayehSureh was arguing that it was her turn and FriemeLeaieh had already gotten to travel a lot.

10. Israel, Feige and I were debating who should go.  Israel said it was ChayehSureh's turn to travel.  I said that FriemeLeaieh was making good points.  I considered the fact that FriemeLeaieh is older.  I said I felt strongly FriemeLeaieh should go. They agreed that FriemeLeaiehwould go with me and Israel because she wasn't settled in Israel, was older andshe could be more helpful.

*aW*

11. I arranged and bought the plane tickets for Israel, FriemeLeaieh and myself to arrive on July 30, 1997. I was able to get a direct flight for myself and arrived sometime before noon. Israel and FriemeLeaieh had a layover in Rome, Italy, so they arrived very late at night.

12. I picked up Israel and FriemeLeaieh up at the airport with a car service and we went to my brother's apartment. When we arrived and were in the street walking to the apartment Israel was very tired and suffering from stomach pain. He sat down outside the apartments and said he did not know if he could get up.

13. Israel and I were thinking of staying at my father's apartment; however, we did not have the key, so we went to my brother's apartment to get the key and ended up staying there.

14. After we got into my brother's apartment, Israel, FriemeLeaieh and I sat at the table talking and eating. While we were talking, FriemeLeaieh mentioned she wanted to see her grandfather the next morning and then go upstate to Monsey to see her friends. Israel was very tired and still not feeling well so he went to be earlier than everyone else, however it was still very late (or early the next morning) when he went to bed. FriemeLeaieh stayed up talking and went to sleep later. I stayed up the whole night.

15. I could not sleep that night. I stayed awake talking to my brother Juda for hours in the dining room. We continued talking in the bedroom. I remember the doors to all the bedrooms were open because I kept seeing and hearing my sister-in-law Mrs. Rachel Weingarten get up many times throughout the night. She would go to the bathroom and then walk to the kitchen to wash her hands. I also went to the toilet a couple of times. The door to Israel's bedroom was open the whole night. I never heard or saw anything inappropriate between Israel and FriemeLeaieh. I remember this because I had already heard about FriemeLeaieh's allegations. I was alert that night and would have noticed if anything inappropriate happened.

16. I went into the room where Israel was sleeping a couple of times throughout the night to wake him up to say the night prayer because he went to sleep without saying it. There were several times when I went into his room and tried to wake him to do this prayer. Each time he was dead asleep.

17. The next morning we received a call that we needed to go to the hospital quickly if we wanted to see our father alive. I awakened Israel just a few hours after he had gone to sleep. The door was still open and he was still sound asleep when I woke him up.

18. After Israel woke up we went to the hospital where my father passed away. When we arrived there were many people in the hospital room and they

*a W*

2

were already reciting the SemaYsrael, Viduy,Nishmas, the prayer book from MaverYavok and other prayerswe say when a person passes away. When someone dies, if possible, there has to be at least ten men present repeating the prayers over and over until the soul leaves the body. There were about 15 men surrounding my father's bed reciting our important prayer when my father was dying. FriemeLeaieh was behind us in the corner. I would have noticed if she would have interrupted this prayer and walked in front of the minion of men to hold her grandfather's hand. It would have stopped the prayer. I did not see that happen.

19. In those early morning hours that Israel and FriemeLeaieh were with us at my brother's house, I never heard or saw anything inappropriate happen between them. When I saw Israel he was either asleep or awake and very emotionaltalking about the situation with my father. We spent time talking about my father's condition and worrying about how we could improve his condition. With all of the circumstances, Israel was in no condition spiritually, mentally, emotionally or physically to have abused FriemeLeaieh.

20. When we were traveling to the hospital, FriemeLeaiehdid not act in a way that would suggest that Israel had mistreated her in any way.

21. After my father died, we immediately began preparing for the funeral services and burial. FriemeLeaiehattended the funeral services with the women. She did not attend the burial services as women do not participate in burials. After the funeral service, FriemeLeaiehleft to go upstate to Monsey.

22. Israel and FriemeLeaieh did not stay in the same place the rest of the time they were in New York as FriemeLeaieh went to Monsey and my brothers and I were mourning the loss of our father in our father's apartment.

23. When we were in New York I was with Israel when he received a telephone call from his wife. During that call Israel learned that his wife had received information that the landlord in Antwerp said they needed to get out of the apartment. After that call Israel asked me to change his and FriemeLeaieh's tickets because they needed to go to Belgium to finish packing the apartment and ship their belongings to Israel. I changed the tickets and arranged the travel for Israel and FriemeLeaieh to travel to Belgium.

24. FriemeLeaieh returned to Israel from Belgium by herself. I picked her up at the airport and took her to her home.

25. FriemeLeaieh acted her usual self when I picked her up at the airport. My observation of her was that she did not seem pale or changed. She was not dressed differently than she normally would be dressed. She also did not appear to me to be in shock or appear as if she had been tortured. She

*a w*

likewise did not appear dazed.In my opinion, FriemeLeaieh did not look or act as someone who had been sexually or physically abused over the course of the last several weeks.

26. I had heard about FriemeLeaieh's allegations against her father from her mother, father, and other people.  I also heard that she later withdrew them.When I was walking with FriemeLeaiehfrom the airport pushing the suitcases, I had an opportunity to speak with her.I was pushing the cart and it was a long walk so I was able to talk to her without her parents about the allegations.  Walking together, I asked her if there was any problem with her father doing anything dirty, sexual or inappropriate with herand told her that if he had, I was there to help her.  As her uncle and as an obligation under Jewish law, I felt an obligation to help her and could assist her.

27. FriemeLeaieh answered no, nothing happened.  She said the allegations were not true.  She did not cry when I asked her about this and did not say that she had just experienced weeks of abuse.

28. Attorneys Alan Stutman and Barry Rhodes did not speak to me about this case until the Friday or Sunday before trial.

29. The one time attorneys Alan Stutman and Barry Rhodes spoke to meJohn Middleton was in the room.  We were in a small room and we were standing. There were no chairs or a conference table.  Barry Rhodes asked me a few questions.  He did not ask me about specific time periods.  He did not ask mequestions about the allegations in Belgium during August 19, 1997 to September 12, 1997, or Israel.  If they would have asked me I could have provided them the names of several witnesses that knew my brother in Belgium.

30. I do not remember all of the questions the attorneys asked me, however, I remember they asked me what was the purpose of my brother's trips.  I told them that we came to New York because my father was ill and that Israel and FriemeLeaieh went to Belgium to finish moving.  In response to their questions, I also told them that my father passed away the day after I arrived, and that same day, after the funeral, FriemeLeaieh went to Monsey.  They also asked me if my brother had a degree. I remember them asking me about Israel's education and a few more questions about my father's apartment. They did not ask me very many questions and I did not know what information was important for the case so I just responded to their questions.

31. At this meeting I asked the attorneys why they had notinterviewed my brother'ssix children or coordinated with them.  They answered that they planned to speak to the children the evening after the first day of trial.

*a w*

32. I would have been available to speak to Alan Stutman or Barry Rhodes any time they needed me.   After they were relieved, I met with Israel's new attorneys many times.  Every time an attorney has asked me to meet them, I have agreed and made myself available.

33. I toldAlan Stutman and Barry Rhodes that I was willing to testify.  They never told me what questions they would ask me and did not explain the process of testifying or coordinate  me or the children testifying in anyway.

34. I also kept asking Mendel Blum when the children should come from Monsey. He told me attorneys Stutman and Rhodes told him there was time and to wait and they would tell me when they needed them.  I kept asking and they kept saying just wait.

35. I was asked about the meaning of the term "mafia" in our Orthodox Jewish community.  In our community the term mafia has a broad meaning and is often used by children and adults to refer to a gangster or bad guy.  It is a common term used in our communities in Israel, Belgium and New York.

36. I related the above information to amember of Israel's current legal team, who typed it for me.

37. I have carefully reviewed the contents of this declaration for accuracy.

38. I declare under penalty of perjury under the laws of the United States of America that the foregoing statement is true and correct.  Executed this date in Brooklyn, New York.


_____
Alfred Weingarten

SEP 23 /4
_____
Date

# EXHIBIT 10

Declaration of Rachel Weingarten

1. My name is Rachel Weingarten. (DOB 8/14/52). I am over 18 and competent to testify to the matter herein.

2. I am married to Israel Weingarten's brother, Judah Weingarten.

3. We have been married since 1971.

4. My husband and I reside at 94 Ross Street Apt. 5k , Brooklyn, New York 11249.

5. We have lived in this apartment since 1975, including during July and August of 1997.

6. Toward the end of July 1997, my father-in-law, Solomon Weingarten, became seriously ill and was hospitalized.

7. We felt it was important that someone remain in the hospital at my father's side 24 hours a day.

8. While my father-in-law was in the hospital, my husband and I took turns staying at his bedside.

9. My father–in-law appeared unconscious when he was in the hospital and breathed using a respirator.  He could not speak, and my husband and I were very concerned about his condition.

10. Two of my husband's brothers, Israel Weingarten and Alfred Weingarten, were living in Israel at the time.

11. Due to my father–in-law's condition, Israel and Alfred were called upon to come to New York to be with their father.

12. Israel Weingarten's oldest daughter, my niece, Frieme Leaieh Weingarten, came with her father Israel.

13. On July 30, 1997, I was at the hospital during the evening hours. A long time has passed since these events occurred so I don't remember exactly what time I came home from the hospital, but it was sometime after 10:00 p.m. and I believe Israel and Frieme Leaieh arrived a couple hours after I returned home.

1

14. When Israel and Frieme Leaieh arrived it was very late and they were both extremely tired from traveling.

15. My father-in-law had an apartment in the building next to our building. When Israel arrived he asked for the keys to his father's apartment so that he and Alfred could stay there, and he said Frieme Leaieh would stay in my apartment.

16. I did not want Alfred and Israel to stay at my father-in-law's apartment because I had spent hours cleaning his apartment in hopes that he would return home. I wanted the apartment to remain clean for his return so I had Alfred and Israel stay in my apartment.

17. Throughout that night when Israel, Alfred and Frieme Leaieh were staying at my apartment, I got up continuously throughout the night due to a medical issue that required me to use the bathroom at least every hour.

18. My apartment is small and, as indicated in the diagram attached to this declaration, the three bedrooms and bathrooms are very close to each other.

19. The diagram is an accurate representation of the layout of my apartment.

20. The bathroom next to the bedroom, is the bathroom I use in the night.

21. We sleep with the doors open so it would be unusual for me to see bedroom doors closed.  None of the doors were closed that night.

22. When I went from my bedroom at the end of the hallway to the bathroom next to it, I could see in to the two other rooms.

23. Each time I got up throughout the night Israel was alone in his bed and Frieme Leaieh was alone in her bed dead asleep like two pieces of wood.

24. I didn't sleep much that night and was up going to the bathroom several times.  When I was up I never heard or saw anything unusual.

25. My recollection is that by the time Israel and Frieme Leaieh went to sleep, there was only a few hours before they woke up the next morning and needed to go to the hospital.

26. Very early the next morning, around 6:00 a.m. on July 31, 1997, we received a call that we needed to return to the hospital because my father-in-law was not going to make it.

2

27. After receiving the call, Israel, Alfred, Frieme Leaieh, myself, and my husband went to the hospital together.

28. Many friends and relatives went to the hospital to see my father-in-law.

29. Israel and Frieme Leaieh were at the hospital as well.

30. After my father-in-law passed away that day, we had a service.

31. Israel and Frieme Leaieh were both present at the service but in different areas as Israel was on the men's side and Frieme Leaieh was on the woman's side. Men and women do not intermix at funerals in our culture.

32. I spent time with Frieme Leaieh at the hospital and at the service and did not notice anything unusual about her demeanor – only mourning for her grandfather.

33. After the service, the men prepared their father for burial and the women left, as they do not participate in the burial preparation or the burial ceremony.

34. I returned to my apartment and Frieme Leaieh went to stay with friends in upstate New York. Frieme Leaieh did not stay in the same apartment as her father for the rest of her stay in New York.

35. Israel and Alfred went to their father's apartment where they stayed for the remainder of their time in New York.

36. Israel and Alfred spent several days observing the traditions that we must observe when a parent dies. I took food to them at my father-in-law's apartment, and another woman served them the food. Other than this, no women were present with the men during this mourning period.

37. I have known Frieme Leaieh since she was born and I have spent time with her over the years. She would visit us every couple of years during the holidays. I was with Frieme Leaieh during the time period discussed above. She appeared to be sad that her grandfather had died. Other than sadness about her grandfather, there was nothing unusual about her demeanor. There was nothing about how she acted the next morning or her interactions with her father that indicated to me that she had been molested by her father during the night.

3

38. When Frieme Leaieh and her family would visit us for the holidays I would spend a lot of time with Frieme Leaieh.   My opinion of her is that she is dishonest.  My memory is that she was often caught making up stories that were not true, about both important and unimportant things.  It also seemed to me that she could make herself cry and laugh easily even if the circumstances didn't warrant such a reaction.

39. I was never interviewed by attorney Alan Stutman, attorney Barry Rhodes, or an investigator working with Alan Stutman or Barry Rhodes.

40. Had Alan Stutman , Barry Rhodes, or an investigator asked to interview me or speak with me, I would have spoken with them and answered their questions.

41. If Alan Stutman, Barry Rhodes, or an investigator would have asked to come to the apartment, I would have let them see the apartment and allowed them to take pictures of the apartment and bedrooms.

42. I did not type this declaration. Instead, I related the above information to a member of Israel's current legal team, who typed it for me.

43. I have carefully reviewed the contents of this declaration for accuracy.

44. I declare under penalty of perjury under the laws of the United States of America that the foregoing statement is true and correct.  Executed this date in Brooklyn, New York.


_____        _____
Rachel Weingarten                                         Date

4

KITCHEN
6'2 x 7'1

R

DINING ROOM
10'11 x 12'

STUDY
10'11 x 12'10

CL

CL

BEDROOM
12' x 11'10

CL

5'4 x 7'

4'10 x 4'8

W/D

BEDROOM
9'11 x 11'10

CL

CL

BEDROOM
14'5 x 12'