# EXHIBIT 11

## Declaration of Juda Weingarten

1.  My name is Juda Weingarten.  (DOB 1/6/49)

2.  Israel Weingarten is my brother.

3.  I reside at 94 Ross Street Apt. 5k  Brooklyn, New York  11249 with my wife, Rachel Weingarten.

4.  We have lived in this apartment for many years and were living in this apartment in July and August of 1997.

5.  Toward the end of July 1997, my father, Solomon Weingarten, became ill and was hospitalized.

6.  My wife and I took turns sitting at his bedside in the hospital so that someone would always be with him.

7.  I believe my father was sedated when he was in the hospital.  He was on a respirator and could not talk.  He just laid there.

8.  Seeing the condition my father was in, the family decided that my brothers Israel Weingarten and Alfred Weingarten should come to New York to be with my father.

9.  Israel Weingarten and Alfred Weingarten, were living in Israel at the time and traveled to New York to be with my father.

10. My niece, Israel's oldest daughter, Frieme Leaieh, came as well.

11. Israel, Alfred, and Frieme Leaieh came to my apartment in New York on July 30, 1997.

12. I don't remember exactly what time Israel and Frieme Leaieh arrived but it was very late that night.

13. We still believed my father would pull through so we had another person stay with my father at the hospital so my wife and I could go home for a few hours and meet our guests.

14. We slept very few hours that night as it was past midnight when we went to sleep and sometime near dawn we received a call that we needed to be at the hospital to see my father.

1

15. I never saw or heard anything unusual between Israel and Frieme Leaieh that night.

16. Our apartment is small and all of the rooms are near each other so it is easy to hear everything in the home.

17. We also sleep with all of the bedroom doors open.

18. This was the only night that Frieme Leaieh and Israel stayed at my apartment during July and August 1997.

19. After that night, Israel stayed at my father's apartment with Alfred for the rest of their stay, and we used that apartment as a mourning place for the men.

20. The morning we received a call that my father was dying we immediately began to prepare ourselves, and went to the hospital where he passed away.

21. Frieme Leaieh was at the hospital but never spoke to or touched my father. I would have remembered had that happened because my father was not speaking and it would have been very unusual for Frieme Leaieh to touch him as that would have been inappropriate for our customs.

22. There were many people at the hospital to see my father.

23. My father passed away and we held services, which ended by about 2:00 p.m.

24. After the services for men and women, I went with my brothers Israel and Alfred and the other men to perform the burial and other mourning traditions.

25. That same day, Frieme Leaieh went upstate New York to visit friends.

26. My brother and his wife, Feige Weingarten, were constantly having problems in their relationship.

27. In my opinion, Feige Weingarten was mentally and emotionally unstable and was the cause of a lot of the unrest in the home. She would often start arguments with the family and would easily become angry for no apparent reason.

28. Prior to Israel Weingarten's trial, no one contacted me or asked me any questions about this period of time.

29. I was never interviewed by attorney Alan Stutman, attorney Barry Rhodes, or anyone from their office.

2

30. Had Alan Stutman , Barry Rhodes, or an investigator asked to interview me or speak with me, I would have spoken with them and answered their questions.

31. If Alan Stutman, Barry Rhodes, or an investigator would have asked to come to the apartment, I would have let them see the apartment and allowed them to take pictures of the apartment and bedrooms.

32. I did not type this declaration. Instead, I related the above information to a member of Israel's current legal team, who typed it for me.

33. I have carefully reviewed the contents of this declaration for accuracy.

34. I declare under penalty of perjury under the laws of the United States of America that the foregoing statement is true and correct. Executed this date in Brooklyn, New York.


_____                    9  23  14
Juda Weingarten                                  _____
                                                 Date


3

# EXHIBIT 12

## Declaration of Sheindl Cohen

1. My name is Sheindl Cohen. My maiden name is Weingarten. I am 22 years old (DOB 7/23/92) and competent to testify in this matter.

2. I am submitting this declaration in my father Israel Weingarten's criminal case in the Eastern District of New York.

3. Since my father's trial I got married. I was a kindergarten teacher for two years and now I'm a homemaker. I have two children, ages 3 and 21 months.

4. I don't remember the date but sometime in the beginning of my father's case, Mendel Blum told me and my siblings that the attorneys wanted to speak with us and took us to Alan Stutman's office. We waited at least two hours and the attorneys never talked to us.

5. I went with my siblings to Alan Stutman's office about three times and each time we waited a long time to talk to the attorneys, however, they never spoke with us.

6. The attorneys never questioned me and never asked me for witness names.

7. Shortly after my father's arrest he began complaining about the attorneys. I don't remember all of the reasons he was not happy with the attorneys but I remember he said they would not listen to him.

8. My father also complained to me that the attorneys wanted him to say lies. For instance, they wanted him to say that he was sexually abusing my mother and not Frieme Leaieh.

9. During the pendency of his case, my father called the house almost daily. Each time he called he complained of the attorneys. My siblings and I would also take turns visiting my father once a week at the MDC. He complained that the attorneys were not working on his case during those visits as well. We as kids didn't know what to do.

10. My siblings and I spoke to Mendel Blum and told him that my father was not happy with the attorneys. Mendel Blum was at our house often during this time and we would talk about how unhappy my father was with the attorneys.

11. One day John Middleton and Mendel Blum came to our apartment together. John Middleton told me he worked with Stutman and Rhodes. I tried to tell him about my mother and the abuse but John Middleton responded that the attorneys knew everything and I didn't have to tell them.

12. I also told John Middleton that the attorneys were not listening to my father and my father was not happy with him. John Middleton said my father talks too long and says a lot of stuff that the attorneys are not interested in hearing.

13. As a child, I remember my siblings and I suffering a lot of abuse from my mother. I don't remember when the abuse started but my mom was a perfectionist. If we messed up she would smack us. She also hit us with hangers and big cooking spoons. She pulled my hair and hung me by my braids. When she would brush my hair she would beat me with the brush. She would also stick clothespins in my ear. Sometimes she would make me stick my tongue out and then hit my chin so I would bite my tongue. I remember one time where my mother was beating us kids and yelling, "why are you hitting my children," while she was doing it.

14. Around 2003, when I was approximately 11 years old my mother came to camp and tried to kidnap me when she did not have custody of me. My mother's face was red and angry and she was chasing me with her fists. The camp counselors tried to pull me away from her and my mother kept screaming, "she's my daughter, she's my daughter," and put her hands around my neck and started strangling me. I began to black out when a construction worker saw what was happening and helped me get away. Rockland County Child Protective Services took a picture of the mark on my neck.

15. When we lived in Israel my father wasn't home a lot on weekends. When he was out my mother would sexually abuse me and my siblings. I remember one time in particular when I saw my mother touch my sister Chanch inappropriately until Chaneh urinated on the floor.

16. One night around 2002 when we lived in Monsey, my mother's nephew came to our house and broke our glass door and beat up my father. I was there and was watching. My mother was standing in the doorway with her arms crossed the entire time. My father was getting really hurt. My siblings and I started jumping on my mom's nephew to get them off my dad. When they got off, my father was lying on the ground and appeared to be unconscious. My mother said it's a pity they didn't break my father's head in half. After my mom's nephew beat up my father, they called the police and my father was taken to the police station. I have pictures of my father after he was beaten up and of my mother standing in the doorway. My father was black and blue and his clothing was torn.

2

17. My father was not physically or sexually abusive toward me and I never saw him be physically or sexually abusive toward my siblings. In fact, my father was a devoted and caring father.

18. I was very young when my sister Frieme Leaieh went to New York with my father when my grandfather was ill. When Frieme Leaieh came home from that trip I remember her being very happy and excited about the new clothes she bought because they were different than the clothes we had before. I remember I was excited because she bought me dresses, jumpers, and Shabbos robes.

19. The trial attorneys never asked me questions about this time and never listened to me when I told them I had information about things I remembered.

20. If they would have asked me, I would have provided the above information to them and would have been willing to testify in my father's case as well.

21. I related the above information to a member of my father's current legal team who typed it for me.

22. I have carefully reviewed the contents of this declaration for accuracy.

23. I declare under penalty of perjury under the laws of the United States of America that the foregoing statement is true and correct. Executed this date in Spring Valley, New York.

Sheindl Cohen                          9/28/14
Sheindl Cohen                          Date

3

# EXHIBIT 13

## Declaration of Alexander Krausz

1. My name is Alexander Krausz. My Jewish name is Shulem Krausz. I am over 18 (DOB: 9/19/44) and competent to testify in this matter.

2. I am providing this declaration in Israel Weingarten's criminal case in the Eastern District of New York. I previously filed an affidavit in this case on April 17, 2009. I incorporate that affidavit into this declaration.

3. I live in Antwerp, Belgium and was close to the Weingarten family when they lived here. They lived in Belgium for about 12 years.

4. In my previous declaration I noted that Rabbi Weingarten and his daughter Frieme Leaieh ate meals at our home on several occasions when they returned to Antwerp in August and September 1997 to finish packing their belongings. I remember this time period because Rabbi Weingarten was mourning the death of his father and I was also helping them move their belongings.

5. Although I don't remember which Saturday it was in August or September of 1997, I remember that during this time Rabbi Weingarten spent a Shabbat dinner with us in addition to eating at our house 2-3 times per week. As Mrs. Weingarten was not with Rabbi Weingarten and Frieme Leaieh, my wife and I invited them to our home to eat meals regularly during this time. I remember hearing my wife ask Frieme Leaieh if she and her father would be eating at our home so that she could prepare the right amount of food. Dinner would usually take 2-3 hours a night and 3 hours on Saturday. Frieme Leaieh would also come to our home without her father and came by herself to eat a couple of times.

6. During this time I also spent a lot of time with Rabbi Weingarten. We went to the synagogue to pray daily and went to the Shul to study for about 2-3 hours per day. Rabbi Weingarten could not miss a prayer because his father had recently passed away and in our religion one must pray daily during the first year of a parent's death.

7. I also helped Rabbi Weingarten with packing and moving the family's belongings in August and September of 1997. During this time, I remember driving Rabbi Weingarten to the port to put the family's belongings into shipping containers.

8. Israel Weingarten's trial attorneys never contacted me. If I they would have contacted me I would have related the above information to them and

1

answered their questions.  I would have also testified to the above information.

9.  I related the above information to a member of Israel's current legal team, who typed it for me.

10. I have carefully reviewed the contents of this declaration for accuracy.

11. I declare under penalty of perjury under the laws of the United States of America that the foregoing statement is true and correct.  Executed this date in Antwerp, Belgium.


_____          SEPT. 14  2014
Alexander Krausz                          Date

2

# EXHIBIT 14

## Declaration of Rachel Krausz

1. My name is Rachel Krausz. I am over 18 (DOB: 1/4/47) and competent to testify in this matter.

2. I am providing this declaration in Israel Weingarten's criminal case in the Eastern District of New York. I previously filed an affidavit in this case on April 12, 2009. I incorporate that affidavit into this declaration.

3. I have known Rabbi Weingarten since 1985 when he moved to Antwerp, Belgium. My husband, Alexander Krausz, met him at the synagogue and they became good friends.

4. Rabbi Weingarten had a special way of teaching children and founded a Yeshiva (boy's school) in an old synagogue. I sent two of my boys, Saul Krausz and Joel Krausz to his Yeshiva. Mr. Weingarten's Yeshiva was highly regarded and successful. I was impressed with how thoroughly my boys were taught and with the values they took from learning at Rabbi Weingarten's Yeshiva.

5. My family went on holidays with the Weingarten family in the camp in the mountains in Switzerland. We were there two different years for about 3 weeks each. We all stayed in one building and spent time together. We went for walks in the afternoon and did other activities.

6. My experience with Frieme Leaieh was that she had an intense way of talking and made a big fuss over everything. She was often overdramatic.

7. I remember when Rabbi Weingarten and Frieme Leaieh Weingarten came to Antwerp in August and September of 1997. I remember this because Mrs. Weingarten was not with them so I invited them to my home to eat often during this time. Rabbi Weingarten and Frieme Leaieh ate by us 2-3 times a week while they were in town. They also spent the Saturday Shabbos dinner with us on one occasion. Frieme Leaieh walked to my house by herself and her father came from the synagogue. When they would come for dinner at my home, Frieme Leaieh and Rabbi Weingarten would stay for approximately an hour and a half to three hours.

8. When Rabbi Weingarten and Frieme Leaieh were at my house for dinner, Frieme Leaieh did not appear to be suffering or in harm in any way. She looked healthy and ate as though she felt well. She did not look pale or dazed. There was nothing that would suggest to me that Frieme Leaieh was being sexually abused during this time period.

1

9.  Israel Weingarten's trial attorneys never contacted me.  If I they would have contacted me I would have related the above information to them and answered their questions.  I would have also testified to the above information.

10. I related the above information to a member of Israel's current legal team, who typed it for me.

11. I have carefully reviewed the contents of this declaration for accuracy.

12. I declare under penalty of perjury under the laws of the United States of America that the foregoing statement is true and correct.  Executed this date in London, England.


_Rachel Krausz_                    _Sept 12 2014_
Rachel Krausz                          Date


2

# EXHIBIT 15

<u>Declaration of Esther Krausz</u>

1. My name is Esther Krausz.  I am over 18 (DOB: 4/15/73) and competent to testify in this matter.

2. I am providing this declaration in Israel Weingarten's criminal case in the Eastern District of New York.  I previously filed an affidavit in this case on April 14, 2009, and I incorporate that affidavit into this declaration.

3. I am the daughter of Alexander and Rachel Krausz.

4. My family knew the Weingarten family when I was growing up.  Our families ate dinners together and celebrated the Sukkot holiday together where we would eat in the Sukkah.  I also saw Frieme Leaieh at school and would babysit Frieme Leaieh and the other Weingarten children occasionally.

5. I remember when Rabbi Weingarten and Frieme Leaieh took the Shabbos meal at my parents' home in the late summer of 1997.  I remember this because my father told me when he was at the Shul he saw Rabbi Weingarten and invited him to his home for Shabbos.

6. I remember speaking with Frieme Leaieh throughout that dinner.  She said there was a new book that she was interested in and her father didn't like it.  She also said they were finishing packing their belongings.

7. When I spoke Frieme Leaieh at that dinner she appeared happy and healthy.  She did not seem disturbed, pale, or ill.  I did not see any signs that she was being abused.  She ate dinner just like everyone else at the table.

8. I was never contacted by an attorney prior to Israel Weingarten's trial.  Had an attorney contacted me I would have related the above information and answered any questions.  I also would have testified to the above facts.

9. I related the above information to a member of Israel's current legal team, who typed it for me.

10. I have carefully reviewed the contents of this declaration for accuracy.

11. I declare under penalty of perjury under the laws of the United States of America that the foregoing statement is true and correct.  Executed this date in London, England.


_Esther Krausz_                          12-09-14
Esther Krausz                            Date

1

# EXHIBIT 16

## Declaration of Gita Krausz

1. My name is Gita Krausz. I am over 18 (DOB 9/14/77) and competent to testify in this matter. I reside in Monroe, New York.

2. On April 17, 2009, I provided an affidavit in Israel Weingarten's federal criminal case in the Eastern District of New York. I have reviewed that affidavit and incorporate it into this declaration, which I am also submitting in that case.

3. I am originally from Antwerp, Belgium and knew the Weingarten family well beginning about 1985 until they left Antwerp and relocated to Israel in 1997.

4. My family lived within walking distance from the Weingarten family. My father was a close friend of Rabbi Weingarten and taught with Rabbi Weingarten at Rabbi Weingarten's Yeshiva. We would have the Weingarten family over for dinner. We also spent the annual Sukkot holiday together for many years; during this holiday, we celebrated together over eight days eating meals outdoors. Our families also spent vacations together in Switzerland.

5. I was older than Rabbi Weingarten's daughter, Frieme Leaieh and I occasionally babysat her and the other Weingarten children. At school, I was in a grade about 4 years ahead of Frieme Leaieh. It was a small school and I remember Frieme Leaieh seeking attention and fake crying on many occasions. Frieme Leaieh had some difficulties with other girls at school because they could not trust what she was saying was true.

6. Rabbi Weingarten was a respected member of the community and ran one of the most prestigious Yeshiva's in Antwerp. Boys who studied at Rabbi Weingarten's Yeshiva did not have to be tested to attend the next level of schooling at any school in Antwerp or Europe. Two of my brothers studied at Rabbi Weingarten's Yeshiva and enjoyed learning with Rabbi Weingarten.

7. I remember the time Frieme Leaieh and her father came to Antwerp from August 1997 to September 1997. I remember this time period because they had been gone for a while and I had not seen them for some time. I also remember it because it was the last time I saw Frieme Leaieh and her father together.

8. During this time I remember spending two Shabbos meals with Frieme Leaieh and her father at my parents' home. They came for the Friday evening meals and the Saturday afternoon meals. Frieme Leaieh usually came over by herself and we sat on the couch talking while we waited for the

1



men to return from Synagogue.  I remember Frieme Leaieh talking about how they still had so much packing to do.   Frieme Leaieh and I also spoke about books and other subjects.

9.  I also remember a Friday night when Frieme Leaieh spent the night at my parent's home during this time in the Summer of 1997 when she and her father had returned to Antwerp to finish packing their belongings.

10. When I saw Frieme Leaieh in August and September of 1997, she appeared happy.  She did not seem pale and she ate normally during meal times. Frieme Leaieh did not act in any way that would suggest her father was sexually abusing her during this time.  She also did not display signs of suffering, pain or mistreatment.   Frieme Leaieh was jovial around her father and was respectful of him.

11. Rabbi Weingarten's previous trial attorneys never contacted me prior to trial to ask me any questions or determine what I knew about the time the Weingartens lived in Antwerp.  Had the attorneys contacted me, I would have willingly spoken to them and provided the information that is set forth in this declaration.  I also would have testified at the trial if I were needed.

12. I related the above information to a member of Israel's current legal team, who typed it for me.

13. I have carefully reviewed the contents of this declaration for accuracy.

14. I declare under penalty of perjury under the laws of the United States of America that the foregoing statement is true and correct.  Executed this date in Monroe, New York.


_____          ___9 | 21 | 14_____
Gita Krausz                              Date

# EXHIBIT 17

Declaration of Elkie Krausz

1. My name is Elkie Krausz.  I am over 18 (DOB 2/3/81) and competent to testify in this matter.  I reside in London, England.

2. On April 14, 2009, I provided an affidavit in Israel Weingarten's criminal case in the Eastern District of New York.  I now reaffirm that affidavit.  I am also submitting this declaration in Rabbi Weingarten's criminal case in the Eastern District of New York at the request of Rabbi Weingarten's current legal team.

3. I am from Antwerp, Belgium and have known Rabbi Weingarten's daughter, Frieme Leaieh Weingarten since we were three years old.  Frieme Leaieh and I attended the Satmar School in Antwerp together from the age of three until Frieme Leaieh left to attend school in England in 1996.   We were in the same class of about 11 girls.

4. Frieme Leaieh and I were best friends when we were children.  When we were young we used to play at each other's homes on Sundays at least a couple of times per month.  We also saw each other daily at school, except on Saturdays.   Frieme Leaieh appeared to me to be a happy child.

5. As we got older, Frieme Leaieh and I were still very good friends.  When my parents traveled to New York when I was 12 years old, I stayed with the Weingarten's at their home for one week because of my close relationship with Frieme Leaieh.  I slept in Frieme Leaieah's bedroom in a bunk bed.  The Weingartens had a small flat and you could hear what was happening within the flat from any room.

6. When I stayed at the Weingarten's home, Rabbi Weingarten always acted appropriately with me.   I saw that Rabbi Weingarten was very devout in his religious practice.

7. When Frieme Leaieh was in school in England I continued to have contact with her by telephone.

8. In August of 1997, Frieme Leaieh returned to Antwerp with her father.  During this time, Frieme Leaieh came to visit us at the Satmar School.  The girls in our class were the same and the Principal was still Rabbi Stauber, who was the principal when Frieme Leaieh attended school there.

1

EK

9. I remember seeing Frieme Leaieh at this time because she had cut her hair in England and I was used to her always wearing her hair in two braids. When she visited, she also wore natural color stockings instead of black, which was surprising to me and the other girls. When I commented on her stockings Frieme Leaieh said she was going to switch back to black because black was coming back into style. I remember this because before Frieme Leaieh moved to England she did not concern herself with style.

10. During the time that Frieme Leaieh was in Antwerp during August and September of 1997, I saw her several times on the street, both by herself and with her father. Each time I saw Frieme Leaieh I stopped and talked to her. Frieme Leaieh appeared happy when I saw her with her father and when I saw her without her father.

11. When I saw Frieme Leaieh during this three-week period in Antwerp in August and September of 1997, she did not appear pale or food deprived and there were no signs she was being abused. Frieme Leaieh appeared to be in good health and spirits.

12. Rabbi Weingarten's previous trial counsel never contacted me prior to trial to ask me any questions or determine what I knew about the time the Weingartens lived in Antwerp. Had the attorneys contacted me, I would have willingly spoken to them and provided the information that is set forth in this declaration. I also would have testified at the trial if I was needed.

13. I related the above information to a member of Israel's current legal team, who typed it for me.

14. I have carefully reviewed the contents of this declaration for accuracy.

15. I declare under penalty of perjury under the laws of the United States of America that the foregoing statement is true and correct. Executed this date in London, England.


E. Krausz

Elkie Krausz

12 SEPT 14

Date


2

# EXHIBIT 18

<u>Declaration of Yosef Chaim Cohen</u>

1. My name is Yosef Chaim Cohen. I am over 18 (DOB: 4/19/69) and competent to testify in this matter. I am a resident of Belgium.

2. I previously filed a declaration in the federal criminal case against Rabbi Weingarten on April 14, 2009. I have reviewed that declaration and adopt it as part of this declaration, which I am also submitting for Rabbi Weingarten's case in the Eastern District of New York.

3. I have known Rabbi Weingarten since 1987. He was close with my wife as my wife's father was already 84 years old at the time she was 15. He became an advisor for my wife and helped her find a school and host family overseas in Belgium. Rabbi Weingarten helped her with family issues, school issues and other issues. He was caring toward her and took responsibility for her much like an uncle.

4. After my wife and I married, we lived in Manchester, England near my parents. In our first year of marriage, Rabbi Weingarten offered me a job in his Yeshiva in Antwerp and my wife and I moved to Belgium.

5. I worked as a teacher for 6 ½ years in Rabbi Weingarten's Yeshiva beginning in October 1988 until it closed in April 1985. Rabbi Weingarten was at the school from 6:30 a.m. until 3 or 4 in the afternoon in the winter. During the summer he came twice: 10:00 a.m. until 5:00 p.m. and in the evening from 8:30 p.m. to 10:30 p.m. In addition to these learning times we had meetings every week about each boy and what we could to help him further. Rabbi Weingarten was very dedicated to the school. He also made sure the boys went to camp in the summer in Switzerland. He spent a lot of time and money organizing this experience for the boys because he felt it was important for their education to spend time in the fresh air and have an experience outside of the city. To this day most of Rabbi Weingarten's pupils have good memories of the education and care they received.

6. Rabbi Weingarten and I became very close when I started teaching at his school and I saw him daily. His family lived just a 10-minute walk from my house. I sometimes visited Rabbi Weingarten at his apartment in Antwerp. He also had students over to his apartment to learn. The apartment was small for a growing family and the rooms were close together. The kitchen was only 5 steps from the bedroom and there was not much privacy.



1

7. Rabbi Weingarten was a generous man. When he started the school he had financial reserves so he did not take any money for his work at the school during the first several years. After several years of not getting paid, the board saw that Rabbi Weingarten needed money and insisted he get paid for his services. Rabbi Weingarten was reluctant to take money for teaching even though he worked long hours at the school. Even when he received payment from the school, Rabbi Weingarten paid the other teachers and staff first and only paid himself when there was money left over. Rabbi Weingarten never misused school or charitable funds.

8. Once per month the children from Rabbi Weingarten's Yeshiva collected charitable contributions. This custom is referred to as Tzedakah and is commonly used in the Satmar community to get children accustomed to helping others. Rabbi Weingarten used the money raised to pay grocery bills of needy families. When the school needed money for books, Rabbi Weingarten announced that collections would go toward books for the school. I was at that speech and saw the new books that were purchased for the school with the money collected by the boys.

9. I remember seeing Rabbi Weingarten when he returned to Antwerp in August and September 1997 after the death of his father. It was my understanding that his purpose in returning was to finish packing the family's personal belongings and to settle affairs in Antwerp. I visited Rabbi Weingarten and Frieme Leaieh at the apartment when they came to Antwerp to finish moving in August and September 2014. The apartment appeared to be in the process of packing and moving. Each time I saw Frieme Leaieh at my home or in the community she appeared to be in good spirits.

10. I also saw Rabbi Weingarten at the Synagogue during August and September 1997. I remember seeing him because he was leading the prayer in honor of his late father. In our religion, leading the prayer in honor of a deceased parent is a duty during the first year and especially during the first 30 days following the passing. Rabbi Weingarten started the morning prayer service at 7:30 a.m. He also led the afternoon and evening prayer services. I remember one day in particular when I helped Rabbi Weingarten gather 10 men so that he could lead a prayer for his father.

11. I remember this time period in August and September 1997 because my wife Sarah Cohen and I had Rabbi Weingarten and Frieme Leaieh as guests at our home frequently for dinner. They came to our home about three times per week for dinner since they were packing their apartment and didn't have all of their kitchen supplies available. Rabbi Weingarten and Frieme Leaieh also spent two Shabbats as guests of my family. Shabbat is celebrated weekly on Saturday; it is a special day for us during which we eat and sing.



2

12. When Frieme Leaieh was visiting us and dining at our home she did not appear distraught or scared of her father. She appeared comfortable and pleasant during that time. There were no signs that suggested to me that she was being sexually abused during this time.

13. I also remember in August and September of 1997 that Rabbi Weingarten had mentioned to me that he was not feeling well. He went to the doctor and was placed in the hospital for a couple of days.

14. During this time, in addition to coming to our home with her father, Frieme Leaieh also came to our home by herself to visit my family. I distinctly remember one night when Frieme Leaieh spent the night at our home without her father. I think this may have been when Rabbi Weingarten was in the hospital. Frieme Leaieh never complained that she was being harmed during this time period.

15. After Rabbi Weingarten and Frieme Leaieh finished packing most of the apartment in September 1997, Frieme Leaieh returned to Israel and Rabbi Weingarten stayed in Antwerp to continue settling his affairs. Once he moved out of the apartment, Rabbi Weingarten stayed at my home for another month in order to finish settling his affairs.

16. Travel is important in our community because we have multinational families and family is very important in our culture. It is common for us to fly internationally multiple times per year.

17. I was asked by a member of Rabbi Weingarten's current legal team about a cassette tape that was presented at Rabbi Weingarten's trial. Rabbi Weingarten was at my home in October 1997 and was showing me a tape recording of telephone call between his daughter Frieme Leaieh and the neighbor Mr. Meierwitz. Rabbi Weingarten was concerned about them having an inappropriate relationship. I was also on the tape as I called the Weingarten home when Frieme Leaieh and Mr. Meierwitz were on the phone and Frieme Leaieh answered the phone and told me her father was not home. When Mr. Weingarten was at my home in 1997, I tried to make a copy of the tape for him and the tape ribbon got tangled. I opened the plastic cassette cover to untangle the ribbon. The only way I could untangle it was to cut the tape ribbon. I cut the ribbon and then taped it back together with cellophane tape. I did not cut out any of the tape ribbon or add anything to it. I did not tamper with the tape: I was fixing it.



3

18. My impression of Rabbi Weingarten is that he is a person of especially good character traits.  People in the community looked up to him because he was intellectual, caring, and spent a lot of time helping people.  Many people came to him to consult on children's education and to discuss points in the Torah. When he saw someone in distress, if there was something he could do he would help.

19. Prior to Rabbi Weingarten's trial, I spoke with Mendel Blum from Monsey, New York and told him that I was available to help with Rabbi Weingarten's case in any way I could.  The only thing he told me I could help with is money. I sent money to Mr. Blum to give to the attorneys.

20. The trial attorneys or their representatives never contacted me prior to Rabbi Weingarten's trial to ask me what I knew or how to get in contact with possible witnesses.

21. If the attorneys had contacted me I would have related the above information to them and answered their questions.  I would have also testified to the above information.

22. I related the above information to a member of Israel's current legal team who typed it for me.

23. I have carefully reviewed the contents of this declaration for accuracy and I am prepared to testify to the facts herein.

24. I declare under penalty of perjury under the laws of the United States of America that the foregoing statement is true and correct.  Executed this date in Antwerp, Belgium.


_____       _____
Yosef Chaim Cohen                      Date

4

# EXHIBIT 19

## Declaration of Sarah Cohen

1. My name is Sarah Cohen. I am over 18 (DOB: 11/8/68) and competent to testify in this matter. I am a U.S. citizen but a resident of Belgium.

2. I am providing this declaration in Israel Weingarten's criminal case in the Eastern District of New York. I previously signed an affidavit in this case on April 14, 2009. I have reviewed my prior declaration and incorporate it into this declaration.

3. I have known the Weingarten family since around 1984. I first met them when they lived in the United States in Williamsburg, New York. I got closer to the Weingarten's when we lived in the same neighborhood in Antwerp, Belgium, a year later.

4. Prior to my marriage in 1987, I visited the Weingarten's once or twice per week for about 2-3 hours each evening. I spent a lot of time with the Weingarten family. Mr. Weingarten was always very appropriate with me. After my marriage, my husband Yosef Chaim Cohen and I went on holiday to Switzerland with the Weingarten's five times for about 3 weeks each time.

5. When Frieme Leaieh Weingarten was 5 years old she was a student in my class. I taught her for one year and then she remained at the school I taught at for several years. I still had consistent contact with her at school, although I would see her more often at her home.

6. When Frieme Leaieh was at school, even as a very young child, she was very dramatic and made things out to be more than they were. I remember wanting her to be in the school plays because she was very good at acting and could easily change her emotions.

7. Once when my husband and I attended the summer camp in Switzerland with Rabbi Weingarten and his family, Frieme Leaieh made up a story about me to her mother. She was about 12 years old and I was already married with two kids at the time. Frieme Leaieh told the lie with a very straight face. I told Mrs. Weingarten that the story was not true in front of Frieme Leaieh. I remember being very upset that she told lies about me to her mother. This upset me so much that I remember it to this day.

1

S. c.

8. Frieme Leaieh felt close to me and would talk to me about school and her mother. Even though we were friends, my opinion of Frieme Leaieh was that she could not be trusted. She would make up stories like it was nothing.

9. I saw Mrs. Weingarten slap and pinch her children. When she became angry Mrs. Weingarten would grind her teeth and scream at them. Mrs. Weingarten could get out of her mind when she was angry. She had a strong way with the kids and was a very stressful person that involved her children in her stress. I observed that Mrs. Weingarten was a perfectionist that had to have the house spotless and everything perfectly lined up. She put a lot of pressure on her children. Mrs. Weingarten was also vocally unhappy with the family's economic situation.

10. Mrs. Weingarten was a perfectionist. At her home the hangers in her closet were always in perfect order with the clothing all hanging the same. When Mrs. Weingarten packed luggage, she folded the clothes in a particular way and made sure they lined up just right. She also packed her things in a certain way. She never finished any of the tasks she started on time and was always running behind because she had to have everything just right. She spent hours in her home making sure everything lined up perfectly. When the Weingarten family moved to Israel during Passover of 1997, they could not finish packing their belongings before they had to leave for the holiday.

11. I remember seeing Rabbi Weingarten and Frieme Leaieh when they returned to Antwerp in August and September of 1997 to finish packing their belongings. Frieme Leaieh and Rabbi Weingarten came to our house to eat regularly in the evenings. Sometimes Frieme Leaieh came to my house with her father and sometimes by herself. I remember when she came on Friday night for dinner she came earlier than her father.

12. When Frieme Leaieh was in Antwerp in August and September 1997, I would call her almost daily to see if she was going to eat at my home so I would know if I needed to prepare more food. When Frieme Leaieh ate at my home she had an appetite and appeared happy.

13. When they were in Antwerp during this time Frieme Leaieh would come to my home specifically to visit.

14. I also saw Frieme Leaieh in the street during this time. I was also with Frieme Leaieh when she went to get something from her apartment. I saw boxes and things around the apartment for packing.

15. When I saw Frieme Leaieh during this three week time period from August 19, 1997 to September 12, 1997, she did not appear pale, depressed, or

2

S.c.

15. When I saw Frieme Leaieh during this three week time period from August 19, 1997 to September 12, 1997, she did not appear pale, depressed, or sunken. I remember her being lively and relaxed. Had there been visible signs that there was something physically or emotionally wrong with Frieme Leaieh I would have noticed because I had already heard rumors of her being sexually abused by her father.

16. After Frieme Leaieh left Antwerp, Rabbi Weingarten stayed to finish moving and settling the family's affairs. He slept at our house during this period.

17. Traveling is very common in the Satmar communities. Many marriages are international relationships so families are spread out throughout different countries. Travel between Belgium, England, Israel and the United States is commonplace. It is also common to travel to see family during the holidays.

18. Israel Weingarten's trial attorneys never contacted me. If they would have contacted me I would have related the above information to them and answered their questions. I would have also testified to the above information.

19. I related the above information to a member of Israel's current legal team who typed it for me.

20. I have carefully reviewed the contents of this declaration for accuracy.

21. I declare under penalty of perjury under the laws of the United States of America that the foregoing statement is true and correct. Executed this date in Antwerp, Belgium.


_____          _____
Sarah Cohen                            Date
                                       15 Sep 2014

3

# EXHIBIT 20

<u>Declaration of Yidel Rotter</u>

1. My name is Yidel Rotter.  I am over 18 (DOB 5/1/56) and competent to testify in this matter.  I am a citizen of Belgium and reside in Antwerp, Belgium.  My address is Terliststraat 17.

2. I understand that I am submitting this declaration in regards to the federal criminal case against Mr. Weingarten in New York.

3. I previously provided an affidavit concerning the federal case against Mr. Weingarten in New York on April 14, 2009.  I have reviewed that affidavit with a member of Mr. Weingarten's current legal team and adopt its contents as part of this declaration.

4. My family has known Feige Weingarten's family for three generations.  Both of our families are from Israel. In 1969 Feige's uncle and my cousin married into the same family, a family who I knew well.  I have now known Feige's family for approximately 44 years and Israel and Feige Weingarten for 34 years.

5. My opinion of Feige is that she changes her mind a lot.  She goes back and forth and will say something and then say the opposite.  She contradicts herself often.

6. In 1988, I moved to Antwerp, Belgium where Feige and Israel were living.  In fact, Israel helped me when I moved.

7. The Weingarten family and I lived around the corner from each other in Antwerp from around 1988 to 1997.  It took me one minute to walk to Israel's apartment from mine.  Our apartments were about 150 meters from door to door.  (At that time I lived on Terliststraat 21, two doors down from where I live now).  Israel's apartment was located at Lange Herentalsestraat 120.  The attached map accurately reflects where our apartments were located.

8. Israel and I walked to the synagogue together regularly and I knew his family well.  I considered myself to be a close friend of Israel, Feige, and the kids.

9. In 1989, I managed a camp in Switzerland for the boys of the school Israel ran.  Israel's family attended the camp at the same time I did.  We were at camp together for 3-4 weeks.  I managed the kitchen and other areas of the camp and Israel taught at the camp.

1

10. There were a small number of families at the camp so we all got to know each other really well. My children who were close to the same age as Israel's children were also present. Israel and I went hiking in the afternoons with the children. We also did other activities together.

11. Israel's daughter, Frieme Leaieh was around eight years old at the time we were at the camp. While at the camp, I remember Frieme Leaieh fabricating stories about the other children and blaming them for things she had done wrong. Although I don't remember the specific details, I remember that several times Frieme Leaieh would say that one of the other children did something to her. When the other children who were present were asked what had happened, it turned out to be the opposite of what Frieme Leaieh had said. When she would get caught lying and making up false stories, she did not react to being caught and did not appear to me to feel bad for being untruthful. In my opinion, Frieme Leaieh told lies without boundaries or regret for having told the lie. This was an issue at the camp because Frieme Leaieh was clever at making people believe her.

12. I remember this because I was managing the camp and it was an issue with the children at the camp. I also remember because I had a close relationship to Israel and all of his kids, including Frieme Leaieh, so it was something that was important to me at the time. I remember telling Israel that Frieme Leaieh has a character trait that is causing problems and will continue to if she is not disciplined for telling false stories. Israel only saw the good qualities of his children and said she would grow out of it.

13. I remember the time period from August 1997 to September 1997 when Israel and Frieme Leaieh returned to Antwerp together to finish moving the family's belongings. I remember this time period because Israel's father had just passed away less than a month before. The first month of the death of a parent has great importance in our community.

14. I knew Israel was very close to his father. It is a practice in our community to visit a mourner as much as possible in order to support him during his time of mourning. I felt that it was my duty to visit Israel daily while he was here in order to support him during this time of mourning. I went to Israel's apartment on a daily basis during that time until I left Belgium to travel to Israel. (Although I don't remember the date I left Belgium, I checked the stamp on my old passport. It shows that I left Belgium on September 15, 1997.)

15. When I visited Israel during this time period, I went to his apartment unannounced. It is common in our community to visit each other without calling first or making plans ahead of time. Because we live so close together, we just stop in on friends and family to visit.

2

16. When I went to Israel's apartment, sometimes he came to the door and sometimes Frieme Leaieh answered the door.  When Israel was available, I sat and conversed with him at his apartment for a substantial period of time. Often while we were sitting at the table talking, Frieme Leaieh brought us water or juice to drink.

17. When I visited, Israel and Frieme Leaieh both appeared normal to me.  I did not see or notice anything out of the ordinary.  Frieme Leaieh's clothing and appearance appeared to be tidy and clean.  Frieme Leaieh did not appear to be pale, hurt or frightened of her father.

18. In addition to seeing Israel and Frieme Leaieh at the apartment, I also saw them separately around the community.

19. I remember one day during this time period when I saw Frieme Leaieh at the grocery near our apartments.  (I have marked the grocer on the map attached to this declaration.)  Frieme Leaieh was alone and remarked that I had not stopped by the house to see her father yet that day.

20. When I saw Frieme Leaieh inside her apartment and on the street she did not appear to be upset or in distress in any way.   She presented herself tidy and clean.

21. Israel and I walked to the synagogue to pray together often during this time. I don't remember exactly which days I walked with Israel to pray but I know that we went together frequently.

22. Typically in our community we pray in the morning and spend about one and a half to two hours at the synagogue praying and socializing.  We then recite the afternoon and evening prayer services at the same visit, separated by a period of study while we are waiting for thirty minutes after the sunset to mark the beginning of the afternoon prayer service.  The evening prayer takes about an hour.  During this time period Israel also was required to lead the prayers and recite the additional Kadduch prayers in memory and honor of his father.   In August in Antwerp the sun sets around 9:00 p.m.  This means the prayers begin around 9:30 and end around 10:30.  It is also common for the men to remain talking outside the synagogue and apartments late into the night.

23. There was nothing about Israel or Frieme Leaieh during this three week time period in Antwerp that led me to believe that Frieme Leaieh was being abused.  I did not see any signs of abuse or unhappiness in Frieme Leaieh. She did not appear withdrawn, sullen, or harmed.  In fact, Frieme Leaieh appeared happy.  I would have noticed if anything was out of the ordinary.

3

24. After Israel was arrested in the United States and prior to his trial, no attorney contacted me regarding the information I had pertaining to the charges.  Had the attorneys contacted me, I would have answered their questions and provided them with the information that is set forth in this declaration.

25. I was also willing to travel to New York to testify regarding these facts. Although normally I would be very reluctant to travel during the purim holiday, given the importance of this trial I traveled to New York to meet with the attorneys and offer my testimony.  I contacted the attorneys through Mendel Blum to let them know that I could testify.  However, I waited and they never called me.  I was also present in court during the sentencing.

26. I related the above information to a member of Israel's current legal team through a Yiddish interpreter.

27. A member of Israel's current legal team typed this declaration for me, and I have carefully reviewed the contents of it for accuracy.

28. I am willing to testify regarding these facts in court.

29. I declare under penalty of perjury under the laws of the United States of America that the foregoing statement is true and correct.  Executed this date in Antwerp, Beligum.


_____          7/9/2014
Yidel Rotter                                    Date


I accurately interpreted this document for Mr. Yidel Rotter.

_____          7/9/2014
                                                    Date


4