# EXHIBIT 31



**Diseases and Conditions**

# Male hypogonadism

By Mayo Clinic Staff

Male hypogonadism is a condition in which the body doesn't produce enough testosterone — the hormone that plays a key role in masculine growth and development during puberty — or has an impaired ability to produce sperm or both.

You may be born with male hypogonadism, or it can develop later in life from injury or infection. The effects — and what you can do about them — depend on the cause and at what point in your life male hypogonadism occurs. Some types of male hypogonadism can be treated with testosterone replacement therapy.

Hypogonadism can begin during fetal development, before puberty or during adulthood. Signs and symptoms depend on when the condition develops.

## Fetal development

If the body doesn't produce enough testosterone during fetal development, the result may be impaired growth of the external sex organs. Depending on when hypogonadism develops and how much testosterone is present, a child who is genetically male may be born with:

- Female genitals
- Ambiguous genitals — genitals that are neither clearly male nor clearly female
- Underdeveloped male genitals

## Puberty

Male hypogonadism may delay puberty or cause incomplete or lack of normal development. It can cause:

- Decreased development of muscle mass
- Lack of deepening of the voice

- Impaired growth of body hair
- Impaired growth of the penis and testicles
- Excessive growth of the arms and legs in relation to the trunk of the body
- Development of breast tissue (gynecomastia)

## Adulthood

In adult males, hypogonadism may alter certain masculine physical characteristics and impair normal reproductive function. Signs and symptoms may include:

- Erectile dysfunction
- Infertility
- Decrease in beard and body hair growth
- Decrease in muscle mass
- Development of breast tissue (gynecomastia)
- Loss of bone mass (osteoporosis)

Hypogonadism can also cause mental and emotional changes. As testosterone decreases, some men may experience symptoms similar to those of menopause in women. These may include:

- Fatigue
- Decreased sex drive
- Difficulty concentrating
- Hot flashes

## When to see a doctor

See a doctor if you have any symptoms of male hypogonadism. Establishing the cause of hypogonadism is an important first step to getting appropriate treatment.

Male hypogonadism means the testicles don't produce enough of the male sex hormone testosterone. There are two basic types of hypogonadism:

- **Primary.** This type of hypogonadism — also known as primary testicular failure — originates from a problem in the testicles.
- **Secondary.** This type of hypogonadism indicates a problem in the hypothalamus or the pituitary gland — parts of the brain that signal the testicles to produce testosterone. The hypothalamus produces gonadotropin-releasing hormone, which signals the pituitary gland to make follicle-stimulating hormone (FSH) and luteinizing hormone (LH). Luteinizing hormone then signals the testes to produce testosterone.

Either type of hypogonadism may be caused by an inherited (congenital) trait or something that happens later in life (acquired), such as an injury or an infection. At times, primary and secondary hypogonadism can occur together.

## Primary hypogonadism

Common causes of primary hypogonadism include:

- **Klinefelter syndrome.** This condition results from a congenital abnormality of the sex chromosomes, X and Y. A male normally has one X and one Y chromosome. In Klinefelter syndrome, two or more X chromosomes are present in addition to one Y chromosome. The Y chromosome contains the genetic material that determines the sex of a child and related development. The extra X chromosome that occurs in Klinefelter syndrome causes abnormal development of the testicles, which in turn results in underproduction of testosterone.

- **Undescended testicles.** Before birth, the testicles develop inside the abdomen and normally move down into their permanent place in the scrotum. Sometimes one or both of the testicles may not be descended at birth. This condition often corrects itself within the first few years of life without treatment. If not corrected in early childhood, it may lead to malfunction of the testicles and reduced production of testosterone.

- **Mumps orchitis.** If a mumps infection involving the testicles in addition to the salivary glands (mumps orchitis) occurs during adolescence or adulthood, long-term testicular damage may occur. This may affect normal testicular function and testosterone production.

- **Hemochromatosis.** Too much iron in the blood can cause testicular failure or pituitary gland dysfunction affecting testosterone production.

- **Injury to the testicles.** Because they're situated outside the abdomen, the testicles are prone to injury. Damage to normally developed testicles can cause hypogonadism. Damage to one testicle may not impair total testosterone production.

- **Cancer treatment.** Chemotherapy or radiation therapy for the treatment of cancer can interfere with testosterone and sperm production. The effects of both treatments often are temporary, but permanent infertility may occur. Although many men regain their fertility within a few months after treatment ends, preserving sperm before starting cancer therapy is an option that many men consider.

## Secondary hypogonadism

In secondary hypogonadism, the testicles are normal but function improperly due to a problem with the pituitary or hypothalamus. A number of conditions can cause secondary hypogonadism, including:

- **Kallmann syndrome.** Abnormal development of the hypothalamus — the area of the

brain that controls the secretion of pituitary hormones — can cause hypogonadism. This abnormality is also associated with impaired development of the ability to smell (anosmia) and red-green color blindness.

- **Pituitary disorders.** An abnormality in the pituitary gland can impair the release of hormones from the pituitary gland to the testicles, affecting normal testosterone production. A pituitary tumor or other type of brain tumor located near the pituitary gland may cause testosterone or other hormone deficiencies. Also, the treatment for a brain tumor, such as surgery or radiation therapy, may impair pituitary function and cause hypogonadism.

- **Inflammatory disease.** Certain inflammatory diseases, such as sarcoidosis, histiocytosis and tuberculosis, involve the hypothalamus and pituitary gland and can affect testosterone production, causing hypogonadism.

- **HIV/AIDS.** HIV/AIDS can cause low levels of testosterone by affecting the hypothalamus, the pituitary and the testes.

- **Medications.** The use of certain drugs, such as opiate pain medications and some hormones, can affect testosterone production.

- **Obesity.** Being significantly overweight at any age may be linked to hypogonadism.

- **Normal aging.** Older men generally have lower testosterone levels than younger men do. As men age, there's a slow and continuous decrease in testosterone production.

- **Concurrent illness.** The reproductive system can temporarily shut down due to the physical stress of an illness or surgery, as well as during significant emotional stress. This is a result of diminished signals from the hypothalamus and usually resolves with successful treatment of the underlying condition.

The rate at which testosterone declines varies greatly among men. As many as 30 percent of men older than 75 have a testosterone level that's below the normal range of testosterone in young men, according to the American Association of Clinical Endocrinologists. Whether treatment is necessary remains a matter of debate.

Risk factors for hypogonadism include:

- Kallmann syndrome
- Undescended testicles as an infant
- Mumps infection affecting your testicles
- Injury to your testicles
- Testicular or pituitary tumors
- HIV/AIDS
- Klinefelter syndrome
- Hemochromatosis

- Previous chemotherapy or radiation therapy
- Untreated sleep apnea

Hypogonadism can be inherited. If any of these risk factors are in your family health history, tell your doctor.

The complications of untreated hypogonadism differ depending on what age it first develops — during fetal development, puberty or adulthood.

## Fetal development

A baby may be born with:

- Ambiguous genitalia
- Abnormal genitalia

## Puberty

Pubertal development can be delayed or incomplete, resulting in:

- Diminished or lack of beard and body hair
- Impaired penis and testicle growth
- Unproportional growth, usually increased length, of arms and legs compared with the trunk
- Enlarged male breasts (gynecomastia)

## Adulthood

Complications may include:

- Infertility
- Erectile dysfunction
- Decreased sex drive
- Fatigue
- Muscle loss or weakness
- Enlarged male breasts (gynecomastia)
- Decreased beard and body hair growth
- Osteoporosis

Although you're likely to start by seeing your family doctor or general practitioner, you may need to consult a doctor who specializes in the hormone-producing glands (endocrinologist). If your primary care doctor suspects you have male hypogondism, he or she may refer you to an endocrinologist. Or, you can ask for a referral.

# EXHIBIT 32

בס"ד

אנחנו יוצאים מה לעכשיו, אנחנו לא רואה לגמרי, אחרים
אנחנו רואים הכביש, לא בבית לפנינו האחרונים לשווא
ימים רוח יותר, שלום רב, הכוסות אלה ובינים אותו
הכל בעין ואחד, רבה אין אנהגא.

אתה היקר! אנחנו הכביש לשווא אתה לא זלין, אנחנו
מתקים רבים מאלה, כי יותר אנו שאנו כבאי לשו
של, אינו לכן הסליחות של את כאן, והיום
ולמאה מקוה לאחרון כן מה לקריה, אין אה
היקר! אינם מקום לפיך כן אם לא אחרים
ר בלו! אם אמרה של וכסה וולאה נשלא,
אנו מאחינו לעזור כן, אם הכביש היום
לעזור את שמנו אלו ואנחנו פים
פ דאונ... וא לאמינו ' סוף של פלו!
כי הראוני י כמה פאנים שורות יש אבל
לאפי כבה, אקירא שמץ לועיני והאין פן
של כבס... אתה הקן! זה המשי!
אל בשרכן לשורו כן אה רבס של פי אין!
אהבת מקבקה הה שסל, אנא, אלא יאהו
אנר, לינליאני, והני אין
ש לקוט.

7


GOVERNMENT
EXHIBIT
4a
08 CR 571 (JG)

[Translation from Hebrew]

With Heaven's Help

I don't know what to write, I have nothing to begin with. I'm ashamed of my bad deeds. Lately I have not caused any contentment to my Creator. I have angered him and saddened him every time and all the time. The burden of my sin is too heavy to bear.

My dear father! My bad deeds are beyond measure. I'm not asking for forgiveness anymore because I know that I don't deserve it at all. I don't understand your patience up to this point and from now on I hope to fix everything I spoiled. But my dear father, I will not criticize you at all if you don't forgive me! What the despicable, base, sinful and criminal deed was, I'm ashamed to write to you. However, necessity made me write whatever I have written in these lines in a sea of tears... Please forgive me at long last! In the past you took pity on me even in a situation just like this one! I'm asking you to have pity on me again... My dear father! Do not despair! I will try to bestow upon you much contentment! I'll ask the Creator of the World to be good to me and not to reject me from both worlds. More than this I cannot write.



GOVERNMENT
EXHIBIT
4b
08 CR 571 (JG

# CERTIFICATE OF ACCURACY

I, the undersigned, Ruth Kohn, hereby certify that I am fluent in the Hebrew and English languages, official interpreter and translator for the Eastern and Southern District of New York courts.  I further certify that the translation of the enclosed letter is an accurate English rendition of the original Hebrew document to the best of my knowledge and belief.

Ruth Kohn

Sworn to this 8th day
of January, 2009

NAOMI JONES
Notary Public, State of New York
No. 31-4618868
Qualified in New York County
Cert. Filed in New York County
Commission Expires _____ 11 30 2010

GOVERNMENT
EXHIBIT
10
08 CR 571 (JG)

# EXHIBIT 33

Declaration of Rabbi Mordechai Stauber

1. My name is Mordechai Stauber. I am over 18 (DOB 7/7/48) and competent to testify in this matter.

2. In 1996, I was the director of a girl's school in Antwerp, Belgium. Frieme Leaieh Weingarten was a student at the school from 1985 to 1996 and I knew the Weingarten family.

3. It was my impression that the religious upbringing that Rabbi Weingarten raised Frieme Leaieh in was too strict. Rabbi Weingarten had very firm regulations and Frieme Leaieh had to be even more religiously observant and "orthodox" than the rest of the students. Examples of this religious rigidity are that Feieme Leaieh was only allowed to listen to music on special occasions and had to wear two braids, which she complained of. Other girls at school looked at Frieme Leaieh as though she were different because of this.

4. At school I observed Frieme Leaieh be very dramatic. She could make a mountain out of a mole hill and exaggerated often. I never knew what was true or not true with her.

5. The FBI contacted me regarding testifying in this case.

6. I answered the FBI agents' questions and told them that everything I did was based on what Frieme Leaieh told me and that I had no independent information as to whether the allegations were true.

7. I told the FBI that I doubted the allegations Frieme Leaieh made against Rabbi Weingarten were true.

8. I also told the FBI that as director of a school, if sexual abuse allegations are raised, I'm obligated to take action whether or not I believe the allegations to be true or false.

9. I told the FBI that after the Weingarten's moved to Israel, Rabbi Weingarten wanted to return to Antwerp, Belgium and requested to have his other daughters enrolled in the school.

10. I told Rabbi Weingarten that I would not allow his children back in school because the allegations, whether true or false, were too damaging to the school's reputation.

11. The FBI agents told me they were not going to call me to testify.

1

12. The trial attorneys for Israel Weingarten never contacted me prior to or during trial.

13. Had Rabbi Weingarten's attorneys contacted me I would have answered their questions just as I answered the questions the FBI posed to me.

14. I also would have agreed to testify in this case if needed.

15. I related the above information to a member of Israel Weingarten's current legal team, who typed it for me.

16. I have carefully reviewed the contents of this declaration for accuracy.

17. I declare under penalty of perjury under the laws of the United States of America that the foregoing statement is true and correct.  Executed this date in Antwerp, Belgium.


_____                    sept. 16   '14
Rabbi Mordechai Stauber                     _____
                                            Date

# EXHIBIT 34

## Declaration of Rabbi David Weis

1. My name is Rabbi David Weis. I am over 18 and competent to testify in this matter.

2. I previously filed an affidavit in Israel Weingarten's criminal case in the Eastern District of New York on September 7, 2011. I have reviewed that affidavit and incorporate it into this declaration, which I am also submitting in Israel Weingarten's case.

3. In 1996, I was the Rabbi of a synagogue in Antwerp, Belgium. In this capacity I received a claim from Frieme Leaieh Weingarten that her father Israel Weingarten was sexually abusing her. I did not investigate Frieme Leaieh's claim nor did I make any determination as to whether the allegations were true or false.

4. Based on Frieme Leaieh's allegation, I determined that whether or not the allegations were true, Frieme Leaieh could not continue living with her father. If Frieme Leaieh was telling the truth, she needed to be protected and if Frieme Leaieh was not telling the truth, she had to be removed from the home to protect her father.

5. Accordingly, I recommended that Frieme Leaieh attend seminary school in Manchester England as it is normal for girls to go to seminary. Rabbi Weingarten gave me Frieme Leaieh's passport.

6. Before Israel Weingarten's trial investigators from the Federal Bureau of Investigations contacted me and I answered their questions. I think they spoke to me for around 2 ½ hours. They also showed me a report and had me sign it.

7. I told the FBI that I had no proof or evidence to support the allegations Frieme Leaieh made.

8. Later, the FBI contacted me about testifying at Rabbi Weingarten's trial. I called them back and told them I was prepared to go to court to testify.

9. In the conversation with FBI agents, I told them that Rabbi Weingarten had said from the start that Frieme Leaieh was making up the allegations against him because she no longer wanted to be part of the Orthodox Jewish community. I told them I now thought it might be true, because after I helped Frieme Leaieh go to England Frieme Leaieh asked me for money and I supported her by giving her pocket money in addition to paying for her school and residence. During this time Frieme Leaieh called me father, and

1

would telephone me.  Once Frieme Leaieh left the U.K. she never called me again (not even an invitation to her wedding).

10. I now believe Frieme Leaieh used me in her plan to leave the community.

11. The trial attorneys for Israel Weingarten never contacted me prior to or during trial.

12. Had the attorneys for Mr. Weingarten contacted me, I would have answered their questions, just as I answered the questions the FBI posed to me.

13. I also would have agreed to testify, had Israel Weingarten's attorneys requested me to, just as I had agreed to do so for the FBI.

14. I related the above information to a member of Israel Weingarten's current legal team, who typed it for me.

15. I have carefully reviewed the contents of this declaration for accuracy.

16. I declare under penalty of perjury under the laws of the United States of America that the foregoing statement is true and correct.  Executed this date in Antwerp, Belgium.

_____
Rabbi David Weis

9/17/14
_____
Date

# EXHIBIT 35

<u>Declaration of Raphael Werner</u>

1. My name is Raphael Werner.  I am over 18 (DOB 1/16/54) and competent to testify in this matter.   I reside in Antwerp, Belgium.

2. I understand that I am writing this declaration with respect to the federal criminal case against Mr. Israel Weingarten in the Eastern District of New York.

3. In August of 1997, I worked at my father-in-Law, Mr. Fink's real estate company called Finspico N.V. in Antwerp, Belgium.   I've worked there for 30 years and have been the general director of the company for 20 years.

4. Rabbi Weingarten was our tenant in 1997 when I worked with my father-in-law.  FINSPICO was Mr. Weingarten's landlord and my father-in-law directly handled Mr. Weingarten's file.

5. I remember there was an issue with Mr. Weingarten not paying his rent and that he was asked to leave the apartment.

6. To my knowledge, none of the attorneys contacted our office prior to Mr. Weingarten's criminal trial in New York in 2009.  Had the attorneys contacted our office at that time, my father-in-law would have still been alive and would have been able to provide them with the details of the tenancy.  My father-in-law passed away in 2014.

7. I related the above information to a member of Israel Weingarten's current legal team, who typed it for me.

8. I have carefully reviewed the contents of this declaration for accuracy.

9. I declare under penalty of perjury under the laws of the United States of America that the foregoing statement is true and correct.  Executed this date in Antwerp, Belgium.

_____
Raphael Werner

Sept 14th, 2014
_____
Date

1

# EXHIBIT 36

<u>Declaration of Rabbi Yosef Meir</u>

1. My name is Yosef Meir. I am over 18 (DOB 9/19/47) and competent to testify to the matter herein.

2. After Feige Weingarten was divorced from Israel Weingarten, I married her and we lived in Monsey, New York together.

3. Feige and I got engaged during the time of the federal court proceedings concerning Israel Weingarten.

4. We were married for a short period of time before we separated.

5. While we were married, Feige spoke to me about her relationship with Israel Weingarten. Some days she told me that he was a very good, pious, man - other days she said he was a bad person.

6. While we were married Feige Weingarten told me that the stories of Israel Weingarten sexually abusing Frieme Leaieh Weingarten were not true and that she made up the stories because she wanted to push him down. She also said she believed he had an affair with another woman and wanted to give him a kick.

7. Within a few months of being married to Feige she began to make up things about me that were untrue.

8. One night Feige called the Rabbi and told him that I left the house and that I was out with other women. She said this as I was standing beside her. I picked up the other phone and told the Rabbi that I was right there next to her. He could hear that we were in the same room.

9. While I was married to Feige she saw things that were not there and hallucinated.

10. For example, one day she told me to watch out for all of the glass on the floor. However, there was no glass on the floor. When I told her there was no glass on the floor, she screamed that it was everywhere.

11. Feige brought in a person to help with the house and then said he was standing under the door listening when we were in bed together. I would check and there was no one standing behind the door or looking under the door. She also accused him of stealing when he was not stealing.



1

12. Feige often talked dirty about other men and would say how they wanted to go to bed with her. She was often making up sexual stories about other people.

13. Sometimes Feige left the house and said she was going to sleep in the street.

14. During our short marriage, Feige screamed and yelled at me daily. She angered easily and for no reason. Sometimes she yelled that she was not cooking or washing. She threatened to burn the food.

15. Feige also threw things at me, including dishes.

16. If I did not agree with what Feige wanted me to, she would cause problems and make up stories about me.

17. Feige cursed her children and said negative things about them.

18. There was always something happening with Feige whether she was telling false stories, yelling at me, or throwing objects at me.

19. During the time we were married there were many times that I could not go home for dinner because Feige was being violent or acting crazy and I feared for my well being.

20. Due to her mental health problems, Feige went to see a psychiatrist while we were married. He placed her on four different medications.

21. Feige is extremely crazy and has a reputation in the community for being crazy. Most people in our community know her to be unreliable, untruthful, and to react violently toward other people.

22. At the grocery store where she works she has been seen yelling at the customers.

23. I became very depressed as a result of my relationship with Feige. After only a few months of marriage, I could not stay married to her because being married to Feige was unbearable.

24. I requested a Get, a Jewish divorce, from her but she did not agree to the divorce. I had to request special permission to obtain the divorce.

25. While we were separated and awaiting the divorce, Feigie threatened me that if I went through with the divorce she would put me in jail the way she put Mr. Weingarten in jail.

J. M.

2

26. During the two years that we were separated before I was granted the divorce I still suffered from Feige. During this time Feige said I needed to give her five million dollars for her to go away.

27. Based on her mental health issues and negative treatment of me, I was given permission from one hundred sixty one Rabbis in the community to divorce Feige.

28. I related the above information to a member of Israel's current legal team, who typed it for me.

29. I have carefully reviewed the contents of this declaration for accuracy.

30. I declare under penalty of perjury under the laws of the United States of America that the foregoing statement is true and correct. Executed this date in Monsey, New York.


_____           September 21, 2014
Rabbi Yosef Meir                                                      Date

3

# EXHIBIT 37

### Declaration of Jacob Klein

1. My name is Jacob Klein. I am over 18 (DOB 4/14/71) and competent to testify in this matter. I reside in Monsey, New York.

2. On September 8, 2009, I submitted a letter to the Court for consideration in Mr. Weingarten's federal criminal case in the Eastern District of New York. I am submitting this declaration in that same case.

3. I know the Weingarten family well. I am married to Rabbi Weingarten's niece. I spent time with the Weingarten's when they lived in Monsey. After Feige Weingarten left the home, sometime in 2001 or 2002, I observed the peace and happiness in the family home with Rabbi Weingarten and his children. I was impressed how Mr. Weingarten was caring for the children and with how the older girls helped with the household needs.

4. I think it was some time in 2002 when Rabbi Jacob Horowitz contacted me and asked if my wife and I could provide foster care for Rabbi Weingarten's six children for the Rockland County Department of Social Services. My wife and I agreed to do it and Child Protective Services (CPS) performed a check of my home for eligibility. Once CPS determined my home was an appropriate placement, the children lived with my family for 10 months.

5. When the children lived in my home, Rabbi Weingarten respected the rules established by the Court and CPS regarding visitation and contact.

6. When the children were with my family in 2002, they were afraid of their mother Feige and would cry and cry when I told them it was time for visitation with her. The youngest child, Schmiel, would get hysterical when he had to go for visitation with his mother. There became a point when the supervised visitation with the mother was stopped because it was too hard on the children. You could see the trauma on their faces when the children spoke of their mother.

7. When the mother would buy the kids presents, the kids threw the presents and did not want anything to do with their mother.

8. However, when the children would have visitation with their father they were always very excited. They went to and returned from the visit with smiles on their faces. They would talk about their father often in a positive way and tell me little stories he would say to them.

9. I became close with the children when they were staying with me. They began to talk to me about the sexual and physical abuse they had suffered at the hands of their mother. The children recounted many negative experiences they had with their mother. One example I remember clearly is when Chayeh Sureh said her mother chased her with a knife and told her when her father came home he would find her dead. Feige also told Chayeh Sureh that she was going to sing at Chayeh Sureh's funeral and feel happy.

10. There were many experiences like this that the kids shared with me about life with their mother physically and sexually abusing them.

11. The children spoke to me both together and individually about their mother abusing them.

12. Rabbi Weingarten's previous trial attorneys never contacted me prior to his trial to ask me any questions.

13. Had the attorneys contacted me, I would have willingly answered their questions and provided the information that is set forth in this declaration. I also would have testified at the trial if I were needed.

14. I related the above information to a member of Israel's current legal team, who typed it for me.

15. I have carefully reviewed the contents of this declaration for accuracy.

16. I declare under penalty of perjury under the laws of the United States of America that the foregoing statement is true and correct. Executed this date in Monsey, New York.


_____                    Sep - 21 - 14
Jacob Klein                                 Date

2

# EXHIBIT 38

Declaration of Sussie Weiss

1. My name is Sussie Weiss. I am over 18 (DOB 12/03/84) and competent to testify in this matter. I reside in Monroe, New York.

2. I was a neighbor of the Weingarten family when they lived in Monsey, NY. I lived on the same block four houses down from them and became good friends with Chayeh Sureh, the oldest daughter living in the home. Chayeh Sureh and I were in the same grade in school and I saw her almost daily.

3. When I would go to the Weingarten home, Mr. Weingarten was always studying. He was a quiet man who did not raise his voice at the children. I saw him more at the Weingarten home after Mrs. Weingarten left the house. He seemed kind-hearted and acted like a good father.

4. I saw Mrs. Feige Weingarten more often when she was still in the home. I was scared of her. She would use dirty language and say inappropriate mean things to the children. She also made fun of people, which made me feel uncomfortable. Because she told lies about others, I was always worried that she would tell lies about me.

5. When I visited Chayeh Sureh at her house I would see and hear her mother yell and scream at her children. She would also grind her teeth at them. Mrs. Weingarten could go from laughing to crying in one second.

6. Mrs. Weingarten was obsessed with cleaning and would tell me which scrubs and sponges I should buy.

7. At her son's Bar Mitzvah, Mrs. Weingarten started screaming and cursing at people. She seemed to put herself before her children.

8. Mrs. Weingarten spread a rumor in our community that Chayeh Sureh was pregnant from her father sexually abusing her. Mrs. Weingarten said Rabbi Weingarten was taking Chayeh Sureh to the doctor to hide the pregnancy.

9. Chayeh Sureh was devastated that her mother was telling these lies about her. She told me her father took her to the doctor because she has Lyme's disease. I also went to the Lyme's disease specialist once with Chayeh Sureh.

10. Feige Weingarten also spread rumors that Chayeh Sureh had contracted AIDS from sleeping with her father. This really hurt Chayeh Sureh because it was not true and mean. I remember Chayeh Sureh crying and going to the doctor to take an AIDS test. The doctor had her fill out a questionnaire and then stated Chayeh Sureh didn't need an AIDS test since she didn't engage in

1

S.W.

sexual behavior. Chayeh Sureh insisted that she needed the test to stop the awful rumors her mother was spreading about her and her father.

11. After my marriage, I moved to Monroe. Chayeh Sureh came to my house in Monroe one day crying because her mother continued to spread false stories about her.

12. Throughout the time I knew Chayeh Sureh she confided in me about how her mother physically and sexually abused her and her siblings. I remember her saying that Mrs. Weingarten would hit her own stomach when she was pregnant saying the baby was too active. She would scream at the baby to get out of her stomach. There was also an incident where Mrs. Weingarten was going to throw her youngest son into the incinerator until her older son stopped her.

13. One time I received an anonymous call. The person said Mrs. Weingarten had a message for me. (I was having fertility issues at the time and had a hard time conceiving.) The person said Mrs. Weingarten wanted me to know that the reason I was having fertility issues was because I was friendly with Chayeh Sureh and I would never have kids if I remained her friend. I was very upset and later asked Mrs. Weingarten about this. She knew about the call but said that the person who called did it on her own. She wouldn't tell me the name of the person who called.

14. I remember when Mrs. Weingarten abandoned the family. I thought it was going to be terrible for the children not to have a mother in the house. I was wrong. The home life was much better than it was before. It was more quiet and peaceful and all of the family's needs were being met. The children appeared happier with Mrs. Weingarten gone. They cared for each other and stuck together. The mood in the home was no longer tense. It was quiet, calm and relaxed.

15. Rabbi Weingarten's previous trial attorneys never contacted me prior to his trial to ask me any questions. Had the attorneys contacted me, I would have answered their questions and provided the information that is set forth in this declaration. I also would have testified at the trial if I were needed.

16. I related the above information to a member of Rabbi Weingarten's current legal team, who typed it for me.

17. I have carefully reviewed the contents of this declaration for accuracy.

2

S.W.

18. I declare under penalty of perjury under the laws of the United States of
America that the foregoing statement is true and correct.  Executed this date
in Monroe, New York.


_____                    _____
Sussie Weiss                                     Date


3

# EXHIBIT 39

## Declaration of Rabbi Daniel Geldzahler

1. My name is Rabbi Daniel Geldzahler.  I am over 18 and competent to testify in this matter.

2. I understand that I am submitting this declaration in Israel Weingarten's federal criminal case in the Eastern District of New York.  Israel Weingarten is known to me by his Yiddish name, Rabbi Yisroel Moshe Weingarten.

3. I previously wrote a letter on the 18th of Marcheshvan 5769 (Gregorian calendar date November 16, 2008), which was submitted in the above-referenced case.  I have reviewed that letter and adopt it as part of this declaration.

4. I am a Dayan (rabbinical judge) in Monsey, New York, and serve as the Av Beis Din (Chief of the Court of the Benth Din).  In that capacity, I handled the custody case that Feige Weingarten brought against Yisroel Moshe Weingarten in the Beth Din.

5. The following is a summary of the Beth Din proceedings.

6. In 2003, Feige Weingarten called a Beth Din (rabbinical court proceeding) against her former husband Rabbi Weingarten.  Rabbi Weingarten and Feige Weingarten were already separated and Feige was petitioning to obtain custody of their six minor children.  It is rare in our religion to have the father, as opposed to the mother, maintain custody of the children.

7. The first session of the rabbinical court was held on April 13, 2003.  Feige Weingarten claimed she should get custody of the children because her ex-husband was sexually abusing them.  She said their daughter Frieme Leaieh Weingarten first told her Rabbi Weingarten was sexually abusing her when Frieme Leaieh was 15 years old.

8. The second session was held around the 20th–22nd of April 2003.  Mrs. Weingarten said her husband laid in bed with Frieme Leaieh once and said it was because she was cold.  Mr. Chaim Lefkowitz came to testify on behalf of Feige Weingarten.  He said he started out on Rabbi Weingarten's side but was now on Mrs. Weingarten's side.  He had no independent knowledge of the events.  He said Mrs. Weingarten tried to cook for the children after she left but they did not want her food.

9. On May 1, 2003, the rabbinical lawyer for Rabbi Weingarten requested a protection order against Mrs. Weingarten and said the children did not want to go to their mother.

1

10. On May 19, 2003, there was a fourth session of the Beth Din.  Mrs. Erental spoke on behalf of Mrs. Weingarten and said she believed Mrs. Weingarten was physically abused by Rabbi Weingarten and that she heard screaming from the Weingarten home.  Mrs. Weingarten said Rabbi Weingarten had their son Yoil lock her in rooms for 14 hours at a time.

11. Mrs. Weingarten said Frieme Leaieh went to New York with her father in July 1997 when Rabbi Weingarten's father was ill.  Feige Weingarten did not say Frieme Leaieh claimed she was sexually abused by her father in New York.  Mrs. Weingarten said after New York, Frieme Leaieh and Rabbi Weingarten flew to Belgium where they spent several weeks dancing day and night and bathing together at the beach.  Feige Weingarten did not say Frieme Leaieh claimed she was sexually abused during this three week time period or that Frieme Leaieh claimed her father wouldn't leave her alone.  Mrs. Weingarten did not say that Frieme Leaieh told her that Rabbi Weingarten had a lot of sex with Frieme Leaieh time after time while she was in Belgium from August to September 1997.  Feige Weingarten said Frieme Leaieh returned looking like a gentile.  Mrs. Weingarten did not say Frieme Leaieh returned looking very changed, very different, or tortured.  Feige Weingarten also did not say the Frieme Leaieh appeared totally broken down when she returned from Belgium.

12. During this session Mrs. Weingarten said the first time Frieme Leaieh told her about her father sexually abusing her was when Frieme Leaieh was 9 years old.  This was significant because it contradicted Mrs. Weingarten's initial testimony to the Beth Din that she first learned about the sexual abuse from Frieme Leaieh when Frieme Leaieh was 15 years old.

13. At this session, Yoil Weingarten testified at the Beth Din.  He described his father as a good person.  He said his mother hit his father and threw dishes at the Weingarten children.  He told of a time when his mother threw a chemical detergent at the kids.  He testified his mother also hit the children and came at his father with a knife.  He said one day when he was cooking for Shabbos, his mother came in screaming and took off all of the knobs from the stove so he could not cook.

14. The fifth session of the Beth Din occurred on May 20, 2003.  Mrs. Weingarten claimed Chayeh Sureh, one of the Weingarten daughters, was being sexually abused by Rabbi Weingarten.  She did not provide details about the alleged sexual abuse.  Mrs. Weingarten said her husband took Chayeh Sureh to the hospital and would not tell her what hospital they were at.  She said Mr. Weingarten was talking to Chayeh Sureh all night at the hospital.

15. Mrs. Weingarten brought in Dr. Isaac Werzberger to testify on her behalf.  He testified that it is unusual for a father to be involved in a teenage girl's medical problems.  He testified that when Mr. Weingarten brought Chayeh

2

Sureh for a doctor visit, Chayeh Sureh developed a rash on her chest. He testified this happens from sexual arousal and that Chayeh Sureh must have been sexually abused. According to Dr. Werzberger, because Chayeh Sureh had a skin rash on her chest, the sexual abuse must be true because that type of rash only occurs when a child has been sexually abused.

16. The Beth Din consulted with an independent doctor and determined Dr. Werzberger's testimony was not accurate.

17. Chayeh Sureh testified that she had no memory of having a rash on her chest. She informed the Beth Din that she suffered from Lyme's disease and provided the name of her specialist for the Beth Din to confirm this. Chayeh Sureh also testified that her mother abused her and cursed her. When Chayeh Sureh would cry, her mother would tell her to keep crying and that she hoped she would die. Chayeh Sureh said she usually took care of herself because her mother didn't take care of her.

18. Mrs. Weingarten also said that Rabbi Weingarten tried to hit Frieme Leaieh and he pushed Mrs. Weingarten when she got in between them. Mrs. Weingarten said that she knows someone who knew Mr. Weingarten when he was a teenager and that Mr. Weingarten was a liar who would speak about inappropriate things as a teenager.

19. At the 6th Beth Din proceeding on June 8, 2003 both parties were represented by attorneys. Both parties agreed there should be a forensic examination of the children and agreed upon on a doctor to conduct the examination. The attorney for Mrs. Weingarten said that Rabbi Weingarten should not be able to keep his passport. Rabbi Weingarten did not agree.

20. June 8, 2003 was the final session of the Beth Din. After this session, Rabbi Weingarten was willing to come back to the Beth Din; however, as addressed in my previous letter to the Court, Mrs. Weingarten did not want to continue with the rabbinical proceedings. In a rabbinical court, both people have to agree to the jurisdiction of the Beth Din.

21. Because Mrs. Weingarten no longer agreed to the Beth Din, there were no ultimate findings. However, prior to Mrs. Weingarten leaving the Beth Din, there was an investigation conducted where the Beth Din found there was no substance to Mrs. Weingarten's claims.

22. Rabbi Weingarten's previous trial attorneys never contacted me prior to his trial to ask me any questions. Had the attorneys contacted me, I would have answered their questions and provided the information that is set forth in this declaration.

23. I also would have testified at Rabbi Weingarten's trial if I were needed.

3

24. Shortly after Israel Weingarten's arrest, I heard he was not getting along with his attorneys because he felt they were not listening to him or doing anything to help him.

25. Before his trial, I visited Rabbi Weingarten at the MDC and he told me he was concerned because the lawyers didn't know the facts of the case.  He was pleading for assistance obtaining new counsel.

26. I related the above information to a member of Rabbi Weingarten's current legal team, who typed it for me.

27. I have carefully reviewed the contents of this declaration for accuracy.

28. I declare under penalty of perjury under the laws of the United States of America that the foregoing statement is true and correct.  Executed this date in Monsey, New York.

_____                    _____Sept 24, 14_____
Rabbi Daniel Geldzahler                                        Date

4

# EXHIBIT 40

<u>Declaration of Edgard Pollak</u>

1. My name is Edgard Pollak.  My Jewish name is Yitzchak Seckel Halevi Pollak.
   I am over 18 (DOB 6/12/56) and competent to testify in this matter.  I am a
   citizen of Belgium and I reside in Antwerp, Belgium.

2. I have been asked to write this declaration for submission in the New York
   federal criminal case of Israel Weingarten.

3. I am currently a member of the Beth Din in Antwerp.  The Beth Din is a
   rabbinical court that investigates complaints and makes decisions in
   different matters.  With respect to criminal matters, the Beth Din works with
   Belgian legal authorities and can assist them under Belgian law.  If the Beth
   Din has any doubt that a case should be referred to Belgian authorities, it will
   not hesitate to do so.

4. In order to preside over the Beth Din, the majority of community members
   voting must accept the Rabbi as a member of the Beth Din.  All members are
   notified that there will be elections. There are three rabbinical judges of the
   Beth Din who review the cases.  Two of the three judges must be in
   agreement for a decision to be reached.

5. I write to explain the process of the Beth Din that occurred in Antwerp,
   Belgium with respect to the allegations that Israel Weingarten had an
   improper relationship with or sexually abused his daughter, Frieme Leaieh.

6. Before any Beth Din in Antwerp was convened regarding this matter, Rabbi
   David Weiss contacted me to come due to an emergency situation.  When I
   arrived there was a teacher and Rabbi David Weiss sitting there.  At the
   meeting, we were not given any background information regarding the
   situation.  We were told by Rabbi David Weiss that he wanted to ask the girl a
   question in our presence.  We did not know about the case and did not
   investigate the matter in any way.  The meeting did not last more than five
   minutes.  Rabbi David Weiss asked Frieme Leaieh Weingarten one question,
   "Is it true."  Frieme Leaieh responded, "yes."  No other questions were asked
   and no other witnesses were called, including Rabbi Weingarten.  In addition,
   no evidence was collected at this time.

7. Later I heard that Rabbi David Weiss unilaterally recommended that Frieme
   Leaieh leave the Weingarten home.  I was not asked about my position with
   respect to this recommendation.   This was not a Beth Din.  I was not a judge
   of the Beth Din at that time and it was not my normal function to handle such
   matters.  The other man was a school teacher without any qualifications
   whatsoever to be a judge in a Beth Din.  Rabbi Weiss was also not a judge of a

recognized Beth Din.  Any document suggesting we were part of a Beth Din is false.

8. Later, an official Beth Din with three members of the rabbinical court convened to address this matter through the proper channels.  The late Rabbi Chaim Kreiswirth lead the investigation.  (He passed away in 2002).  The Beth Din judges contacted me to provide information as to what occurred at the sitting with Rabbi David Weiss and I told them. Later, in my presence, the three judges of the Beth Din determined that the allegations were unfounded.

9. There are approximately 1500 families in the Antwerp Orthodox Community. It is a close-knit community where most of us know each other.  Each year a directory is created which lists each community member's name, home telephone number, mobile phone number and address.  This directory is distributed to members and easily accessible.  When Mr. Weingarten's current legal team contacted me, I provided them with a copy of the directory to keep so that they could locate and contact witnesses easily.

10. None of Mr. Weingarten's attorneys contacted me prior to Mr. Weingarten's trial in New York.  Had they contacted me, I would have provided them with the above information and answered their questions.  I also would have helped them reach out to any community members they wished to interview and would have provided them with a copy of the community directory.  I would have also agreed to testify regarding this matter.

11. I related the above information to a member of Israel's current legal team, who typed it for me.

12. I have carefully reviewed the contents of this declaration for accuracy.  Each word was translated for me from Yiddish into English.

13. I declare under penalty of perjury under the laws of the United States of America that the foregoing statement is true and correct.  Executed this date in Antwerp, Belgium.


_____          14 Sept. 2014
Pollak, Edgard                               Date
_____

2