# EXHIBIT 41

# DANIEL B. SCHWARTZ, ESQ.

December 1, 2008

Re:  United States v. Weingarten

To Whom it May Concern:

The undersigned is an attorney admitted to practice in the State of New York.  I was counsel to the defendant, Israel Moshe Weingarten, in various matters hotly litigated in the Family Courts of Rockland and Orange Counties.  The purpose of this letter is to address certain allegations contained in the Memorandum of Law in Support of the Government's Motion for a Permanent Order of Detention dated October 6, 2008.

The government's Memorandum of Law states that the defendant defied orders of the Family Court, specifically that he did not appear in Court on October 31, 2003.  I was the attorney of record on that date.  On October 31, 2003, in the late morning, I received a call from the Rockland County Family Court advising me that Child Protective Services was seeking pre-petition removal of the Weingarten children, and that argument on that application would be made at 2:30 p.m.  I tried several times to contact my client and advise him of that turn of events.  I was unable to reach him, as he had traveled out of Rockland County with the children for the Jewish Sabbath which commenced that evening at approximately 4:30 p.m.  As such the defendant did not know of the October 31, 2003 appearance.  He first learned of it the following Monday when I advised him that the Court issued an Order granting Pre-Petition relief.  Upon learning of the order, the defendant, through co-counsel, immediately arranged to surrender the children as directed by the Court.

To be clear, I was the defendant's attorney for the entirety of all Family Court matters in 2003 and 2004.  Rabbi Weingarten NEVER violated or ignored any order of directive of the Court.  Additionally he never missed any scheduled court appearance.  Even upon learning in 2004 that the FBI and the Kings County and the Rockland County District Attorneys were investigating this matter, the defendant did not attempt to flee the jurisdiction or thwart Court orders.  There simply is no basis in fact to justify the allegation or implication that the defendant sought to flee or avoid appearing in Court.

Very truly yours,

Daniel B. Schwartz

20 Barnacle Dr. ▪ New Hempstead, New York 10977 ▪ Phone: 845-406-4504 ▪ Fax: 845-810-7999

# EXHIBIT 42

## Declaration of Demosthenes Lorandos

1. My name is Demosthenes Lorandos.  (New York Bar Number # 4380168 )

2. I represented Israel Weingarten during his sentencing proceedings.

3. I was contacted by Menachem Blum in January 2009 to represent Mr. Weingarten in his criminal trial.

4. I communicated several times with Mr. Blum. To the best of my recollection, I also met with Mr. Weingarten in January or February 2009, before trial began.

5. Mr. Weingarten wanted me to replace his lawyers.

6. I was willing to step in as counsel; however, in order to be effective, I needed an adjournment to review the materials and prepare for the trial.

7. I also recognized immediately that Mr. Stutman and Mr. Rhodes were woefully unprepared. I did not want to join that existing dysfunctional team. I was willing to step in as lead counsel, but not to join the sinking ship.

8. Upon my first meeting with Mr. Weingarten it was immediately apparent that he had psychological issues.

9. Over the course of my representation with Mr. Weingarten, I met with him several times, for several hours at each time. During each visit, from the first to the last, I noticed that Mr. Weingarten was perseverative and repetitive. He focused on the same thing, over and over again.

10. It was incredibly difficult to get Mr. Weingarten to shift focus or change topics.

11. He was unable to grasp even fairly simple legal points I made.

12. He had little or no ability to stop talking.

13. He had pressured speech.

14. He had a mild tremor, which I noticed when he handed me papers. His hands shook.

15. I noticed that he was often flushed and sweating. He had difficulty breathing at times.

1

16. He presented as hyper anxious.

17. Mr. Weingarten had little to no understanding of how the United States criminal justice system worked. It was extremely difficult to get him to understand concepts with which he was not already familiar.

18. He wasn't just inflexible; he was entrenched in one way of thinking. It was very difficult to go in a different direction with him. I couldn't pull him off his topics.

19. I spent hours with Mr. Weingarten trying to communicate with him. He was confusing and difficult to understand. He also had a hard time grasping the legal concepts I tried to explain to him. I tried to explain the same thing seven or eight times, and he still did not get it.

20. By the time I was retained for Mr. Weingarten, I had very little time in which to develop material for use at his sentencing.

21. There was specific information I needed from him in order to do my job, and he could not get to the point and give me the specific information I needed. Getting information from Mr. Weingarten was like pulling teeth. It's not that he was refusing to give it to me; it was that he got stuck on irrelevant and minor details and was unable to focus on the important issues.

22. He had scrupulous attention to detail. This meant he often focused on a minor point to the exclusion of seeing the bigger picture. He had no ability to discern between what was important and what was irrelevant.

23. He was frustrated by his inability to get his point across. He had an intense need to have me understand what he was trying to say.

24. It required a lot of time to work with Mr. Weingarten because of his difficulties in communicating and processing information.

25. All of these characteristics were immediately apparent and they persisted throughout my meetings with him. What I have described here was his constant presentation.

26. He wanted to be of help to his attorney; the problem was he could not communicate or understand effectively. He so clearly had serious psychological issues that impeded his ability to work with counsel.

27. Mr. Weingarten had significant anxiety. His deficiencies were exacerbated by the circumstances he was in. He was facing terrible consequences. His attorneys were ill prepared to defend him.

2

28. In my opinion Mr. Weingarten was not in any shape to represent himself. He was not competent to do so. Had I represented Mr. Weingarten at trial, I would have sought a psychological evaluation, particularly if the issue of self-representation arose.

29. I also did not believe he was even competent to stand trial. He could not rationally assist counsel. Most of the information I did receive that was of benefit came from independent investigation.

30. When I stepped into the case, I was astounded at the lack of preparation or work product from Mr. Stutman or Mr. Rhodes.

31. I continually pressed them for materials on the case, which they did not provide. They were not cooperative. Once we discussed the possibility of raising ineffective assistance of counsel, they became extremely hostile. They cursed me.

32. I had a short period of time to conduct the investigation that had not been done.

33. Still, I was able to speak with and obtain letters from a large number of witnesses. These witnesses were readily available and willing to speak with me.

34. My work at sentencing was entirely focused on attempting to prove Mr. Weingarten's innocence. I wanted to have Mr. Weingarten evaluated psychologically for sentencing but was overruled by other members of the team. I was not lead counsel at the sentencing stage.

35. I did not type this declaration. Instead, I related the above information to a member of Mr. Weingarten's current legal team, who typed it for me.

36. I have carefully reviewed the contents of this declaration for accuracy.

37. I declare under penalty of perjury under the laws of the United States of America that the foregoing statement is true and correct to the best of my information, belief and recall. Executed this date in _MICHIGAN_.

Demosthenes Lorandos                     9 - 28 - 2014
                                         Date

3

EXHIBIT 43

<u>Declaration of Dr. Jason Krellman, Ph.D., ABPP-CN</u>

I, Jason Krellman, Ph.D., ABPP-CN, declare:

1. I am a New York State- licensed clinical psychologist with a specialty in clinical neuropsychology. I am board certified in clinical neuropsychology by the American Board of Professional Psychology (ABPP), a credential that represents the highest indicator of competence in the practice of clinical neuropsychology.

2. I completed a Bachelor of Arts degree, with a major in psychology, minor in writing, and distinction for empirical research, from the Richard Stockton College in 2001. I earned my Masters of Philosophy (2005) and Doctor of Philosophy (2009) degrees in clinical psychology, with a specialty in clinical neuropsychology, from the City University of New York. In 2009, I completed a one-year pre-doctoral internship in clinical psychology (clinical neuropsychology track) in the North Shore-Long Island Jewish Health System, and I then completed a two-year post-doctoral fellowship in clinical neuropsychology and traumatic brain injury rehabilitation research at Mount Sinai School of Medicine in 2011. My clinical training from 2004 to 2011 involved extensive experience in the neuropsychological assessment and treatment of cognitive and emotional deficits in individuals with a number of neurological (e.g. stroke, epilepsy, dementia, traumatic brain injury) and psychological (e.g. major depression, personality disorders, schizophrenia, etc.) disorders.

3. From October 2011 to April 2013, I was a staff neuropsychologist at the Rusk Institute of Rehabilitation Medicine – New York University Langone Medical Center, where I conducted neuropsychological evaluation and provided

1

psychotherapeutic and cognitive rehabilitation treatment to outpatients with neurological and/or psychological disorders. I also held the academic rank of Clinical Instructor of Rehabilitation Medicine at New York University School of Medicine

4. Since May 2013, I have been an Assistant Professor of Rehabilitation and an attending neuropsychologist at the Icahn School of Medicine at Mount Sinai. I also serve as Director of Training for the Department's post-doctoral fellowship in clinical neuropsychology and traumatic brain injury rehabilitation research, of which I am a graduate. My role as training director involves supervision of the clinical and research work of numerous recently graduated PhD neuropsychologists. I am the principal investigator on a number of research studies funded by the Centers for Disease Control (CDC) and the National Institute on Disability and Rehabilitation Research (NIDRR), and an investigator on other such studies, all of which relate to treatments for sequelae of traumatic brain injury. I have published several peer-reviewed papers related to my research and have presented on topics relevant to neuropsychological assessment and traumatic brain injury at both local and national conferences.

5. At Mount Sinai, I maintain a clinical practice within the Department of Rehabilitation Medicine comprised of neuropsychological assessment and treatment of individuals with neurological and/or psychological disorders. I also engage in forensic consulting work and conduct independent medical evaluations at the behest of disability insurance providers.

6. I was contacted by Mr. Weingarten's attorneys to conduct a comprehensive neuropsychological evaluation to assess his cognitive functioning and determine whether he possesses cognitive deficits.

7. I examined Mr. Weingarten at the Petersburg Medium Federal Correctional Institution in Hopewell, Virginia on September 24, 2014. The examination involved a series of standardized neuropsychological tests administrated over the course of 5 hours.

8. As part of the evaluation, I reviewed transcripts of the criminal trial, wherein Mr. Weingarten represented himself. I also reviewed affidavits of his trial counsel, Mr. Rhodes, dated April 23, 2009, and Mr. Stutman, dated April 24, 2009; and his counsel during the sentencing phase, Mr. Lorandos, dated September 28, 2014.

9. The following neuropsychological tests were administered:

   a. Advanced Clinical Solutions (ACS) for WAIS-IV [Test of Pre-morbid Functioning (TOPF)]

   b. Animal Naming Test

   c. Brief Visuospatial Memory Test – Revised (BVMT-R)

   d. Controlled Oral Word Association Tests (COWAT)

   e. Go/No-Go Test

   f. Hopkins Verbal Learning Test – Revised (HVLT–R)

   g. Rey 15-Item Memory Test

   h. Rey Complex Figure Test (RCFT)

   i. Short Category Test, Booklet Format

   j. Stroop Tests (Word, Color, Color-Word)

k.  Test of Memory Malingering (TOMM)

l.  Trail Making Test (Trials A & B)

m.  Wechsler Adult Intelligence Scale, Fourth Edition (WAIS-IV; Digit Span, Coding, and Symbol Search subtests)

n.  Wechsler Memory Scale, Fourth Edition (WMS-IV; Logical Memory Subtest)

o.  Wisconsin Card Sorting Test-64 (WCST)

10. Mr. Weingarten was informed of the nature and purpose of the evaluation, the limits of confidentiality and privilege, and that he was required to put forth good effort. He agreed to proceed with the evaluation and was generally cooperative throughout.

11. Based on qualitative and quantitative data obtained from my clinical interview of Mr. Weingarten and administration of formal neuropsychological tests, I have formed opinions regarding Mr. Weingarten's neuropsychological functioning that I hold to a reasonable degree of professional certainty. These opinions and the basis for these opinions are set forth below.

Behavioral Observations

12. Mr. Weingarten presented as a well-groomed male who appeared his stated age. He wore a Yakima, correctional facility-issued jumpsuit, and sneakers. He spoke accented English at a conversational level. He seemed to have an adequate English vocabulary but he was occasionally agrammatical in a manner consistent with English as a second language. He was generally cooperative throughout the evaluation and quickly established rapport. He was occasionally impulsive, e.g.

4

providing answers before questions were completed. He was verbose and

somewhat tangential in spontaneous speech (e.g. lapsing into detailed descriptions

of his educational background when asked about his daily work duties prior to his

incarceration). Impulsivity, verbosity and tangentiality, as exhibited by Mr.

Weingarten, is often indicative of executive dysfunction (see description of test

findings below).

Performance Validity

13. Mr. Weingarten's performance on measures of performance validity (e.g.

effort/motivation to perform at his best) was consistently within normal limits,

suggesting that he put forth at least adequate effort during the evaluation and that

these findings represent an accurate assessment of his current cognitive abilities

and skills.

| Test of Memory Malingering | Raw | Interpretation | Normative Source |
|---|---|---|---|
| Trial 1 | 50 | WNL | |
| Trial 2 | 50 | WNL | Manual |
| Retention | N/A | WNL | |

| | Raw | Interpretation | Normative Source |
|---|---|---|---|
| Rey 15-Item | 11/15 | WNL | Manual |

| | Raw | Interpretation | Normative Source |
|---|---|---|---|
| WAIS-IV Reliable Digit Span | 9 | WNL | Manual |

Executive Functioning

14. "Executive functioning" refers to a number of interrelated cognitive functions,

most of which are subserved by the function of the frontal lobe of the brain and/or

via interactions between the frontal lobe and other brain structures. Executive

5

functions include behavioral regulation (e.g. modulating behavior based on the current context/circumstance), planning and organization, multi-tasking, mental flexibility, deductive reasoning/trial-and-error learning, rule learning, hypothesis generation/testing, etc. Mr. Weingarten's performance on measures of executive functioning was variable, with some functions intact, others weak, and still others impaired.

|  | Raw | T Score | Percentile | Interpretation | Normative Source |
|---|---|---|---|---|---|
| Stroop Tests |  |  |  |  |  |
| Color-Word | 39 | 44 | 27 | Average | Golden (1978) |
| Interference | -3.1 | 47 | 38 | Average |  |

|  | Raw Score | Interpretation |
|---|---|---|
| Go/No-Go Test | 20/20 | WNL |

15. Mr. Weingarten exhibited impairments on 3 measures of executive functioning (Trail Making Test – Part B, Wisconsin Card Sorting Test, and Short Category Test), all of which require mental flexibility and 2 of which (Wisconsin, Short Category) require the ability to formulate and test hypotheses/problem solving strategies without clear instructions ("concept formation") and using only implicit feedback from the examiner. Overall, his performance on these measures suggests deficits in cognitive flexibility, deductive reasoning/learning from feedback, and problem solving in novel (e.g. abstract, unfamiliar) situations.

16. Mr. Weingarten's performance on the Trail Making Test – Part B was in the borderline impaired range and poorer than expected given his performance on Part A of the test. Part A requires the examinee to sequence single digit numbers presented on a page by connecting them in order using a pencil. Part B is more challenging because it requires the examinee to sequence both numbers and letters

in an alternating manner, a task that requires multi-tasking, flexible thinking, and task-shifting abilities. Individuals with intact cognitive abilities generally require about 1.5 − 2 times the number of seconds to complete Part B as they do to complete Part A. A greater discrepancy and/or errors on the task are indicative of executive dysfunction. Indeed, Mr. Weingarten required almost 3.5 times the number of second to complete Part B as he required to complete Part A and he made 2 "set-loss" errors (i.e. failure to properly alternate between numbers and letters), 1 during the practice trial and 1 during the actual test. The increased time he required to complete Part B in addition to the "set-loss" errors suggest deficits in cognitive flexibility (or, cognitive rigidity), an executive function impairment.

|  | Time/Errors | z-Score | Percentile | Interpretation | Normative Source |
|---|---|---|---|---|---|
| **Trail Making Test – Part B** | 134s/1 | -1.37 | 9 | **Borderline** | Tombaugh, Rees & McIntyre (1996) |

17. The Wisconsin Card Sorting Test (WCST) requires an individual to match cards from a deck to 1 of 4 "key" cards based on the color, shape, or number of design elements on the card. The individual is not explicitly told how to sort the cards; he must independently generate a hypothesis (e.g. that cards can be sorted by matching by shape), test that hypothesis by making a sort/match consistent with their hypothesis, and change their hypothesis as needed based on implicit feedback from the examiner (i.e. feedback that the match made by the individual is correct or incorrect). Again, there are 3 different ways to sort/match the cards (i.e. by color, shape, and number of design elements), and a pre-determined order in which individuals must match the cards (by color, shape, and then number).

7

Each time a choice is made the person is told whether they are correct or incorrect and, in this way, most people typically learn all 3 sorting rules.

18. Mr. Weingarten was able to learn and shift between the first two sorting rules (color and shape) quickly, but he was unable to deduce the third rule (sorting by number of design elements), despite approximately 30 sorting attempts accompanied by feedback. Interestingly, there were a few instances wherein Mr. Weingarten accidentally made a sort according to the third rule and was given feedback that this was correct but could not use that information to learn the sorting rule. That is, he saw on repeated occasions, for example, a card with four blue circles matched to a card with four yellow crosses and was told that this was a correct match/sort, but he could not learn this information and use it to modify his approach to the task. This resulted in an abnormally high number of errors on this task (impaired range score) and an impaired score on the "learning to learn" scale, which assesses an individual's ability to effectively use feedback to modify their approach and successfully complete the task. Overall, his performance on the WCST also suggests deficits in cognitive flexibility and an inability to effectively use feedback to modify his task approach in the moment.

19. Mr. Weingarten exhibited similar impairments on the Short Category Test (SCT). The SCT is comprised of 5 subtests, each with 20 stimulus cards that depict designs made up of different shapes, lines, colors, and figures. An individual is shown the cards one at a time and told that the design on each card is associated with a number between 1 and 4 but they are not told what that association is. There are 5 different design-number associations that the individual must learn by

using only the feedback from the examiner about whether each of the individual's response is correct or incorrect (similar to the WCST). The correct figure-number association changes from subtest to subtest; for example, at some points during the SCT, the number-figure association is based on the spatial location of an atypical figure in an array of figures, while at other points during the test the association is based on the proportion of a design that is ghosted-in rather than solid. An individual must deduce and shift between the principles underlying the different possible figure-number associations using the examiner's implicit feedback. This requires abstract concept formation, learning capacity, adaptive skill, and cognitive flexibility on the part of the individual. Mr. Weingarten's total score on the SCT was in the impaired range, as just over half of his responses were errors. Similar to his performance on the WCST, he was able to deduce the initial, most straightforward matching principle, but he was generally unable to use feedback from the examiner to deduce subsequent matching principles. Indeed, he was only able to consistently learn and use 1 of the 4 more abstract matching principles and only after receiving excessive feedback.

| | Raw | T Score | Percentile | Interpretation | Normative Source |
|---|---|---|---|---|---|
| **Wisconsin Card Sorting Test-64** | | | | | |
| Categories | 2 | | 11-16 | Low average | Manual (Age & Education Corrected) |
| Trials to 1st category | 12 | | >16 | Average | |
| Failure to Maintain Set | 0 | | | | |
| Learning to Learn | -27.03 | | <1 | Impaired | |
| Total Errors | 32 | 33 | 4 | Impaired | |
| Perseverative Responses | 9 | 45 | 30 | Average | |
| Perseverative Errors | 9 | 44 | 27 | Average | |
| Non-perseverative errors | 23 | 25 | 1 | Impaired | |
| Conceptual Level Responses | 29 | 35 | 6 | Borderline | |

| | Raw Error Score | T-Score | Percentile | Interpretation | Normative Source |
|---|---|---|---|---|---|
| **Short Category Test, Booklet Format** | 51 | 68 | 96 | Impaired | Manual |

## Attention and Working Memory

20. Mr. Weingarten's performance on measures of attention suggest that he is capable of adequately paying attention to and briefly retaining very simple information (e.g. progressively longer strings of single digits presented verbally). His performance on measures of working memory suggests that he is also adequately capable of mentally manipulating very simple information in the moment (e.g. reversing the order of or sequencing progressively longer strings of single digits presented verbally). However, Mr. Weingarten exhibits deficits in the immediate processing of more complex information (e.g. a list of related and unrelated words, an array of geometric figures; see paragraph 25).

| | Raw | Percentile | Interpretation | Normative Source |
|---|---|---|---|---|
| **Wechsler Adult Intelligence Scale – Fourth Edition Digit Span** | | | | Manual |
| **Longest Span Forward** | 5 | 13 | Low average | |
| **Longest Span Backward** | 5 | 66 | Average | |
| **Long Span Sequencing** | 6 | 63 | Average | |

## Cognitive Processing Speed

21. Mr. Weingarten's performance on measures of cognitive processing speed suggest that he is capable of performing both visual (e.g. symbol-digit matching) and verbal (e.g. single word reading) tasks with adequate speed overall. However, his performance on 1 of 5 measures in this domain was borderline impaired (WAIS-IV Coding subtest). This subtest requires a greater degree of some aspects of

10

executive functioning (i.e. working memory and cognitive flexibility) than any of the other tests in this domain. Indeed, the demands of the subtest require the individual to learn nine unique abstract symbol-number associations and apply these to the task in a rapidly alternating manner. Given his adequate working memory ability (see paragraph 14) and his generally impaired cognitive flexibility (see paragraphs 15-19), this finding is highly suspicious as yet another manifestation of his executive function impairment.

| | Raw | Standard Score | Percentile | Interpretation | Normative Source |
|---|---|---|---|---|---|
| **Wechsler Adult Intelligence Scale – Fourth Edition** | | | | | |
| Coding | 35 | 6 | 9 | Borderline | Manual |
| Symbol Search | 22 | 8 | 25 | Average | |

| | Time/Errors | z-Score | Percentile | Interpretation | Normative Source |
|---|---|---|---|---|---|
| **Trail Making Test – Part A** | 39s/0 | -0.26 | 42 | Average | Tombaugh et al. (1996) |

| | Raw (age-corrected) | T Score | Percentile | Interpretation | Normative Source |
|---|---|---|---|---|---|
| **Stroop Tests** | | | | | |
| Word | 111 | 51 | 53 | Average | Golden (1978) |
| Color | 68 | 42 | 23 | Low average | |

<u>Intellectual Functioning</u>

22. Mr. Weingarten's pre-morbid (i.e. lifetime) intellectual functioning was estimated to be in the low average range using a single-word reading test. Both his current verbal and non-verbal intellectual functions were assessed in the average range. These findings suggest that his vocabulary, visual construction ability, and abstract reasoning in approaching visual logic puzzles and verbal analogies are adequate.

|  | Raw | Standard Score | Percentile | Interpretation | Normative Source |
|---|---|---|---|---|---|
| Advanced Clinical Solutions – Test of Pre-morbid Functioning | 25 | 84 | 14 | Low average | Manual |

|  | Raw | Standard Score | Percentile | Interpretation | Normative Source |
|---|---|---|---|---|---|
| Wechsler Abbreviated Scale of Intelligence Scale – Second Edition |  |  |  |  |  |
| Block Design | 31 | T = 51 | 53 | Average | Manual |
| Vocabulary | 32 | T = 44 | 27 | Average | |
| Matrix Reasoning | 18 | T = 54 | 66 | Average | |
| Similarities | 29 | T = 49 | 46 | Average | |
| Verbal Comprehension Index |  | 95 | 37 | Average | |
| Perceptual Reasoning Index |  | 104 | 61 | Average | |
| Full Scale |  | 99 | 47 | Average | |

## Language

23. Mr. Weingarten's expressive and receptive language abilities were grossly intact. He exhibited some restricted word knowledge, difficulty retrieving words, and occasional improper grammar/use of words consistent with his English-as-a-second- language status. On formal test of language functioning, his ability to retrieve words from his lexicon and to generate items belonging to specific semantic categories (e.g. animals) was adequate.

|  | Raw | z-Score | Percentile | Interpretation | Normative Source |
|---|---|---|---|---|---|
| Controlled Oral Word Association Test (FAS) | 40 | -0.40 | 37 | Average | Kozara & Cullum (1995) |

|  | Raw | z- Score | Percentile | Interpretation | Normative Source |
|---|---|---|---|---|---|
| Categorical Fluency |  |  |  |  |  |
| Animal Naming Test | 15 | -1.19 | 13 | Low average | Kozara & Cullum (1995) |
| Supermarket Items | 27 | 0.27 | 58 | Average | |

<u>Visual Perception/Construction</u>

24. Mr. Weingarten's ability to copy a complex figure with numerous details was somewhat below average. He did not demonstrate visual misperception of the figure, either as a whole or with respect to its many individual details, but his approach to the task was somewhat careless and his copy somewhat sloppy and rushed. Similarly, his performance on measures primarily tapping other cognitive domains but that have a strong visuospatial component was indicative of adequate visuospatial skills.

| | Raw | Percentile | Interpretation | Normative Source |
|---|---|---|---|---|
| Rey Complex Figure Test (Copy) | 31 | 19 | Low average | Manual |

<u>Learning and Memory</u>

25. Learning and memory involves 3 phases of information processing: learning (acquisition), storage, and recall of information. Recall can occur either spontaneously (i.e. remembering independently) or with assistance (i.e. when given a cue/reminder, or when one is asked to recognize whether or not a piece of information was seen or heard before). Neuropsychological tests of learning/memory are structured to assess an individual's ability to process information in each of the 3 stages. For example, in the Brief Visual Memory Test – Revised (BVMT-R), individuals are first shown an array of 6 geometric designs for 10 seconds and then the array is taken away and the individual is asked to draw as many of the figures as he can remember and draw the designs in their correct location on the page (Trial 1). The individual is then shown the array of designs two more times for 10 seconds each (Trails 2 and 3) and each time he is

asked to draw as many figures as he can remember and to draw the designs in their correct location on the page. Cognitively intact individuals are generally able to draw at least some of the designs on Trial 1 (demonstrating learning) and draw more designs with greater spatial accuracy on Trials 2 and 3 (demonstrating learning and benefit from repetition). After 20-25 minutes, the individual is asked again to draw as many designs as he can remember and to draw the designs in their correct locations on the page to assess spontaneous recall ability (Recall Trial). Immediately after the Recall Trial, an individual is shown a series of geometric designs, some of which were part of the array shown earlier and some of which are completely new, and the individual is asked to state whether or not each design was part of the array (Recognition trial). Individuals who perform much better on the recognition trial than the recall trial are said to have deficits retrieving information from memory (i.e. spontaneously recalling information without assistance).

26. Mr. Weingarten's performance on measures of learning and memory suggests weaknesses in the learning and retrieval of recently learned information in that his scores on most learning/acquisition trials of most measures were in the impaired to low average ranges, lower than expected given estimates of his baseline functioning based on educational/occupational achievement and his current intellectual functioning. For example, on the BVMT-R, he could not learn any (0) of the designs on Trial 1 and could only learn a minimal amount of information on Trial 2 (3/12). It was only on the Trial 3 that he was able to learn just more than half of the array (7/12). On the BVMT-R, he was able to learn/immediately

process so little information, that his delayed recall was impaired. Only with the benefit of cues on the recognition trial, was he able to recall an adequate amount of information on the BVMT-R. Overall, his performance on the BVMT-R is indicative of his performance on most learning/memory measures, which is suspicious for deficits in the learning/processing and retrieval of new information.

27. Indeed, his performance was consistently in the average range on only 1 of 4 measures of learning and memory. That measure involves learning and recalling details of 2 short stories, and even individuals with learning deficits can often perform well on the task because it involves contextualized information and is therefore generally less challenging. Mr. Weingarten's delayed recall of information was generally adequate in that he tended to remember the majority of the information he was able to learn, suggesting minimal decay or forgetting of information over time. His recall was improved on recognition trials of all measures (e.g. when he was asked to recognize information with which he was previously presented), again suggesting some difficulty retrieving/accessing information from memory. Overall, Mr. Weingarten's performance on measures of learning and memory suggest difficulty with retrieving (accessing) recently learned information, which is an important aspect of executive functioning.

| | Raw | T Score | Percentile | Interpretation | Normative |
|---|---|---|---|---|---|

| | | | | | Source |
|---|---|---|---|---|---|
| **Brief Visuospatial Memory Test – Revised** | | | | | Manual |
| **Trial 1** | 0 | 24 | <1 | Impaired | |
| **Trial 2** | 3 | 27 | 1 | Impaired | |
| **Trial 3** | 7 | 41 | 18 | Low average | |
| **Total Recall** | 10 | 28 | 1 | Impaired | |
| **Delayed Recall** | 5 | 35 | 7 | Borderline | |
| Recognition | 6 | | >16 | WNL | |

| | Raw | Standard Score | Percentile | Interpretation | Normative Source |
|---|---|---|---|---|---|
| **Hopkins Verbal Learning Test – Revised** | | | | | |
| Trial 1 | 6 | T = 45 | 31 | Average | |
| **Trial 2** | 7 | T = 36 | 8 | **Borderline** | Manual |
| Trial 3 | 9 | T = 41 | 19 | Low average | |
| Trials 1-3 | 22 | z = -1.04 | 16 | Low average | |
| Delayed Recall | 9 | z = -0.26 | 42 | Average | |
| Recognition Hits | 12 | | | | |
| False Positives | 0 | | | | |
| Discrimination | 12 | z = 0.91 | 83 | High average | |

| | Raw | z Score | Percentile | Interpretation | Normative Source |
|---|---|---|---|---|---|
| **Rey Complex Figure Test** | | | | | |
| **Immediate Recall** | 11 | -1.44 | 8 | **Borderline** | Manual |
| Delayed Recall | 13.5 | -0.95 | 18 | Low average | |

| | Raw | Scaled Score | Percentile | Interpretation | Normative Source |
|---|---|---|---|---|---|
| **Wechsler Memory Scale, Fourth Addition, Older Adult Battery** | | | | | |
| Logical Memory I | 21 | 8 | 25 | Average | |
| Logical Memory II | 20 | 10 | 50 | Average | Manual |
| Recognition | 28 | | | WNL | |

<u>Summary and Conclusions</u>

28. The findings of neuropsychological testing revealed that Mr. Weingarten
    exhibited deficits in several aspects of executive functioning, including learning
    and retrieval of recently heard or seen information, cognitive flexibility, and the
    ability to learn task rules and form concepts using feedback. His performance on
    measures in other domains of functioning was generally adequate, and both
    quantitative and qualitative indicators of performance validity suggest these data
    accurately reflect his past and current cognitive abilities.

29. The presence of consistently below-expectation performance on multiple
    measures of similar cognitive functions constitutes a likely chronic and clinically-
    recognizable pattern of cognitive impairment; in this case, one suggestive of
    frontal lobe systems (or, "executive") dysfunction.

30. Mr. Weingarten's executive dysfunction is very likely to impact his daily, real-
    world functioning in specific and significant ways. In reviewing descriptions of
    Mr. Weingarten's behavior contained in the affidavits of his trial counsel and
    sentencing phase counsel, and transcripts of the trial itself, I believe it likely that
    several examples relate to or are likely the result of his executive dysfunction.
    Firstly, Mr. Weingarten's weakness in the processing and retrieval of information
    he has just learned means that he will likely have difficulty absorbing and
    effectively using new information. Such individuals tend to rely on already-
    learned information and/or their established pattern of behavioral responses
    because they are less able to accommodate new information. It is very possible
    that this tendency was being manifested in Mr. Weingarten's apparent "refusal" to

17

follow advice of counsel and reliance on his own manner and approach to his defense.

31. Mr. Weingarten's reduced ability to effectively reason and analyze information in novel problem solving situations and to think flexibly means that he is likely to become stuck in "mental ruts," especially when situations are new or unfamiliar, and that he is likely to rigidly repeat mistakes despite feedback from the environment and/or other individuals. Consistent with this, the Court noted Mr. Weingarten's difficulty modifying his approach in the courtroom (e.g. his style of examining a witness) even with excessive instruction/feedback: "[W]hy have you disregarded my encouragement to you to get to the testimony that if unrebutted will... convict you? Whether it's bubble wrapped or cardboard... or big containers or little containers, you are on trial for sexually abusing your daughter and for traveling in interstate commerce to do so. You really ought to get off these paralyzing details about how things were packed. If they are somehow related to your defense, you ought to get to the link to how it's related to your defense." *Id.* at 496. Similarly, sentencing phase counsel stated "He had a hard time grasping the legal concepts I tried to explain to him. I tried to explain the same thing seven or eight times, and he still didn't get it." [Lorandos Affidavit, 9/28/14] Indeed, Mr. Weingarten's performance on the WCST and SCT show that he has an objective cognitive deficit in his ability to understand new concepts even when given excessive feedback and instruction.

32. Overall, it is clear that both the Court and several of Mr. Weingarten's counsel repeatedly attempted to teach him information (e.g. legal concepts, proper

methods of examining a witness, etc.), understanding of which was vital to his actions as a *pro se* attorney and critical to his ability to adequately assist counsel, but Mr. Weingarten was unable to accommodate new information and follow instructions. This cognitive/behavioral pattern, evident in the transcripts and statements I have reviewed, is identical to the pattern I observed in his performance on objective measures of cognitive function, such as the WCST, SCT, and Trail Making Test – Part B.

33. Individuals with Mr. Weingarten's pattern of performance on the WCST and the SCT often also have difficulty identifying the most critical aspects and ignoring irrelevant aspects of a situation in order to effectively solve problems and approach tasks. Indeed, he was repeatedly unable to "see the forest for the trees" or the "big picture" on the WCST and SCT – he could not recognize the critical clues needed for success on these tasks even with guidance from the examiner. Consistent with this, sentencing phase counsel stated that "...he often focused on a minor point to the exclusion of seeing the big picture. He had no ability to see what was important and what was irrelevant." [Lorandos Affidavit, 9/28/14]. Similarly, trial counsel stated that "When pressed re [sic] the details of the case, he would change the subject or start a harangue on irrelevancies.... His view of how to defend the case was the foolish notion that each and every fact, however minor or immaterial, had to be rebutted. He thus refused to focus on key issues or witnesses and became obsessed with minutiae." [Rhodes Affidavit, 4/23/09]. Similarly again, there were instances where the Court discussed Mr. Weingarten's inability to "get to the point" and focus on important details: "I don't know

19

exactly where you're going, whether you're going to spend this entire cross-examination debating whether it was the first or second day of Purim, or whether your daughter touched your skin before you had her touch your penis. I'm not exactly sure where this cross-examination is going." RT 3/3/09 at 346-47.

"[D]oes it really matter if the rain went into it? Sustained." RT 3/4/09 at 464.

"[I]t's enough on subject of the invitation to the wedding. Please move on." *Id.* at 572. "I want you to focus it. You continue to ask questions exhaustively about the configuration of the apartment, Jewish law about who stands where at the funeral, the linguistic capabilities of Belgium movers, your father's estate, light itineraries.... From time to time you alight on important issues in the case, the claim of abuse." *Id.* at 486.

34. Mr. Weingarten was also described by trial counsel as being unable to be "brief" or "stay on point." [Nov. 27, 2008 Letter to Court from Rhodes]. Similarly, counsel stated that Mr. Weingarten was "very verbose, dominating every conference with excruciatingly complicated details, but not very forthcoming with information that both myself and co-counsel felt were of vital importance to the defense of the case." [Stutman Affidavit, 4/24/09]. This verbosity and tangentiality, which I also observed during my examination, is likely another manifestation of Mr. Weingarten's deficit in identifying relevant aspects of a situation and ignoring irrelevant aspects. That is, if an individual cannot identify the main point or relevant points of the matter being discussed, he is likely to spend a great deal of time talking about irrelevant or idiosyncratically-related details without "getting to the point." Cognitive rigidity can then cause the

individual to get "stuck" on irrelevant details and be unable to redirect himself to the relevant details or be redirected by others, even by those in authority, such as medical treatment providers, law enforcement officers, etc.

35. Trial counsel further noted that Mr. Weingarten had "demands" that were "unneeded and foolish in the extreme." [Dec. 7, 2008 Letter to Court from Rhodes] and noted that "nothing they could do persuaded the defendant." This latter point is strikingly similar to the deficits Mr. Weingarten exhibited on both the WCST and SCT, wherein he was unable to learn new ways to approach the tests despite excessive feedback from the examiner. Mr. Weingarten's performance on validated, formal measures of effort suggested that he indeed was motivated to perform well. Taken together with his impaired scores on the WCST and SCT, this finding suggests that his poor performance was not intentional but the rather result of a cognitive limitation not under his control.

36. Indeed, many individuals with executive dysfunction are viewed as oppositional and obstinate because their cognitive/behavioral rigidity and other limitations are misinterpreted as willful qualities that are under their conscious control. On the contrary, executive dysfunction, though often manifest in the way in which one behaves, is the result of compromised brain function that is not under conscious control of the individual. Further, because awareness of cognitive deficits can be compromised in those with executive dysfunction, affected individuals do not complain about their cognitive/behavioral oddities and do not perceive these as symptoms. Therefore, their inflexibility, disorganization, and/or unreasonableness

are often seen simply as character traits and not properly identified as symptoms of cognitive compromise.

37. Individuals with executive dysfunction also tend to perform more poorly – that is, their cognitive functioning worsens further – under stressful and/or psychologically distressing conditions. Therefore, individuals with cognitive deficits are not well-suited to situations that are fast-paced, high-pressure, or very novel. It follows that Mr. Weingarten's neuropsychological deficits contraindicate his role as a *pro se* attorney in a matter associated with serious consequences adjudicated in a format that is unfamiliar to him. In addition, individuals such as Mr. Weingarten require assistance and counsel from others who understand and are willing to accommodate for their executive functioning deficits by interacting in a patient, sensitive, and non-judgmental manner.

38. In sum, my evaluation suggests that Mr. Weingarten possesses neuropsychological deficits evidenced by impaired performance on objective tests of cognitive function. He demonstrated adequate functioning in other cognitive domains, but those findings in no way negate the significance of his executive dysfunction. The brain's "executive functions" control and manage all other cognitive functions; an analogy can be made that the executive system is like the conductor of an orchestra: responsible for managing and organizing all the different pieces of the orchestra to produce a clear, coherent piece of music. Similarly, an individual with executive dysfunction but relatively intact functions in other cognitive domains is very much like an orchestra with all the right instruments but no competent leader, the result being a person with adequate

22

orientation, knowledge, etc. but without the resources to effectively marshal those abilities to successfully complete tasks. Having reviewed trial transcripts and statements by trial counsel, I believe with a reasonable degree of professional certainty that, in this way, his neuropsychological deficits rendered Mr. Weingarten unable to represent himself, and unable to assist his counsel in his own defense.  The objective cognitive impairments identified by my evaluation likely also existed in 2008 at the time Mr. Weingarten waived counsel and proceeded to trial *pro se*.  Mr. Weingarten was unable to carry out the basic tasks needed to defend himself, as he most probably lacked the basic ability to effectively absorb, consider, and integrate new information or distinguish relevant from irrelevant information without repeated explanations and patient advice of counsel.

39. I declare under penalty of perjury under the laws of the United States of America that the foregoing statement is true and correct.  Executed September 28, 2014 in New York, NY.



Jason Krellman, Ph.D., ABPP-CN

23

# EXHIBIT 44

# TARGEM TRANSLATIONS, INC.

### 143 Rodney Street, Brooklyn NY 11249
### Tel: 718-384-8040

CASE NAME:  Israel Weingarten

DATE:  August 27, 2014

LANGUAGES:  YIDDISH/ENGLISH

PARTICIPANTS, ACCORDING TO CLIENT: UNIDENTIFIED FEMALE 1: **FRUMA LEAH WEINGARTEN**
UNIDENTIFIED FEMALE 2: **CHAYALA MEYEROWITZ**

ABBREVIATIONS:  [U/I] Unintelligible in English
[PH] Phonetic spelling in English
[ ] Translator's note
// - Voices overlap

| PARTICIPANTS | ENGLISH TRANSLATION |
|---|---|
| UNIDENTIFIED FEMALE 1 | Hello? |
| UNIDENTIFIED FEMALE 2 | Hello Fruma Leah. Good day, what's up? |
| UNIDENTIFIED FEMALE 1: | Oh, thank God. |
| UNIDENTIFIED FEMALE 2: | How's it going? |
| UNIDENTIFIED FEMALE 1: | So-so. Its going. |
| UNIDENTIFIED FEMALE 2: | Already calmed down a little? |
| UNIDENTIFIED FEMALE 1: | No, not really, every day new worries, new things. |
| UNIDENTIFIED FEMALE 2: | Who? Did you talk to your mother already? |
| UNIDENTIFIED FEMALE 1: | Yes, I spoke with my mother today. |
| UNIDENTIFIED FEMALE 2: | And? Your brother is still here? |
| UNIDENTIFIED FEMALE 1: | No, my brother went back already. |
| UNIDENTIFIED FEMALE 2: | Thank God. [beep] |
| UNIDENTIFIED FEMALE 1: | Who's beeping? |
| UNIDENTIFIED FEMALE 2: | I don't know, something's beeping, not by me. |
| UNIDENTIFIED FEMALE 1: | No, not by you? Do you have any news, Chayala? |
| UNIDENTIFIED FEMALE 2: | What? |
| UNIDENTIFIED FEMALE 1: | Do you have any news? |
| UNIDENTIFIED FEMALE 2: | Yes, I wanted something. We wanted to work out something here together, to do you good, to help you. |
| UNIDENTIFIED FEMALE 1: | Who? |
| UNIDENTIFIED FEMALE 2: | I mean, me and my husband, I mean. |

1

| PARTICIPANTS | ENGLISH TRANSLATION |
|---|---|
| UNIDENTIFIED FEMALE 1: | Yes, yes. |
| UNIDENTIFIED FEMALE 2: | What? I mean, you shouldn't worry, that everything will be good, and- and-and- the main [thing is] you should be strong just these few more days, I mean, the main [thing is] he should be able to over- |
| UNIDENTIFIED FEMALE 1: | Are you indeed standing there so hard? |
| UNIDENTIFIED FEMALE 2: | What? |
| UNIDENTIFIED FEMALE 1: | Do you know what's doing? [beep] how the situation is now? |
| UNIDENTIFIED FEMALE 2: | It's not so hard but you know, the main [thing is] your father wants to blame everything on the neighbor, and on you, that is the main that- |
| UNIDENTIFIED FEMALE 1: | Yes, that I know, I mean. |
| UNIDENTIFIED FEMALE 2: | What did your mother say to you? |
| UNIDENTIFIED FEMALE 1: | Hm? |
| UNIDENTIFIED FEMALE 2: | Who? |
| UNIDENTIFIED FEMALE 1: | Yes, I told my mother too. |
| UNIDENTIFIED FEMALE 2: | And what did she answer to that? |
| UNIDENTIFIED FEMALE 1: | She said yes, it's an old story, take the fault off from [him]self. |
| UNIDENTIFIED FEMALE 2: | Yes, that's the main [thing] he wants. |
| UNIDENTIFIED FEMALE 1: | Yes, why not, uhu. |
| UNIDENTIFIED FEMALE 2: | What do you think? What can he blame the neighbor? Did he talk about it? |
| UNIDENTIFIED FEMALE 1: | What? |
| UNIDENTIFIED FEMALE 2: | Did he ever talk about it, that he  wants to blame the neighbor with something? |
| UNIDENTIFIED FEMALE 1: | He said that he wants to blame whoever he can, he already told me. |
| UNIDENTIFIED FEMALE 2: | On whoever he can. |
| UNIDENTIFIED FEMALE 1: | Yes. |
| UNIDENTIFIED FEMALE 2: | But why did he particularly pick on the neighbor? |
| UNIDENTIFIED FEMALE 1: | He will never admit anything. |
| UNIDENTIFIED FEMALE 2: | And- and why did he particularly pick on the neighbor? |
| UNIDENTIFIED FEMALE 1: | Why not? Because with whoever I had contact, on that one he picks, don't you know? One can't pick on a  person just like that. [beep] |
| UNIDENTIFIED FEMALE 2: | But did he have any reason in doing so? |
| UNIDENTIFIED FEMALE 1: | No. |
| UNIDENTIFIED FEMALE 2: | And you, you know too, that he wants to blame, that you're a this, that you're a that- |
| UNIDENTIFIED FEMALE 1: | I know! |
| UNIDENTIFIED FEMALE 2: | That you convinced him- |
| UNIDENTIFIED FEMALE 1: | That what? |
| UNIDENTIFIED FEMALE 2: | And that you convinced him the whole thing, he wants to deny it, like. |

2

| PARTICIPANTS | ENGLISH TRANSLATION |
|---|---|
| UNIDENTIFIED FEMALE 1: | I know. |
| UNIDENTIFIED FEMALE 2: | Um- and- |
| UNIDENTIFIED FEMALE 1: | Well, that's how it goes. |
| UNIDENTIFIED FEMALE 2: | And if you convinced him, there's no such thing, one can ask at where it started at all. |
| UNIDENTIFIED FEMALE 1: | Yes, I know. |
| UNIDENTIFIED FEMALE 2: | At how old? |
| UNIDENTIFIED FEMALE 1: | Just one problem is, that I don't have witnesses, I already told you. |
| UNIDENTIFIED FEMALE 2: | You don't have any ideas, and he does have ideas? There's no such thing, if you don't have ideas you don't have to worry. |
| UNIDENTIFIED FEMALE 1: | I know, I hope it'll be good. |
| UNIDENTIFIED FEMALE 2: | The main [thing is] if you tell the truth, nothing can happen. |
| UNIDENTIFIED FEMALE 1: | *Ahm*[1]. |
| UNIDENTIFIED FEMALE 2: | G-d sticks up for the truth. |
| UNIDENTIFIED FEMALE 1: | Sure. |
| UNIDENTIFIED FEMALE 2: | That's why I'm am even a little confused with the whole thing, back and forth with the cassette, and- and do you not know anything about the tape indeed? |
| UNIDENTIFIED FEMALE 1: | I know nothing. I knew there were always such things- |
| UNIDENTIFIED FEMALE 2: | I don't mean anything -- if he forced you then you're not at fault. |
| UNIDENTIFIED FEMALE 1: | What? |
| UNIDENTIFIED FEMALE 2: | If he forced you to - make-  talk on the telephone like that to the neighbor -- then you're not at fault. |
| UNIDENTIFIED FEMALE 1: | Ach![2] Are you normal?! |
| UNIDENTIFIED FEMALE 2: | And, no, that's why I am so confused about all these things, so I wanted to clarify a few things. Do I know? If the Rabbinical judge calls me or something, do you understand? |
| UNIDENTIFIED FEMALE 1: | Yes. |
| UNIDENTIFIED FEMALE 2: | I mean, it's just for your benefit, you don't have to worry that I'm asking that they'll do something. This is just for your benefit, directly. |
| UNIDENTIFIED FEMALE 1: | Yes. |
| UNIDENTIFIED FEMALE 2: | I mean, you have nothing left to lose with him. |
| UNIDENTIFIED FEMALE 1: | Indeed not. |
| UNIDENTIFIED FEMALE 2: | That's why I wanted to ask you a few things - at what age - if you remember - did he start with this? |
| UNIDENTIFIED FEMALE 1: | At age ten. I told you already. |
| UNIDENTIFIED FEMALE 2: | At age ten. |
| UNIDENTIFIED FEMALE 1: | *Ahm.* |

1 Expression of affirmation
2 Expression of denial

| PARTICIPANTS | ENGLISH TRANSLATION |
|---|---|
| UNIDENTIFIED FEMALE 2: | I didn't remember exactly. And um... Indeed, why didn't you ever tell your mother? |
| UNIDENTIFIED FEMALE 1: | Firstly, I didn't have witnesses. |
| UNIDENTIFIED FEMALE 2: | And? |
| UNIDENTIFIED FEMALE 1: | And secondly, I didn't want to disrupt the marriage. I [inaudible] because of that. |
| UNIDENTIFIED FEMALE 2: | And he finished too? |
| UNIDENTIFIED FEMALE 1: | Not in me. |
| UNIDENTIFIED FEMALE 2: | *Ahm.* Just next to you, you saw it. |
| UNIDENTIFIED FEMALE 1: | Yes. Always. |
| UNIDENTIFIED FEMALE 2: | And he used to do it how often? |
| UNIDENTIFIED FEMALE 1: | Whenever it was in the mood. |
| UNIDENTIFIED FEMALE 2: | And Friday night, [beep] when your mother was home, like that- literally- when- um... It was um... Still- I mean when she was still at home, he also used to do it? |
| UNIDENTIFIED FEMALE 1: | What? |
| UNIDENTIFIED FEMALE 2: | Friday night when your mother was surely home, yes? |
| UNIDENTIFIED FEMALE 1: | Yes. |
| UNIDENTIFIED FEMALE 2: | He also used to do it? |
| UNIDENTIFIED FEMALE 1: | Yes, sure. |
| UNIDENTIFIED FEMALE 2: | *Ahm* |
| UNIDENTIFIED FEMALE 1: | The last time it was, it was Friday night. [beep]. Is someone next to you there, Chayala? |
| UNIDENTIFIED FEMALE 2: | And he wasn't afraid of your mother? |
| UNIDENTIFIED FEMALE 1: | What? |
| UNIDENTIFIED FEMALE 2: | Why? He wasn't afraid of your mother? |
| UNIDENTIFIED FEMALE 1: | No. Never. |
| UNIDENTIFIED FEMALE 2: | And how about the other sisters? |
| UNIDENTIFIED FEMALE 1: | I don't know, Chayeh Sura says- telling about an old thing [beep], I don't know exactly what. |
| UNIDENTIFIED FEMALE 2: | She didn't tell you? |
| UNIDENTIFIED FEMALE 1: | No. |
| UNIDENTIFIED FEMALE 2: | And and what about hitting, did the children ever see that he's hitting the mother? |
| UNIDENTIFIED FEMALE 1: | Sure. |
| UNIDENTIFIED FEMALE 2: | They saw it. |
| UNIDENTIFIED FEMALE 1: | Chayala, you're asking so suspicious! |
| UNIDENTIFIED FEMALE 2: | I want to make everything clear, I want to know, it's been quite long ago that you told me- in Antwerp. |

4

| PARTICIPANTS | ENGLISH TRANSLATION |
|---|---|
| UNIDENTIFIED FEMALE 1: | Yes. |
| UNIDENTIFIED FEMALE 2: | Do you understand? |
| UNIDENTIFIED FEMALE 1: | Are you calling from your home? |
| UNIDENTIFIED FEMALE 2: | Yes, yes. |
| UNIDENTIFIED FEMALE 1: | It's so funny. [chuckle] It's like a cross examination. |
| UNIDENTIFIED FEMALE 2: | Like a what? |
| UNIDENTIFIED FEMALE 1: | It's like a cross examination. |
| UNIDENTIFIED FEMALE 2: | And your mother used to- him- he blames your mother, that your mother just used to hit. |
| UNIDENTIFIED FEMALE 1: | Chayala, you heard everything behind the door, I don't know why you still have to ask. |
| UNIDENTIFIED FEMALE 2: | What? |
| UNIDENTIFIED FEMALE 1: | You heard everything behind the wall and everywhere, I don't know why you have to ask. |
| UNIDENTIFIED FEMALE 2: | I didn't hear that he's hitting. I'm sorry, that I couldn't hear. |
| UNIDENTIFIED FEMALE 1: | No? You didn't hear crying all the time? Screaming? |
| UNIDENTIFIED FEMALE 2: | Yes, I heard all the time, screaming and hysterical and that. But hitting can't be heard, that's not noisy. |
| UNIDENTIFIED FEMALE 1: | Yes, one hears that one is hitting, I mean, one could. |
| UNIDENTIFIED FEMALE 2: | Your mother doesn't want to imagine, can anyone imagine on such a holy person? I mean, particularly I had to know? |
| UNIDENTIFIED FEMALE 1: | Oh. [beep] |
| UNIDENTIFIED FEMALE 2: | That's the problem. |
| UNIDENTIFIED FEMALE 1: | Aha. Sure, that's also what I thought, that's why- is also one of the reasons why I didn't tell anybody. |
| UNIDENTIFIED FEMALE 2: | Hm. The mother also hit? |
| UNIDENTIFIED FEMALE 1: | [deep breath] my mother? No. Never. She couldn't. |
| UNIDENTIFIED FEMALE 2: | And the home was really sad. That is, they were afraid of him? |
| UNIDENTIFIED FEMALE 1: | Chayala! You're still asking such questions? You were there. I don't know what you want. You saw the whole time we were sad. Don't you remember what happened when I went to sleep to Libby the first [inaudible] |
| UNIDENTIFIED FEMALE 2: | Well, yes, that I surely remember. |
| UNIDENTIFIED FEMALE 1: | Oh. |
| UNIDENTIFIED FEMALE 2: | [unintelligible] when I didn't know. |
| UNIDENTIFIED FEMALE 1: | Also. |
| UNIDENTIFIED FEMALE 2: | What do you mean, that is, you literally used to regard your father as a terrorist? |
| UNIDENTIFIED FEMALE 1: | Hm? |
| UNIDENTIFIED FEMALE 2: | You literally used to regard your father as a terrorist? |
| UNIDENTIFIED FEMALE 1: | Terrorist? I don't know if terrorist is exactly the appropriate word. He was regarded, yes, very not nice. [beep] |

| PARTICIPANTS | ENGLISH TRANSLATION |
|---|---|
| UNIDENTIFIED FEMALE 2: | A kind of fear of him and and- |
| UNIDENTIFIED FEMALE 1: | Yes, we were terrified of him. |
| UNIDENTIFIED FEMALE 2: | And whom did you ever tell the story? |
| UNIDENTIFIED FEMALE 1: | Hm? |
| UNIDENTIFIED FEMALE 2: | Whom did you ever tell the story? |
| UNIDENTIFIED FEMALE 1: | Chayala, what is the matter with you today? |
| UNIDENTIFIED FEMALE 2: | I'm telling you, it's for your benefit, do you understand? |
| UNIDENTIFIED FEMALE 1: | I already spoke with the Rabbinical judge [beep] about these things. |
| UNIDENTIFIED FEMALE 2: | When? |
| UNIDENTIFIED FEMALE 1: | Friday. |
| UNIDENTIFIED FEMALE 2: | Only, there is another problem- that your mother denied the whole story then after the Shiva[3] |
| UNIDENTIFIED FEMALE 1: | And so? |
| UNIDENTIFIED FEMALE 2: | At the Rabbinical judge |
| UNIDENTIFIED FEMALE 1: | But the Rabbinical judge, the Rabbinical judge will speak with my mother, it's okay. |
| UNIDENTIFIED FEMALE 2: | But why did she deny it? [beep] |
| UNIDENTIFIED FEMALE 1: | Because she was afraid of my father. |
| UNIDENTIFIED FEMALE 2: | Is that how afraid she was of him? |
| UNIDENTIFIED FEMALE 1: | Yes. |
| UNIDENTIFIED FEMALE 2: | Not because she believed that maybe it's not- |
| UNIDENTIFIED FEMALE 1: | *Ach!*[4] Are you normal?! |
| UNIDENTIFIED FEMALE 2: | Aha. |
| UNIDENTIFIED FEMALE 1: | [inaudible] my mother is- she- the whole time on my side. Do you understand? |
| UNIDENTIFIED FEMALE 2: | And I heard that he was in Manchester? [beep] I didn't know anything [about it]. |
| UNIDENTIFIED FEMALE 1: | Yes, the Rabbinical judge was in Manchester. |
| UNIDENTIFIED FEMALE 2: | No! Your father, when you were there. |
| UNIDENTIFIED FEMALE 1: | When I was there? |
| UNIDENTIFIED FEMALE 2: | Yes. |
| UNIDENTIFIED FEMALE 1: | Who told you? |
| UNIDENTIFIED FEMALE 2: | What? |
| UNIDENTIFIED FEMALE 1: | Who told it to you? |
| UNIDENTIFIED FEMALE 2: | I heard. I also didn't know. Was he there in Manchester when you were there? |

---

3 Seven day mourning period after a deceased
4 Expression of denial

6

| PARTICIPANTS | ENGLISH TRANSLATION |
|---|---|
| UNIDENTIFIED FEMALE 1: | I don't know. |
| UNIDENTIFIED FEMALE 2: | You have no idea? [beep] |
| UNIDENTIFIED FEMALE 1: | Could be. I don't know anything. |
| UNIDENTIFIED FEMALE 2: | You don't have any idea at whom he stayed, that [you] know? |
| UNIDENTIFIED FEMALE 1: | No. |
| UNIDENTIFIED FEMALE 2: | What did he do? |
| UNIDENTIFIED FEMALE 1: | I don't know anything. From whom did you hear it? |
| UNIDENTIFIED FEMALE 2: | I don't know exactly. I heard such a rumor, I never knew about it. |
| UNIDENTIFIED FEMALE 1: | [Inaudible] From whom did you hear it? |
| UNIDENTIFIED FEMALE 2: | Um, my husband probably heard from someone. [beep] |
| UNIDENTIFIED FEMALE 1: | *Ahm* |
| UNIDENTIFIED FEMALE 2: | I don't know |
| UNIDENTIFIED FEMALE 1: | Not that I know of. I don't know. |
| UNIDENTIFIED FEMALE 2: | You have no idea? |
| UNIDENTIFIED FEMALE 1: | No. Many things could be. |
| UNIDENTIFIED FEMALE 2: | Did the Satmar Rabbinical judge indeed tape down the conversation you had then? |
| UNIDENTIFIED FEMALE 1: | When? |
| UNIDENTIFIED FEMALE 2: | When, then when you were at him. [beep] |
| UNIDENTIFIED FEMALE 1: | No, not the Satmar Rabbinical judge. Pollack. |
| UNIDENTIFIED FEMALE 2: | But you were at the Satmar Rabbinical judge's home? |
| UNIDENTIFIED FEMALE 1: | When? |
| UNIDENTIFIED FEMALE 2: | When you spoke then. |
| UNIDENTIFIED FEMALE 1: | No, I was in Manchester, leave me alone. |
| UNIDENTIFIED FEMALE 2: | What are you talking, Pollack- |
| UNIDENTIFIED FEMALE 1: | It was Pollack who taped down. |
| UNIDENTIFIED FEMALE 2: | No? It wasn't the Satmar Rabbinical judge? [beep] |
| UNIDENTIFIED FEMALE 1: | No. |
| UNIDENTIFIED FEMALE 2: | That's what I understood from you. |
| UNIDENTIFIED FEMALE 1: | No, Pollack taped me down. |
| UNIDENTIFIED FEMALE 2: | Who was ever there? |
| UNIDENTIFIED FEMALE 1: | What? |
| UNIDENTIFIED FEMALE 2: | Who was ever there? |
| UNIDENTIFIED FEMALE 1: | Only Rabbi Pollack. |
| UNIDENTIFIED FEMALE 2: | Alone, you and him. |

7

| PARTICIPANTS | ENGLISH TRANSLATION |
|---|---|
| UNIDENTIFIED FEMALE 1: | *Ahm* |
| UNIDENTIFIED FEMALE 2: | And you told him everything? |
| UNIDENTIFIED FEMALE 1: | Yes, I had to, because he was like, you know, like he was supposed to be my guardian. |
| UNIDENTIFIED FEMALE 2: | [beep] He went with Rabbi Royde or what? |
| UNIDENTIFIED FEMALE 1: | Rabbi Royde told him to be for me, I mean he should work to care for me, yes, he couldn't, couldn't even manage |
| UNIDENTIFIED FEMALE 2: | Still, he knew everything he couldn't even manage. |
| UNIDENTIFIED FEMALE 1: | *Ahm* |
| UNIDENTIFIED FEMALE 2: | He didn't go to the Rabbis? |
| UNIDENTIFIED FEMALE 1: | He told me to tell, but I couldn't follow him [beep] |
| UNIDENTIFIED FEMALE 2: | Why? |
| UNIDENTIFIED FEMALE 1: | Because my father was wild. |
| UNIDENTIFIED FEMALE 2: | Where? Only on the telephone. |
| UNIDENTIFIED FEMALE 1: | Yes. At all. Threatened. |
| UNIDENTIFIED FEMALE 2: | You were afraid of him. |
| UNIDENTIFIED FEMALE 1: | Yes. |
| UNIDENTIFIED FEMALE 2: | And if you knew indeed that it's a great sin, were you - weren't you afraid to let yourself with him? |
| UNIDENTIFIED FEMALE 1: | What? |
| UNIDENTIFIED FEMALE 2: | Afterward. [beep] |
| UNIDENTIFIED FEMALE 1: | I thought, what can I do? Do I have a choice? |
| UNIDENTIFIED FEMALE 2: | If not, he would [do] you - what? |
| UNIDENTIFIED FEMALE 1: | I don't know, I - Afterward, it began bothering me less. Because - |
| UNIDENTIFIED FEMALE 2: | You got used to it already. |
| UNIDENTIFIED FEMALE 1: | Yes, yes, used to it. That's it. [beep] |
| UNIDENTIFIED FEMALE 2: | And what was in Antwerp, in America, in Antwerp you were with him alone for so long- |
| UNIDENTIFIED FEMALE 1: | *Ahm* |
| UNIDENTIFIED FEMALE 2: | Did he try it there as well? |
| UNIDENTIFIED FEMALE 1: | Chayala, what is the matter with you today? You're making me nervous, [inaudible] [chuckle] I don't have patience to you. |
| UNIDENTIFIED FEMALE 2: | I intend your benefit. |
| UNIDENTIFIED FEMALE 1: | But tell me, from where are you talking? The truth. [beep] |
| UNIDENTIFIED FEMALE 2: | What do you mean by saying 'the truth'? I really want to help you. I really pity you, I understand there were difficult days for you and and- |
| UNIDENTIFIED FEMALE 1: | I want to go to sem, help me go to sem. |
| UNIDENTIFIED FEMALE 2: | You understand, he spreads rumors on you and on my husband, and on this and on that, [beep] and we have to battle against it. |

8

| PARTICIPANTS | ENGLISH TRANSLATION |
|---|---|
| UNIDENTIFIED FEMALE 1: | Who can help? |
| UNIDENTIFIED FEMALE 2: | If one is serious about it and tells the truth, and it's only for heaven's sake, G-d can certainly help, G-d will certainly help, I promise. |
| UNIDENTIFIED FEMALE 1: | I don't know, I don't have strength. |
| UNIDENTIFIED FEMALE 2: | Tears - the gateways of tears are never blocked. |
| UNIDENTIFIED FEMALE 1: | I cried the entire day. [beep] |
| UNIDENTIFIED FEMALE 2: | But Rivky is good, no? |
| UNIDENTIFIED FEMALE 1: | Yes, but I want to go to sem. |
| UNIDENTIFIED FEMALE 2: | Which one? |
| UNIDENTIFIED FEMALE 1: | The old one. |
| UNIDENTIFIED FEMALE 2: | Not the new? |
| UNIDENTIFIED FEMALE 1: | First I want to try there, in the old one. |
| UNIDENTIFIED FEMALE 2: | One minute, another thing - indeed, why didn't you ever tell it to your mother? |
| UNIDENTIFIED FEMALE 1: | Because, I told you already, because I didn't want to ruin the marriage [beep] and I knew that I don't have witnesses. |
| UNIDENTIFIED FEMALE 2: | I understand, and um. how about- |
| UNIDENTIFIED FEMALE 1: | Chayala, someone is next to you. |
| UNIDENTIFIED FEMALE 2: | No, why? |
| UNIDENTIFIED FEMALE 1: | [laughs] tell me the truth. |
| UNIDENTIFIED FEMALE 2: | Why were you so afraid [beep] that he should be hit? |
| UNIDENTIFIED FEMALE 1: | Because I don't want it should be said that I killed him. |
| UNIDENTIFIED FEMALE 2: | Who's going to think? Who? |
| UNIDENTIFIED FEMALE 1: | My whole family is on my father's side. |
| UNIDENTIFIED FEMALE 2: | Your father's side? |
| UNIDENTIFIED FEMALE 1: | Yes, Yonesen too. |
| UNIDENTIFIED FEMALE 2: | And he's on his side? |
| UNIDENTIFIED FEMALE 1: | I don't know exactly, my mother also doesn't know exactly. [beep] |
| UNIDENTIFIED FEMALE 2: | Your mother doesn't know if he's on his side? |
| UNIDENTIFIED FEMALE 1: | What? |
| UNIDENTIFIED FEMALE 2: | Your mother doesn't know if he's on his side? |
| UNIDENTIFIED FEMALE 1: | No, because he was now at home for Shabbos, and she doesn't know for sure. He said that [it's] better he shouldn't come home now. My brother said- |
| UNIDENTIFIED FEMALE 2: | Who said so? |
| UNIDENTIFIED FEMALE 1: | Yonesen, yes. |
| UNIDENTIFIED FEMALE 2: | And until now? [beep] |
| UNIDENTIFIED FEMALE 1: | I don't know. I don't know. |

9

# EXHIBIT 45

# TARGEM TRANSLATIONS, INC.

143 Rodney Street, Brooklyn NY 11249
Tel: 718-384-8040

CASE NAME:          Israel Weingarten

DATE:                    August 27, 2014

LANGUAGES:         YIDDISH/ENGLISH

PARTICIPANTS, ACCORDING TO CLIENT: UNIDENTIFIED MALE 1: HERSHY MEYEROWITZ
                                    UNIDENTIFIED FEMALE 1: FRUMA LEAH WEINGARTEN
                                    UNIDENTIFIED MALE 2 : YOSEF CHAIM COHEN

ABBREVIATIONS:      [U/I] Unintelligible in English
                    [PH] Phonetic spelling in English
                    [ ] Translator's note
                    // - Voices overlap

| PARTICIPANTS | ENGLISH TRANSLATION |
| --- | --- |
| | [BEGINNING OF RECORDING] |
| | [Telephone rings] |
| UNIDENTIFIED FEMALE 1: | Yes. |
| UNIDENTIFIED MALE 1: | [inaudible] Okay? |
| UNIDENTIFIED FEMALE 1: | Yes, but no- it's not nice of you. I've so- I happened to bath yesterday. Not nice. I thought   You don't have to be scared. He won't come in so fast. You can wait a little longer. For a half hour you could definitely- |
| UNIDENTIFIED MALE 1: | You don't know what could possibly happen. |
| UNIDENTIFIED FEMALE 1: | Nothing could happen. I promise you. |
| UNIDENTIFIED MALE 1: | don't know. don't know. Maybe somebody could ask him for some little thing in the synagogue [inaudible] I remembered something; I must to run home quickly. [inaudible] He will come running home quickly because he needs to take something. |
| UNIDENTIFIED FEMALE 1: | Leave me alone. |
| UNIDENTIFIED MALE 1: | You can't know. |
| UNIDENTIFIED FEMALE 1: | Leave me alone. Don't talk nonsense. |
| UNIDENTIFIED MALE 1: | Nonsense? |
| UNIDENTIFIED FEMALE 1: | Let go. You're talking nonsense now. |
| UNIDENTIFIED MALE 1: | Why I am talking nonsense? |
| UNIDENTIFIED FEMALE 1: | Because so; he won't come home. I know my father better than you. Come, I am missing you for so long already. What do you want? Once |

1

| PARTICIPANTS | ENGLISH TRANSLATION |
|---|---|
| | and for all; a good one. Hm? |
| UNIDENTIFIED MALE 1: | [inaudible] |
| UNIDENTIFIED FEMALE 1: | Hm? [What] do I know? Whatever you want. |
| UNIDENTIFIED MALE 1: | [Inaudible] |
| UNIDENTIFIED FEMALE 1: | Hm? |
| UNIDENTIFIED MALE 1: | A good- [Inaudible] |
| UNIDENTIFIED FEMALE 1: | However you want it. It'll happen by itself. We'll see what will be. Come over. |
| UNIDENTIFIED MALE 1: | Not there. |
| UNIDENTIFIED FEMALE 1: | What? |
| UNIDENTIFIED MALE 1: | Certainly not there. |
| UNIDENTIFIED FEMALE 1: | Why? |
| UNIDENTIFIED MALE 1: | [inaudible] Do you know what happens if just then he knocks in? [inaudible] half naked [inaudible] |
| UNIDENTIFIED FEMALE 1: | [unintelligible] |
| UNIDENTIFIED MALE 1: | No, not. |
| UNIDENTIFIED FEMALE 1: | Hm. |
| UNIDENTIFIED MALE 1: | Do you understand? |
| UNIDENTIFIED FEMALE 1: | Hm. |
| UNIDENTIFIED MALE 1: | [whispering to unidentified] sh... be quiet. sh... quiet. |
| UNIDENTIFIED FEMALE 1: | So, perhaps you come still? Come. Come. It's silly to argue. You could have been here for ten minutes. |
| UNIDENTIFIED MALE 1: | [Inaudible] |
| UNIDENTIFIED FEMALE 1: | Come. [inaudible], you can tell me good bye then. |
| UNIDENTIFIED MALE 1: | No, no, no, no. It won't happen. |
| UNIDENTIFIED FEMALE 1: | Yep. |
| UNIDENTIFIED MALE 1: | No. |
| UNIDENTIFIED FEMALE 1: | [Inaudible] |
| UNIDENTIFIED MALE 1: | No. |
| UNIDENTIFIED FEMALE 1: | It's forever. |
| UNIDENTIFIED MALE 1: | No. |
| UNIDENTIFIED FEMALE 1: | Yes. |
| UNIDENTIFIED MALE 1: | No. |
| UNIDENTIFIED FEMALE 1: | You can tell me that you don't need me. [chuckling] |
| UNIDENTIFIED MALE 1: | No. No. [inaudible] |
| UNIDENTIFIED FEMALE 1: | I don't have another opportunity. |

2

# EXHIBIT 46

# TARGEM TRANSLATIONS, INC.

### 143 Rodney Street, Brooklyn NY 11249
### Tel: 718-384-8040

CASE NAME:          Israel Weingarten

DATE:               August 27, 2014

LANGUAGES:          YIDDISH/ENGLISH

PARTICIPANTS, ACCORDING TO CLIENT): UNIDENTIFIED MALE 1: **HERSHY MEYEROWITZ**
                        UNIDENTIFIED FEMALE 1: **FRUMA LEAH WEINGARTEN**
                        UNIDENTIFIED FEMALE 2: **CHAYELE MEYEROWITZ**
                        UNIDENTIFIED FEMALE 3: **CHAYEH SURA WEINGARTEN**

ABBREVIATIONS:       [U/I] Unintelligible in English
                     [PH] Phonetic spelling in English
                     [ ] Translator's note
                     // - Voices overlap

| PARTICIPANTS | ENGLISH TRANSLATION |
|---|---|
| | [BEGINNING OF RECORDING] |
| | [Dialing] |
| | [Telephone rings] |
| Unidentified Female 2: | Hello? |
| Unidentified Female 1: | Chayala? |
| Unidentified Female 2: | Yes. |
| Unidentified Female 1 | What's doing? |
| Unidentified Female 2 | Thank G-d. [and] You? |
| Unidentified Female 1: | Thank G-d. I'll be traveling soon. |
| Unidentified Female 2: | Yes? |
| Unidentified Female 1: | Yes. I am leaving from here half past three. |
| Unidentified Female 2: | Oh! Very good. |
| Unidentified Female 1: | Do you understand? |
| Unidentified Female 2: | Did you work hard yesterday? |
| Unidentified Female 1: | Yes, pretty much. Do I know? Yes- no- what do I know? |
| Unidentified Female 2: | When is he coming home? |
| Unidentified Female 1: | My father is already home. |
| Unidentified Female 2: | Where is he now? |
| Unidentified Female 1: | He went to run some errands. He's not here now. |

1

| PARTICIPANTS | ENGLISH TRANSLATION |
| --- | --- |
| Unidentified Female 2 | Oh. |
| Unidentified Female 2 | [Inaudible] Come home already. You're staying in Israel, I guess. |
| Unidentified Female 1 | What? Until after the holidays. |
| Unidentified Female 2 | And afterward? |
| Unidentified Female 1 | Afterward we're coming back. |
| Unidentified Female 2 | Where? |
| Unidentified Female 1 | We bought an apartment. |
| Unidentified Female 2 | Bought? |
|  | [Beeping] |
| Unidentified Female 1 | Oh, I have a beep, a second, yes? |
| Unidentified Female 2 | Yes. |
| Unidentified Female 1 | One minute. Hello? |
| Unidentified Female 3 | Hello? |
| Unidentified Female 1 | Hello? |
| Unidentified Female 3 | Fruma Leah? |
| Unidentified Female 1 | Yes. |
| Unidentified Female 3 | I wanted to tell you that Mommy is not home and she went to the grocery to ask if we could still buy on credit, yes? |
| Unidentified Female 1 | so? |
| Unidentified Female 3 | and she doesn't have the car anymore. |
| Unidentified Female 1 | So? |
| Unidentified Female 3 | And yesterday they said that they'll give her the answer of that woman by today at ten. |
| Unidentified Female 1 | What card? |
| Unidentified Female 3 | A Car. |
| Unidentified Female 1 | So? |
| Unidentified Female 3 | To go pick you up. |
| Unidentified Female 1 | So? |
| Unidentified Female 3 | And today she called that she's very upset why they didn't give an answer. She doesn't want to go with him anymore. |
| Unidentified Female 1 | So what is? So what's going to be? |
| Unidentified Female 3 | And Mommy doesn't know what to do. |
| Unidentified Female 1 | So take another car. Look for another taxi driver. |
| Unidentified Female 3 | No; there is no other; there is only from the- from the- just, like those who ride like the taxi, like; yes, and mommy doesn't want to ride alone with a *shegotz*[1]. Yonesen, she is not reaching Yonesen. She thought to |

[1] reference for non-Jew

| PARTICIPANTS | ENGLISH TRANSLATION |
| --- | --- |
| | go with Yonesen perhaps, but she's not reaching him and doesn't know what to do. |
| Unidentified Female 1: | I don't know. Call me up within the hour if you don't know an answer. I need to leave very soon. Okay? Call me again in an hour. |
| Unidentified Female 3: | Mommy asked Alter Rueven. He said that perhaps they could go take you. I don't know. |
| Unidentified Female 1: | No. Mommy should come. |
| Unidentified Female 3: | But she can't come. She doesn't know what to do. |
| Unidentified Female 1: | Perhaps a different one? |
| Unidentified Female 3: | We already looked for, We already looked for another one. |
| Unidentified Female 1: | Perhaps she should ask one of the brothers who can drive; or Shraga, Mommy should pay. [Inaudible] Call me back in an hour. I have so much work to finish. Okay? |
| Unidentified Female 3: | Okay. |
| Unidentified Female 1: | Bye, bye. |
| Unidentified Female 2: | Yes. |
| Unidentified Female 1: | It was my sister Chaya Sura, so sweet. |
| Unidentified Female 2: | About what? |
| Unidentified Female 1: | About coming to take me from the airport. I am traveling by myself. |
| Unidentified Female 1: | Oh. |
| Unidentified Female 2: | Did he tell you anything yesterday, that Cohen? |
| Unidentified Female 1: | What? |
| Unidentified Female 2: | [inaudible] saw talking with him. |
| Unidentified Female 1: | No. |
| Unidentified Female 2: | Didn't tell anything to your father? |
| Unidentified Female 1: | No. |
| Unidentified Female 2: | From where do you know? |
| Unidentified Female 1: | What? |
| Unidentified Female 2: | From where do you know he didn't say? |
| Unidentified Female 1: | It doesn't seem. |
| Unidentified Female 2: | Do you think he noticed it? |
| Unidentified Female 1: | No. |
| Unidentified Female 2: | Oh. |
| Unidentified Female 2: | Was it good at Sura? Did you enjoy? |
| Unidentified Female 1: | Yes. Just so. I am going soon. Finish, finish vacation. |
| Unidentified Female 2: | Finish vacation? Vacation is just begining. |
| Unidentified Female 1: | What do you mean vacation is just beginning? |

3

| PARTICIPANTS | ENGLISH TRANSLATION |
|---|---|
| Unidentified Female 2: | What do you mean, was it vacation such hard work? |
| Unidentified Female 1: | No. I was outside the family. Yes? |
| Unidentified Female 2: | So, but it's still better to be in the family than outside. No? |
| Unidentified Female 1: | Yes. Sure. I surely missed them. And how. |
| Unidentified Female 2: | Sure. |
| Unidentified Female 2: | There you will need to work less hard than here. |
| Unidentified Female 1: | Yes. Here moving out was hard. |
| Unidentified Female 2: | So where did you buy an apartment? |
| Unidentified Female 1: | In Belgielei. On top of the general bank. |
| Unidentified Female 2: | Really? |
| Unidentified Female 1: | Hmm. |
| Unidentified Female 2: | Where is this? There, at the turn? |
| Unidentified Female 1: | There at Nervierstraat. |
| Unidentified Female 2: | Yes? |
| Unidentified Female 1: | Hmm. |
| Unidentified Female 2: | A small apartment? |
| Unidentified Female 1: | It's not too big but it is not necessarily small. |
| Unidentified Female 2: | How many bedrooms? |
| Unidentified Female 1: | Two big bedrooms. |
| Unidentified Female 2 | This is not big. It's tiny. |
| Unidentified Female 1: | Yes, but look, my two brothers are in Yeshiva and Yoel also stays in Yeshiva. |
| Unidentified Female 2: | Which floor is it? |
| Unidentified Female 1: | I think the fourth. |
| Unidentified Female 2: | My sister lived in that house, in the past. |
| Unidentified Female 1: | Yes? |
| Unidentified Female 2: | On the second floor. |
| Unidentified Female 1: | Wow. |
| Unidentified Female 2: | I remember it being a tiny apartment. Perhaps you have a bigger apartment. |
| Unidentified Female 1: | I don't know. |
| Unidentified Female 2: | You didn't even see it? |
| Unidentified Female 1: | I don't know. If it's much bigger? No. |
| Unidentified Female 2: | As long as healthy[2] I think you should stay there. |

[2] Expression of: No big deal

# EXHIBIT 47

| | |
|---|---|
| | he's doing with the girls. |
| V2: | What? I'll do even better. Don't worry. |
| V1: | Feige'la, don't be stupid, lay yourself into- |
| V2: | Ask Esther'ka if she has a spare mattress for me. |
| V1: | No mattress! I want you to lay in **her** bed, the [UI]. Send her in, listen, heed me, Feige'la. |
| V2: | Yes. |
| V1: | Send her in to him, to his bedroom; in your bed. |
| V2: | Ach[1]! She wouldn't want to go, the sanctimonious one. |
| V1: | Why not? |
| V2: | [yells at unidentified child:] How many cups are you taking? Put it down! Put it down! Put it down, wash a cup. No, I need [them] for dinner. Every minute, [she takes another] cup, not washing. She's drinking from plates. [chants mockingly:] don't scold me. Don't scold me. she's sitting and listening to a tape on Thursday afternoon. |
| V1: | Then she tells the stinker that you scolded her. |
| V2: | Yes, soon, [he] is coming home: 'Mommy scolded me'. |
| V1: | Yes, that's what they are, dolls. |
| V2: | And then they're going around the entire day [chants mockingly:] 'daddy, daddy, daddy, daddy...tamaty.' [yells at unidentified child] there are no dairy cups! I disposed of them. Wash, wash a meat[2] one. I saw you grabbing two! I do want to yell! I do want to yell! You haughty one. |
| V1: | Who? |
| V2: | The same high and mighty person as my- as the old one. Ouch, the same temperament, it drives  insane. I don't know how one can be such a copy. |
| V1: | All [are] one copy, dump them all into the garbage! |
| V2: | One copy, Yoel and Chana Golda, Yoel and Chana Golda; the same garbage truck. |
| V1: | Should I tell you something? |
| V2: | Yes. |
| V1: | Yonesen is gold compared to them, he never- |
| V2: | I'll tell you something, Fruma Leah, yes, yes |
| V1: | One second, let me talk. |
| V2: | Yes. |
| V1: | He hasn't ever uttered, I attest. |
| V2: | Yes. |
| V1: | That- when he was still a religious boy- |
| V2: | Yes. |
| V1: | He never uttered a word against you. |
| V2: | Yes. |
| V1: | And even now when he is this way [nonreligious], he was at me three times. I told you. |
| V2: | Yes. |
| V1: | And he didn't utter a word against you. I mentioned: do you know that the mother |

[1] expression of denial
[2] According to Jewish law, meat and dairy are to be handled and consumed seperately