# EXHIBIT 51

CANETTI AND TRODDLER                PAGE 01

F.C.A.§ 1039

At a term of the Family Court
State of New York, held in and
the County of Rockland, at 1
Main St., Suite 300 Floor 3,
City, NY 10956, on October
2004

PRESENT: Hon. Rachelle Kaufman

In the Matter of                                        File #:      19332
                                                        Docket #:    NN-03487-

Sheindl Weingarten (DOB: 7/23/1992),

A Child under Eighteen Years of Age                     ORDER
Alleged to be Neglected by                              (ADJOURNMEN
                                                        CONTEMPLATIO
Israel Moshe Weingarten,                                DISMISSAL)
                              Respondent.

        The petition of Rockland County Department of Social Services under Articl
Family Court Act, having been filed in this Court on November 3, 2003, alleging tha
Sheindl Weingarten (DOB: 7/23/1992), is neglected;

        And Petitioner, Respondent and counsel for Respondent and the child's atto
guardian having appeared before this Court;

        And the matter not yet having come on for a fact-finding hearing before this Co

        And Petitioner, Respondent and the child's attorney or law guardian having co
this proceeding be adjourned in contemplation of dismissal;

        Now, therefore, upon the motion of Petitioner, it is hereby

        ORDERED that the petition herein is adjourned in contemplation of dismissal u

21, 2005, upon the following terms and conditions with a view to ultimate dismissal of
in furtherance of justice. The Respondent shall comply with the terms and conditions of
"Appendix A" which is incorporated herein.; and it is further

ORDERED that the child protective agency shall make a progress report to the c
and law guardian on the implementation of this order no later than ninety (90) days from
this order.

Docket No:

PURSUANT TO SECTION 1113 OF THE FAMILY COURT ACT, AN APPEAL F
ORDER MUST BE TAKEN WITHIN 30 DAYS OF RECEIPT OF THE O
APPELLANT IN COURT, 35 DAYS FROM THE DATE OF MAILING OF THE O
APPELLANT BY THE CLERK OF COURT, OR 30 DAYS AFTER SERVICE BY A
THE LAW GUARDIAN UPON THE APPELLANT, WHICHEVER IS EARLIEST.

*November*

Dated: October 21, 2004                              ENTER

Hon. Rachelle Kaufman

Check applicable box:
☐ Order mailed on [specify date(s) and to whom mailed]: _____
☐ Order received in court on [specify date(s) and to whom given]: _____

14/9/04

PAGE 03     CANETTI AND TROCKLER     04562409986     13:09

## TERMS OF ACD FOR ISRAEL WEINGARTEN

**THE RESPONDENT SHALL:**

1. Provide adequate and proper food, supervision, housing, clothing, and medical care meet the needs of the children.

2. Provide a competent caretaker for the children when you cannot be with the children

3. Cooperate in obtaining and accepting medical treatment or psychiatric diagnosis or treatment, alcoholism or drug abuse treatment, and employment or counseling service determined appropriate for the children.

4. Cooperate in obtaining and accepting medical treatment or psychiatric diagnosis or treatment, alcoholism or drug abuse treatment, and employment or counseling servic

# EXHIBIT 52



# Letter II

①

(2)

און איך האב נישט קיין [illegible]
איך [illegible] [illegible] [illegible] [illegible] [illegible] [illegible]
ווייל איך [illegible] שוין [illegible] [illegible]
[illegible] [illegible] [illegible] איך [illegible] [illegible]
[illegible] [illegible] [illegible] [illegible] [illegible] [illegible] [illegible]
[illegible] [illegible] [illegible], ווייל איך [illegible] [illegible] נישט
[illegible] [illegible] [illegible] [illegible] [illegible] [illegible]
[illegible] [illegible] [illegible] איך [illegible] [illegible] [illegible]
[illegible] [illegible] [illegible] [illegible] [illegible] [illegible]
[illegible] [illegible], איך [illegible] [illegible] [illegible]
[illegible] [illegible] [illegible] [illegible] [illegible] [illegible]
[illegible] [illegible] [illegible] [illegible] [illegible] [illegible]
[illegible] איך [illegible] [illegible] [illegible]
איך [illegible] שוין [illegible] [illegible] [illegible]
[illegible] [illegible] [illegible] [illegible] [illegible] [illegible]
[illegible], [illegible] [illegible] [illegible] [illegible] [illegible] [illegible]
[illegible] [illegible] [illegible] [illegible] [illegible] [illegible] [illegible]
[illegible] [illegible] [illegible] [illegible], [illegible]
[illegible] [illegible] [illegible] [illegible] [illegible]

[illegible] [illegible]

# EXHIBIT 53

62

Jennifer Heller

Q.   In layman's terms?

A.   She was I guess paranoia.

Q.   How did that exhibit itself?

A.   She made some statements about me personally.

Q.   What did she say?

A.   First there were allegations that there were pictures of Mr. Weingarten and myself together, that he was paying me and that we were sleeping together.

Q.   Was that alleged to have occurred in Orange County?

A.   I don't know where.

Q.   Did she state that to you directly?

A.   She stated to Jaffa Sabo the interpreter and in front of my supervisor Diane Watson.

Q.   Do you know when that occurred?

A.   If I had my notes I could look.

MS. BARBASH:  Ballpark.

A.   Sometime 2003 after the July incident 2003.

Q.   Did she make any other allegations against you?

62

Jennifer Heller

1     Q.   In layman's terms?

2     A.   She was I guess paranoia.

3     Q.   How did that exhibit itself?

4     A.   She made some statements about me

5 personally.

6     Q.   What did she say?

7     A.   First there were allegations that there

8 were pictures of Mr. Weingarten and myself together,

9 that he was paying me and that we were sleeping

10 together.

11    Q.   Was that alleged to have occurred in

12 Orange County?

13    A.   I don't know where.

14    Q.   Did she state that to you directly?

15    A.   She stated to Jaffa Sabo the

16 interpreter and in front of my supervisor Diane

17 Watson.

18    Q.   Do you know when that occurred?

19    A.   If I had my notes I could look.

20         MS. BARBASH:   Ballpark.

21    A.   Sometime 2003 after the July incident

22 2003.

23    Q.   Did she make any other allegations

24 against you?

# EXHIBIT 54

<u>Declaration of Chayeh Sureh Weingarten</u>

1. My name is Chayeh Sureh Weingarten. I'm 28 years old (DOB 12/27/85) and competent to testify in this matter.

2. I am the second oldest daughter of Israel Weingarten.

3. I am submitting this declaration in my father's federal criminal case in the Eastern District of New York. I previously submitted an affidavit in the same case on April 14, 2009 and adopt that affidavit as part of this declaration.

4. I have been married for four years and have three children, ages 3, 2, and 7 months.

5. Before having children, I worked as a nursery assistant. Now I take care of my children and home.

6. The following is some of the information I remember about my father's criminal case in the Eastern District of New York.

7. At the start of my father's case attorney Alan Stutman met with me in his office. He never asked me anything that I knew about the case. The meeting was short and he spent the whole meeting telling me why he was the best attorney to represent my father. Then he told me to contact John Middleton from then on.

8. The first few weeks of my father's case I called Alan Stutman at least 7 to 8 times and did not get any response from him. Later in the case I continued to call him. I probably called him at least 20 times where I left messages. Allen Stutman never answered my calls and I never received a return call from him.

9. Throughout my father's case I called John Middleton too many times to say.

10. My father started complaining to me about attorneys Stutman and Rhodes from the beginning of his case. He was concerned that they were not working on the case and did not know the facts because they would not listen to him. My father continued expressing his concern to us throughout his case. My poor experience with Alan Stutman did not alleviate those concerns.

11. During my father's case I had first-hand knowledge of information that was important for his case. I tried to talk to the attorneys about his information but the attorneys would not listen to me.

1

12. A few days before trial we learned that attorneys Stutman and Rhodes had not interviewed any of the many witnesses that could testify about the allegations my sister Frieme Leaieh was making. I called Mr. Herszaft in England and asked him for help.

13. The Friday before trial I kept calling the attorneys to see if I could get them to do something. I finally got to speak to Alan Stutman. I told Alan Stutman on the phone that I have the names and phone numbers for several witnesses. I knew that the families Cohen, Englander, and Krausz all had direct contact with my father and Frieme Leaieh during the time period FriemeLeaieh was alleging sexual abuse. I tried to give these names to Alan Stutman but he told me he already knew everything. I told him I wanted to tell our side of the story and he didn't listen to me. He told me they had a defense about my father's penis so the other information was not important.

14. Had the attorneys spoken to me about what I knew about the case I could have told them the following information.

15. In July 1997 we were at our apartment in Israel when we learned my grandfather was in the hospital. My uncle Alfred sent a person with a cellphone to our apartment, and he was on the line talking to my father and made arrangements for my father to go to New York. My uncle Alfred said my grandfather was not doing well and my aunt and uncle in New York needed help caring for him at the hospital because they had been staying there day and night.

16. As soon as my father said he would go, Frieme Leaieh started begging to go to New York with my father. I really wanted to go to New York too and it was my turn to travel so I said I should get to go. My father said he agreed with me. Then Frieme Leaieh started saying all the reasons she should get to go instead of me. She was begging to go. She said she was older so she could be more helpful and could go shopping by herself and bring back clothing for the whole family. She also said her friends from seminary were in New York and that she had not seen them in a long time. She argued that because I was in school and she was not, she should go because I shouldn't miss school. My sister Frieme Leaieh was always very convincing. She had a way of getting what she wanted. She kept pushing and pushing her point until both parents agreed with her. Then the two grown-ups said Frieme Leaieh would get to go. I remember feeling really disappointed.

17. When Frieme Leaieh and my father were in New York, I was at home in Israel when my mother received a notice that our belongings in our apartment in Belgium needed to be moved out of the apartment. I was there when my mother called my father and told him he and Frieme Leaieh needed to go to Belgium to finish packing the belongings. My mother was worried if my

2

father and sister returned to Israel first, all of our belongings would be thrown out.

18. When Frieme Leaieh returned from Belgium in September 1997, she appeared very happy and looked healthy. She did not look pale, tortured or changed. She talked about what a great time she had and showed us all of the clothing she bought in New York. She also gave us the other kid's clothes from New York as well. I remember she was really excited that she had bought a short sleeved night gown because normally we always had long sleeved night gowns. Frieme Leaieh was full of energy and excited about her trip. She talked about how much fun she had on the trip.

19. My family rented an apartment in New York during the celebration weeks of my sister Frieme Leaieh's wedding and we went to the apartment a week before the wedding. When we were at the apartment, Frieme Leaieh asked me for forgiveness for spreading rumors and lies about my father and ruining our family. She was crying as she asked me forgiveness. I saw her take my other siblings into the room to speak with them as well.

20. My mother and Frieme Leaieh both came to me and asked me to tell people that my father was touching me inappropriately and sexually abusing me. I told them that it was not true, and they told me if anyone asked me that I should say it was true.

21. I heard my mother and Frieme Leaieh try to get the other kids to lie as well.

22. I felt very frustrated throughout my father's case because the things Frieme Leaieh and my mother was saying that my father did were things my mother did to us children, not my father.

23. My mother used to tell rumors about me that I was having sex with my father. She told people in the community that I had contracted the AIDS virus, which was not true. She also spread a rumor that I had a miscarriage with my father's baby. This hurt me really bad because I suffered from Lyme's disease and had great difficulty with these rumors.

24. Because of my disability, Lyme's disease, I supposed to have a live hook up for class where I could participate in school from home. After my mother told the school I was staying home because I was supposedly pregnant, I was no longer permitted to participate via the live hook up. The principal became less accommodating after my mother spread the rumors. I had good skills for teacher training and also made good model lessons. My teacher was happy with my performance but I was not able to pursue my dream of being a teacher because of all of the lies my mother spread about me in the community.

3

25. I was never sexually abused by my father.  When my mother would not help me with my medical needs, my father was there to help me get treatment for my disease.  My father is the one who made sure I got the medical treatment I needed.  I kept going to doctors to show that I was not having sex with my father but my mother kept spreading the rumors.

26. Moses Vitriol assisted my mother and helped her try to find out information about me when she was spreading rumors about me.

27. My mother was abusive to the children in our family, not my father.

28. I tried to give Alan Stutman and Barry Rhodes this information that I had regarding my father's case, however, they would not listen to me.

29. I would have been available to speak to Alan Stutman or Barry Rhodes any time they needed me.  After they were relieved, I met with my father's new attorneys many times.  Every time an attorney has asked me to meet them, I have agreed and made myself available.

30. I told Alan Stutman and Barry Rhodes that I was willing to testify.  They never told me what questions they would ask me and did not explain the process of testifying or coordinate me or the children testifying.

31. I related the above information to a member of my father's current legal team who typed it for me.

32. I have carefully reviewed the contents of this declaration for accuracy.

33. I declare under penalty of perjury under the laws of the United States of America that the foregoing statement is true and correct.  Executed this date in Guatemala City, Guatemala.


_C. Wng_____        _September 28, 2014_____
Chayeh Sureh Weingarten                        Date

4

# EXHIBIT 55

<u>Declaration of Yoil Weingarten</u>

1. My name is Yoil Weingarten.  I am over 18 and competent to testify in this matter.

2. I am the second oldest son of Israel Weingarten.

3. I previously submitted an affidavit in my father's criminal case in the Eastern District of New York on April 14, 2009.  I have reviewed that affidavit and include it as part of this declaration.

4. I have been married for 4 years and have one 3 month old child.

5. I work as a substitute teacher and editor.

6. My father started complaining that the attorneys were not working on his case or listening to him from the start of the case.

7. The attorney that represented my father at the initial appearance was Keneth Gribbitz.  My father liked this attorney very much.  He said he listened to him and understood the facts.

8. One or two days later Alan Stutman appeared and my father said Alan Stutman would not listen to him.  He asked why Keneth Gribbitz was replaced because he felt Mr. Gribbitz made sense and Alan Stutman was not making sense to him.

9. During my father's case he complained to me too many times to count about how bad the attorneys Alan Stutman and Barry Rhodes were.  He said they never listened to him and he didn't believe they were working on his case.

10. My father complained that Mr. Stutman  told him he didn't want his explanation of the case because he already had a theory to defend the case.  That concerned my father because he had so much information to provide the attorneys about the allegations.

11. After the court hearings my father would call and complain that the attorneys did not know the facts of the case and that they were not prepared.  My father kept asking me how the attorneys could know anything if they didn't listen to him and didn't contact the kids or other witnesses.

12. My father was asking for a new attorney to represent him as early as October 2008.

13. I tried to work with Alan Stutman in order to help with my father's case. I tried to give him witness names but he was not receptive. When I went to see Alan Stutman in person, John Middleton called me into his office and told me he was in charge of getting witnesses. I gave him the names of many witnesses in Belgium and England: Mr. Cohen from Belgium, Mr. Krausz from London, the cleaning lady, Friedman from Belgium, Moshe Kraus from Manchester and many others. I don't remember all of the names but I tried to go through each of the allegations and provide the witnesses that would have helpful information.

14. The night before trial my father called me crying and said his attorneys are not prepared. My father said he didn't know what to do. He said he didn't want to represent himself because he didn't know anything about trial and is not practiced in that area but he also didn't see how these attorneys could represent him when they were not familiar with the facts of his case. My father asked me again if the attorneys had contacted me. I said no.

15. I was asked about government's exhibit 4a. That exhibit is a letter of forgiveness that I wrote. Like Yom Kippur is forgiveness day for the Jewish people, there is a lot of prayers in the same type of expressions asking for forgiveness from god, in the same way it is common to write to parents when asking for forgiveness. I had not been talking to my father in the most honorable way a child could speak to his father. I wrote my father this letter asking for forgiveness. It was very emotional for me and I was crying when I wrote it. This type of request for forgiveness is very important in our culture.

16. My opinion about my father is that he is a very respectful father. He is responsible for his children, takes care of them, honors them and gives them a good education. I have never seen my father have any inappropriate relations with children. He was never inappropriate with me. He was a strict father like all my friends parents in the ultra-orthodox community. However, he was not abusive at all, just loving and carefully, and I had a lot of success in school because of my father.

17. I don't have a relationship with my mother because my mother treated us children bad when we were young. She would always get angry at us over nothing. My father got hit a lot of times by my mother. The cleaning lady used to grab my mother and take her to the bed to calm her down when she got out of control. She would get crazy with cleaning the house and would clean it until you could touch the floor with your tongue.

18. I never saw my father be inappropriate with any of his children. My mother touched the children inappropriately and would tell us not to tell our father, we were influenced not to say, because we were afraid that she will hit us if we do say it to our father.

19. I watched Frieme Leaieh cry to my father during Passover in April 1997. She said she was so sorry she made up the rumors about him and that there is no way she would be able to make it right.

20. Before she got married, my sister Frieme Leaieh admitted to me that the rumors she told that gave my father a bad name were not true. She was crying and asking me for forgiveness. She was crying to me in such a sorry way and you could tell she felt she had done something really terrible. I told her I forgave her.

21. My mom made up lies about people when she was in a bad mood. One day she made up that I was sleeping with a prostitute. My mother also told me my father was sleeping with prostitutes. When I asked my mom about the lies she was saying about my father and Frieme Leaieh she said she already repented and prayed to God to forgive and put coins in the charity box. I told her she had to apologize to Tatti.

22. I told Alan Stutman and Barry Rhodes that I was willing to testify. They never told me what questions they would ask me and did not explain the process of testifying or coordinate me or the children testifying.

23. I related the above information to a member of my father's current legal team who typed it for me.

24. I have carefully reviewed the contents of this declaration for accuracy.

25. I declare under penalty of perjury under the laws of the United States of America that the foregoing statement is true and correct. Executed this date in Guatemala City, Guatemala.


_____          Sep 28, 2014
Yoil Weingarten                           _____
                                          Date

# EXHIBIT 56

<u>Declaration of Shmiel Weingarten</u>

1. My name is Shmiel Weingarten. I am over 18 years of age (DOB 7/29/95) and competent to testify in this matter.

2. I am the youngest son of Israel Weingarten.

3. I am submitting this declaration in my father's federal criminal case in the Eastern District of New York.

4. I have been married for three years and have two children, ages 2 and 5 months.

5. I met attorney Alan Stutman one time a few days after my father's arrest. John Middleton was there and he did most of the talking. Alan Stutman fell asleep in the meeting. The attorneys did not ask me any questions.

6. Throughout the case I would talk to John Middleton but he never asked me for assistance getting witnesses or other evidence.

7. The attorneys did not ask me about my experiences growing up with my father and mother and did not ask me to testify in the case.

8. During the course of my father's case, my father complained that the attorneys did not come to see him very often and that they did not appear to be familiar with the facts of the case. He told me when they did come to see him they did not take any notes when he would give them the names of people to contact. He said when the attorneys would come the next time they hadn't remembered anything he had told them the visit before.

9. Most of the times I visited my father in custody he was crying in desperation because he felt his attorneys were not prepared.

10. My siblings have spoken with other attorneys to try to get my father new counsel.

11. The Sunday before trial my father called and asked if his attorneys had spoken to me or the other kids about the case. I told him attorneys Stutman and Rhodes still had not spoken to me.

12. The morning of the last day of trial my siblings and I were called to testify and came as fast as we could but we were too late. The attorneys did not tell me I would be testifying prior to that.

1

13. Had the attorneys spoken to me about my father's case I would have assisted them in any way I could.

14. I related this information to a member of my father's current legal team who typed it for me.

15. I have carefully reviewed the contents of this declaration for accuracy.

16. I declare under penalty of perjury under the laws of the United States of America that the foregoing statement is true and correct. Executed this date in Guatemala City, Guatemala.


S. Weingar
_____        September 28, 2014
Shmiel Weingarten                       Date

2

# EXHIBIT 57

<u>Declaration of Maurice Herszaft</u>

1. My name is Maurice Herszaft.  I am over 18 (DOB: 3/24/65) and competent to testify in this matter.

2. I understand that I am providing this declaration in Israel Weingarten's criminal case in the Eastern District of New York.

3. I know Israel Weingarten from Antwerp, Belgium.  I previously lived in Antwerp and now reside in London.

4. In around 1993, Israel Weingarten and I were members of the Committee for the Preservation of Jewish Cemeteries and worked on this project together for several years.  Mr. Weingarten was in charge of the Belgium branch of this committee

5. A few days after Rabbi Weingarten's arrest in this case, Mendel Blum, a friend of Rabbi Weingarten from the upstate New York Satmar community advised me that Rabbi Weingarten had been arrested.

6. After I received this call from Mr. Blum, I began working on Rabbi Weingarten's case to locate witnesses and information that could assist the defense.  It was my understanding Mendel Blum was working in this capacity as well.

7. I don't remember the exact date but sometime between November 2008 and December 2008, Mr. Blum provided me with John Middleton's telephone number in Brooklyn, New York and said I should contact John Middleton as he was working with Rabbi Weingarten's attorneys Alan Stutman and Barry Rhodes.

8. Beginning in November or December 2008, I began calling John Middleton to provide him witness names and contact information in addition to other evidence I had gathered for the case.  I called John Middleton and informed him that I had important information and witnesses for Rabbi Weingarten's case and I would like to speak with Mr. Stutman and/or Mr. Rhodes.  John Middleton told me that I could not speak to the lawyers and that any contact needed to go through him.  From this conversation with John Middleton, I had the understanding he was part of the legal team defending Mr. Weingarten.  Mr. Middleton led me to believe he was acting on behalf of Mr. Stutman and Mr. Rhodes.  Despite John Middleton telling me he did not want the witness names or information I had collected, I continued calling because I felt the witnesses and information was important for the case.

1

9. I called John Middleton numerous times between December 2008 and February 19, 2009: on about 10 occasions he did not answer his phone and I received an answering machine. About 5-6 times he answered the phone and said he was in court or busy and could not talk. There were approximately three times where he actually answered the phone. On those occasions Mr. Middleton did not speak to me for very long; when I asked to speak to attorneys Stutman and Rhodes, he refused. John Middleton said the attorneys would not speak to me and they did not need my list of witnesses. John Middleton shut me down every time I tried to discuss the information I had collected.

10. It has been a long time, so I don't remember the exact date, however, sometime in December 2008 or January 2009, Rabbi Weingarten's son Yoil Weingarten sent me a detention application filed by the government in Rabbi Weingarten's case. He asked me to review the application as it set forth the government's theory of the case. I reviewed the application to see if I had information regarding any of the allegations the government was raising. Much of the information set forth in the application was incorrect, so I gathered witnesses and evidence that refuted the allegations. When I telephoned John Middleton, he said the attorneys were not interested in that information either.

11. A few examples of the information I had either collected or learned of after Yoil Weingarten contacted me included:

 a. A tape recording between Moshe Kraus and Feige Weingarten, Rabbi Weingarten's wife, on which Mrs. Weingarten discussed that the allegations against Mr. Weingarten were fabricated and not true, including minutes of the tape recording;

 b. An official document written by Rabbi David Weiss of Antwerp, that Frieme Leaieh admitted she had an affair with the neighbor. ;

 c. Information that a tape recording existed between Frieme Leaieh and Mr. Meyerowitz, the neighbor who Frieme Leaieh had a relationship with.

 d. A transcript from a New York family court proceeding where Jennifer Heller, case worker for child protective services, testified that Mrs. Weingarten had fabricated allegations against her and Rabbi Weingarten, alleging that she was having a sexual relationship with Mr. Weingarten. This was significant as it was believed that Mrs. Weingarten helped fabricate these allegations and she also was being asked to testify as a witness for the government in the case against Rabbi Weingarten;

2

    e.   Documents from New York child protective services stating an investigation in the custody proceeding revealed the children should be kept in Rabbi Weingarten's custody and the contact information for Bryan Dlouhy, the child protective services social worker;

    f.   Contact information for Max Gold, the attorney who obtained a no contact order against both Rabbi Weingarten and Mrs. Weingarten in Hull, England, in 1999;

    g.   A document from the Antwerp Rabbinical Court describing the proceedings and findings regarding the allegations against Rabbi Weingarten in Antwerp;

    h.   Letters and documents from witnesses the government had contacted in its investigation;

    i.   Notes I had compiled regarding information that was inaccurate in the government's filings;

    j.   Witnesses to contact such as Moshe Kraus, Max Gold, Jennifer Heller, family law attorney Linda Christopher, Rabbi David Weis, child protective service workers, Rabbinical Judge Geldzahler, Chief Rabbi Yitzok Tuvia, four other rabbinical court judges and others;

    k.   I was also aware of a witness list Mendel Blum had compiled.

12. I flew to New York on February 15, 2009.  The Weingarten children contacted me concerned that the attorneys had not contacted any of the witnesses in the case and were not prepared for trial.  I went to Monsey to help them. When I was with the Weingarten children, they requested I look through two boxes of documents they had obtained.  I responded that that's what the attorneys are for and that I am not an attorney.  The children were concerned the attorneys had not reviewed the documents so I nevertheless spent several hours over the course of two days looking through the boxes for information that may be helpful.  Although I could not look through everything, I found several documents that I felt may be useful to the attorneys at trial and separated them from the rest.  I never saw the attorneys when I was in New York and was told that they would not see me.  Frustrated that they would not return my calls and would not see me when I had traveled so far, I returned to London.

13. Thursday morning before trial I received a call from Mendel Blum and Yoil Weingarten asking that I return to New York.  That day I flew straight to New York on February 26, 2009.

3

14. When I arrived in New York, I went with Mendel Blum to John Middleton's office. I saw that John Middleton's office was next to Alan Stutman's office with a door connecting the two offices. I had all the information on the desk of John Middleton and he was not interested in it. Alan Stutman was not in. Mendel Blum and I took documents to John Middleton's office where there were two big boxes of papers that I was advised by Mr. Blum had not yet been reviewed by the attorneys. John Middleton still did not want to receive the documents or witness information I had. John Middleton said the attorneys were going to refute Frieme Leaieh's testimony by arguing that the government prepared Frieme Leaieh to testify many times.

15. After leaving the lawyers' offices, I then visited the Weingarten children in Monsey. They were scared because they felt the attorneys were unprepared to represent their father.

16. On Monday, we received notice that Mr. Weingarten was representing himself. The children told me that they thought that might happen because the night before their father called and asked each of the kids separately if the attorneys had contacted them. The children responded that the attorneys had not contacted any of them.

17. Mendel Blum had prepared a proposed defense witness list that he had shown me during my first visit to New York in February. During that visit Mr. Blum informed me that was the witness list he provided to the attorneys. When I returned and Mr. Weingarten was representing himself, I learned from Mendel Blum that none of the witnesses from the list had been contacted by the attorneys and none of the proposed witnesses were planning to come to court to testify at trial. As none of us were attorneys, we did not know what to do.

18. With only a few days before trial, there was no time to speak with all of the necessary witnesses and make arrangements to get them to the United States from Europe.

19. Israel Weingarten's trial attorneys never contacted me despite my many attempts to contact them.

20. If the attorneys had contacted me I would have assisted them in any way I could.

21. I related the above information to a member of Mr. Weingarten's current legal team, who typed it for me.

22. I have carefully reviewed the contents of this declaration for accuracy.

4

23. I declare under penalty of perjury under the laws of the United States of
America that the foregoing statement is true and correct.  Executed this date
in London, England.

_____     12 SEP 2014
Maurice Herszaft                Date

5