UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-----------------------------------------------------X

UNITED STATES OF AMERICA

    - against -             <u>Cv. No. 14-5738 (JG)</u>

ISRAEL WEINGARTEN,

               Defendant.
-----------------------------------------------------X


DEFENDANT ISRAEL WEINGARTEN'S REPLY TO THE GOVERNMENT'S
MEMORANDUM IN OPPOSITION TO HIS MOTION TO VACATE, SET ASIDE, OR
CORRECT HIS SENTENCE, UNDER 28 U.S.C. §2255


Oral Argument scheduled for January 30, 2015 at 11:00 a.m.


Counsel for Mr. Weingarten:

| | |
|---|---|
| Jodi Thorp | Todd W. Burns |
| California Bar No. 223663 | California Bar No. 194937 |
| Law Offices of Jodi Thorp | Burns & Cohan, Attorneys at law |
| 1010 Second Avenue, Suite 1800 | 1350 Columbiat Street, Suite 600 |
| San Diego, California  92101 | San Diego, California  92101 |
| 619-233-3169 | 619-236-0244 |
| jodithorp@thorplawoffice.com | todd@burnsandcohan.com |
| | |
| Admitted *pro hac vice* | Admitted *pro hav vice* |


Clarke and Rice, APC
1010 Second Avenue Suite 1800
San Diego, California  92101
619-308-8484

# TABLE OF CONTENTS

*Page*

TABLE OF AUTHORITIES . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . iii

INTRODUCTION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

STATUTE OF LIMITATIONS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

    I.     Introduction . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

    II.    The Government's Procedural Default Arguments . . . . . . . . . . . . . . . . . . . . . 2

        A.    Actual Innocence Exception . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

        B.    Ineffective Assistance – Freestanding Claim Or Exception To Default
            . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

    III.   Non-Retroactivity Of 2003 Amendment To §3283 . . . . . . . . . . . . . . . . . . . . 5

    IV.   Inapplicability Of §3283 – Categorical Approach . . . . . . . . . . . . . . . . . . . . . 11

UNPREPARED TRIAL COUNSEL, AND BREAKDOWN IN ATTORNEY-CLIENT
RELATIONSHIP . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

    I.     Introduction . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

    II.    Need For An Evidentiary Hearing . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

    III.   Constitutionally Offensive Choice Claim . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

        A.    The Government's Waiver Argument . . . . . . . . . . . . . . . . . . . . . . . . . 16

        B.    The Government's Argument That Defense Counsel Were
            Prepared . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

        C.    The Government's Prejudice Argument . . . . . . . . . . . . . . . . . . . . . . . 20

    IV.   Relief Is Also Warranted If The Court Applies A Traditional Ineffective
        Assistance Of Counsel Test . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

    V.    Irreconcilable Conflict And Breakdown In Attorney-Client Relationship . . . . . 21

i

VI.     Rhodes And Stutman Declarations . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24

    A.     Mr. Stutman's Puffing And The *Canales* Case . . . . . . . . . . . . . . . . . . . 24

    B.     Failure To Locate And Interview Witnesses . . . . . . . . . . . . . . . . . . . . . . 27

    C.     Failure To Visit Alleged Crime Scenes . . . . . . . . . . . . . . . . . . . . . . . . . . 29

    D.     Failure To Prepare Tape Recordings For Trial . . . . . . . . . . . . . . . . . . . . 29

    E.     Failure To Hire Expert Regarding Mr. Weingarten's Physical
        Characteristics . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 29

    F.     Claims That Mr. Weingarten Did Not Complain About Attorney
        Preparedness Until The "Eve Of Trial" . . . . . . . . . . . . . . . . . . . . . . . . . . 30

    G.     Failure To Interview Witnesses With Respect To Family Court
        Proceedings . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 32

    H.     Mr. Rhodes's New Claim That Mr. Weingarten Wanted To Represent
        Himself So He Could Affect Feige, Frieme Leaieh, And Yoinesun
        Weingarten . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 33

VII.    Conclusion . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 34

GOVERNMENT MISCONDUCT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 37

I.      Introduction . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 37

II.     Misconduct With Respect To Repentance Letter . . . . . . . . . . . . . . . . . . . . . . . 37

III.    Misconduct With Respect To Principal Stauber And Rabbi Weis . . . . . . . . . . 42

IV.     Procedural Default . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 46

SENTENCING CLAIM . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 47

CONCLUSION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 49

CERTIFICATE OF SERVICE . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 50

# TABLE OF AUTHORITIES

*Page*

## FEDERAL CASES

*Bracy v. Gramley*,
   520 U.S. 899 (1997) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 41

*Brady v. Maryland*,
    373 U.S. 83 (1963) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 37, 42, 45, 46

*Bridges v. United States*,
   346 U.S. 209 (1953) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11, 12

*Burrell v. United States*,
   384 F.3d 22 (2d Cir. 2004) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

*Crandell v. Bunnell*,
   144 F.3d 1213 (9th Cir. 1998) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

*Dopp v. Franklin National Bank*,
   461 F.2d 873 (2d Cir. 1972) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

*Drake v. Portundo*,
   321 F.3d 338 (2d Cir. 2003) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 41

*Fogerty v. Fantasy, Inc.*,
   510 U.S. 517 (1994) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

*Harris v. Nelson*,
   394 U.S. 286 (1969) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 35, 40

*I.N.S. v. St. Cyr*,
   533 U.S. 289 (2001) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

*James v. United States*,
   550 U.S. 192 (2007) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

*Jenkins v. Artuz*,
   294 F.3d 284 (2d Cir. 2002) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 43

*Johnson v. United States*,
   529 U.S. 694 (2000) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

*Landgraf v. USI Film Products*,
    511 U.S. 244 (1994) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5, 6, 7

*Leocal v. Ashcroft*,
    543 U.S. 1 (2004) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11, 13

*Linstadt v. Keane*,
    239 F.3d 191 (2d Cir. 2001) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

*Massaro v. United States*,
    538 U.S. 500 (2003) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

*Mayo v. Henderson*,
    13 F.3d 528 (2d Cir. 1994) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4, 5

*McDaniel v. U.S. District Court*,
    127 F.3d 886 (9th Cir. 1997) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 41

*Nijhawan v. Holder*,
    557 U.S. 29 (2009) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

*Olivas-Motta v. Holder*,
    746 F.3d 907 (9th Cir. 2013) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

*Pavel v. Hollins*,
    261 F.3d 210 (2d Cir. 2001) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

*Pham v. Terhune*,
    400 F.3d 740 (9th Cir. 2005) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 41

*Sanchez v. Mondragon*,
    858 F.2d 1462 (10th Cir. 1988) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

*Slevin v. United States*,
    1999 WL 549010 (S.D.N.Y. 1999) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 47

*United  States v. Acevedo*,
    229 F.3d 350 (2d Cir. 2000) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

*United States v. Blueford*,
    312 F.3d 962 (9th Cir. 2002) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 39

*United States v. Cruz*,
    977 F.2d 732 (2d Cir. 1992) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 47

iv

*United States v. Jeffries*,
    405 F.3d 682 (8th Cir. 2005) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

*United States v. Kojayan*,
    8 F.3d 1315 (9th Cir. 1993) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 45

*United States v. Leo Sure Chief*,
    438 F.3d 920 (9th Cir. 2006) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

*United States v. Reyes*,
    302 F.3d 48 (2d Cir. 2002) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 40

*United States v. Richardson*,
    512 F.2d 105 (3d Cir. 1975) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8, 9, 10

*United States v. Schneider*,
    2010 WL 3656027 (E.D. Penn. 2010) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9, 12

*United States v. Valentine*,
    820 F.2d 565 (2d Cir. 1987) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 39, 40, 43, 45, 46

*United States v. Vickers*,
    2014 WL 1838255 (W.D.N.Y. 2014) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9, 12

*United States v. Wallach*,
    935 F.2d 445 (2d Cir. 1991) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 40

*Webster v. Fall*,
    266 U.S. 507 (1925) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10, 47

*Welsh v. United States*,
    844 F.2d 1239 (6th Cir. 1988) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

**STATE CASES**

*People v. Canales*,
    *N.Y. Sup. Ct., Kings County*, Case No. 8406/07 . . . . . . . . . . . . . . . . . . . . . . . . . . 25, 16

*People v. Canales*,
    110 A.D. 3d 731, 734 (N.Y. 2013) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 26

**FEDERAL STATUTES/ACTS**

18 U.S.C. §2423 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9, 11, 13

18 U.S.C. §3283 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5, 6, 7, 8, 8, 10, 11, 12

18 U.S.C. §3286(b) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6, 7, 8

18 U.S.C. §3299 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

18 U.S.C. §3500 (Jencks Act) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 44, 45

18 U.S.C. §3509(k) (1991) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

28 U.S.C. §2255 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . *passim*

149 Cong. Rec. H2319-01, 2003 WL. 1561556 (2003) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

149 Cong. Rec. H2950-01, 2003 WL. 1832092 (2003) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

Pub. L. 107-56, Title VIII, §809(b) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

**RULES**

Rules Gov. §2255 Proc. 6(a) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 34, 40

Rules Gov. §2255 Proc. 15 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 28, 44, 46

## INTRODUCTION

In his initial §2255 memorandum, Israel Weingarten raised several issues, under seven major headings.  The government filed its opposition memorandum on December 18, 2014.  This reply memorandum responds to arguments that the government made with respect to the claims raised under the first four major headings in Mr. Weingarten's initial memorandum (*i.e.*, the statute of limitations; unprepared counsel, breakdown in attorney-client relationship; government misconduct; and sentencing).

Before turning to the government's arguments, there is a preliminary point to note.  The government's arguments rely in large part on the declarations of Mr. Weingarten's former counsel, Barry Rhodes and Alan Stutman.  On January 6, 2015, Mr. Weingarten filed a motion to strike those four declarations.  In a January 16, 2015 scheduling order, the Court indicated that the government should respond to that motion and that the motion would be considered on January 30, when there will be oral argument with respect to the claims raised in Mr. Weingarten's initial memorandum. Given the timing, in this reply brief Mr. Weingarten addresses statements made in the attorneys' declarations.  Moreover, the attached declaration of attorney David V. Kirby (exhibit 4) deals in depth with the claims made in those declarations.  Mr. Weingarten nonetheless believes that the declarations should be stricken, and if the government wants to rely on declarations from Mr. Rhodes and Mr. Stutman, those should be prepared and submitted pursuant to a court-supervised process, along the lines indicated in Mr. Weingarten's January 6, 2015 motion to strike.

Mr. Weingarten now turns to addressing many of the government's arguments.

## STATUTE OF LIMITATIONS

### I.      Introduction

Mr. Weingarten begins his discussion of the two statute of limitations issues raised by responding to the government's procedural default arguments.  He then addresses the government's arguments with respect to each issue.

### II.     The Government's Procedural Default Arguments

In his initial §2255 memorandum, Mr. Weingarten wrote that the statute of limitations claims are not barred by the procedural default doctrine because of the actual innocence exception and ineffective assistance of counsel.  The government's responses are addressed here.

#### A.      Actual Innocence Exception

In his initial memorandum, Mr. Weingarten relied on *Burrell v. United States*, 384 F.3d 22, 27 (2d Cir. 2004), which indicates that the actual innocence exception to procedural default applies here because the statute of limitations arguments, if correct, are a complete legal defense to the offenses charged.  *See* 9/30/14 Weingarten Memo. at 11-12.  Early in its opposition memorandum, the government said that it would deal with this issue later, but it never did.  *See* 12/18/14 Gov't Memo. at 21.  The silence suggests the lack of a good rebuttal.

#### B.      Ineffective Assistance – Freestanding Claim Or Exception To Default

In his initial memorandum, Mr. Weingarten wrote that his procedural default may also be excused due to ineffective assistance, or, alternatively, that the statute of limitations claims may be considered under the guise of a freestanding ineffectiveness claim.

The government argues that Mr. Weingarten "should not be permitted to disguise" his statute of limitations claims "as claims for ineffective assistance."  12/18/14 Gov't Memo. at 21.  There is nothing wrong with considering these issues as freestanding ineffectiveness claims. *See, e.g., United*

2

*States v. Acevedo*, 229 F.3d 350, 353, 356 (2d Cir. 2000).  But this dispute is irrelevant because, as the government acknowledges, ineffective assistance may be relied on to excuse procedural default, and under either approach the relevant questions are the same:  (1) was counsel's performance deficient; and (2) was Mr. Weingarten prejudiced thereby?

With respect to the first question, the government claims that attorney Barry Rhodes, who handled the pretrial motions, made a strategic decision not to raise the statute of limitations issues. That strategic decision, the government says, should be accorded deference.  *See* 12/18/14 Gov't Memo. at 25.   To support the factual premise of its argument, the government relies on Mr. Rhodes's November 20, 2014 declaration.  In that declaration, Mr. Rhodes does not say that he spotted the statute of limitations issues raised here, and then made a strategic decision not to raise them.  This is what he says:

> What the petitioner contends was an improper "concession," is better labeled a technique of writing and of appellate strategy. . . .  I always go for what I believe is the strong point and let the weaker possibilities languish.  I would not clutter a legal submission with arguments as seemingly tenuous as those proposed by petitioner's latest advocates.

11/20/14 Rhodes Dec. at 2-3.  In short, Mr. Rhodes denigrates the issues raised here, he does not claim to have made a strategic decision not to raise them himself.[1]  In fact, on September 19, 2014 attorney Jodi Thorp spoke with Mr. Rhodes and asked him if he had spotted the statute of limitations, and he said that he had not.

The government nonetheless projects its misconstruction of Mr. Rhodes's statement onto Mr. Weingarten's successor counsel.  Specifically, the government claims that, like Mr. Rhodes, those successor counsel made "studied determinations" and "strategic choices" to not raise the

---

[1]  By characterizing as "tenuous" arguments that are directly supported by Supreme Court and circuit case law, Mr. Rhodes evidences that his bias against Mr. Weingarten has clouded his legal judgment.

statute of limitations issues.[2]  *See* 12/18/14 Gov't Memo. at 26-27.  The government offers no evidence to support that assertion, and successor counsel deny it.[3]  *See* 1/14/15 Lorandos Dec. (Exhibit 1); 1/8/15 Newman Dec. (Exhibit 2); 1/16/15 Baker Dec. (Exhibit 3).

But even if the government's factual premises regarding the attorneys' strategic decisions were correct, its legal argument falls flat.  Because the cost to the defense of raising either issue was so small, and the benefit was barring the prosecution, no attorney could reasonably decide to not raise either issue.  *See* 1/19/15 Kirby Dec. at ¶¶11-13 (Exhibit 4).  Moreover, as discussed in Mr. Weingarten's initial §2255 memorandum, "the Second Circuit [has] explained that 'a petitioner may establish constitutionally inadequate performance if he shows that counsel omitted significant and obvious issues while pursuing issues that were clearly and significantly weaker.'"  9/30/14 Weingarten Memo. at 14 (quoting *Mayo*, 13 F.3d at 533).  The government ignores *Mayo* and the other relevant case law cited in Mr. Weingarten's brief.

The only case that the government cites in this context illustrates the difference between a strategic trial decision, which is afforded deference, versus the "strategic" decisions that the government imagines here.  *See* 12/18/14 Gov't Memo. at 25 (citing *DeLuca v. Lord*, 77 F.3d 578, 588 n.3 (2d Cir. 1996)).  In *DeLuca*, the court found that defense counsel unreasonably abandoned an extreme emotional disturbance defense because his decision was "so hasty and based on so little" that it could "not be considered either a reasonable professional judgment or a reasoned strategic choice."  *Id.* at 588.  The court noted that its "finding of deficient performance [did] not rest on

---

[2]  The government makes these assertions to support its claim that Mr. Weingarten was not prejudiced by counsel's deficient performance.  *See* 12/18/14 Gov't Memo. at 26.  But the prejudice analysis entails considering the merits of the statute of limitations issues, and if either is meritorious, prejudice is a foregone conclusion.  *See, e.g., Mayo v. Henderson*, 13 F.3d 528, 536 (2d Cir. 1994).

[3]  It bears noting that in light of Mr. Rhodes's invited error, successor counsel would have been barred (or at least badly handicapped) from raising these issues.

4

judicial disagreement with a reasoned strategic decision of trial counsel." *Id.* Then, in the footnote quoted by the government in its opposition memorandum, the court said that a decision "not to pursue a defense does not constitute deficient performance if, as is typically the case, the lawyer has a reasonable justification for the decision." *Id.* at 588 & n. 3. That is because trial strategy decisions usually are based on an inexact weighing of many factors, and it can be very hard to know what the right choice is, even with 20/20 hindsight. Here, on the other hand, the issues are clear-cut, and there is "no [valid] reason," strategic or otherwise, that excuses counsel's failure to raise a meritorious issue that would have barred prosecution. *Mayo*, 13 F.3d at 533 (quoting *Fagan v. Washington*, 942 F.2d 1155, 1157 (7th Cir. 1991)).

Mr. Weingarten now turns to the merits of the two statute of limitations claims, beginning with non-retroactivity of the 2003 amendment to §3283.

## III.    Non-Retroactivity Of 2003 Amendment To §3283

The government argues that (1) when Congress lengthened §3283's limitations period in 1991 and 2003, (2) it demonstrated its desire to increase the temporal reach of statutes involving sexual abuse of a minor, thus (3) it must have wanted those changes to apply retroactively (*i.e.*, to conduct committed before the amendments became effective). *See* 12/18/14 Gov't Memo. at 34. The government essentially argues "that retroactive application of [the amendment to §3283] would vindicate its purpose more fully." *Landgraf v. USI Film Products*, 511 U.S. 244, 285 (1994). "That consideration, however, is not sufficient to rebut the presumption against retroactivity." *Id.* at 286. As the Court explained in *Landgraf*:

>Statutes are seldom crafted to pursue a single goal, and compromises necessary to their enactment may require adopting means other than those that would most effectively pursue the main goal. A legislator who supported a prospective statute might reasonably oppose retroactive application of the same statute.

*Id.*

In addition to the government's argument being rejected in *Landgraf*, the government's reasoning is firmly rebutted when one considers the circumstances surrounding the 2001 amendment to the limitations provision in 18 U.S.C. §3286(b). That provision applies to "federal crimes of terrorism," an area in which Congress has demonstrated strong interest. When enacting §3286(b), Congress made clear its intent that it be applied retroactively, by stating, "The amendments made by this section shall apply to the prosecution of any offense committed before, on, or after the date of the enactment of this section." Pub. L. 107-56, Title VIII, §809(b). A year later, Congress amended §3283 and expressed no such intent. This buttresses the presumption against retroactivity with the principle of negative implication. "As the [legislation with respect to §3286(b)] indicates, Congress clearly knows how to [indicate that a statute should be applied retroactively] when it so desires." *Fogerty v. Fantasy, Inc.*, 510 U.S. 517, 524 n.11 (1994). That it did not make such a statement with respect to §3283 affirmatively shows that Congress did not want that provision to apply retroactively.[4]

To support its what-Congress-must-have-wanted argument, the government relies on an April 9, 2003 House of Representatives' "Joint Explanatory Statement of the Committee of Conference." The government's memorandum quotes two sentences from that statement, but several sentences preceding the portion quoted by the government are relevant:

---

[4] In his initial memorandum, Mr. Weingarten pointed to the negative implication raised by similar explicit statements of Congressional intent with respect to other statute of limitations amendments. *See* 9/30/14 Weingarten Memo. at 6. The government ignored this.

6

> Section 202 of the conference report contains similar language to section 202 of the House amendment. The Senate bill did not have comparable language. The House amendment created a new section in the criminal code that provided that child abductions and felony sex offenses are not subject to a statute of limitations. The conference report amends the current law that covers the statute of limitations for offenses involving the sexual or physical abuse of a child. This section adds crimes of kidnapping and extends the statute of limitations to the life of the child victim. . . . Under current law, the standard limitation rules do not bar prosecution "for an offense involving the sexual or physical abuse of a child under the age of eighteen years . . . before the child reaches the age of 25 years."

149 Cong. Rec. H2950-01, 2003 WL 1832092 (2003). This indicates disagreement between the House and Senate with respect to the 2003 amendment to §3283. A House floor debate that occurred two weeks prior sheds further light on that dynamic. During that debate, Congressman Holt indicated that the core of the legislation at issue related to a national Amber Alert program, but "the other side here insists on putting other things into the bill. These might be controversial. At least they are complicated and serious issues that deserve to be aired and debated, such things as . . . eliminating the statute of limitations in some circumstances . . . ." 149 Cong. Rec. H2319-01, 2003 WL 1561556 (2003). Thus, a fair reading of the portion of the legislative history quoted by the government is that the House and Senate compromised with respect to the amendment to §3283, but Congress deliberately chose not to make that amendment retroactive. *See Landgraf*, 511 U.S. at 286 ("[a] legislator who supported a prospective statute might reasonably oppose retroactive application of the same statute"). Regardless, the legislative history quoted does not rebut the strong presumption against retroactivity. Nor does it rebut the negative inference raised by the fact that Congress did not explicitly make §3283 retroactive, as it had done a year earlier with §3286(b).

The government also argues that the first nine words of §3283 evidence Congress's intent that the provision be applied retroactively. To reiterate, like the present version, the 2003 version of §3283 stated:

> *No statute of limitations that would otherwise preclude prosecution* for an offense involving the sexual or physical abuse . . . of a child under the age of 18 years shall preclude such prosecution during the life of the child.

(Emphasis added.)  Relying on the emphasized language, the government argues that applying "[t]he pre-2003 version of the statute would do exactly that – preclude prosecution during the lifetime of a child victim by cutting it off at the victim's 25th birthday.  The wording of the statute is clear: Congress intended for the 2003 statute to be the only governing statute of limitations for live claims of child sexual abuse."  12/18/14 Gov't Memo. at 34.  To the contrary, this language expresses Congress's intent as to the reach of the statute as enacted, it does not say anything about whether the statute has retroactive effect.  It certainly does not amount to the "clear statement" of legislative intent necessary to rebut the presumption against retroactivity.  *Johnson v. United States*, 529 U.S. 694, 701 (2000).  This is especially evident when one considers that:  (1) the 2001 amendment to §3286(b) discussed above contains language that is functionally equivalent to that relied on by the government here (*i.e.*, "[n]otwithstanding any other law"); yet (2) when it amended §3286(b), Congress explicitly said that it intended the change to apply retroactively.  Congress would have done the same if it intended the amendment to §3283 to apply retroactively.

As indicated in Mr. Weingarten's initial §2255 memorandum, in *United States v. Richardson*, 512 F.2d 105 (3d Cir. 1975), the Third Circuit applied the same principles relied on here and arrived at a holding that is on-point and supports Mr. Weingarten's position.  The government responds by stating, "Not only is *Richardson* inapposite in the context of child sexual abuse, but also Congress amended the draft registration statute [at issue in *Richardson*] decades ago, with completely different objectives in mind."  12/18/14 Gov't Memo. at 35-36.  *Richardson* relied on the presumption against retroactivity, which "embodies a legal doctrine centuries older than our Republic," "is deeply rooted in our jurisprudence," and is based on "[e]lementary considerations of fairness."  *I.N.S. v. St. Cyr*,

8

533 U.S. 289, 316 (2001) (quotations omitted).  The Supreme Court has identified no exception to that longstanding presumption for statutes involving child sexual abuse.

The government's attempt to distinguish *Richardson* is particularly unconvincing in light of *United States v. Schneider*, 2010 WL 3656027, at *1 n.1 (E.D. Penn. 2010).  In that case, the government "concede[d]" that 18 U.S.C. §3299 – which became effective on July 27, 2006, and abolished the limitations period for certain offenses against children – did not apply.  *See id.*  The government made that concession based on *Richardson*, even though Schneider was charged with violations of 18 U.S.C. §2423.  In short, in a context functionally identical to that presented here, the government conceded that *Richardson* controlled.  Of course, the district court in *Schneider* is located in the Third Circuit, and thus it was bound by *Richardson*, but it is telling that the government in that case did not make the weak arguments that it makes in this case.[5]

Having failed to rebut the logic or holding of *Richardson*, the government attempts to convince the Court that there is a substantial amount of non-binding case law in its favor.  Specifically, the government cites four cases.  One of those is *Schneider*, a curious choice in light of the government's concession in that case.  Two of the others do not address the issue presented here.[6]  The government says that the courts in those cases could not have "simply overlook[ed] the question of Congressional intent," and must have "impliedly" ruled as the government posits.  12/18/14 Gov't Memo. at 36.  "Questions which merely lurk in the record, neither brought to the attention of the court nor ruled upon, are not to be considered as having been so decided as to

---

[5] Notably, section 3299 contains a first clause (*i.e.*, "[n]otwithstanding any other law") that is functionally identical to the first nine words of §3283 ("[n]o statute of limitations that would otherwise preclude prosecution"), on which the government places such great weight in this case.

[6] *See United States v. Vickers*, 2014 WL 1838255, *8-9 (W.D.N.Y. 2014) (dealing with *ex post facto* claim); *United States v. Leo Sure Chief*, 438 F.3d 920 (9th Cir. 2006) (defendant argued that amendment to statute of limitations effectively repealed prior limitations period).

9

constitute precedents." *Webster v. Fall*, 266 U.S. 507, 511 (1925). Of course, none of the cases cited by the government is binding precedent for this Court, and thus at best can only be considered persuasive. But how is the Court to be persuaded by opinions that do not even indicate that the issuing court considered the relevant issue, much less provide any reasoning for resolving the issue?

The only case on which the government relies that indicates that the court considered the relevant issue, in an analogous context, is *United States v. Jeffries*, 405 F.3d 682 (8th Cir. 2005). The opinion in *Jeffries* begins by saying, "Jeffries argues that Congress did not explicitly make either §3509(k) or §3283 retroactive and that without such clear statement each provision is presumed to operate prospectively with no application to offenses before the date of its enactment . . . ." *Jeffries*, 405 F.3d at 684. While this indicates that the retroactivity issue was on the court's radar, the opinion then focused almost entirely on the *ex post facto* claim raised. On the retroactivity issue, the court only said:

> Both the title and the wording of §3509(k) indicate that Congress intended by it to extend the general statute of limitations. When enacted in 1990, it was entitled "Extension of child statute of limitations" and it stated that no statute of limitations that would otherwise preclude prosecution should act as a bar before the victim reaches the age of twenty five. 18 U.S.C. § 3509(k) (1991). The statutory language of § 3509(k) was later recodified at §3283 and continued to extend the statute of limitations in child abuse cases.

*Jeffries*, 405 F.3d at 684. This is the same reasoning advanced by the government that has already been addressed above. It amounts to saying that because Congress thought it important to pass a new law, it must have intended that law to apply retroactively. That logic would swallow the presumption against retroactivity whole, and is contrary to the case law discussed above. In short, *Jeffries* is not persuasive, *Richardson* is.

10

## IV.    Inapplicability Of §3283 – Categorical Approach

As discussed in Mr. Weingarten's initial §2255 memorandum, even if §3283 may be applied retroactively, it does not by its terms apply *categorically* to §2423(a) or (b) offenses.  In its opposition memorandum, the government does not dispute that if a categorical analysis applies, Mr. Weingarten must prevail.  Instead, the government says that "[a] categorical, elements-based analysis is not suited to the 2423 context" because, the government claims, "Congress's clear intent is to expand the prosecution of child sexual abuse cases . . . ."  12/18/14 Gov't Memo. at 32.

The government's argument that the categorical approach is "not suited to the 2423 context" is unmoored from the law.  The categorical approach is applied across the entire range of federal criminal offenses, including the most serious, and the Supreme Court has never suggested that there is an exception for §2423 offenses.  Moreover, in *Bridges v. United States*, 346 U.S. 209 (1953), the Supreme Court applied the categorical approach in the context of assessing the applicability of a statute of limitations.  Echoing its broader argument, the government says that "*Bridges* is not applicable or instructive in the context of child sexual abuse cases."  12/18/14 Gov't Memo. at 32. The government does not explain why not.  And a wealth of Supreme Court case law indicates that, in light of the language used in §3283, a strict categorical analysis applies.  *See* 9/30/14 Weingarten Memo. at 8-9.  The government's contrary position is not only unmoored from the controlling case law, if accepted it would mean that the statute of limitations to be applied when a §2423 offense is charged would vary depending on the specific allegations in the indictment.  That is, in §2423 cases in which the government does not charge that the defendant's actual conduct involved sexual abuse of a minor, section 3283 would not apply, and vice-versa.  The government provides no precedent for such an approach, which is contrary to Congress's use of the word "offense" in §3283. *See Leocal v. Ashcroft*, 543 U.S. 1, 7 (2004) ("offense" signifies that a court must look to the

11

elements of the statute charged, "rather than to the particular facts relating to [the defendant's] crime").

The government claims that Mr. Weingarten "posits the same arguments as those advanced by the defendants," and rejected by the courts, in *United States v. Vickers*, 2014 WL 1838255, *11 (W.D.N.Y. 2014), and *Schneider*. 12/18/14 Gov't Memo. at 31. The magistrate judge's report and recommendation in *Vickers* does not discuss (or even cite) *Bridges*, or any of the other controlling Supreme Court case law, and it does not provide any meaningful analysis; it merely cites to *Schneider* and declines to apply the categorical approach. *See id.*

So the government's argument rests on *Schneider*. As an initial matter, if the Court were to give substantial weight to that opinion, Mr. Weingarten would prevail on the non-retroactivity issue. Setting that aside, the district court's reasons for rejecting the categorical approach in *Schneider*, and its manner of distinguishing *Bridges*, were as follows:

> Although *Bridges* also interpreted the word "involve" in the context of a statute of limitations' applicability, the statute in that case, the WSLA, is dissimilar to §3283 because the WSLA targeted a narrow category of crimes and was intended to be narrowly applied. In contrast, Congress has sought to progressively lengthen the statute of limitations to allow prosecution for child sex offenses by extending the limitations period first to the victim's 25th birthday, then to encompass the life of the victim, and finally to abolish the limitations period entirely for some categories of offenses.

*Schneider*, 2010 WL 3656027, *3. The court in *Schneider* also found it significant that "§3283's description of an offense involving the sexual abuse of a child makes no reference to the elements of a crime and by its terms applies to 'offenses' rather than 'charges.' Moreover, §3283's limitations period applies to offenses 'involving' child sexual abuse, not to offenses 'constituting' such abuse." *Id.* Far from being persuasive, this reasoning is wrong on every point.

12

First, the categorical approach is applied across a broad range of cases, and the district court's conclusion that it should not be applied when a §2423 offense is charged has no principled legal foundation.  More important, the court was wrong with respect to its treatment of both of the key words here, "offense" and "involving."  With respect to the former, the Supreme Court has held that the word "offense" signifies that a court must look to the elements of the statute charged, "rather than to the particular facts relating to [the defendant's] crime."  *Leocal v. Ashcroft*, 543 U.S. 1, 7 (2004).  With respect to "involving," the Supreme Court has twice clarified that use of the word "involving" does not expand the elements-based inquiry, as "it too refers to crimes as generically defined."  *Nijhawan v. Holder*, 557 U.S. 29, 36 (2009); *James v. United States*, 550 U.S. 192, 201-02 (2007).  After *Nijhawan* and *James*, it is well-established that the "use of the word 'involving' . . . is entirely consistent with . . . an element of the generic crime" approach.  *Olivas-Motta v. Holder*, 746 F.3d 907, 915 (9th Cir. 2013) (citing *Nijhawan* and *James*).

In sum, the key case on which the government relies gets the important questions exactly wrong.

## UNPREPARED TRIAL COUNSEL, AND BREAKDOWN
## IN ATTORNEY-CLIENT RELATIONSHIP

### I.       Introduction

In the second argument section of Mr. Weingarten's initial §2255 memorandum, he raised

three claims.  The first two – unconstitutional choice and ineffective assistance – are based on the

same facts.  The only difference between the two claims is that for the first prejudice is presumed.

The third claim – breakdown in the attorney-client relationship – is based on many of the same facts

as the first two (*i.e.*, the attorneys' lack of preparation and the toll that took on the relationship), but

also relies on other things that the attorneys did that damaged the relationship.  Before turning to the

government's arguments with respect to those claims, it is necessary to first discuss the

government's reconfiguration of the claims.

In its opposition memorandum, the government incorrectly says that Mr. Weingarten has

raised several claims based on his assertion that "trial counsel's[7] performance in pretrial hearings

and pleadings was deficient."  *See*  12/18/14 Gov't Memo. at 38.  The government then complains

that none of these "nitpick" claims individually establishes a claim for ineffective assistance.  *See*

12/18/14 Gov't Memo. at 38-42.  What the government has characterized as "nitpick" claims are

actually rocks in the mountain of evidence that shows defense counsel were not prepared.  *See*

9/30/14 Weingarten Memo. at 16-57 (detailing background facts in section titled, "events that led

to Mr. Weingarten's request to discharge counsel").  Rather than address the mountain, the

---

[7] The government repeatedly refers to Mr. Rhodes and Mr. Stutman as "trial counsel," and asserts that their lack of preparation should be accorded the deference given to an attorney's strategic trial decisions. *See, e.g.*, 12/18/14 Gov't Memo. at 39, 47.  The attorneys did not represent Mr. Weingarten during trial, and "[t]he issue here . . . is not legal strategy, but preparation." *Sanchez v. Mondragon*, 858 F.2d 1462, 1466 (10th Cir. 1988).

14

government selectively discusses a few of the rocks, and treats each as an individual claim. While this divide and conquer strategy is not surprising, it is also not convincing.

The unfortunate thing about the government's approach, however, is that it makes it more difficult to cogently address its arguments with respect to the three claims actually raised by Mr. Weingarten. Nevertheless, Mr. Weingarten does that below, in argument sections keyed to the three claims. After that, Mr. Weingaren addresses some of the statements in Mr. Rhodes's and Mr. Stutman's declarations, which were attached to the government's opposition memorandum. But first he discusses the government's assertion that the Court can resolve the claims discussed here without holding an evidentiary hearing.

## II.      Need For An Evidentiary Hearing

The government says that the Court should not hold an evidentiary hearing. If the Court follows that suggestion, it must resolve the many fact disputes in Mr. Weingarten's favor, in which case the government cannot prevail. *See, e.g., Dopp v. Franklin Nat. Bank*, 461 F.2d 873, 879 (2d Cir. 1972) ("a judge should not resolve a factual dispute on affidavits or depositions, for then he is merely showing a preference for one piece of paper to another") (quotation omitted).

The Court could, however, decline to resolve the many fact disputes and still rule in Mr. Weingarten's favor. That is because the government's arguments rely on the declarations of Mr. Rhodes and Mr. Stutman, and even if the Court accepts all of their statements as true, they have failed to provide any justifications for their failures to: (1) prepare to deal with the repentance letter; (2) visit the Brooklyn apartment central to this case, and seek to interview the people who were there on the night of July 30-31, 1997; (3) have translated and transcribed tape recordings that contained important statements (which they instead turned over to the government without doing any review); (4) hire an expert on child sexual abuse; and (5) prepare for trial the 911 tape that the government

15

provided to them in discovery, which they apparently lost.  Moreover, in their declarations the attorneys do not claim to have adequately investigated the case.  Instead, they blame their woeful investigation on (1) lack of funding, (2) Mr. Weingarten, and (3) Mr. Weingarten's mostly-unnamed supporters.  As discussed in detail in the declaration of David V. Kirby (exhibit 4), those explanations demonstrate the attorneys' failure to understand their responsibilities, and establish wide-ranging deficient performance.[8]

In sum, there is an adequate record for the Court to grant relief on the three claims involved here without holding an evidentiary hearing.  But if the Court is not going to do that, an evidentiary hearing is required.  Mr. Weingarten now turns to the government's arguments with respect to the three claims.

## III.   Constitutionally Offensive Choice Claim

Mr. Weingarten's first claim is that he was impermissibly forced to choose between representing himself or going to trial with counsel that were not prepared.  Below, he responds to the government's waiver arguments, then addresses the government's claim that counsel were adequately prepared, and finally discusses the government's treatment of prejudice.

### A.      The Government's Waiver Argument

The government argues that Mr. Weingarten's constitutionally offensive choice "claim was previously litigated and resolved on direct appeal, and as such it should be dismissed as procedurally barred." 12/18/14 Gov't Memo. at 18, 52.  That is not correct.  The constitutionally offensive choice claim raised here is essentially an ineffective assistance claim, the only difference being that when framed as a constitutionally offensive choice claim prejudice is presumed.  The claim focuses on

---

[8]  Mr. Kirby's declaration alone establishes that defense counsel were not reasonably prepared.  Its contents are not re-hashed in this memorandum, but instead are emphasized in some places.

whether the attorney's preparation was deficient under the *Strickland* standard. *See Crandell v. Bunnell*, 144 F.3d 1213, 1216 (9th Cir. 1998) (when addressing such a claim, a "district court [should use] the first prong of the ineffective assistance of counsel standard in *Strickland*"). In post-trial proceedings, Mr. Weingarten tried to raise an ineffectiveness/lack of preparation claim and the Court indicated that it should be raised in a later §2255 motion. *See* 5/8/09 Order at 1 ("the claim that counsel rendered ineffective assistance to the defendant prior to trial is not addressed here, and it may be asserted again in a collateral challenge pursuant to 28 U.S.C. §2255"). The primary reason that such claims generally must be brought in §2255 proceedings, and may not be raised on direct appeal, is that their resolution often relies on introduction of new evidence. *See, e.g., Massaro v. United States*, 538 U.S. 500, 504 (2003). Consistent with that principle, the Court declined to address the issue earlier, and ordered that it be raised in §2255 proceedings. Mr. Weingarten is now doing that, and is relying on a wealth of new evidence. It is clear, therefore, that this claim has not been litigated previously, and is not barred.

The government also emphasizes that in denying Mr. Weingarten's post-trial motions, the Court found that Mr. Rhodes and Mr. Stutman were prepared for trial. That finding was based in large part on the attorneys' telling the Court that they were prepared. *See* 5/8/09 Order at 16-17. Based on the evidence now before the Court, it is apparent that was not true. Indeed, in their recent declarations the attorneys admit that they were not prepared, and offer unreasonable excuses for that.

### B.    The Government's Argument That Defense Counsel Were Prepared

As mentioned, the government's claim that defense counsel were prepared for trial relies on the attorneys' declarations. But as discussed in detail in attorney David Kirby's declaration (exhibit 4), Mr. Rhodes's and Mr. Stutman's declarations show that they were *not* adequately prepared for trial, and their excuses for that are unreasonable. Undoubtedly because of this, the government's

memorandum mostly ignores the specifics of what the attorneys failed to do.  Instead, the government makes the general claim that the attorneys' "investigative trails continued to be frozen by the Satmar community," and they "followed as many leads as they could feasibly tackle and stopped pursuing certain lines of investigation when it was reasonable to do so."  12/18/14 Gov't Memo. at 45-46.  But the attorneys' declarations don't identify any "frozen trails," nor "multiple leads" that they followed.  Instead, they admit that no investigator was hired, almost no one was interviewed, none of the alleged crime scenes were visited, and no experts were consulted.  For all of this, the attorneys blame:  (1) lack of money; and (2) Mr. Weingarten's supporters for not doing the attorneys' jobs, and for dictating the scope and nature of the investigation.  That is not a reasonable basis to fail to investigate.  *See* 1/19/15 Kirby Dec. at ¶¶16-19, 39-43, 62 (Exhibit 4).

Considering what the declarations say, it is surprising that the government writes that defense counsel made a "studied decision not to scour the globe," because the "time it would take to travel between three continents and several countries outweighed the potential benefit, especially in light of the lack of funding and cooperation they received."  12/18/14 Gov't Memo. at 45.  As an initial matter, the government, like defense counsel, mistakenly relies on a lack of funding and cooperation from third parties as a valid excuse for the attorneys' failure to investigate.  *See* 1/19/15 Kirby Dec. at ¶39.  Even setting that aside, defense counsel did not "make a studied decision not to scour the globe."  Their failure to go to, much less scour, the Brooklyn apartment is more aptly described as indolence than as a "studied decision."

Without any good excuse for the obvious things that defense counsel failed to do, the government seeks refuge in what the attorneys supposedly did.  Specifically, the government says that counsel made an "objectively reasonable" decision to forego any investigation and focus on "a trial strategy of attacking the credibility of the Government's key witnesses."  12/18/14 Gov't

18

Memo. at 46.  This makes no sense, because the investigation would have provided a wealth of evidence useful for "attacking the credibility of the Government's witnesses."  Moreover, it is not reasonable for attorneys to decide to forego basic investigative steps because they think they will do a great job cross examining the government's witnesses.  Finally, the government's argument relies on the attorneys' claims that they were prepared to cross examine the government's witnesses "based on the extensive records [they] reviewed."  *Id.*  at 44 (quoting Stutman declaration).  To support this claim, the government quotes from Mr. Rhodes's 2014 declaration, in which he says:

> I located discrepancies between the victim and her mother and outlined them, read everything we had from the Family Court proceedings and made notes of items I thought could be used on cross-examination of every expected witness, outlined a summation, [and] reviewed the 3500 materials and cross-referenced them to the cross-examination notes, with color highlighting and with color-coordinated tabulations . . . .

*Id.* at 45 (quoting 11/20/14 Rhodes Dec. at 4).  Had Mr. Rhodes or Mr. Stutman prepared in the manner stated, they would have some sort of documentary corroboration.  They claim they do not because they gave everything to Mr. Weingarten or his successor counsel.  *See, e.g.*, 11/24/14 Rhodes Dec. at 26; 9/29/14 Rhodes Letter (Exhibit 5).  None of those people received the materials described, or anything like them.  Which leaves the Court with having to iron out this dispute.

Fortunately, common sense goes a long way here.  Any sentient attorney who was discharged under the circumstances involved in this case would know to a near certainty that he would later be required to defend his trial preparation.  No such attorney would give away every shred of evidence that would enable him to do so, while making nary a copy.  But that is what Mr. Rhodes and Mr. Stutman claim to have done.  Indeed, they claim that they do not even have any electronic files relating to this matter, which means they either:  (1) did all of their trial preparation by hand; or (2) they went out of their way to destroy electronic files.  The first is very hard to believe, the second

19

is more likely and invites a strong adverse inference.  *See, e.g., Welsh v. United States*, 844 F.2d
1239, 1246 (6th Cir. 1988) ("some kind of adverse inference should flow from the fact of destruction
of evidence").

In short, the evidence before the Court, and the inference raised based on Mr. Rhodes's and
Mr. Stutman's claims to have disposed of relevant evidence, establishes that they were not prepared
for trial, and their excuses for that are unreasonable.

### C.     The Government's Prejudice Argument

As Mr. Weingarten stated in his initial §2255 memorandum, prejudice is presumed for this
claim.  *See* 9/30/14 Weingarten Memo. at 17, 89, 94.  The government does not address that point.

Instead, the government says that Mr. Weingarten was not prejudiced because the evidence
that defense counsel failed to obtain through a common sense investigation "would [not] have been
admissible at trial," and, even if some of it were admissible, it could only "have been used to
challenge certain peripheral details of the victim's testimony . . . ."  12/18/14 Gov't Memo. at 48-49.
It is sufficient to say that the Second Circuit has a decidedly different view.  *See, e,g, Pavel v.
Hollins*, 261 F.3d 210, 218, 220-21 (2d Cir. 2001);  *Linstadt v. Keane*, 239 F.3d 191, 200, 203, 205
(2d Cir. 2001).

### IV.    Relief Is Also Warranted If The Court Applies A Traditional Ineffective Assistance Of Counsel Test

As discussed in Mr. Weingarten's initial §2255 memorandum, relief is still warranted if the
Court applies a traditional ineffective assistance of counsel test, rather than a constitutionally
offensive choice test.  Either way, the deficient performance analysis is the same, and hinges on
counsel's lack of preparation.  The only difference is with respect to whether a showing of prejudice
is required.  As Mr. Weingarten stated in his initial memorandum:

> [E]ven if that is assessed by looking only at what counsel did up until Mr. Weingarten began representing himself, prejudice is overwhelmingly evident. Put succinctly, there were no witnesses scheduled to come (or under subpoena), no witness files to use, and no exhibits prepared to be introduced. . . . Mr. Weingarten effectively stepped into the inept shoes cobbled by his unprepared counsel. Had counsel actually prepared, Mr. Weingarten could have presented a wealth of evidence to support his defense. And there was so much good evidence available that, even if it had been clumsily presented, there is a reasonable probability that Mr. Weingarten would have been acquitted.

9/30/14 Weingarten Memo. at 94-95. As discussed in the preceding section of this memorandum, the government's response with respect to prejudice is unconvincing.

## V.   Irreconcilable Conflict And Breakdown In Attorney-Client Relationship

In his initial memorandum, Mr. Weingarten argued that there was a breakdown in the attorney-client relationship, and a conflict of interest, thus defense counsel should have sought to withdraw. In response, the government says that "[i]f there was an irreconcilable breakdown in the attorney-client relationship, Mr. Rhodes and Mr. Stutman were certainly not aware of it," because Mr. Weingarten "verbalized nothing . . . about the distress he claims." 12/18/14 Gov't Memo. at 50.

There are key disputed facts with respect to this issue. But there are many undisputed facts that make the government's (and Mr. Rhodes's and Mr. Stutman's) assertion hard to accept. Among those undisputed facts are the following.

1. In a November 27, 2008 letter to Mr. Weingarten (filed with item 47 on the criminal docket), Mr. Rhodes acknowledged that their "last session [was] a bit harsh."

2. In a December 7, 2008 letter to the Court (item 22 on the criminal docket), Mr. Rhodes denigrated Mr. Weingarten and revealed client confidences. As the Court will recall, this letter related to Mr. Rhodes's filing of a new, signed declaration from Mr. Weingarten to support defense pre-trial motions. In addressing this letter in his initial §2255 memorandum, Mr. Weingarten

21

explained why Mr. Rhodes's complaints in that letter were unnecessarily harsh and unfair.  *See* 9/30/14 Weingarten Memo. at 29-32.  The government responds by framing Mr. Weingarten's treatment of this subject as an independent claim of ineffectiveness, and then says that Mr. Weingarten "attacks" Mr. Rhodes's pretrial motions "down to the letter."  12/18/14 Gov't Memo. at 40.  That is not correct, and the government misses the point.  The point is that the letter was unseemly and unfair, which is why it harmed the attorney-client relationship.

In his November 2014 declaration, Mr. Rhodes also missed this point.  There, Mr. Rhodes wrote that Mr. Weingarten "argues that I had an irreconcilable conflict of interest because I made him sign a false affidavit in support of our omnibus motions."  11/20/14 Rhodes Dec. at 17.  Later in his declaration, Mr. Rhodes justified his December 7 letter as merely "apologizing to the Court for having to file a replacement affidavit."  *Id.* at 21.  The letter did much more than apologize to the Court, and any reasonable attorney would know that sending it to the Court, and filing it publicly, would badly damage the attorney-client relationship.  *See* 1/19/15 Kirby Dec. at ¶60 (Exhibit 4).

3.  At the December 12, 2008 hearing, Mr. Stutman told the Court (through its clerk) that he and Mr. Rhodes wanted to be relieved, then changed his mind for unstated reasons.  *See* 12/12/08 RT at 3-4.

4.  In many hearings, Mr. Weingarten complained that his counsel were not prepared, and they repeatedly demonstrated, and even admitted, that they were not prepared.

5.  Following the worsening of his relations with counsel, Mr. Weingarten met with several other lawyers in an effort to replace defense counsel.

22

6.  In a January 11, 2009 letter to Mr. Weingarten (exhibit 6), Mr. Rhodes acknowledged that Mr. Weingarten had complaints and that he might soon be removed from "the defense team."[9]

7.  In a January 26, 2009 email to Mr. Blum, Mr. Rhodes wrote that Mr. Weingarten was "unhappy that the bail situation has not gone forward, that the witnesses have not been produced or located or interviewed, and about 100 other things.  So he has questions and problems about everything and with everyone, me included."  1/26/09 Rhodes Email (Exhibit 15, and previously filed as item 76-2 on the criminal docket).  In the email Mr. Rhodes also complained about not being paid, and seemed to suggest that because of that he would not do needed motion work.  *See id.*

8.  In a February 8, 2009 letter to Menachem Blum (exhibit 7), Mr. Rhodes wrote that Mr. Weingarten had "threatened" to hire new attorneys, and acknowledged that he and Mr. Stutman had been "crying about being cheated . . . ."

9.  In a February 23, 2009 letter to the Court (item 47 on the criminal docket), Mr. Rhodes again denigrated Mr. Weingarten and revealed client confidences.

10.  And, of course, there is defense counsel's admitted failure to investigate the case, a failure they blame on others.

While Mr. Rhodes and Mr. Stutman may not have been able to perceive a breakdown in the attorney-client relationship, under the circumstances any reasonable attorney would expect, and perceive, nothing less.  Perhaps the attorneys' inability to recognize the breakdown is connected to their failure to understand their professional responsibilities and the importance of doing an

---

[9]  The attached copy of this letter is not signed and is not on Mr. Rhodes's letterhead. Mr. Rhodes gave that document to Mr. Blum.  Mr. Weingarten does not recall ever receiving an identical, signed letter.  Nevertheless, the letter evidences Mr. Rhodes's knowledge of problems in the relationship.

investigation.  Whatever the cause, the attorneys' willingness to soldier on, in the midst of such a troubled relationship, was, at best, misguided.

The government also claims that there must not have been a breakdown in the relationship, because Mr. Weingarten asked that he be allowed to confer with the attorneys during his trial. *See* 12/18/14 Gov't Memo. at 51.  That a man in Mr. Weingarten's situation might want some assistance from the attorneys does not establish a healthy attorney-client relationship.  Far more telling is the fact that Mr. Weingarten repeatedly rejected the attorneys' assistance during the trial. *See* 11/20/14 Rhodes Dec. at 24; 4/23/09 Rhodes Dec. at 12.

## VI.   Rhodes And Stutman Declarations

It does not seem worthwhile to list all of the disputes between (1) Mr. Rhodes and Mr. Stutman's declarations versus (2) the many declarations and other evidence submitted by Mr. Weingarten.  Presumably those disputes will be addressed, if necessary, through an evidentiary hearing.  And while it is tempting to respond to the many portions of Mr. Rhodes's November 2014 declaration that misconstrue Mr. Weingarten's arguments (or worse), that also does not seem like it would be especially useful for the Court.[10]  Nevertheless, there are some points in the attorneys' declarations that warrant a response, and those are addressed here.

### A.   Mr. Stutman's Puffing And The *Canales* Case

In his November 2014 declaration, Mr. Stutman wrote that he had recently been hired by Mr. Weingarten's "insular community" to represent a witness in an investigation, a claim that undersigned counsel have been unable to verify. *See* 11/21/14 Stutman Dec. at 4.  Regardless, the

---

[10]  One example is Mr. Rhodes's characterization of his many factual misstatements during the proceedings as amounting to "minor inconsistencies and rhetorical flourishes," which he excuses by saying that "perhaps [he] erred [because he] knew of other allegations" of abuse. 11/20/14 Rhodes Dec. at 19.  This sort of nonsensical statement, and gratuitous attack, provides strong support for Mr. Weingarten's motion to strike the attorneys' declarations.

claim is not relevant, except that it seems to confirm Mr. Stutman's misguided view that his client in Mr. Weingarten's case was the Satmar community (*i.e.*, the people who were paying, nor not paying, him). *See* 1/19/15 Kirby Dec. at ¶¶16-19 (exhibit 4). Mr. Stutman also boasts about a recent not guilty verdict in a case he tried. *See* 11/21/14 Stutman Dec. at 3. Far more relevant to this case is Mr. Stutman's performance in *People v. Canales*, N.Y. Sup. Ct., Kings County, Case No. 8406/07.

Mr. Canales was convicted of murder and possession of a firearm, and he moved to vacate those convictions based on Mr. Stutman's wide-ranging ineffectiveness. *See* 11/4/11 Order at 1 (Exhibit 8). Among other things, that motion was based on Mr. Stutman having failed to: (1) hire an investigator; (2) hire experts; (3) interview witnesses at the crime scene; (4) interview government witnesses; or (5) interview witnesses identified by the defendant. *See* Cooper Affirmation at ¶ 3 (Exhibit 9).

The trial court found ineffectiveness, and the most disturbing failure it pointed to was Mr. Stutman's incorrectly conceding to the jury that a video played at trial showed his client chasing the murder victim. *See* 11/4/11 Order at 30-31 (Exhibit 8). That was a big blunder, considering that it was obvious that the person being chased and the murder victim wore noticeably different clothing. *See id.* at 18-21. When questioned about this at a post-trial evidentiary hearing, Mr. Stutman claimed that he could not recall what he was thinking. *See id.* at 18. He probably wasn't doing much thinking, and he certainly wasn't doing much acting, as evidenced by the trial court's findings that he failed to: (1) allow his client to view the relevant video; (2) discuss the video with his client; (3) interview witnesses at the crime scene; and (4) interview witnesses identified by his client, who could support that Mr. Canales and the murder victim were friends. *Id.* at 18-20. As in this case, Mr. Stutman blamed his failures on his client, claiming that Mr. Canales did not give him the names of any people that were on the street at the time of the murder.

Mr. Canales disputed that assertion.  The trial court rejected Mr. Stutman's claim, noting that, if nothing else, Mr. Stutman could have learned some of those names from discovery produced by the State, and learned other names by straightforward investigation.  *See id.* at 18, 20.  Furthermore, there was evidence that witnesses attempted to contact Mr. Stutman, but he never returned their phone calls.  *See* 1/13/11 Canales Aff. (Exhibit 10).

Not surprisingly, the trial court found Mr. Stutman to be incredible.  One point in this context bears emphasizing.  Mr. Stutman's failure to review the key video with his client was, if true, professionally damning.  Mr. Stutman claimed that he did review the video with Mr. Canales, in a private meeting they had in the courtroom.  The trial court rejected that claim, noting that there would be a record of any such event, and there was not.  *See* 11/4/11 Order at 18 (Exhibit 8).  The trial court also questioned Mr. Stutman's repeated claims that he could not recall important facts.  It found those claims to be surprising, because it thought that the case would leave a lasting impression on Mr. Stutman.  After all, the court wondered, how often had one of Mr. Stutman's clients stood up after closing arguments and told the court that his attorney got the facts all wrong and misstated key evidence?  *See id.* at 31-32.

The trial court vacated Mr. Canales's murder conviction, but let the firearm conviction stand.  The State appealed.  In a published opinion, the Appellate Division of the Supreme Court affirmed the trial court's vacating of the murder conviction, and went a step further, vacating the firearm conviction.  *See People v. Canales*, 110 A.D. 3d 731, 734 (N.Y. 2013) (Exhibit 11).  It found that "the litany of failures by [Mr. Stutman] documented by the [trial court] established that the defendant was denied 'meaningful representation' by his trial attorney."  *Id.* at 734.

Mr. Stutman's wholesale failure to do his job in this case is on par with *Canales*.  The difference here is that Mr. Weingarten pulled the plug before trial, rather than waiting for the

Stuman debacle during trial.  Notably, both cases were litigated in the same time frame.  This sort of complete professional collapse often flows from a personal issue in the attorney's life.  Perhaps that was the case here, though it doesn't really matter.

### B.    Failure To Locate And Interview Witnesses

In reviewing the attorneys' declarations, it is hard to get a hold on what they claim with respect to their inability to find and interview witnesses.  One reason is the lack of key details in their declarations.  Another reason is that there are contradictions in the declarations.  For example, in Mr. Rhodes's 2014 declaration alone, he said that Mr. Weingarten:  (1) "was not forthcoming with the names of particular witnesses;" (2) provided names of witnesses, but those were only character witnesses, and Mr. Weingarten purportedly did not want character witnesses to be called; (3) provided the names of witnesses, including in Belgium, but only "just before trial started;" and (4) "told [Mr. Rhodes]  of some witnesses, who may have been named, but for whom we received no telephone numbers or addresses."  11/20/14 Rhodes Dec. at 6, 8-9, 15; *see also* 4/23/09 Rhodes Dec. at 2 (indicating that Mr. Rhodes knew the name of the family's maid from their time in Belgium, who was a very important witness); 11/20/14 Rhodes Dec. at 10 (indicating that Mr. Rhodes knew the name of one of Frieme Leaieh Weingarten's friends, who could have been an important witness).

Whatever the attorneys claim now, at the February 6, 2009 hearing they told the Court that they could not be ready for trial, in large part because there were several witnesses that they needed to bring from Europe.  *See* 9/30/14 Weingarten Memo. at 43-46.  This was not some minor point at the hearing; instead, the attorneys beseeched the Court for a trial continuance based on their need to bring those witnesses for trial.  For the attorneys to now claim (or imply, because it is not really clear what they claim) that they knew of no such witnesses is to tell the Court that they misled it

27

repeatedly, and with vigor, during the February 6 hearing.  To this, Mr. Rhodes says, "The answer lies in our desire to please the petitioner and in the inability to prepare anything that involved lost tape recordings or obtaining witnesses who had yet to be identified."  11/20/14 Rhodes Dec. at 15. This amounts to saying that (1) the attorneys misled the Court, and (2) they were not prepared for trial.  Neither helps the government.

While there are many fact disputes in this context, a dose of common sense is again useful. Within a few weeks after trial, attorney Demonsthenes Lorandos obtained declarations from over a dozen key witnesses in Europe, many of whom are the same people identified in Mr. Weingarten's §2255 memorandum.  Not only was this easy for Mr. Lorandos to do, it was easy for attorney Richard Lipsman, who did much of the investigation in preparation for filing the §2255 motion.[11] *See* 1/22/15 Lipsman Dec. (Exhibit 12); 9/28/14 Lorandos Dec. at ¶¶33-34 ("in a short period of time" "I was able to speak with and obtain letters from a large number of witnesses" who "were readily available  and willing to speak with me") (Exhibit 42 to Mr. Weingarten's initial §2255 memorandum).  Had Mr. Rhodes and Mr. Stutman made any effort, they could have accomplished the same.

There is another point that bears making with respect to the attorneys' failure to talk with witnesses, and their failure to even send an investigator to do so.  In his November 2014 declaration, when discussing his handling of the government's request to take foreign depositions, Mr. Rhodes claimed that Mr. Weingarten "did not say, he did not even hint, that the proposed witnesses in the Rule 15 motion had exculpatory information."  11/20/14 Rhodes Dec. at 13.  Mr. Weingarten did more than hint, he said during the December 15, 2008 hearing that he "would be happy" to have

---

[11] Mr. Lipsman's declaration is especially noteworthy with respect to the fact that it was so easy to find witnesses and evidence, if only the attorneys would try.  Why they would not is unclear, but it seems likely that it had to do with money.

those witnesses brought to the United States for trial.  12/15/08 RT at 32.  Mr. Rhodes skipped that

hearing, even though he was responsible for handling the motions.

### C.      Failure To Visit Alleged Crime Scenes

To excuse defense counsel's failure visit (or at least have an investigator visit) the Brooklyn

and Belgium apartments central to this case, and photograph and diagram those scenes, Mr. Rhodes

stated that "[w]e anticipated government charts and photographs of the apartments."  11/20/14

Rhodes Dec. at 8.  It is not clear what Mr. Rhodes based that expectation on, but the government's

discovery, memorialized in filed letters to the Court, did not raise any such expectation, and the

government did not introduce "charts and photographs" of either apartment.  The only thing of this

sort that was introduced at trial was a hand-drawn diagram made by Frieme Leiaeh Weingarten,

which Mr. Stutman objected to because it was not-to-scale, but then withdrew the objection.  *See*

RT at 241-42.  As a result, when Mr. Weingarten tried to rebut the accuracy of Frieme Leaieh's

diagram and characterizations of the apartment during her cross-examination, he had no objective

evidence on which to rely.  *See, e.g.,* RT at 457, 469.

### D.      Failure To Prepare Tape Recordings For Trial

In his 2014 declaration, Mr. Rhodes admits that defense counsel delegated to others the job

of translating and transcribing important tape recordings, instead of taking control of the project

themselves.  *See* 11/20/14 Rhodes Dec. at 7.  A February 8, 2009 letter from Mr. Rhodes to

Menachem Blum (exhibit 7) confirms that is what happened.

### E.      Failure To Hire Expert Regarding Mr. Weingarten's Physical Characteristics

In his April 2009 declaration, Mr. Rhodes wrote that he wanted to hire a urologist to testify

regarding deformities to Mr. Weingarten's penis.  He claimed that Mr. Weingarten's supporters

"said there was money for the hiring of a medical expert, but no funds were provided for that

29

purpose." 4/23/09 Rhodes Dec. at 4.  Mr. Rhodes seemed to be indicating that a urologist was not hired because funds were not provided by Mr. Weingarten's supporters.

Now, in his 2014 declaration, Mr. Rhodes says that a urologist was not hired "because of petitioner's rejection of every urologist."  11/20/14 Rhodes Dec. at 12.  There is no evidence that Mr. Weingarten rejected any urologist.  There is, however, evidence, in addition to what Mr. Rhodes said in his 2009 declaration, that shows that defense counsel did not hire a urologist because Mr. Weingarten's supporters did not pay for one.

First, in a February 8, 2009 letter (exhibit 7), Mr. Rhodes delegated to Mr. Blum the responsibility of finding, and paying, a urologist, stating, "I cannot make these arrangements; I am not being paid for my own work, and certainly not in a position to hire an expert.  You and perhaps John Middleton have knowledge of the money sources and how to tap them."

Second, in a February 15, 2009 email (exhibit 13), Mr. Rhodes wrote to Mr. Blum that he had found two urologists, who were available at "potentially huge expense," but he wrote that he and Mr. Stutman would not pay to retain them.

### F. Claims That Mr. Weingarten Did Not Complain About Attorney Preparedness Until The "Eve Of Trial"

In his November 2014 declaration, Mr. Rhodes wrote that Mr. Weingarten "claimed that [defense counsel] were unprepared only as the March trial date neared," and Mr. Rhodes said that it was his "distinct recollection" that the reason these complaints came at all was so they "could be used as a delaying tactic."  11/20/14 Rhodes Dec. at 13-14; *see also* 4/23/09 Rhodes Dec. at 4 ("The defendant expressed no dissatisfaction with me or with Mr. Stutman as his lawyers until the eve of trial").  Mr. Rhodes's recollection is not consistent with the record.

30

As early as December 15, 2008, Mr. Weingarten told the Court that his attorneys failed to understand important facts and that they could not be ready for trial by March 2, 2009. *See* 12/15/08 RT at 41-42. Mr. Rhodes skipped that hearing.

In a January 11, 2009 letter to Mr. Weingarten (exhibit 6), Mr. Rhodes recognized that his "status as [Mr. Weingarten's] attorney [was] in question," but asserted that "all of [his] complaints [could be] so easily remedied."[12]

As discussed above, in a January 26, 2009 email to Mr. Blum, Mr. Rhodes wrote that0 Mr. Weingarten was "unhappy that the bail situation has not gone forward, that the witnesses have not been produced or located or interviewed, and about 100 other things. So he has questions and problems about everything and with everyone, me included."[13]  1/26/09 Rhodes Email (Exhibit 15, and previously filed as item 76-2 on the criminal docket).

And in a February 8, 2009 letter to Mr. Blum (exhibit 7), Mr. Rhodes referred to the fact that Mr. Weingarten had "threatened" to "bring[] in new attorneys."

Moreover, both attorneys acknowledge that Mr. Weingarten interviewed other attorneys during the period of their representation. *See* 11/20/14 Rhodes Dec. at 13; 4/24/09 Stutman Dec. at 3. This hardly evidences a positive relationship until "the eve of trial."

Notably, in the context of claiming that Mr. Weingarten did not have any complaints about defense counsel until just before trial, Mr. Rhodes's declaration says, "It was the petitioner's initial

---

[12]  As mentioned above, this letter, which is un-signed and not on letterhead, was given to Mr. Blum by Mr. Rhodes. While Mr. Weingarten does not recall receiving the letter, it nonetheless evidences Mr. Rhodes's knowledge that Mr. Weingarten had complaints long before "the eve of trial."

[13]  This email, among *many* other things, calls into question Mr. Rhodes's claim that Mr. Weingarten did not give him witness names, or did so late in the game – had Mr. Weingarten not done so, why would he be complaining about the attorneys' failure to talk to those witnesses?

belief that the trial would never occur.  He thought the case would be dismissed as a consequence

of the pretrial motions."  11/20/14 Rhodes Dec. at 14.  Mr. Weingarten hardly had such confidence.

But if he did, that might have been caused by Mr. Rhodes's cocksure attitude, reflected in his

January 11, 2009 letter (exhibit 6):

> As you can see from the enclosure, we have received a response to our pre-trial
> motions.  Extremely good thinking by me uncovered the one major defect in this
> case: the failure to properly instruct the grand jury on the elements of the offenses
> with which you have been charged.  There are other problems with the prosecution,
> but one way or another they will ultimately be overcome.  The grand jury error can
> be parried by the prosecutors but with some more good legal work and writing by us
> it will be a thrust into the heart.

Considering the rest of the letter, a fair reading is that Mr. Rhodes was well aware that

Mr. Weingarten was upset with him, and he wrote this letter to make it seem as if he was doing a

great job.  While Mr. Weingarten does not recall receiving this letter, Mr. Rhodes gave an unsigned

copy to Mr. Blum.  Perhaps Mr. Rhodes wrote the letter to prime the Satmar community funding

pump.

### G.     Failure To Interview Witnesses With Respect To Family Court Proceedings

In his initial §2255 memorandum, Mr. Weingarten pointed out that defense counsel made

no effort to track down any of the witnesses who could have provided compelling testimony about

the Weingarten family court proceedings and related CPS investigations.  In response to this,

Mr. Rhodes's 2014 declaration implies that he and Mr. Stutman were afraid to contact those

witnesses, stating:  "We were also told that Rockland County was 'hostile' country, because

someone there was the 'sheriff' and actively working for years to bring the petitioner to justice.

Both Mr. Stutman and I were advised by Mendel Blum and others to be 'extra careful' about going

there lest we ourselves be falsely accused."  11/20/14 Rhodes Dec. at 19.  This is not a valid reason

to fail to find, interview, and prepare for trial witnesses who could have badly undercut Feige and

Frieme Leaieh Weingarten's claims, and cast the case in a very different light.  *See* 1/19/15 Kirby Dec. at ¶43 (Exhibit 4).

### H.     Mr. Rhodes's New Claim That Mr. Weingarten Wanted To Represent Himself So He Could Affect Feige, Frieme Leaieh, And Yoinesun Weingarten

In his 2009 declaration, Mr. Rhodes said that he thought that Mr. Weingarten chose to represent himself because "he believed and believes that he knows best, that he knows all, that everyone else is ignorant, and [he] told me and Alan Stutman that he felt wonderful after he decided to go pro se and had gained complete control of the case."  4/23/09 Rhodes Dec. at 1.

Mr. Stutman also offered his assessment in this regard in his 2009 declaration, stating that Mr. Weingarten "insisted that only he knew that the facts of the case intimately, and since he had been previously successful in a Rabbinical Court,[14] he felt confident that he would do a better job defending himself than could his attorneys."  4/24/09 Stutman Dec. at 4.

Now, in his 2014 declaration, Mr. Rhodes has offered something new, stating that Mr. Weingarten "verbalized that he wanted to challenge his relatives face-to-face, in the mistaken belief that they would not testify against him if he himself were the examiner."  11/20/14 Rhodes Dec. at 14.  Had Mr. Weingarten actually said such a thing, Mr. Rhodes or Mr. Stutman would have mentioned it in their less-than-reserved 2009 declarations.  And there is even more compelling evidence that Mr. Rhodes's new claim is not true.

On September 19, 2014, attorney Jodi Thorp had a lengthy, wide-ranging conversation with Mr. Rhodes.  During that conversation, Mr. Rhodes said that he had come to agree with the theory (indicated in the Court's May 8, 2009 order) that perhaps Mr. Weingarten wanted to represent himself in the hope that he could exercise some influence over Feige, Frieme Leaieh, and Yoinesun

---

[14] This claim does not make sense because Mr. Weingarten was represented by counsel in rabbinical court.  *See* 9/22/14 Weingarten Dec. at ¶4(a) (Exhibit 1 to initial §2255 memorandum).

Weingarten during cross examination.  *See* 5/8/09 Order at 21 ("I now believe the main argument I was using to dissuade him from representing himself was the most likely reason he was going to represent himself no matter what I said").[15]  Mr. Rhodes did not say to Ms. Thorp, however, that Mr. Weingarten ever said that he wished to represent himself so he could affect his family members during cross examination, or because he thought that they would not testify against him if he were acting as his own counsel.  Now, with his indignation peaked by having read Mr. Weingarten's §2255 memorandum, Mr. Rhodes claims to have a new recollection.  That cannot be credited, and it is not correct.

**VII.    Conclusion**

As indicated, Mr. Weingarten believes that the Court may grant relief on all three claims addressed above without holding an evidentiary hearing, based on the undisputed facts and what Mr. Rhodes and Mr. Stutman have admitted in their declarations.  However, should the Court decline to do that, or to grant relief on one of the other claims raised in Mr. Weingarten's §2255 motion, Mr. Weingarten believes an evidentiary hearing is necessary.

Before proceeding with an evidentiary hearing on the issues discussed above, however, he requests that the Court permit the following discovery, for which there is "good cause."  Rule 6(a),

---

[15]  Undersigned counsel respectfully submit that the Court's belief is contrary to the record, because, for example, Mr. Weingarten repeatedly asked the Court for more time to hire new counsel, and he asked that Mr. Lorandos be permitted to cross examine Frieme Leaieh.  But whatever the Court concludes in this regard, such a finding cannot excuse defense counsel's failures, for two obvious reasons.  First, a defendant has a right to have prepared counsel, and the Supreme Court has never suggested that when a defendant says he wants to exercise that right, a court may nonetheless find the right waived based on its belief that the defendant does not truly want to exercise that right.  That would be a strange new twist on what is required for an effective waiver.  Second, if counsel had done their jobs pre-trial, Mr. Weingarten would have been in a position to present a much more compelling defense than he did.  Put differently, whatever the Court concludes about Mr. Weingarten's true, as compared to stated, desires, he was prejudiced by counsel's lack of preparation.

34

Rules Gov. §2255 Proc.; *Harris v. Nelson*, 394 U.S. 286, 300 (1969) ( good cause is shown "where specific allegations before the court show reason to believe that the petitioner may, if the facts are fully developed, be able to demonstrate that he is confined illegally and is therefore entitled to relief").

 1. He requests to be able to subpoena the email providers for Mr. Rhodes, Mr. Stutman, Mr. Blum, and John Middleton, for copies of all emails sent or received between October 2009 to present, which relate to the subject matter of this case.  There is good cause for such discovery because an obvious issue for the evidentiary hearing is what the attorneys were told and knew with respect to potential witnesses.   Mr. Blum was the attorneys' primary contact amongst Mr. Weingarten's supporters, he communicated with the attorneys about witnesses via emails, and Mr. Middleton was regularly copied on those emails.  *See, e.g.*, 1/31/09 Email from Blum to Rhodes, Stutman, and Middleton (indicating that Mr. Blum was coordinating witness calls for the following Monday, and he would provide a summary of what information they could provide) (Exhibit 16 hereto, and previously filed as item 76-3 on the criminal docket).  Moreover, Mr. Middleton was a frequent intermediary between Mr. Blum (and other Weingarten supporters) and the attorneys.

 2. He requests that the Court order Mr. Rhodes and Mr. Stutman to turn over to Mr. Weingarten's present counsel any documents (including electronic documents) and materials (including recordings, correspondence, and calendar entries) that are in their custody and control and that relate to this case in any way.  There is good cause for such discovery because it will reveal the attorneys' preparation, or lack thereof.  Moreover, any such materials should have been turned over long ago because, under the New York Rules of Professional Conduct, Mr. Weingarten has a right to his file materials.

3.  He requests that the Court order the government to turn over to Mr. Weingarten's present counsel any correspondence, including electronic correspondence, between or amongst the government, Mr. Rhodes, and Mr. Stutman.  He also requests that the government turn over copies of any discovery that Mr. Rhodes or Mr. Stutman provided to the government.  There is good cause for this discovery because it will evidence the attorneys' preparation, or lack thereof.

4.  He requests that he be permitted to subpoena from the Metropolitan Correctional Center copies of recordings of all of his telephone calls and all visiting records relating to him (for social and attorney visits).  There is good cause for this discovery because it will show, among other things, Mr. Weingarten's state of mind and repeated complaints with respect to defense counsel, and will evidence when, and the amount of time, that defense counsel met with Mr. Weingarten.

## GOVERNMENT MISCONDUCT

### I.    Introduction

Mr. Weingarten has raised two claims of government misconduct, with related *Brady* claims for both.   He first addresses the government's arguments in each context, then responds to its procedural default argument.

### II.    Misconduct With Respect To Repentance Letter

With respect to the government's introduction into evidence of the repentance letter, Mr. Weingarten's primary claim is that the government knew, or had strong reasons to know, that he did not write that letter, and thus it was improper to try to raise the contrary inference with the jury.   Mr. Weingarten's secondary claim is that if the government withheld material or information indicating that Mr. Weingarten did not write the letter, that amounts to a *Brady* violation.

The government relegates to a footnote its treatment of the primary claim, and does not dispute the key facts.   Specifically, the government does not dispute that it introduced the letter with the intent that the jurors infer that it amounted to Mr. Weingarten's confession to the criminal acts alleged during the trial.   The government also does not dispute that so read, the letter would ensure Mr. Weingarten's conviction.   And the government does not dispute the following portion of Mr. Weingarten's September 22, 2014 declaration:

> While I was in court, the prosecutor asked me if I recognized the handwriting on the letter that was later introduced as Exhibit 4a.   I said yes, it was my son Yoil's handwriting.   I asked the prosecutor where the second page of the letter was, and she shrugged, as if she did not know the answer.   The prosecutor asked if the translation of the letter that she had was accurate, and I responded that generally it was.   I asked the prosecutor why she was going to introduce the letter, and she shrugged again, as if she did not know.

9/22/14 Weingarten Dec. at ¶4(d).[16]  That exchange occurred on March 4, 2009, when the prosecutor asked Mr. Weingarten to stipulate to the accuracy of the translation of the letter.  *See* Trial Exh. 8 (Exhibit 14 hereto).  The government introduced the letter five days later, on March 9, 2009.  *See* RT at 853.

Given the undisputed facts, it is surprising that the government claims that before it introduced the letter, it did not have any reason to know that Mr. Weingarten did not write it.  *See* 12/18/14 Gov't Memo. at 58 n.5.  The government just ignores that five days before the government introduced the letter, Mr. Weingarten told one of the prosecutors that Yoil wrote it.  Then the government justifies its actions by saying that it "introduced the letter as a paper found on the defendant at the time of his arrest."  *See id.*; *see also id.* at 55 (claiming the letter was in Mr. Weingarten's "pocket at his arrest").  Before considering this statement, it is useful to clarify the circumstances under which the letter was seized.

Mr. Weingarten was arrested at home, early in the morning, and he was in his pajamas.  The arresting agents took him out to one of their cars, and then later took a jacket and pants from his home.  *See* RT at 851.  Just prior to Mr. Weingarten's appearing in court, one of the FBI agents gave him the jacket and pants.  *See* RT at 851-52.  Before doing so, however, the agent checked the jacket's pockets, which is where he said he found the "piece of paper" that the government introduced at trial.  *See* RT at 852.  Thus, stating that the letter was "found on the defendant at the time of his arrest," and that it was introduced as such, is not exactly accurate.

---

[16]  The government sort-of disputes Yoil Weingarten's sworn statement that he wrote the letter, saying that Yoil's declaration "carries little credible weight."  12/18/14 Gov't Memo. at 58 n.5.  It carries more weight than the nothing that the government has submitted to rebut it.  And if Mr. Weingarten had written the letter, the government would be able to prove it quite easily.

38

What the government is left with is claiming that the prosecutors believed that it was appropriate to introduce this explosive piece of evidence based solely on an agent having found it in the pocket of a jacket that he took from Mr. Weingarten's home.  As pointed out in Mr. Weingarten's initial §2255 memorandum, when confronted with those circumstances the prosecutors must have given *some* thought to how they would lay the foundation to introduce the letter.  And having thought about that problem, the prosecutors surely would have done *something* to try to determine who wrote the letter.

But setting these obvious points aside for a moment, the best case scenario for the government is that, at the moment it introduced the letter, the government knew that (1) it had woefully insufficient evidence to support the conclusion that Mr. Weingarten wrote the letter, and (2) Mr. Weingarten had said five days earlier that his son Yoil wrote the letter to him.  And common sense buttressed Mr. Weingarten's claim:  after all, it is the receiver of a letter that usually possesses it, not the sender.  Faced, at best, with theses circumstances, the government nevertheless introduced the letter, intending that the jurors would conclude that it was Mr. Weingarten's confession.  "[I]it is decidedly improper for the government to propound inferences that it knows to be false, or has very strong reason to doubt . . . ."  *United States v. Blueford*, 312 F.3d 962, 968 (9th Cir. 2002) (citing approvingly to *United States v. Valentine*, 820 F.2d 565, 571 (2d Cir. 1987)).  The government had *at least* strong reason to doubt that Mr. Weingarten wrote the letter.

Moreover, in the five-day gap mentioned, it would have been easy for the government to ask Yoil Weingarten if he wrote the letter, or for the government to get the answer to that question in many other ways (*e.g.*, by asking Feige, Frieme Leaieh, or Yoinesun Weingarten).  Maybe the government did that, which is something that should be thoroughly explored through discovery and, if necessary, an evidentiary hearing.  But if government counsel did not do anything to learn the

39

answer, and instead just introduced the letter, that is the type of willful blindness that equates to knowledge. *See United States v. Reyes*, 302 F.3d 48, 54 (2d Cir. 2002) ("the substantive justification for the rule is that deliberate ignorance and positive knowledge are equally culpable") (quoting *United States v. Jewell*, 532 F.2d 697, 700 (9th Cir.1976) (*en banc*)); *see also United States v. Wallach*, 935 F.2d 445, 457 (2d Cir. 1991) (finding misconduct because "the prosecutors may have consciously avoided recognizing the obvious").

Of course, the "best case" construction of the facts relied on above is not really plausible, as it requires believing that the prosecutors gave no thought to how they would go about introducing this bombshell evidence.  That is incredible.  These apparently were not rookie prosecutors.  It stands to reason that they thought about it, and they surely did *something* based on those thoughts. What they thought alone is relevant to their culpability here.  *See, e.g., Valentine*, 820 F.2d at 570 (in assessing whether relief is warranted due to prosecutorial misconduct, a key factor is the severity of the government's misconduct).  Mr. Weingarten submits that the Court should get to the bottom of what the prosecutors and agents thought, what they did, and what they knew.  He therefore requests that the Court authorize discovery.

In 1976, Congress enacted rules for *habeas* cases involving state and federal convictions. In both contexts, Rule 6(a) permits a court to authorize discovery upon a showing of "good cause." The advisory committee notes issued when the rules were enacted in 1976 state that the rules should be construed *in pari materia*, and the "good cause" test to be applied "is consistent with *Harris v. Nelson*, 394 U.S. 286 (1969)."  According to *Harris*, good cause is shown "where specific allegations before the court show reason to believe that the petitioner may, if the facts are fully developed, be able to demonstrate that he is" entitled to relief. *Id.* at 300.  Notably, "[t]o obtain Rule 6(a) discovery [a petitioner] need not demonstrate that he will ultimately prevail on his underlying

40

. . . claim." *Pham v. Terhune*, 400 F.3d 740, 743 (9th Cir. 2005); *see also Bracy v. Gramley*, 520 U.S. 899, 909 (1997) ("It may well be . . . that petitioner will be unable to obtain evidence sufficient to support a finding of actual judicial bias in the trial of his case, but we hold that he has made a sufficient showing . . . to establish 'good cause' for discovery").

In deciding whether to authorize discovery here, the Second Circuit's opinion in *Drake v. Portundo*, 321 F.3d 338 (2d Cir. 2003), is instructive. There the prosecutor was alleged to have introduced testimony that he "knew or should have known" was perjury. *See id.* 344-45. The Second Circuit held that the district court should have authorized discovery because: (1) "[t]he prosecutor evidently made no independent inquiry into [the witness's] background;" and (2) the timing of events raised suspicions about what the prosecutor knew, or should have known. *See id.* at 346. Notably, the court stated that discovering more facts was important to assessing the prosecutor's "degree of complicity or negligence (or worse) . . . ." *Id.* at 345.

The "cause" for authorizing discovery here is at least as "good" as in *Drake*, based on what is known and on what common sense suggests. *See also McDaniel v. U.S. District Court*, 127 F.3d 886, 888 (9th Cir. 1997) (holding that petitioner has established good cause for discovery if his "claims do not appear purely speculative or without any basis in the record"). Accordingly, Mr. Weingarten requests that the Court enter an order allowing for the following discovery:

1. That the government turn over in discovery copies of all materials that relate to the repentance letter.

2. That Mr. Weingarten may issue interrogatories to the trial prosecutors and the FBI case agent inquiring what they were, and are, aware of with respect to who wrote the repentance letter; when they became aware of such facts; what communications they had regarding the repentance letter; and the details of those communications.

41

3.  That Mr. Weingarten may issue interrogatories to the Frieme Leaieh Weingarten, Feige Weingarten, and Yoinesun Weingarten inquiring about any communications they had with government representatives regarding the repentance letter, and the details of any such communications.

Once appropriate discovery has been provided, Mr. Weingarten may ask the Court to proceed with an evidentiary hearing.

## III.   Misconduct With Respect To Principal Stauber And Rabbi Weis

Mr. Weingarten also made two claims with respect to Principal Stauber and Rabbi Weis. The primary claim is that the government committed misconduct when it misled the jury into thinking that Principal Stauber and Rabbi Weis credited Frieme Leaieh's claims of sexual abuse, and thus took extraordinary steps to help her "escape." The secondary, related claim is that the government violated *Brady* when it failed to reveal in discovery that Principal Stauber and Rabbi Weis had made statements indicating that they did not credit Frieme Leaieh's claims of abuse.

The government again relegates to a footnote its treatment of the primary misconduct claim, but Mr. Weingarten will address it here. The government does not dispute what is set out in Principal Stauber's and Rabbi Weis's recent declarations. In brief, those declarations indicate that: (1) the two men told FBI agents that they were available to testify at trial, and they expected to be called at trial; (2) the FBI agents indicated that the men would be called at trial; (3) subsequently, in lengthy conversations with FBI agents, the men said that they did not credit Frieme Leaieh's claims of abuse; and (4) the FBI agents then told Principal Stauber that they would not call him to testify at trial, and they failed to follow up with Rabbi Weis to arrange for his appearance at trial.

As set out in Mr. Weingarten's initial §2255 memorandum, despite what Principal Stauber and Rabbi Weis had told FBI agents, the government: (1) introduced evidence designed to support

42

the belief that the two men credited Frieme Leaieh's claims of abuse, and thus made extraordinary efforts to get her away from her father; and (2) argued that point repeatedly in closing. The government responds by focusing solely on the evidence it introduced, writing:

> The Government properly introduced evidence of events that occurred during Jane Doe's attempts to escape from her father – this included the actions taken by Rabbi Weiss and Principal Stauber. None of those events were fabricated or intended to mislead.

12/18/14 Gov't Memo. at 61 n.6. This ignores the government's closing argument, in which the prosecutors repeatedly argued that Principal Stauber and Rabbi Weis: (1) "knew what had happened to" Frieme Leaieh, RT at 974; (2) "found out" what was going on, RT at 975; (3) "listen[ed] to" Frieme Leaieh and then helped her "escape;" and (4) "start[ed] to interfere" in Mr. Weingarten's abuse, RT at 1059. The message, sent again and again, was that these men credited Frieme Leaieh's claims and thus helped her escape. It is undisputed that while making that argument, the government knew about the two men's statements to the contrary. In short, the government misled the jury in its closing argument, and that is not disputed in its §2255 opposition memorandum.

Instead, as the quote above indicates, the government argues that during trial the prosecutors "introduced evidence" about "the actions taken by Rabbi Weiss and Principal Stauber," and "[n]one of those events were fabricated or intended to mislead. . . ." Given what the prosecutors did during closing, that assertion does not save the government – a prosecutor's misleading statement in closing, even if not based on trial evidence, is improper. *See, e.g., Valentine*, 820 F.2d at 570 (holding that by advancing a trial theory that it knew was contrary to the *undisclosed* grand jury testimony, the government "violated the due process prohibition against a prosecutor's making knowing use of false evidence, including by misrepresenting the nature of nontestimonial evidence") (quotation and citations omitted); *see also Jenkins v. Artuz*, 294 F.3d 284, 294 (2d Cir. 2002).

But it is also evident that during the trial the prosecutors carefully laid the groundwork for their improper argument. To begin with, the prosecutors foreshadowed their effort in the government's opening statement, asserting that "members of the community in Belgium tried to help. They tried to intervene. They tried to get her away from this defendant by sending her to boarding school in England." RT at 122. At trial, when defense counsel objected to some of the testimony that laid the basis for the government's improper argument, government counsel said, "We are not offering it for the truth of the matter. It is simply part of the story. It describes her state of mind and what eventually led her to leave Belgium shortly thereafter." RT at 254. The relevant testimony did not in any way describe Frieme Leaieh's state of mind – it purported to describe the state of mind of Principal Stauber and Rabbi Weis. That is what the government used it for in closing, and it strains credulity to believe that was not a calculated effort. Whatever the case, the closing argument was misconduct enough.

Having mostly ignored the primary claim raised in this context, the government instead focuses on the related *Brady* claim. It makes three arguments in that regard.

First, the government says that it "wanted to call Weiss and Stauber as trial witnesses and moved to depose them under Rule 15," and it "disclosed all that it anticipated Rabbi Weiss and Principal Stauber could and would testify to, in connection with the Rule 15 proceedings." 12/18/14 Gov't Memo. at 58-59. The only "disclosures" that the government made during the Rule 15 litigation were to the Court, and that apparently was limited to summaries of testimony, which were sealed and not provided to the defense. *See* 12/15/08 RT 3-5, 37. The Court did, however, tell the government to turn those summaries over to the defense as part of its *Jencks*/§3500 production. Undersigned counsel have reviewed the §3500 materials produced by the government, and there is nothing related to Principal Stauber or Rabbi Weis. Moreover, this is a bit of a red herring, because

44

even if the government had earlier in the proceedings (*i.e.*, during the Rule 15 litigation) turned over something with respect to statements made by those two men, that does not mean that it complied with its *Brady* obligations to turn over information with respect to their subsequent statements to FBI agents.

Second, the government argues that "since Weiss and Stauber did not testify at trial," their statements that were contrary to the inference the government raised at trial, and argued in closing, "would not constitute impeachment evidence" that was discoverable under *Giglio* or 18 U.S.C. §3500. 12/18/14 Gov't Memo. at 59-60. For this assertion, the government cites cases that are not on-point, not binding (one should not even have been cited because it is an unpublished decision from 2001), and deal with facts nothing like what is presented here. *See id.* at 60. On the other hand, the government says nothing about *United States v. Kojayan*, 8 F.3d 1315, 1317-19, 1323 (9th Cir. 1993), which deals in-depth with analogous facts and is discussed in Mr. Weingarten's initial §2255 memorandum.[17] *See* 9/30/14 Weingarten Memo. at 114. Nor does the government say anything about the implications of Federal Rule of Evidence 806, which is also discussed in Mr. Weingarten's initial memorandum. *See id.* 113-14.

Finally, the government argues that Principal Stauber's and Rabbi Weis's "personal opinions are not *Brady* and do not warrant disclosure under that rule." 12/18/14 Gov't Memo. at 60. That may be true as a general matter. But having chosen to venture into this area and mislead the jury, the government is in no position to rely on such evidentiary niceties. That is the point made by the court in *Kojayan*, and suggested, but not decided, by the Second Circuit in *Valentine*, 820 F.2d at

---

[17] In addition, in *Valentine* the Second Circuit indicated that the facts involved here may raise *Brady* concerns, but it declined to address that issue because it found that reversal was appropriate in that case based on the government's misleading the jury. *Valentine*, 820 F.2d at 571 ("We do not reach the question of whether the prosecutor's conduct also offended the standards established by *Brady v. Maryland* and its progeny").

## IV.    Procedural Default

The government repeatedly asserts that the misconduct and related *Brady* claims were/are procedurally defaulted. *See* 12/18/14 Gov't Memo. at 55, 58, 61. The government does not explain why that is so, but presumably the government is claiming that those issues should have been raised during Mr. Weingarten's first appeal. The government does not say how Mr. Weingarten's appellate counsel could be expected to raise those issues, or the Second Circuit decide them, given that the evidence on which they rely was not in the record. Moreover, Mr. Weingarten only became aware of the undisclosed statements of Principal Stauber and Rabbi Royde in September 2014, and it seems highly likely that appropriate discovery will reveal important new facts with respect to the repentance letter. *See Valentine*, 820 F.2d at 571 (holding that procedural default does not apply when claim is based on evidence that was withheld by the government). But in the event that the government's un-explained default claim is right, and one of Mr. Weingarten's counsel should have earlier raised the misconduct and *Brady* issues involved here, Mr. Weingarten relies on ineffective assistance of counsel to excuse that default.

## SENTENCING CLAIM

Mr. Weingarten's sentencing claim is based on the Court's having impermissibly punished him based on (1) his representing himself at trial, and (2) his cross examination of his family members.   Or at least the record evidences an "unacceptable risk" of such a constitutional infringement.  *United States v. Cruz*, 977 F.2d 732, 734 (2d Cir. 1992).

The government first argues that this claim may not be considered here because the Second Circuit "impliedly" and silently rejected it during the second appeal.  For this proposition, the government relies solely on *Slevin v. United States*, 1999 WL 549010, *3 (S.D.N.Y. 1999), in which the §2255 "petitioner's ineffective assistance claims" were "all identical in substance to" claims he raised on direct appeal.  The government does not even try to argue that the sentencing claim raised in Mr. Weingarten's §2255 motion is "identical in substance" to any claim he raised during his second direct appeal, nor can it credibly make that argument.  "Questions which merely lurk in the record, neither brought to the attention of the court nor ruled upon, are not to be considered as having been so decided as to constitute precedents."  *Webster v. Fall*, 266 U.S. 507, 511 (1925). That principle applies equally well to the government's procedural bar argument.[18]

With respect to the merits, the government claims that rather than punishing Mr. Weingarten for exercising his constitutional rights, the Court punished him based "*on the nature in which* the defendant conducted [cross examinations] – he questioned them so as to revictimize them." 12/18/14 Gov't Memo. at 62.  It is debatable whether that is a fair characterization of the record, on more than one level.  Regardless, the government's very fine distinction does not change the

_____

[18] If the government's legal position were correct, a sentencing-based ineffectiveness claim could never be brought against an attorney who had raised *any* sentencing issue on direct appeal, even if the attorney had missed an obvious and meritorious sentencing issue.  That regime would bar nearly all, perhaps all, sentencing phase ineffectiveness claims in capital cases, as *habeas* courts would presume that the court on direct appeal had "impliedly" blessed the sentence, *in toto*.

outcome.  If there was anything improper about the "nature in which [Mr. Weingarten] conducted" examinations of his family members, and that conduct was sanctionable, the Court should have identified that conduct and dealt with it separately.  It is impermissible to instead increase the defendant's punishment for the offense on that basis, because it creates an "unacceptable risk" that the Court has penalized the defendant for exercising his constitutional rights.

**CONCLUSION**

Mr. Weingarten requests that the Court rule as indicated above and in his initial §2255 memorandum.


Respectfully submitted,


 s/ *Jodi Thorp*_____                 s/ *Todd W. Burns*_____
Jodi Thorp                                             Todd W. Burns
California Bar No. 223663                               California Bar No. 194937
Law Offices of Jodi Thorp                              Burns & Cohan, Attorneys at law
1010 Second Avenue, Suite 1800                         1350 Columbia Street, Suite 600
San Diego, California  92101                           San Diego, California  92101
619-233-3169                                           619-236-0244
jodithorp@thorplawoffice.com                           todd@burnsandcohan.com

Admitted *pro hac vice*                                Admitted *pro hav vice*

49

## CERTIFICATE OF SERVICE

Counsel for Defendant certifies that the foregoing pleading is true and accurate to the best of his information and belief, and that a copy has been caused to be delivered, via ECF, to government counsel.

Dated: January 23, 2015                       s/ *Todd W. Burns*
                                        Todd W. Burns
                                        California Bar No. 194937
                                        Burns & Cohan, Attorneys at law
                                        1350 Columbia Street, Suite 600
                                        San Diego, California  92101
                                        619-236-0244
                                        todd@burnsandcohan.com